UNITED STATES DISTRICT COURT EASTERN
DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| SURANI S. OLSEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No.: 3:23 CV 475 |
| | ) |
| CITY OF RICHMOND | ) |
| | ) |
| Serve: WIRT P. MARKS | ) |
|    CITY ATTORNEY | ) |
|    900 East Broad Street, Suite 400 | ) |
|    Richmond, VA 23219 | ) |
| | ) |
| Defendant. | )   **TRIAL BY JURY DEMANDED** |
| | ) |

JUL 2 6 2023

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

### PLAINTIFF'S COMPLAINT

COMES NOW Plaintiff, Surani S. Olsen ("<u>Plaintiff</u>"), and brings this action for damages against Defendant, City of Richmond ("<u>Defendant</u>"), and complains as follows:

### SUMMARY OF THE ACTION

1.    This is a civil rights action brought by Plaintiff, a current Defendant's employee who has been discriminated by Defendant because of Plaintiff's race, national origin, and age, and retaliated against Plaintiff's participation in Equal Employment Opportunity's ("<u>EEO</u>")  protected activity. Plaintiff has also been subjected to a hostile work environment by way of unwarranted actions being taken against Plaintiff, having disrespected, and being treated differently when compared to other similarly situated employees who are not of Plaintiff's protected classes.

1

2.    As a result of this discrimination and retaliation, Plaintiff is seeking all available remedies, including compensatory and punitive damages, as well as attorney's fees and expenses.

## JURY TRIAL DEMAND

3.    Under Fed. R. Civ. P. 38 (b), Plaintiff hereby demand trial by jury on all issues triable to a jury of the within action, including this Complaint, and any further pleadings.

## PARTIES

4.    Plaintiff, Surani Olsen, is a citizen of the United States, is a South-east Asian, and is a resident of York County, Virginia. Plaintiff has been employed by the defendant since December 2016 and is currently employed by the defendant as a Program and Operations Manager in the City of Richmond (the Defendant), VA, 23224.  Plaintiff  believes that at all times relevant herein, the Defendant (through its staff or managers or supervisors) was responsible in some manner for the occurrences, offenses, and injuries stated in this complaint.

5.    Since on and after January 1, 2004, Defendant has been a municipal public agency and an employer subject to the requirement of Title VII.y

## JURISDICTION AND VENUE

6.    This action arises under the Age Discrimination in Employment of Act of 1967, as codified, 29 U.S.C §§ 621 to 634 ("ADEA"), and Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*

7.    This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28

2

U.S.C. §§ 1331 *et seq.* (federal question) and 1343 (civil rights).

8.    Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. 1981a, and Defendant is subject to the personal jurisdiction of this Court in the Eastern District of Virginia because Defendant maintains facilities and business operations in this District, and all or most of the events and issues giving rise to this action occurred in this District in Richmond, VA.

9.    Venue is further proper in this judicial District pursuant as Plaintiff is employed by Defendant at the City of Richmond, Virginia, where the stated discriminations and retaliations occurred, and plaintiff's employment records are maintained by Defendant in this judicial District and Division.

## STANDING AND SUMMARY OF MAIN COMPLAINTS

10.    Plaintiff has satisfied all of the procedural and administrative requirements set forth in Section 706 of Title VII, 42 U.S.C. § 2000e-5, in particular:

   a.    In November 22nd, 2022, I, Surani S. Olsen, the Plaintiff, submitted a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) under Agency Case No. 438-2023- 00359 ("Charge") complaining that   Plaintiff was discriminated against based on race and national origin when black eye was mentioned in Plaintiff's phone call with the Director of the Department of Public Utilities about a permit,   when Plaintiff was discriminatorily requested to send Plaintiff draft review emails to the Department of Public Utilities' Director, when Plaintiff was discriminatorily instructed to revise Plaintiff's out of office email

3

message to add the referred persons' titles, and finally as the Defendant's retaliation to Plaintiff's complaint about the aforementioned discriminations to the Defendant's Human Resources on July 15, 2022, Plaintiff was removed from the Water Resources Program and Operations Manager position and was stripped off any Water Resources' administrative and management duties (Plaintiff managed two plan reviewers and inspectors before the reassignment) on August 29th, 2022, and was then reassigned to the Combined Sewer Overflow Division, to work under an engineering manager (LAH) whose Plaintiff had a disagreement with previously regarding his project's permitting requirements. Plaintiff did not have any experience previously in managing construction projects even though Plaintiff had project management experience. Plaintiff was also discriminated by the Defendant through its staff by limiting Plaintiff's period to file the discrimination complain to around 31 days from the 180 days allowed by EEOC, and for did not awarding Plaintiff the salary raise that the Defendant awarded to all general employees in 2019.

b. Plaintiff timely filed the aforementioned Charge with the EEOC within three hundred (300) days from the latest date of discrimination relative to this matter. Plaintiff's Charge was then revised and resubmitted in March 2023.

c. On April 27, 2023, Plaintiff received the Notice of Right to Sue letter from the EEOC, and by July 26, 2023 Plaintiff timely filed Plaintiff's original complaint with this court within 90 days from receipt of the Notice of Right to Sue.

d. The above Charge was then revised on July 26th, 2023 to include age discrimination due to the Plaintiff was replaced with an engineer who was younger than 40 years

old and does not have all the State required certifications to be the Acting Water

Resources Manager on August 29th, 2022, as Plaintiff was over 49 years old at the

time of the replacement.

## STATEMENT OF CLAIMS AND INJURIES COMMON
## TO ALL COUNTS

11.  Plaintiff has been employed by Defendant since December 2016 in various positions and between December 2020 and August 2022, Plaintiff had been employed by Defendant as a Water Resources Program and Operations Manager.  Currently Plantiff is employed by Defendant as a Program and Operations Manager in other Division.

12.  Plaintiff promotion from Project Management Analyst position to Senior Engineer was approved in December 2018 by Human Resources but plaintiff only received around $3000 raise in 2019, because Human Resources staff delayed to apply this raise immediately and applied it in 2019 at the same day all other City's employees received general pay raise, causing Plaintiff did not receive the general pay raise that all other general employees received in that year.  According to Human Resources staff, Plaintiff did not receive the general employee's raise due to already received the promotional raise.  The only different between plaintiff and other employees of the Defendant was that Plaintiff is South-East Asian and originally came from Indonesia.  Since Plaintiff did not receive the general pay raise that all Defendant's employees received in 2019 causing Plaintiff salary to be lower than other senior engineers in Plaintiff division in 2019 who perform the same duties and missing out on all future compounded salary increases.  However, Human Resources treated Plaintiff's former staff, who was not South-East Asian and did not come from Indonesia originally differently.  According to Plaintiff's former staff, Saber Moazamigoodarzi, he received both the general raise and promotional raise in 2022 when Plaintiff promoted him from engineer to Senior Engineer.  Plaintiff was the only South-East Asian and the only employee who originally came from Indonesia in my division when this occurred.

In addition, historically, Plaintiff had been discriminated by the Defendant, as Plaintiff also did not receive the $1,000.00 bonus that all other qualified employees received in 2017 due to the Defendant cut off the one- year employment eligibility period to around four to eight days prior to Plaintiff's employment anniversary.

13.  As part of Plantiff' duties as the Water Resources Program and Operations Manager was to review plans/permits to ensure their compliance with applicable Water Resources' City Code, State and federal's regulatory requirements.

14. On March 18th, 2022, Plantiff received a call from DPU (Department of Public Utilities) Director, Ms. April Bingham, who  mentioned black eye when she asked Plantiff about a permit for Bon Secours that Plantiff still needed to approve, which was humiliating and discriminating as Plantiff has dark circle around Plantiff's eyes and the permit had not been approved due to the deadline that the other Department set that was around 2 weeks after the call.  Plantiff explained to Ms. Bingham that Plantiff had approved Plantiff's Division permit for the project around 2 months ago, while showing her and another person in the call (Mr. Jonathan Cosby) the permit database/record.  Plantiff also explained that Plantiff could approve this building permit for the project immediately since Plantiff's Division permit had been approved. Plaintiff felt hurt and discriminated because Ms. Bingham mentioned black eye as this project should not be a black eye or a mark of shame or humiliating setback as plaintiff had approved Plaintiff's division permit around two months ago and furthermore Plaintiff felt humiliation due to the black eye comments as Plaintiff has black circle around Plaintiff's eyes.  The delay of approval was also due to the other department's staff was late (around 1- 2 months) in assigning the reviews to Plantiff and other departments and that they assigned deadline weeks after the call.  Plantiff then approved the permit on the same day after she called. Even though she apologized after Plantiff asked for her explanation, her statement about black eye had humiliated, insulted, and discriminated me.  Plaintiff then complained about this treatment to Human Resources, which is detailed later in this document.  Plaintiff felt that Ms. Bingham's comment was discriminatory since Plaintiff was the only South-East Asian and the only one who came from Indonesia with black circles around Plaintiff' eyes from all Defendant's staff and managers who were involved in the approval of this permit.

15. On July 13th, 2022, Mr. Leonard Mantey, a Senior Deputy Director from the PDR (Permit and Development Review Department, one of the Defendant's departments) wrote an email to Plantiff, accusing Plantiff to be vindictive in the reviews/comments on the permit for a property that was located at Yorktown Avenue, even though Plantiff's comments were mainly for enforcement of the City Code requirements as required and Plantiff could not approve the permits since Mr. Mantey and/or the permittee did not submit all the required documents in Plantiff comments/emails previously to Mr. Mantey. Plantiff considered Mr. Mantey's accusation as a humiliating, insulting, and discriminatory comments since as enclosed Plantiff comments were only to apply the City Code, State, and Federal's floodplain requirements and Plantiff never heard and/or seen Mr. Mantey called other permit reviewer vindictive both in person or in his emails.

Below are the timelines and comments on the project at Yorktown Avenue that Plaintiff have provided to Mr. Mantey as required by the City Code and FEMA. Since the Defendant participates in the National Flood Insurance Program and as a member of Community Rating System , the Defendant is required to comply with the Floodplain Ordinance in the City Code and FEMA requirements so the Defendant's residents are qualified to buy the NFIP insurance.  Currently around 600 properties are insured through NFIP with a total coverage of around several hundred millions.  Under this program, flood insurance policies are required for any federal loans including mortgages.

a. The first permit application for the house on Yorktown Avenue  was submitted with a total construction cost of $30,000.00, which exceeds 50% of the building value based on the City property tax assessment ($51,000.00).  Therefore, Plaintiff informed MR. Mantey and the permitee that the proposed development was a significant improvement and had to be fully compliance with the City Code, and Plaintiff provided all the City Code requirements.  Mr. Mantey then provided an appraisal letter stating that the property value was between $90,000.00 and 120,000.00, therefore, Plaintiff informed him that only the building value is counted, he needed to provide the building value in the letter. He refused to cooperate and comply with the City Code, and never submitted this document.

b. The contractor then said the permitee could not upgrade the proposed development to be fully compliance with the City Code requirements and cancelled the permit application and submitted a new permit application on May 27, 2022 with a total construction cost of $24,000.00. Plaintiff's next comment was sent on June 9th, 2022 requesting the  contractor/ permitee to submit a signed construction contract or a detail construction cost as required by FEMA 480 and per the guidance from Virginia Department of Conservation and Recreation (DCR).  The contractor refused to submit this document and if they submitted the document to Mr. Mantey, Mr. Mantey did not submit the documents to Plaintiff or Water Resources Division but he submitted it to the State when the State requested it in September 2022, which shows that Mr. Mantey could have submit this information to Water Resources without involving the State if he supported Water Resources Division and Plaintiff's effort in applying the City Code.

c. In the third comments, Plaintiff informed Mr. Mantey that if any building code violations were identified before the fire event, the repair costs due to these violations could be excluded from the construction cost but the document that Mr. Mantey submitted was inspection after the fire event so Plaintiff informed him that it would not be qualified on July 12, 2022, which made him very angry and called Plaintiff vindictive.

16.   DPU Director (Ms. April Bingham) required Plantiff to send all the draft customer letter/emails to the her, plantiff's supervisor (Patrick Bradley), and other division manager (Jonathan Cosby) on July 14th, 2022, when other program and operations manager who also reviewed plans/permits were not required to do so.  She said that it's due to two emails where in one of the emails the Senior Deputy Director of other Department (Leonard Mantey) called Plaintiff vindictive. As mentioned previously in number 15, all plantiff's emails to Mr. Mantey were enclosed and none of these emails were vindictive as Plaintiff were trying to help the permitee by providing various options to meet the City Code requirements to obtain their building permit, which were clear from all Plaintiff's emails but Ms. Bingham discriminatorily ignored these facts.  Mr. Mantey and this permitee did not submit the required documents in all Plantiff's email, instead, called Plaintiff vindictive. The second email that Ms. Bingham mentioned in the meeting was from Mr. Mantey's staff, Mr. David Alley, the building commissioner, whose staff was 4 months late in assigning the plan/permit at Yorktown Avenue to Plantiff or Plantiff's Division for review, asking Plaintiff and other divisions to approve the permit

7

before the deadline that his staff set but Ms. Bingham discriminatorily ignored these facts as well.  Before or after this email Plantiff had complained to the Director about Mr. Mantey's department several lateness (sometimes between 1 months to 4 months)  in assigning plans to be reviewed by Plantiff's Division/Plantiff and other departments. When Plantiff asked in the meeting, Ms. Bingham also refused to allow Plantiff to inform my customers/permitees that the draft review comments were being reviewed by the Director and/or her team when they asked for the comments even though this review might extend the review period.  Eventhough, none of the emails were vindictive as they were all valid regulatory requirements based on the City Code that Plaintiff was required to enforce on the Director behalf by the City Code but Ms. Bingham discriminatorily ignored these facts.  Ms. Bingham also refused to reconsider her decision even after Plaintiff told her that the two emails were less than 5% of Plaintiff's customers or less than 1% of Plaintiff's Division customers, so it would not be significant. The requirements for Plaintiff to send my draft customers' permitting emails to Director Bingham was hostile, humiliating, and discriminatory since it added permit processing steps and time compared to other managers' processing steps and time and Plaintiff was the only South-East Asian manager with Indonesia origin in the DPU Department.  No other program and operations managers (including Susan D. Hamilton and Charles S. Yates) who also reviewed permits/plans like Plantiff were asked to send their draft emails to Ms. Bingham.  When Plaintiff complained to Human Resources staff (Shiron Haskins, she does not work with the Defendant any more since last month) in the July 14th meeting and told her that Plaintiff would like to escalate the issue since Plaintiff did not think it's fair to ask me to send the draft emails to the Director when Plaintiff could not inform the customers that her team was reviewing the comments, Ms. Haskins told Plaintiff that she did not think that it could be escalated for someone else to step in.  Ms. Haskins then told Plaintiff in the same meeting that discrimination complaint could be submitted to Ms. Brenda Henderson.

17.  As mentioned previously, Plantiff then contacted Ms. Henderson and had a meeting with Ms. Henderson about submitting discrimination complaint in July 2023.  She provided plaintiff with the complaint form.  Plantiff told her about black eye comment from Ms. Bingham and other complaints.  In her email in July 2022, Ms. Henderson also gave Plaintiff deadline to file a complaint by August 15, 2022, which was discriminatorily only around 31 days and far less than 180 days that was allowed by State and Federal government regulations.

Plaintiff emailed her on November 18th, 2022, and December 1st, 2022 to file a complaint in person but she did not respond and nobody else responded on her behalf if she had left. Plaintiff also left a message for her replacement by phone but did not receive any responses. Plaintiff suspected that she had left the City.  Plaintiff called the DCAO (Bob Steidel ) to complain after unable to contact Ms. Henderson but without asking Plaintiff what had happened or asked for Plaintiff's complete explanation, the DCAO accused plaintiff of disrespectful so Plaintiff did not submit a complete complain to him and ended the phone call and decided to file an EEOC complain later.

18.    After Plaintiff complained about DPU Director's request to Ms. Haskins (the Defendant's Human Resources Generalist) on July 14th, 2022, and talked to Brenda Henderson (the Defendant's EEO/Equal Employment Opportunity Manager) about the above discriminatory requirement and the Director's black eye comments on July 15th, 2022, Plaintiff was removed from the Water Resources Program and Operations Manager position  and was reassigned to other Division on August 29th, 2022, which Plaintiff felt as the Defendant's retaliation action against Plaintiff because of Plantiff's complaints to Ms. Haskins and Ms. Henderson.  It was also retaliation due to Plaintiff was reassigned to work under another Manager ( Mr. Lowell Alan Harrison/LAH) who had argued with Plaintiff regarding his project's permit requirements, even though, he later agreed and submitted his permit application before the meeting on July 14th, 2022 above).  Plantiff believes that this was also a discrimination action against Plantiff since no other program and operations managers who had also denied more than 2 plans/permit applications based on the City Code requirements and received emails from Mr. Alley and Mr. Mantey from PDR Department requesting to approve permits/plans during the same period, were removed from their positions and Plaintiff was the only South-East Asian and the only reviewer who originally came from Indonesia. LAH resigned in May 2023 and Ms. Haskins left the City in May 2023.

19.    When Plaintiff emailed the director to question her about this reassignment, Plaintiff was told it was due reorganization/restructuring and no performance issues were mentioned in the email from the Director as there were no performance issues recorded in Plaintiff's previous performance evaluation in July 2022 and this year performance evaluation in February/March 2023 that were done by two different supervisors (Patrick Bradley and L. Alan Harrison). However, Plaintiff was told by Mr. EW (was an interim DPU Deputy Director and current Deputy Director) that this decision was made by the Director and other Directors ( where none of these staff were South-East Asian or originally came from Indonesia except Plaintiff) and  they had never consulted on this decision with Plaintiff prior to the reassignment.  This sudden reassignment was very humiliating, discriminatory, and disrespectful since Plaintiff was removed with a very short notice (only two days) and was informed by Mr. EW (who was the interim Deputy Director) that Plaintiff would have to report to Mr. LAH and asked for a project from him, he even smiled many times during the meeting when Plaintiff asked him why Plaintiff was removed, which made Plaintiff feel humiliated.  It's also discriminatory that Plaintiff was moved to a much smaller office that was smelly regularly (due to near a wastewater laboratory and a wastewater treatment plant) even though a larger office is available in the building and other buildings, and all Plaintiff staff were reassigned to be managed by others, and one of Plaintiff staff, who was younger than 40 years old and had less than 1 year experience in Water Resources permitting and did not have the required certifications to manage Water Resources Division (Plantiff's previous Division) was then promoted to be an acting Water Resources Manager to replace Plaintiff, which exposed Defendant's discriminatory action that was based on age, race and national origin.  This staff was not South-East Asian and was not originally from Indonesia like Plaintiff.

22.    On August 29th, 2022, Plaintiff's out of office email was corrected by the DPU Director (Ms. April Bingham) and she asked Plaintiff to add the title in front of Plaintiff's former staff name and the PDR Deputy Director name whom Plaintiff deferred to in the out of office email.  Plaintiff felt that this Defendant action that was done by Ms. Bingham was very insulting, humiliating, and

9

discriminatory based on race and national origin, because she did not correct all other managers'
(Susan D. Hamilton, Howard Glenn, and Lowell Alan Harrison) out of office emails, who also did
not add any titles in front of the names of the persons that they deferred to in their out of office
emails (Plaintiff have copied of these emails from 2022 and 2023) and Plaintiff was the only
manager who is South-east Asian and was originally from Indonesia.

23. Currently Plaintiff does not receive the same amount of salaries compared to other program and
operations managers, even though they may have worked longer than Plaintiff at the City but
some may have almost the same years of experience with Plaintiff if including Plaintiff's
experience working with other companies (Plaintiff has worked in the environmental engineering
field for over 21 years, have a professional engineer (PE) license and a master degree).

24. After Plaintiff was reassigned to manage City's CSO projects since September 2022,  Plaintiff has
not been provided with access to Rapids' project management tab and buyer center/
management tab like the other project managers (Todd Loney and Robert Stone) so Plaintiff
would have to asked for other manager's (Mr. Stone) help to access Plaintiff's contract data and
other information when Plaintiff need the information. While Mr. Loney, who started to work
with the City in November last year,  was provided with the tabs since last year not long after he
started.  Between these three managers, Plaintiff is the only one who is a South-East Asian and
originally came from Indonesia. Plaintiff has complained to Plaintiff's supervisor and the IT
Department has started to work on July 19th, 2023 but no improvements have been made.

25.  When Plaintiff was a Water Resources Program and Operations Manager from 2021 until August
29th, 2022, Plaintiff was unable to access the hiring software that the Defendant used (Neogov)
while other program and operations managers in DPU were provided with the access.  Plaintiff had
to ask for help from another Program and Operation Manager and/or from the Human Resources
Generalist to check if any applications were received and for copies of the resumes of the
applicants or had to wait for the Human Resources staff to email the resumes before scheduling
the interviews.  This had caused delay of interview scheduling and had caused Plaintiff to lose
several very qualified candidates as they were already hired by other company when we scheduled
the interview, causing the short-staff issue to be continued and Plaintiff would have to do a lot of
permit/plan reviews and hired a third party consultant while also managing the Division and
performing other Manager's reporting tasks. Other program and operations managers (Susan D.
Hamilton and Howard Glenn) who were hiring new staff for their divisions in 2021 and 2022 were
able to access Neogov hiring software to see the hiring process and their candidates' resumes but
Plaintiff could not and had to ask other manager or human resources staff to send me the
candidates' resumes from Neogov software.  Between these managers, Plaintiff was the only one
who is South-East Asian and came from Indonesia originally.  This issue also exposed the
Defendant's other discriminatory actions through its staff against Plaintiff based on Plaintiff's race
and national origin.

26. On July 27th, 2022, Mr. Leonard Mantey (Senior Deputy Director of PDR/Permit and Development
Review Department) submitted a project's detailed contract document to DPU Director (Ms.
Bingham).  Plaintiff considered Mr. Mantey's action as unfair discrimination against Plaintiff since
he had refused and never submitted the same document to Plaintiff when Plaintiff asked for it
several times before July 27th, 2022, he even called Plaintiff "vindictive" in his email after Plaintiff's

latest email asking for the same document and Plaintiff was the only permit reviewer for this project that is a South-East Asian from Indonesia.

27. On February 23rd, 2023, Plaintiff received Plaintiff's interim performance evaluation (for period of July 1st, 2022 until December 1st, 2022) from a former supervisor, LAH, and he refused when Plaintiff asked him to include Plaintiff's accomplishments from July 1st until August 31st, 2022 in the evaluation. Even though Plaintiff was managed by a different supervisor for the period in question, he refused to review, Plaintiff believe that Plaintiff should also be evaluated for my performance during the period as other program and operations managers were evaluated based on their performances during the whole period.   Plaintiff was the only manager who is South-East Asian and originally came from Indonesia who worked under LAH.

28. The effect of the aforementioned discriminatory practices deprived Plaintiff of statutory rights of equal employment opportunities, and otherwise caused Plaintiff's humiliation and mental anguish, adversely affected Plaintiff reputation internally and externally that was Plaintiff built for over 6 years because Plaintiff was suddenly assigned to other division and disappeared from internal and external meetings with other department staff, the permittees, and their engineers/consultants. In addition to the aforementioned claims and injuries, Plaintiff had to the following hostile work environment (some of these actions felt as retaliations to Plaintiff's complaints to the Human Resources Department and the EEOC (Equal Employment Opportunity Commission) , causing humiliations, suffering, emotional distress, and mental anguish and adding to Plaintiff's causes of difficulty to sleep and relax at home (physical damage) last year and this year:

a.    Last year, Plaintiff was laughed at by my colleague (SY), other program and operations
manager, during our phone call, just after my reassignment.  This manager had
resigned last year and found a better position.

b.    Starting early this year, Plaintiff was removed from Senior Manager meetings with the
former Deputy Director (LAH) and the other Senior Manager meetings that the Human
Resources arranged, which felt as retaliation due to Plaintiff's complaints to Human
Resources staff and then EEOC.  From all managers in the DPU Department, Plaintiff
was the only South-East Asian from Indonesia.

c.    This year, Plaintiff applied for similar position with other localities and just after
Plaintiff's interview with the other locality staff, Plaintiff's former supervisor (LAH) told
Plaintiff in a meeting that one of the localities' director was his closed friend even

though Plaintiff did not ask him about it or informing him that Plaintiff had an interview. The other locality's interviewer had informed Plaintiff that they were going to call the Defendant to ask questions about Plaintiff. After several weeks, Plaintiff was not selected for both positions with two different localities and did not get the higher salary range that were available for negotiation with the positions.

d.   This year, Plaintiff was also laughed at by a consultant of my Plaintiff's assignment during our first online meeting with B&C, a consultant of the Defendant. Another consultant was also in the meeting did not laugh.

e.   This year, in March, when Plaintiff was talking to a former supervisor (LAH) in front of contractors, consultants, who were all men, he suddenly said loudly, "Don't wipe your butt (he might have said ass or butt) before you shit!", which was very humiliating and causing Plaintiff's mental anguish. LAH resigned in May 2023.

f.   Starting July this year, Plaintiff was moved to an office where the offices for several instrumentation and control and other supervisors where located. Somebody blocked the woman bathroom with a heavy printer table on July 17th, 2023. Even though Plaintiff could move it back, Plaintiff could feel that Plaintiff is unwelcome in the new office and Plaintiff has a video of this action.

g.   In Plaintiff new office, a City staff, who is a supervisor but are not managers like Plaintiff, kept making comments about taking dump after Plaintiff went to the bathroom in the last two weeks. Plaintiff felt his comments were intentionally done since he never makes any taking dump comments before Plaintiff went to the bathroom in the last two weeks and only did it after, which makes Plaintiff feel uncomfortable to go to the rest room. After two weeks, plaintiff finally complained to

plaintiff's supervisor on July 24th, 2023 and he had informed the manager who

managed these staff, and this manager has told his supervisor to inform these staff to

be mindful about the comments or conversations they have out loud to ensure they

exemplify professionalism.  He also apologized for the uncomfortable comments.

h.  After Plaintiff was reassigned, Plaintiff was moved to an office near a lab that was sprayed with an outdoor pesticide monthly from September 1st, 2022 until presence but Plaintiff was never informed about the pesticide spraying from September 1st, 2022 until March 2023. In March 2023,  Plaintiff talked to the pesticide spraying contractor about the spraying and then informed  Plaintiff's former supervisor that Plaintiff would like to be informed of any future spraying events in advance.  Even though another supervisor whose office in the same area, has always been informed before the spraying, Plaintiff was not informed between those periods and in April 2023.  Other manager who also had an office in the same area of building, usually was not in the office on Fridays during the spraying even though she was not informed as well. Plaintiff then requested to my former supervisor (LAH), plant supervisor (BJ), maintenance staff, and maintenance supervisor to inform Plaintiff ahead of the spraying or the spraying schedule since around the end of March 2023 but was not informed until the end of May 2023. Before Plaintiff was informed, Plaintiff had to call the maintenance staff (CB) and he actually yelled at Plaintiff for asking for the schedule and he asked me why did Plaintiff think that Plaintiff was special.  Plaintiff told him that Plaintiff was not special and not only Plaintiff, but everyone who works in that office should know the spraying schedule. He was very disrespectful and told Plaintiff that he had 50,000 things to take care off and then hang up after he yelled at Plaintiff. After Plaintiff  complained to Plaintiff's former supervisor, he called back and told me the schedule the next day appropriately without yelling. Plaintiff was then moved to other office with AC and no pesticide spraying (not that Plaintiff know off) .  This staff also honked his truck loudly when he met with Plaintiff to show Plaintiff's new office.

i.  In Plaintiff 's new office, the Defendant's staff, whose office is in the same building and

works  under Mr. CB's supervisory, is a supervisor but are not managers like Plaintiff,

kept making comments about taking dump after Plaintiff went to the bathroom in the

last two weeks.  Plaintiff felt his comments were intentionally done since he never

makes any taking dump comments before Plaintiff went to the bathroom in the last

two weeks and only did it after, which makes Plaintiff feel uncomfortable to go to the

rest room.  After two weeks, plaintiff finally complained to plaintiff's supervisor on

July 24th, 2023 and he had informed the manager who managed these staff, and this

manager has told his supervisor to inform these staff to be mindful about the

comments or conversations they have out loud to ensure they exemplify

professionalism. He also apologized for the uncomfortable comments.

j.      One day last week, in the hallway outside of Plaintiff's office, the cleaning staff sang

"Get out of here, get out of here, I want to be where you are." By the time Plaintiff

was going outside my room to ask her, what did she mean with the song since Plaintiff

never heard of any songs with lyrics like that, she had left the building. Plaintiff has

not informed Plaintiff's supervisor about this since she denied it when Plaintiff asked

her about it.

k.      Regularly sewage and rotten egg smells blow through my former office area at the
        Wastewater Treatment Plant (WWTP) where Plaintiff's office was located after the
        reassignment from September 1st, 2022 until early July 2023. One day, on April 17, 2023 a
        massive volume of rotten egg smell spew out from Plaintiff's office radiator filled the room
        with the smell, even another staff whose office outside Plaintiff's office (JK) also smelled it
        immediately. This event made Plaintiff's very worry about the effect of the gases to
        Plaintiff's health since the heating radiator in this office was very old.

j.      After Plaintiff reassignment, Plaintiff was not informed when the other manager and her
        staff were allowed to work from home due to non-working heater in Plaintiff's former
        office building at the WWTP since before Christmas 2022, which caused Plaintiff to
        experience working in the cold office for hours after Plaintiff came back to the office on
        December 28th, 2022. Plaintiff then contacted Plaintiff's former supervisor about it to ask
        to be allowed working from home around 11:00 AM, which was responded and allowed
        around 1:00 PM. Plaintiff also found out after Plaintiff suffered in temperature between
        77 and over 80 degrees Fahrenheits in the spring/summer before Plaintiff was told that
        Plaintiff could work remotely or move to other office when that occurred, while other
        manager was already told that she and her staff could do that since a year or over year
        ago. Plaintiff was the only South-East Asian who originally came from Indonesia in that
        office. However, since July 10th this year, Plaintiff has been moved to another office inside
        a trailer with good AC and heating system.

k.      Plaintiff was told that Plaintiff needed to learn by my former supervisor (LAH) in at least
        two meetings last year with the other project manager while the other project manager
        (who was just hired late last year) was not told that he needed to learn, which was
        discriminatory as Plaintiff was the only South-East Asian and the only person who
        originally came from Indonesia in this Division. Plaintiff's former supervisor might also had
        told a consultant that Plaintiff needed to learn because the consultant told his staff in

front of Plaintiff that Plaintiff would learn from them/from this project in a site visit last year. LAH also had told another consultant something that caused the consultant (from B&C) to laugh at Plaintiff in the beginning of our first project meeting. Another consultant witnessed this occurrence.

l.      Last year, after the reassignment, one colleague (other program manager) called Plaintiff and laughed when Plaintiff picked up the phone the first time after Plaintiff was reassigned, another one, Plaintiff's former administrative staff was condescending and disrespectful when Plaintiff called him about returning a hard drive and also often did not respond when Plaintiff needed his help to pay training fees and other fees. When Plaintiff entered one of the the Defendant's building on Commerce Rd. last year, a group of inspectors, yelled asking where was Plaintiff's former admin staff name as if that Plaintiff was scared of him due to the reassignment. Plaintiff's former administrative staff informed Plaintiff  that he met/talked with DPU Director before Plaintiff reassignment.

n.      An older consultant (who works with one of our consultant, AECOM) frowned and won't smile back, when Plaintiff  smiled at him at the entrance to the City Hall weeks ago when Plaintiff went there to pick up Plaintiff's office laptop. He also put his hand under his chin as if he was pulling a trigger to his chin while he looked at Plaintiff when Plaintiff tried to talk to him as he won't talk to Plaintiff, which was offensive and disrespectful.  This consultant currently has a project with the Defendant and had called out the DPU Director with her first name.  He also mentioned the DPU Director's body shape and his staff body's shape and what type of shoes they  wear when he talked to one of the Deputy Director in a training meeting that all managers attended (he mentioned that one of their staff wore high heels like our Director).  Plaintiff did not catch all the things that he said but Plaintiff heard (as we were seating at the same table), the point was that he said the current selected staff consultant for the Defendant from his company has body shape and wears high heels similar to our DPU Director, and that my supervisor, LAH, learned the hard way. Plaintiff wore sport shoes at that point and  has a slim body shape.

o.      In 2022, Mr. David Alley from PDR Department approved the Water Resources part of a building permit application at Yorktown Avenue using Plaintiff's name without informing Plaintiff and confirming with Plaintiff if Plaintiff agreed to approve the permit, which caused humiliation, mental anguish, and emotional distress due to Plaintiff's requested documents had not been submitted by the permittee at the time Mr. Alley approved the permit.

### Count No. 1
### Violations of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. (Disparate Treatment-Unlawful Discrimination Based on Race)

29.    Plaintiff hereby incorporates by reference and re-states each of the claims contained in all previous paragraphs of this Complaint as if set out here in full.

30.    Plaintiff is a Southeast Asian female.

31.    Plaintiff's work performance met or exceeded and continues to meet or exceed the performance expectations of Defendant.

32.    During Plaintiff's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against Plaintiff with respect to the terms and conditions of Plaintiff employment based on Plaintiff's race.

33.    The unlawful employment practices include, without limitation, disparate treatments/corrections, and unwarranted treatments/reassignments because of Plaintiff's race.

34.    Other similarly situated employees who were not of Plaintiff's race did not face such disparate treatment or unwarranted treatments.

35.    The effect of these practices deprived Plaintiff of equal employment opportunities because of Plaintiff's race.

36.    These unlawful employment practices were intentional.  The unlawful employment practices were undertaken with reckless indifference to Plaintiff's federally protected rights.

37.    As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered mentally in the form of worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, and this mental damage has caused physical damage/suffering including difficulty to sleep and relax at home, all to her damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

38.    The other effect of the aforementioned discriminatory practices deprived Plaintiff of statutory rights of equal employment opportunities, and otherwise caused Plaintiff's humiliation and

16

mental anguish, adversely affected Plaintiff reputation internally and externally that was Plaintiff

built with hard works for over 6 years because Plaintiff was suddenly assigned to other division

and disappeared from internal and external meetings with internal (other departments' staff) and

external customers (permittees, developers, and engineers).

39. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff

has been injured in that Plaintiff has suffered, a loss of salary increases, bonus,

employment benefits (from the other job applications), career path opportunities (from

the other job applications), and expenses, in an amount to be proven at trial.

40. As a result of Defendant's acts of discrimination as stated herein, Plaintiff is entitled to

reasonable attorney's fees and cost of suit, punitive damages, and compensatory

damages

## Count No. 2

### Violations of the Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e, et seq.
**(Disparate Treatment-Unlawful Discrimination Based on National Origin)**

41. Plaintiff hereby incorporates by reference and re-complains each of the claims contained in all

preceding paragraphs of this Complaint as if set out here in full.

42. Plaintiff is South-East Asian descent and originally came from Indonesia.
43. Plaintiff's work performance met or exceeded and continues to meet or exceed the performance expectations of Defendant.
44. During Plaintiff's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against him with respect to the terms and conditions of his employment based on Plaintiff's national origin.
45. The unlawful employment practices include, without limitation, disparate

treatment/corrections, and unwarranted treatments/reassignments because of Plaintiff's

national origin.

46. Other similarly situated employees who were not of Plaintiff's national origin did not face
such disparate treatment or unwarranted corrections/punishments/reassignment.

47. The effect of these practices deprived Plaintiff of equal employment opportunities and
otherwise adversely affected Plaintiff's employment status because of Plaintiff's national
origin.

48. These unlawful employment practices were intentional.

49. The unlawful employment practices were undertaken with reckless indifference to
Plaintiff's federally protected rights.

50. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered
generally physical and mental damage in the form of extreme and enduring worry, suffering,
pain, humiliation, embarrassment, mental anguish, and

emotional distress, and this mental damage/distress has also caused physical damage/suffering
including difficulty to sleep and relax at home, all to Plaintiff damage, in amounts within the
jurisdictional limits of this Court, to be proved at trial.

51. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has
been injured in that Plaintiff has suffered a loss of salary increases (compounded from 2019's
pay raise and other potential job application), a bonus, and expenses, in an amount to be
proven at trial.

52. As a result of Defendant's acts of discrimination as alleged herein, Plaintiff is entitled to
reasonable attorney's fees and costs of suit, and compensatory and punitive damages.

**Count No. 3**
**Violations of the Age Discrimination in Employment Act of 1967**
**29 U.S.C. §621 et. seq.**
**(Disparate Treatment-Unlawful Age Discrimination)**

53.    Plaintiff hereby complains each claim contained in all preceding paragraphs of this complaint as
        if set out here in full.

54.    Plaintiff was 50 years old at the time this Charge is filed.

55.    During Plaintiff's employment, Defendant engaged in unlawful discriminatory employment
        practices by discriminating against Plaintiff based on Plaintiff age including but not limited to
        replacing Plaintiff with an engineer with one year permit review experience engineer who was
        younger than 40 years old and did not have the required State's administrator certifications.
        Plaintiff was removed from the Water Resources Program and Operations Manager on August
        29th, 2022 even though the plaintiff had received performance evaluation in July 2022 that
        shows plaintiff exceeded or meet expectations for the position and between July and August
        29th, 2022 that Plaintiff did not receive any warning of the required performance
        improvements.

56.    As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered
        generally physical and mental damage in the form of enduring worry, suffering, pain,
        humiliation, embarrassment, mental anguish, and emotional distress, and this mental damage
        has caused physical damage/suffering including difficulty to sleep and relax at home, all to
        Plaintiff's damage, in amounts within the jurisdictional limits of this Court, to be proved at
        trial.

57.    The other effect of the aforementioned discriminatory practices, they deprived Plaintiff of

statutory rights of equal employment opportunities, and otherwise caused Plaintiff's humiliation and mental anguish, adversely affected Plaintiff reputation internally and externally that was Plaintiff built with hard works for over 6 years because Plaintiff was suddenly assigned to other division and disappeared from internal and external meetings with internal (other departments' staff) and external customers (permittees, developers, and engineers).

58.     As a result of Defendant's acts of discrimination as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit, compensatory damages and punitive damages.

### Count No. 4
### Retaliation in Violation of Title VII
### 42 U.S.C. §§ 2000e, et seq.
### (Retaliation for Engaging in Protected Activity)

59.     Plaintiff hereby incorporates as though fully claimed herein the complains set forth in the foregoing paragraphs.

60.     Title VII prohibits agencies from causing a hostile work environment for its employees.

61.     Plaintiff engaged in a statutorily protected activity when Plaintiff complained about the discriminating treatments that Plaintiff received to the Human Resources staff (Shiron Haskins, HR generalist, who had left the City since May 2023) and the Defendant's EEOC Manager (Brenda Henderson, who could not be contacted by email or phone since August 2023 and she and/or her replacement did not response to email or phone. She

20

might had left the City since last year).

62.     As a result of Plaintiff's internal complaint to the Human Resources staff and City's EEOC manager, Defendants, by and through certain supervisors, retaliated against Plaintiff by removing Plaintiff from the Water Resources Program and Operations Manager position on August 29th, 2023 and reassigned Plaintiff to the Combined Sewer Overflow Division to work as a project manager under a new supervisor, LAH, which has impacted Plaintiff's professional reputation and standing in the department and in the City since Plaintiff disappeared from permit meetings with internal and external customers.

63.     Plaintiff was subjected to hostile and oppressive work environment after this reassignment.

64.     The effect of these practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected Plaintiff's employment status because of Plaintiff's race, national origin, age and engagement in EEO protected activity.

65.     These unlawful employment practices were intentional.

66.     The  effect of the aforementioned discriminatory practices deprived Plaintiff of statutory rights of equal employment opportunities, and otherwise caused Plaintiff's humiliation and mental anguish, adversely affected Plaintiff reputation internally and externally that was Plaintiff built with hard works for over 6 years because Plaintiff was suddenly assigned to other division and disappeared from internal and external meetings with internal (other departments' staff) and external customers (permittees, developers, and engineers).  As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and may continue to suffer, generally mental and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to Plaintiff's damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

67.     As a result of Defendant's acts of discrimination as alleged herein, Plaintiff is entitled to

reasonable attorney's fees, costs of suit, compensatory damages, and punitive damages.

68.    Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a,

Plaintiff prays for relief as set forth below.

## RELIEF

THEREFORE, considering the all the previous claims and injuries, Plaintiff respectfully prays that this Honorable Court:

a) Enter judgment on Plaintiff's behalf against Defendant;

b) Enter an Order declaring that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964,  and restraining and enjoining Defendant from further violations;

c) Enter an Order that Defendants be required to promulgate an effective policy against such discrimination and to adhere thereto;

d) Enter an Order directing injunctive relief where appropriate and applicable;

e) Award Plaintiff compensatory damages for emotional distress, mental anguish, and humiliation in the past and future, for losing the total time, physical and mental efforts that Plaintiff have invested to work with the Defendant for over 6 years to build the reputation, trust, and gain respect from Plaintiff's colleagues, subordinates, internal customers (from other Defendant's Departments), and external customers (permittees), and to show Plaintiff's integrity and competency in enforcing the permitting regulatory requirements but Plaintiff's reputation has been damaged and Plaintiff's efforts have been wasted when Plaintiff was removed from the Water Resources Program and Operations Manager position to managing Combined Sewer Overflow

22

projects in August 2022 in a very short notice.   Award Plaintiff' compensatory damages for other humiliation due to discriminatory treatments and hostile work environments, that Plaintiff had endured and may endure in the future.

f) Award Plaintiff punitive damages due to Defendant's conduct that has caused Plaintiff to suffer a hostile working environment after the reassignment, humiliations, insults, and disrespects due to the order to send my draft emails to the DPU Director and her team, and from administrative staff, consultants, and my former supervisor.

g) Award Plantiff the cost expended herein, including reasonable attorneys' fees.

h) Prejudgement and post-justment interest, and

i) Grant such other relief as this Court may consider just and proper.

Dated: July 26, 2023                                  Respectfully submitted,

                                                      SURANI S. OLSEN
                                                      PLANTIFF