# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| **SURANI OLSEN**, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 3:23-cv-475 |
| | : | |
| **CITY OF RICHMOND,** | : | |
| | : | **TRIAL BY JURY DEMANDED** |
| Defendant. | : | |
| | : | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, Surani Olsen ("Plaintiff"), by and through her undersigned counsel, and moves this Honorable Court for judgment against Defendant, City of Richmond ("Defendant"), on the grounds and praying for the relief hereinafter set forth:

## SUMMARY OF THE ACTION

1. This is a civil rights action brought by Plaintiff, a current Defendant employee, who has been discriminated and retaliated against by Defendant because of her race, color, national origin, and participation in Equal Employment Opportunity ("EEO") protected activity.

2. Plaintiff has also been subjected to a hostile work environment by way of unwarranted actions being taken against Plaintiff, being disrespected and humiliated publicly, and being treated differently with different standards when compared to other similarly situated employees who are not of Plaintiff's protected classes.

3. As a result of this discrimination and retaliation, Plaintiff is seeking all available remedies, including compensatory and punitive damages, as well as attorney's fees and court expenses.

## JURY TRIAL DEMAND

4. Under Fed. R. Civ. P. 38 (b), Plaintiff hereby demand trial by jury on all issues triable to a

1

jury of the within action, including this First Amended Complaint, and any further pleadings.

## PARTIES

5. Plaintiff is a citizen of the United States, female, and a South-east Asian American from Indonesia. She has a heavy accent as a result of her national origin. At all relevant times hereto, Plaintiff has lived in the Commonwealth of Virginia. Plaintiff has been employed by Defendant since December 2016 in Richmond, VA.

6. Since January 1, 2004, Defendant has been a municipal public agency and an employer subject to the requirements of Title VII.

## JURISDICTION

7. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

8. This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 *et seq.* (federal question) and 1343 (civil rights).

## VENUE

9. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. 1981a, and Defendant is subject to the personal jurisdiction of this Court in the Eastern District of Virginia because Defendant maintains facilities and operations in this District, and all or most of the events and issues giving rise to this action occurred in this District and Division in Richmond, VA.

10. Venue is further proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(1) and (d), this Division under L.C.R. 3(B)(4), and under 42 U.S.C. Section 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2); as Plaintiff is employed by Defendant in Richmond, VA, where the alleged offenses and injuries occurred, and Plaintiff's employment records are maintained by Defendant in this judicial District and Division.

## STANDING

11. Plaintiff has satisfied all of the procedural and administrative requirements set forth in Section 706 of Title VII, 42 U.S.C. § 2000e-5, in particular:

   a.  On November 22, 2022, and as later amended in March 2023, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) under Agency Case No. 438-2023- 00359 ("Charge"), alleging she was discriminated and retaliated against based on race, color, and national origin; had been  exposed to a hostile work environment; and retaliated against for engaging in EEO protected activity.

   b.  Plaintiff timely filed the aforementioned Charge with the EEOC within three hundred (300) days from the latest date of discrimination relative to this matter.

   c.  On or after April 27, 2023, Plaintiff received a Notice of Right to Sue letter from the EEOC, and less than 90 days upon receipt of the Notice of Right to Sue, on July 26, 2023, Plaintiff timely filed her Complaint against Defendant.

## FACTUAL ALLEGATIONS

12. Plaintiff has been employed by Defendant since December 2016 in various positions.

13. Between December 8, 2020, through August 29, 2022, Plaintiff held the title "Program and Operations Manager". Her duties included administration of various permitting programs. She also held supervisory and management duties which included supervision of multiple, permit-reviewer engineers, a project management analyst, and multiple inspectors.

14. On August 29, 2022, Plaintiff was **demoted** to another division of Defendant to no longer have any supervisory duties. Plaintiff filed her Charge in large part as a result of the demotion, a clear adverse employment action.

15. While Plaintiff is still employed by Defendant, Plaintiff continues to be subjected to a hostile

work environment, daily discrimination and retaliation, and still receives lesser pay on each paycheck than her male counterparts despite having better qualifications.

### Plaintiff's Employment History with Defendant and Compensation Inequity Based on Sex

16. Plaintiff interviewed with Defendant in December 2016 for a Project Management Analyst position. Plaintiff was the only South-East Asian American from Indonesia who had applied for the position. She was the only candidate forced to wait in City Hall for nearly an hour only to be informed from the security team for Defendant that while they were aware of other candidate interviewing for the position, they were unaware of Plaintiff's interview. She was the only candidate who had not received an interview schedule email from Human Resources (HR). Nevertheless, Plaintiff was ultimately interviewed, hired, and soon after promoted to Senior Project Management Analyst.

17. In December 2018, the Plaintiff was promoted from Senior Project Management Analyst position to Senior Engineer, which was accompanied by a 4.6% salary increase, approximately $3,000.00. However, the salary increase was not applied until February 2019 due to an administrative delay by HR. This delay coincided with the processing of a general salary increase for all employees.

18. While Plaintiff's promotional increase was applied at that time, Plaintiff did not receive the general salary increase that other employees received. An HR staff member informed Plaintiff that this exclusion was due to the fact that Plaintiff had already received a promotional raise.

19. This delay and exclusion of Plaintiff from the general salary increase resulted in Plaintiff's 2019 salary being lower than that of similarly situated Senior Engineers in the same division, including Mr. Stewart Platt, a non-Southeast Asian American male ("Mr. Stewart").

20. Despite performing equivalent duties, and at times carrying a significantly heavier workload, Plaintiff's salary remained lower and continues to remain lower than her male counterparts. Moreover, Plaintiff holds a professional engineering license, which Mr. Platt does not possess, further demonstrating the inequity in compensation.

21. Moreover, Plaintiff has observed since 2022 that her salary was and continues to remain (via each paycheck) lower than that of other Project Manager,  Program and Operations Managers, and Engineering Managers, including Mr. William Boston ("Mr. Boston"), Mr. Howard Glenn ("Mr. Glenn"), and Mr. Kenny Weeks ("Mr. Weeks"), all of which are non-Southeast Asian American males.

22. These employees, despite similar titles (Mr. Glenn and Mr. Weeks) and similar qualifications and duties (Mr. Boston), receive higher compensation, even though Plaintiff has a Professional Engineer License while the other (male) managers do not.

23. Additionally, the treatment of Mr. Saber Moazamigoodarzi, a male colleague ("Mr. Moazamigoodarzi"), further underscores the disparity in treatment based on sex; specifically, Mr. Moazamigoodarzi informed Plaintiff that he received both a general salary increase and a promotional raise when he was promoted to Senior Engineer in 2022.

## Immediate Discrimination as Program and Operations Manager

24. On December 8, 2020, Plaintiff was promoted to Program Operations Manager in Water Resources. Plaintiff was required to prepare and submitted various reports to FEMA on January 29, 2021, and was thereafter required to attend an online meeting on February 1, 2021. Plaintiff's laptop, however, crashed after  Defendant's IT staff remotely connected to it to fix its MS Outlook.  This staff  was male and not of Southeast Asian American descent. When Plaintiff asked other IT staff to help retrieve the file, they told Plaintiff that it would take time but they had never got back to Plaintiff with the files.    . Thankfully, Plaintiff had backed up the reports and timely submitted them while also attending the meeting timely. Plaintiff believes that the IT staff member caused the computer to crash and lose the files, because she was Southeast Asian American with a substantial accent.

## Discrimination and Hostile Work Environment Created by Mr. Mantey

25. Mr. Leonard Mantey ("Mr. Mantey") was at all relevant times hereto Plaintiff's supervisor and Senior Deputy Director from the Permit and Development Review Department ("PDR"). He is

also not Southeast Asian American or from Indonesia.

26. On July 13, 2022, Mr. Mantey sent Plaintiff an accusatory email, falsely accusing her of being "vindictive" in her professional capacity regarding a permit for a property located at Yorktown Avenue. This accusation, which was baseless and without merit, targeted Plaintiff's professional integrity and her role in enforcing the City of Richmond's Code—an essential aspect of her duties as a Water Resources Manager.

27. The false characterization of Plaintiff as "vindictive" was not only defamatory but also created a public record that undermined her reputation within the PDR. The email was sent to several other PDR employees, further magnifying the defamation. The harm caused by this false and damaging accusation constitutes a materially adverse action, as it directly attacked Plaintiff's professional credibility and standing within the department.

28. The defamatory nature of this email was particularly egregious because Plaintiff is a Southeast Asian American and the only employee to receive such an accusation, while other similar situated employees, who are not Southeast Asian Americans, who also reviewed the same permit as Plaintiff, were not subjected to similar defamatory remarks. This disparate treatment, coupled with the false and harmful characterization of Plaintiff, further demonstrates a discriminatory motive, contributing to an abusive and hostile work environment.

29. Furthermore, Mr. Mantey's actions were not only defamatory but also interfered with Plaintiff's ability to perform her job duties effectively. As the CRS Coordinator responsible for coordinating with federal and state agencies such as FEMA and DCR, Plaintiff relied on accurate and timely information to ensure compliance with floodplain management regulations. The email from Mr. Mantey, combined with the failure to involve Plaintiff in the permit approval process, jeopardized her professional obligations. Specifically, Mr. Mantey's actions, alongside the improper approval of the permit without Plaintiff's knowledge or consent, placed Plaintiff in a

precarious position where she could be held accountable by FEMA and DCR for potential noncompliance.

30. This improper approval of the permit by Mr. Mantey's staff, Mr. David Alley of PDR ("Mr. Alley") in 2022, which occurred without Plaintiff's involvement or consent, further exacerbated the hostile work environment.

31. After Mr. Mantey's accusation, Mr. Alley then approved the Water Resources portion of the Yorktown Avenue permit without consulting Plaintiff, who was the manager of the Water Resources Division at that time. This decision, made in conjunction with the Assistant City Attorney, was made without informing Plaintiff, causing significant humiliation and emotional distress. The approval, which was done using Plaintiff's name, created the false impression that Plaintiff had approved the permit, despite her having no prior knowledge of or involvement in the approval process.

32. Moreover, the approval of the permit without Plaintiff's input had the potential to harm her career in floodplain management, as any future reviews or audits would suggest Plaintiff's approval of the permit, despite her lack of involvement. This exposure to potential future career harm, coupled with the public perception created by the unauthorized use of Plaintiff's name, further contributed to the emotional distress and mental anguish Plaintiff experienced.

33. Additionally, this decision could have led to complications with FEMA, as Plaintiff was responsible for submitting floodplain management/permitting reports to federal agencies. The permit that had been improperly approved without Plaintiff's proper involvement, could have caused issues with FEMA's review of Plaintiff's reports and jeopardized her standing with federal agencies.

34. In sum, the actions Mr. Mantey, Mr. Alley, and the Assistant City Attorney, along with the exclusionary conduct and false accusations, constitute a pattern of retaliation and discrimination

that has materially affected Plaintiff's career and well-being. These actions have significantly altered the terms and conditions of Plaintiff's employment, created an abusive and hostile work environment, and undermined her professional standing.

## **Discrimination and Hostile Work Environment Created by Ms. Bingham**

35. Ms. April Bingham ("Ms. Bingham"), was at all relevant times hereto, Plaintiff's supervisor and the Director of the Department of Public Utilities ("DPU").

36. Ms. Bingham discriminated and ultimately retaliated against Plaintiff based on Plaintiff's national origin, race, and color, as well as Plaintiff engaging in EEO protected activity.

37. The conduct of Ms. Bingham, Defendant's employee, was sufficiently severe and pervasive, and directly resulted in harm to Plaintiff's employment conditions, creating an abusive working environment which began in early 2022.

38. On March 18, 2022, Plaintiff received a phone call from Ms. April Bingham, and another manager, Mr. JC, neither of which are of Southeast Asian American descent.

39. During the call, Ms. Bingham used the phrase "Black Eye" when talking to Plaintiff about a permit, a phrase she did not use with another Program and Operations Manager from DPU, who also reviewed the same permit and was late in approving the permit or similarly situated employees ("Black Eye Comment").

40. Prior to this call, Ms. Bingham and Plaintiff had interacted personally (face-to-face) numerous times and, as a result, Ms. Bingham was aware that, due to Plaintiff's race and ethnicity, Plaintiff has certain physical characteristics which include dark circles that surround Plaintiff's eyes and appear to be black eyes at first glance.

41. This was the first time Plaintiff has ever heard anyone use that term in a conversation with Plaintiff. Plaintiff  considered the Black Eye Comment a pejorative reference to Plaintiff's ethnic appearance, and  took great offense to it. Plaintiff would later hear this term again by a consultant of

Defendant during an online meeting and on the phone in April 2023.

42. Plaintiff notified Defendant HR representative, Brenda Henderson ("Ms. Henderson"), about the comments and informed her that Plaintiff would like to file a complaint. Plaintiff felt deeply hurt, humiliated, emotionally disturbed, offended, and discriminated against by Ms. Bingham.

43. While Ms. Bingham later apologized in an email, Plaintiff felt that the apology did not adequately address the discriminatory nature of the remark and Ms. Bingham thereafter continued to harass and retaliate against Plaintiff as a result of her complaint to HR.

44. On July 8, 2022, Plaintiff sent multiple emails regarding a permit application at Abbey Road (the "Abbey Road Project"). These emails were sent in accordance with Plaintiff's duties, as mandated by the Local Ordinances of the City of Richmond, Virginia. These actions were necessary to prevent delays in the permitting process, particularly given the location of the site in a Resource Protection Area (RPA), where timely communication is crucial for compliance.

45. Not long after Plaintiff sent emails regarding the Abbey Road Project, on the same day, Ms. Bingham sent Plaintiff an email restraining and interfering with her ability to send further emails in connection with the Abbey Road Project. Such restraint and interference were not levied against any other employees of Defendant.

46. Ms. Bingham's instruction to limit communication, in the face of these legitimate professional needs, and attempt by Ms. Bingham to obscure the paper trail that reflected Plaintiff's efforts and diligence, Ms. Bingham's actions created an abusive working environment designed to undermine Plaintiff's professional standing and ability to perform her duties effectively.

47. On July 14, 2022, Ms. Bingham also imposed another discriminatory and retaliatory requirement upon Plaintiff, mandating that Plaintiff submit drafts of all customer letters and emails to her and her team for prior review before sending them to customers. This directive was memorialized by Patrick Bradley in an email to Plaintiff, attached hereto as **Exhibit A**, and

incorporated by such reference.

48. This requirement was not applied to other Program and Operations Managers, such as Scott Yates ("Mr. Yates") or Susan Hamilton ("Ms. Hamilton"), individuals who have similar duties as Plaintiff but neither of which are Southeast Asian Americans from Indonesia,

49. In explanation, Ms. Bingham stated that this requirement only applied to Plaintiff in part because Plaintiff was accused of being vindictive by Mr. Mantey, a supervisor of Plaintiff who was similarly discriminated and retaliated against Plaintiff, as described below, and subject Plaintiff to a hostile work environment.

50. The imposition of this review process significantly altered Plaintiff's employment conditions, as it unnecessarily prolonged the review period for customer communications. This delay, imposed solely upon Plaintiff, led to frustration and complaints from customers. However, Plaintiff was prohibited from informing customers that the delays were caused by the requirement to send drafts to Ms. Bingham and her team, thus exposing Plaintiff to unwarranted customer dissatisfaction and further humiliation.

51. This requirement, along with Plaintiff's inability to explain the delay, as Plaintiff was forbidden to inform permittees and/or their consultants that the draft response was being reviewed by Ms. Bingham and her team, created an abusive working environment by isolating Plaintiff from the ability to perform her job duties effectively, while subjecting her to unnecessary scrutiny and accountability that her colleagues, other Program and Operations Managers, did not face.

52. Additionally, when Plaintiff sought to inform customers of the delays and the involvement of Ms. Bingham's team, Ms. Bingham denied this request, effectively placing the burden of customer complaints solely on Plaintiff.

53. This decision, along with Ms. Bingham's failure to respond to or approve Plaintiff's draft responses, in a timely manner or otherwise, to a permittee's engineer about the floodplain entrance

issue after July 14, 2022, further exacerbated the situation, leading to additional customer complaints and causing severe emotional distress and mental anguish for Plaintiff.

54. In response to these new requirements, Plaintiff complained to a HR representative Ms. Shiron Haskins ("Ms. Haskins"), about Ms. Bingham's directive.

55. Ms. Haskins informed Plaintiff that she could submit another complaint to Defendant's EEO Manager, Ms. Brenda Henderson ("Ms. Henderson").

56. Other than such suggestion, Ms. Haskins failed to escalate the matter or address the discriminatory nature of the requirement, further allowing the hostile work environment to persist.

57. In retaliation to Plaintiff's complaint, Ms. Bingham publicly and ironically reiterated the baseless accusation that Plaintiff was "vindictive," further humiliating Plaintiff in front of Ms. Haskins and her former supervisor, and exacerbating Plaintiff's emotional distress and mental anguish.

### Formal EEO Meeting and Defendant's Intentional Misconduct in EEO Process

58. On July 15, 2022, Plaintiff met with Defendant's EEO Manager, Ms. Henderson, who is not Southeast Asian American or from Indonesia.

59. During this meeting, Plaintiff disclosed Ms. Bingham's discriminatory conduct, including, but not limited to, the Black Eye Comment made by Ms. Bingham, and expressed Plaintiff's intent to file a formal discrimination complaint based on the actions described above.

60. Ms. Henderson provided Plaintiff with a complaint form and instructed Plaintiff to submit the complaint by August 15, 2022, which was approximately 31 days from the date of the meeting. This email is attached hereto as **Exhibit B**, and incorporated herein by such reference.

61. This deadline, oddly enough, was inconsistent with the federal government's prescribed time frame of 180 days for filing discrimination complaints under Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race and national origin.

62. Such a shortened deadline for filing a formal charge, when compared to the federally mandated period, further exacerbates Plaintiff's allegations of discriminatory treatment.

63. Subsequently, on November 18, 2022, and again on December 1, 2022, Plaintiff emailed Ms. Henderson to inquire about the status of the complaint and to seek guidance on the filing process.

64. Ms. Henderson failed to respond to these emails.

65. Plaintiff also attempted to reach out to Chester Kelly ("Mr. Kelly"), a colleague of Ms. Henderson, by leaving a voicemail message requesting assistance.

66. Mr. Kelly, who is also not Southeast Asian American or from Indonesia, did not respond to Plaintiff's inquiry either.

67. Plaintiff's repeated attempts to address her complaint through the internal channels were met with silence and inaction, further highlighting the lack of support and responsiveness from Defendant's HR department.

68. In light of the lack of response and the failure to provide adequate guidance on filing the complaint, Plaintiff was compelled to take further action and filed the Charge with the EEOC, following Plaintiff's demotion as discussed immediately below.

**Retaliation and Adverse Employment Action by Demotion**

69. On August 29, 2022, less than 1.5 months from Plaintiff meeting with Defendant EEO representative Ms. Henderson, Plaintiff was demoted.

70. Plaintiff first learned about the demotion on August 25, 2022, from Mr. Eric Whitehurst ("Mr. Whitehurst"), who is not a South-East Asian American or from Indonesia.

71. While laughing and exhibiting a sardonic smile, Mr. Whitehurst informed Plaintiff to report to Mr. Lowell Alan Harrison ("Mr. Harrison") for assignment of her next project on August 29, 2022.

72. In response to Plaintiff's request for an explanation, Mr. Whitehurst said that the decision was made by Directors, including Ms. Bingham and/or Mr. Manley, the two individuals who Plaintiff had

reported to Defendant's HR and EEO representatives.

73. Plaintiff was removed from the position of Water Resources Program and Operations Manager, a role that had involved significant supervisory, programmatic, and administrative responsibilities.

74. Plaintiff was demoted to a different division, effectively stripping Plaintiff of all supervisory and managerial duties associated with the Water Resources Division.

75. These actions taken against Plaintiff were directly and causally related to Plaintiff's complaints of discriminatory treatment and retaliation Plaintiff engaging in EEOC protected activity.

76. The demotion from a higher-ranking position and the stripping of Plaintiff's responsibilities represents materially adverse actions that would dissuade a reasonable employee from further engaging in protected activity, such as timely filing a formal charge of discrimination with the EEOC or reporting further discriminatory conduct.

77. Plaintiff demotion acted as chilling effect.

78. The temporal proximity between Plaintiff's complaints (on July 14th and 15th, 2022) and the adverse employment action (demotion) taken on August 25, 2022, supports an inference of retaliatory intent.

79. These retaliatory actions altered the terms and conditions of Plaintiff's employment, creating an environment that was both hostile and abusive, and limited Plaintiff's future employment prospects and promotional opportunities within Defendant.

80. Plaintiff was replaced by Mr. Moazamigoodarzi, who did not even have the required certifications to assume the overall position. As Mr. Moazamigoodarzi was unqualified for the position, Defendant assigned a male manager (WB) to manage the consultants, and two male consultants were assigned to perform permit review duties. Similarly, Mr. Rodney King ("Mr. King") was assigned to manage the inspectors previously managed by Plaintiff despite not having the

requirement management certifications. None of these male individuals were Southeast Asian American or from Indonesia.

81. Plaintiff held all such certifications and satisfactorily had performed all of these duties as a single individual. Defendant went out of its way to retaliate against Plaintiff. Defendant essentially replaced Plaintiff with three individuals.

82. Plaintiff was demoted to work as a Project Manager in a field that Plaintiff did not have any experience and supervised by an individual (Mr. Harrison) who had previously argued with Plaintiff on multiple occasions (regarding the permit requirements at 3300 Williamsburg Avenue).

83. Plaintiff was the only Southeast Asian American or of Indonesian descent in her new Division.

84. Plaintiff was held to an unreasonable and unrealistic standard by Mr. Harrison, placing learning requirements upon Plaintiff that had not been placed on similarly situated individuals.

## Office Relocated to Unbearable Working Conditions

85. Defendant's demotion of Plaintiff was an attempt, albeit unsuccessfully, to constructively discharge Plaintiff.

86. In connection with her demotion, Plaintiff was immediately relocated from the eighth floor in a high rise building on Broad Street to a much smaller office (around half the size of Plaintiff's former office) at the Administrative Building of the Wastewater Treatment Plant.

87. Plaintiff's office in the Administrative Building did not have a working HVAC system so there was no AC during the summer, resulting in internal room temperatures in excess of 80 degrees Fahrenheit, and no heat in the winter, resulting in internal room temperatures around 60 degrees Fahrenheit.

88. Equally disturbing was an awful sewage or rotten egg smell that permeated the air in her office, likely due to the proximity to the wastewater treatment plant.

89. In addition, mold covered the heater unit in her office room as well as along the office walls and ceilings. Unlike her previous office, this office was located in the regulatory floodway with a high risk of annual flooding.

90. By way of corroboration, on April 17, 2023, a massive volume of rotten egg gas spew out from Plaintiff's office radiator and filled the room with the smell. Another staff member outside of Plaintiff's office smelled it immediately and commented the same to Plaintiff.

91. This event caused Plaintiff's mental anguish and made Plaintiff's concerned about the effect of the gases to Plaintiff's health since the heating radiator in this office was very old and moldy. Other radiators in the other staff's offices in the same building did not spew out the rotten egg gas on that day.

92. Not only was Plaintiff exposed to mold and toxic gas, but she may also have been exposed to asbestos based on a purported laboratory test report which concluded that asbestos was in the ceiling tiles and possibly the basement tunnels.

93. Plaintiff refused to quit despite the demotion and absurd working conditions.

94. Consequently, after repeated complaints, Plaintiff was moved to a maintenance trailer at the Wastewater Treatment Plant, and finally to the Operations Building, as further described below.

**Hostile Work Environment Continued – Inability to Access Critical Software Tools**

95. Following Plaintiff's demotion on August 29, 2022 and refusal to quit despite such demotion and relocation to unbearable working conditions, Defendant continued to create an unbearable working environment in hope that Plaintiff would simply resign.

96. From the end of August 2022 until July 19, 2023, Plaintiff was subjected to discriminatory treatment regarding access to essential project management software used for managing Defendant's CSO projects. Specifically, Plaintiff was denied access to the Rapids project

management tab and the buyer center/management tab, tools that were critical for accessing contract data and project-related information.

97. In contrast, Plaintiff's colleagues—Todd Loney ("Mr. Loney") and Mr. Stone—who were also project managers in the DPU, were granted access to these tools without delay. Neither of these individuals are Southeast Asian American or from Indonesia.

98. Mr. Loney, who began working for Defendant in November 2022, was provided access shortly after his start date, while Plaintiff, who had been employed by Defendant for over 6 years and demoted in August 2022, was denied access for almost a year.

99. Plaintiff's inability to access necessary tools placed Plaintiff at a disadvantage, forcing Plaintiff to repeatedly rely on Mr. Stone to obtain contract data and other information, which created inefficiencies in performing job duties and affected Plaintiff's professional performance.

100. After months of being denied access, despite repeated requests, Plaintiff redirected her request and escalated the issue by emailing one of Plaintiff's former supervisors, Mr. Whitehurst. Only after this request, and multiple others, did the Defendant's staff begin processing Plaintiff's access on July 19, 2023, nearly a year after Plaintiff was demoted to manage the CSO projects.

**Hostile Work Environment Continued – Denial of Site Access**

101. In addition to Defendant's refusal to provide Plaintiff access to critical software solutions, Defendant did not grant access to Plaintiff to the McCloy Pump Station, where Plaintiff served as a Project Manager since January 2023.

102. Plaintiff requested written access to the McCloy Pump Station but her supervisor, Mr. Whitehurst, did not approve Plaintiff's access request for nearly two months.

103. Defendant immediately granted access to all male, non-Southeast Asian American contractors and consultants involved in the project.

104. During the time period her access request was pending, Plaintiff was required to request

help from her colleagues, consultants, and contractor in order to access the site.

105. Plaintiff eventually obtained the access in her card in May 2024, nearly 1.5 years later, about two or three months after submitting the request to her former supervisor and escalating the matter. However, most of the construction works, start-up and testing for the project that Plaintiff managed at the site was completed.

106. After receiving her access card, Plaintiff continued to have issues at the McCloy Pump Station. On at least one occasion, Defendant's security staff at the Douglasdale Pump Station refused to grant Plaintiff access to the Douglasdale Pump Station, the first access point before reaching the McCloy Pump Station. Specifically, the regular security guard who had previously opened the gate for around four months, refused to unlock the gate. Then another security personnel, who was armed (who never showed up before), delayed, and intimidated Plaintiff despite her having the proper access credentials. This sudden and unnecessary escalation was unjustified, intimidating, and created an environment of fear and hostility for Plaintiff, and since it occurred immediately after Plaintiff's EEOC filing—raises a strong inference of retaliatory motive.

**<u>Interim Performance Evaluation: Unfair and Inaccurate</u>**

107. On February 23, 2023, Plaintiff received Plaintiff's interim performance evaluation, which, noticeably, was devoid of Plaintiff's accomplishments over the review period from July 1, 2022 to August 31, 2022. Plaintiff asked Mr. Harrison to include all Plaintiff's accomplishments for this timespan in the performance evaluation but he refused.

108. The omission of accomplishments in an evaluation, particularly when compared to other employees' evaluations, creates an adverse employment action that has the potential to harm Plaintiff's career trajectory.

109. Defendant intentionally omitted Plaintiff's accomplishments and failed to provide Plaintiff a fair and accurate performance review. In connection with the demotion, this further had an adverse

effect on Plaintiff's employment opportunities for advancement, increases in compensation, and continued employment.

110. The failure to accurately document and evaluate Plaintiff's performance is more than a clerical error—it undermined Plaintiff's professional reputation and opportunities for growth within the organization, especially when contrasted with the treatment of other managers who do not share Plaintiff's racial or national origin background. This selective omission supports the inference that Plaintiff's evaluation was biased and discriminatory, constituting an unlawful practice.

**<u>Inability to Relocate to New Locality and Hostile Work Environment by Mr. Harrison</u>**

111. By March 2023, while Plaintiff refused to resign despite the repeated abuse, Plaintiff applied to two positions within Defendant in different localities. Both of these positions offered better compensation packages.

112. After several weeks, Plaintiff was not selected for either position in either locality.

113. The interviewer for one of these positions identified that he would contact Plaintiff's supervisor(s) to discuss Plaintiff.

114. Mr. Harrison, Plaintiff's supervisor, identified to Plaintiff after one of the interviews that one of interviewers from one of the localities was his personal friend.

115. This conversation with Plaintiff came in the wake of a humiliating incident with Mr. Harrison in March 2023. During such conversation, with multiple contractors and consultants present—all who were male and non-Southeast Asian American—Mr. Harrison instructed Plaintiff: "Don't wipe your butt (or possibly 'ass') before you sh**!"

116. This statement, made in front of others, was not only highly inappropriate but also caused Plaintiff significant mental anguish and distress.

117. Prior to this incident, Plaintiff had informed Mr. Harrison that Plaintiff intended to file a complaint regarding Plaintiff's demotion and that Plaintiff was considering legal action due to Mr.

Harrison's directive prohibiting Plaintiff from directly contacting any State Agencies.

118. Mr. Harrison asserted that he did not believe Plaintiff would prevail in any lawsuit against Defendant, which further exacerbated Plaintiff's hostile work environment. Mr. Harrison resigned from his position in May 2023.

### Retaliation and Hostile Work Environment Created by Ms. Bingham Continues

119. In May 2023, a permittee purportedly contacted Ms. Bingham to request a reimbursement of the total cost of his stormwater management (Best Management Practice or "BMP") design fee for his permit at Larus Court. His permit had been approved by an engineer supervised by Plaintiff in her prior position with DPU but later revoked by a consultant that was hired subsequent to Plaintiff's demotion.

120. Plaintiff was never contacted by Ms. Bingham regarding this issue. Instead, the permittee contacted Plaintiff via a carbon copy email to Plaintiff and threatened a lawsuit against Defendant

121. Plaintiff immediately responded on June 5, 2023, to a Defendant's City Attorney, providing the relevant information, including the subdivision permit requirements, to clarify that the previous permit requirements were valid.

122. Ms. Bingham immediately responded to Plaintiff's email to "minimize and/or eliminate written communication" regarding the matter, while cc'ing others.

123. This directive by Ms. Bingham was perceived by Plaintiff as retaliatory and discriminatory, aimed at minimizing Plaintiff's ability to document Plaintiff's work's compliance with the applicable regulations, thereby obscuring the paper trail reflecting Plaintiff's efforts in accordance with City ordinances.

124. This instruction was particularly concerning because Plaintiff had acted in accordance with the prescribed regulations and had provided written records to support the permit decision, which were required for future Department of Environmental Quality (DEQ) compliance audits.

125. Ms. Bingham's actions seem to suggest a retaliatory attempt to undermine Plaintiff's hard work and due diligence in fulfilling Plaintiff's duties.

126. Moreover, after Plaintiff's demotion, the consultant, hired post-demotion, approved the permittee's application for an "Agreement in Lieu of Plans"—a decision Plaintiff and Plaintiff's former staff had previously rejected.

127. Plaintiff's rejection had been based on the interpretation of the City Code, which held that the agreement was only applicable to single-family residences that are not located within a common plan of development. The consultant's subsequent approval of the application of the agreement in lieu of plans, despite Plaintiff's objection and established criteria, underscores a possible deviation from established policies.

128. Later in May 2023, specifically on May 15, 2023, and during an official meeting, Ms. Bingham issued an instruction that Ms. Barbara Jackson, Wastewater Treatment Plant Operations Supervisor ("Ms. Jackson"), be included in all meetings related to Combined Sewer Overflow (CSO) projects. Previously, Plaintiff was only required to engage the Operations Division as necessary, either before preconstruction meetings or after design completion. Plaintiff felt that this change in protocol was implemented in retaliation for Plaintiff's prior protected activities and had the effect of diminishing Plaintiff's authority and professional standing within the department.

129. Ms. Bingham's decision to include Ms. Jackson in all CSO project meetings subjected Plaintiff to enhanced scrutiny and undermined her role within the department.

130. Ms. Jackson was not Southeast Asian American or from Indonesia.

### Hostile Work Environment Created by Ms. Jackson

131. In July 2023, Ms. Jackson loudly dismissed the necessity of the Dock Street Pump Station Upgrades  Project in Plaintiff's office, despite Plaintiff's detailed explanations, which could be heard by his staff, whose office was located in front of Plaintiff's former office.

132. Ms. Jackson also dismissed the necessity of the Pump Stations' generators project, and repeatedly claimed that the existing generator was sufficient or that unit could be borrowed from the Water Treatment Plant.

133. When Plaintiff reiterated the project's necessity and the legal implications of its cancellation, including potential federal scrutiny regarding the allocated federal grant, Ms. Jackson continued to disregard the explanation. The persistent rejection of Plaintiff's professional expertise contributed to the hostile work environment.

134. In June 2023, in a meeting with Mr. Mr. Whitehurst and Ms. Jackson in Mr. Whitehurst's office, Plaintiff was instructed by both Mr. Whitehurst and Ms. Jackson to cancel the Pump Stations Generator Project, despite its critical function of designing and procuring generators for five combined sewer pump stations. Ms. Jackson repeatedly claimed that she has an existing generator, or a generator could be borrowed from the Water Treatment Plant, which was supported by Mr. Whitehurst.

135. Mr. Whitehurst then requested Plaintiff to cancel the generator project, which Plaintiff did. The cancellation of a critical infrastructure project under Plaintiff's purview directly undermined her authority and role within Defendant.

136. On August 10, 2023, in a meeting attended by external consultants, Ms. Jackson openly and aggressively berated Plaintiff, asserting that she was the decision-maker, contrary to the known chain of command, which designated Mr. Whitehurst as the responsible official. This occurred in front of professional colleagues before Mr. Whitehurst's arrival, following Plaintiff's attempt to discuss the budget for a critical switchgear project. Ms. Jackson's conduct was demeaning, public, and intended to diminish Plaintiff's authority.

137. When Mr. Whitehurst arrived at the meeting, he failed to recall the scope of the Dock Street Pump Station Upgrades Project despite multiple prior discussions and email communications

with Plaintiff. Instead of consulting Plaintiff, Mr. Whitehurst deferred to external consultant, a decision that publicly undermined Plaintiff's expertise and professional credibility. The presence of another external consultant in the meeting, Mr. George Guhse ("Mr. Guhse"), who displayed hostility and questioned the necessity of the project in an unfriendly manner, further exacerbated the humiliation. This pattern of treatment altered Plaintiff's working conditions and created an abusive working environment.

138. While Ms. Jackson later apologized for yelling at Plaintiff and publicly humiliating her, an apology does not mitigate the severe emotional distress, mental anguish, and humiliation that Plaintiff endured.

### Relocation to Maintenance Trailer and Retaliation by Mr. Battle

139. In September 2022, Plaintiff was relocated to the unbearable working conditions in the Administrative Building of the Wastewater Treatment Plant as described above.

140. Unlike other individuals, all of whom were non-Southeast Asian American, including Ms. Jackson, Plaintiff was never informed about the schedule for pesticide spraying despite repeated requests to Maintenance Staff member, Mr. Christopher Battle ("Mr. Battle"), the Plant Manager, and Ms. Jackson.

141. On at least one occasion, Mr. Battle yelled at Plaintiff and instructed her to go home.

142. Plaintiff ultimately complained of Mr. Battle to her supervisor, Mr. Harrison, which finally prompted Mr. Battle's compliance with the scheduling request.

143. In retaliation, Plaintiff was relocated to a new, which presented similar issues, and more, as the Administrative Building

144. *Plaintiff's new office was a maintenance trailer*, which she perceived as yet another attempt by Defendant to constructively discharge Plaintiff; a substantially fall from the grace of her large office on the eighth floor of a high rise building just months before.

145. Plaintiff's office, a trailer, had a damaged ceiling and was poorly constructed. Her entire office shook whenever nearby construction activities occurred, sending debris onto Plaintiff's filing cabinet and office equipment. The shaking of the office and falling debris not only created an unsafe work environment but also posed a direct threat/hazard to Plaintiff's physical safety and caused her severe anxiety and mental anguish.

146. The office's proximity to ongoing construction activities further exacerbated the situation. The frequent extreme building vibrations and shaking, particularly when roadwork, excavation, pipe installations, and other construction activities were carried out nearby, further disrupting Plaintiff's ability to concentrate and perform her job. The vibrations damaged the building's foundation tiles, which exacerbated the unsafe and unstable environment.

147. Plaintiff also experienced the same issues with the heating and cooling relative to her office that she had experienced in the Administrative Building.

148. In addition, her office's plumbing was defective. The women's restroom often malfunctioned, failing to properly flush, and, despite weekly (and sometimes daily) visits from the cleaning staff, the toilet was disgustingly not cleaned for the first 4 months Plaintiff worked in the Maintenance Building.

149. During this period, Plaintiff had to leave the Maintenance Building simply to use other restroom facilities, further disrupting her work and contributing to a degrading and hostile work environment.

150. Plaintiff was also denied access to a key to the front door of her office (maintenance trailer) for the first four months of her employment, and for nearly a year, was not given the proper office identification and name tag (inclusive of title information).

151. All male staff in the same building were granted keys and name tags which included their titles. Female cleaning staff who regularly visited the building were also granted a keys. None of these staff were Southeast Asian American or from Indonesia.

152. This denial of access to the key was a continuous and persistent inconvenience, particularly after 3:30 or 4:00 PM when other staff members had left for the day. As a result, Plaintiff was often locked out of her trailer and had to seek assistance from maintenance personnel, causing significant disruption to her work and adversely altering the conditions of her employment.

153. The lack of a name tag with title may have caused other staff to believe that Plaintiff had been further demoted to an hourly staff member, further undermining Plaintiff and permitting the hostile work environment to continue during the time period she maintained an office in the maintenance trailer, as identified herein.

154. Lastly, Plaintiff was also subjected to undue anxiety related to plumbing issues that occurred in the men's restroom. In October or November 2023, for several consecutive days, someone deliberately left the tap running in the restroom, potentially causing flooding. Plaintiff was informed by another staff after the fact that Mr. Douglas Yarhouse (discussed below) was the party responsible.

**<u>Retaliation by HR Representative Ms. Brodie</u>**

155. Ms. Patra Brodie ("<u>Ms. Brodie</u>"), a non-Southeast Asian American who was also not from Indonesia, was employed by Defendant in its HR department and was aware of Plaintiff's Charge.

156. On June 27, 2023, Ms. Brodie twice interrupted and prevented an operational staff member from answering Plaintiff's questions related to a project site by making demeaning statements in front of several operational staff, further contributing to the hostile work environment, humiliated Plaintiff and diminished her professional authority.

157. Plaintiff reasonably believes that these actions, including the demeaning statements and interference with her ability to communicate effectively with her colleagues, were retaliatory in nature, given Ms. Brodie's knowledge of Plaintiff's Charge and EEO meeting with Ms. Henderson.

158. In August 2023, Ms. Brodie singled out Plaintiff, requesting her attendance at an hourly payroll training session. This training, which focused on how to enter non-exempt hourly employee time, was primarily attended by non-management staff members who were not salaried and were paid on an hourly basis. An email communication discussing this training is attached hereto as **Exhibit C**, and incorporated by such reference.

159. Despite Plaintiff's position as a salaried Program and Operations Manager, Ms. Brodie insisted that Plaintiff attend the training with non-management staff members, while no other Program and Operations Managers, or similarly situated employees, were subjected to such a requirement. Plaintiff was the only Southeast Asian American or of Indonesian descent to attend.

160. On June 27, 2023, Ms. Brodie not only singled Plaintiff out but such training requirement also had the potential to damage her professional reputation by suggesting to other staff that she was being relegated to a lower-status, non-managerial role. This shift in perception likely fostered a sense of hostility and undermined Plaintiff's standing among her colleagues, further contributing to an abusive and detrimental working environment,

161. Ms. Brodie's behaviors undermined  Plaintiff's professional standing and emotional well-being.

### Extreme Weather Conditions Policy Discriminatorily Applied

162. In February 2024, Plaintiff was informed Mr. Whitehurst, that as a Program and Operations Manager, she was considered an "essential" employee and that Defendant's policy regarding early closures or delayed opening of work hours during extreme weather conditions did not apply to her.

163. Despite this directive, Plaintiff was informed that another female Program and Operations Manager, who is not Southeast Asian American, was permitted to leave early and arrive late during snowstorm alerts in February 2024.

164. This disparate treatment constitutes a materially adverse action because it subjected Plaintiff to different and more burdensome working conditions compared to her colleague, based on her protected status as a Southeast Asian American.

165. The discriminatory nature of this unequal treatment is evidenced by the fact that Plaintiff, as a Program and Operations Manager, was held to a stricter standard than her colleague, solely because of her ethnic background. Plaintiff's colleague, who was allowed to leave early and come late during the snowstorm alerts, is not of Southeast Asian descent, highlighting the racial disparity in the treatment of similarly situated employees.

166. This conduct also creates an abusive and hostile working environment, as it not only subjected Plaintiff to less favorable working conditions but also fostered an atmosphere of resentment and exclusion based on racial and ethnic lines. Such unequal treatment is sufficiently severe to alter the terms and conditions of Plaintiff's employment, contributing to the ongoing hostile environment she has described herein.

167. In sum, the differential treatment of Plaintiff, coupled with the racial and ethnic disparity in how the snowstorm alert policy was applied, constitutes a materially adverse action that is causally linked to Plaintiff's protected status.

**Retaliation and Hostile Work Environment Created by Mr. Yarhouse**

168. Mr. Douglas Yarhouse ("Mr. Yarhouse") was a male coworker of Plaintiff who was not a Southeast Asian American, had knowledge of Plaintiff's Charge, and had an office directly next to Plaintiff's office in the maintenance trailer.

169. Mr. Yarhouse engaged in pattern of abuse against Plaintiff in July 2023.

170. Nearly every day in July 2023, Mr. Yarhouse forcefully pushed his desk against the shared wall between his office and Plaintiff's former office, creating loud, sudden noises that startled Plaintiff. This conduct was intentional and designed to intimidate Plaintiff, reinforcing an abusive work environment.

171. In July 2023, after Plaintiff requested information from Mr. Yarhouse regarding an electrical source for a project, Mr. Yarhouse positioned himself behind Plaintiff's half-open office door and stated, "What could/would you do, what would I get?" Plaintiff understood this as an implied quid pro quo demand, which caused Plaintiff to feel intimidated and deterred Plaintiff from seeking further assistance from Mr. Yarhouse.

172. On July 17, 2023, Plaintiff discovered that the women's restroom door had been physically blocked with a heavy printer table and a large box, preventing access, purportedly by Mr. Yarhouse. Plaintiff immediately requested a security camera installation in the area to Mr. Battle and other maintenance staff but was denied. A photograph of the entrance to the woman's restroom and adjacent table is attached hereto as **Exhibit D**, and incorporated by reference.

173. Between July 11 and July 21, 2023, Mr. Yarhouse made repeated loud and offensive statements about needing to use the restroom ("no time to go taking dump") not long after Plaintiff went to the women's restroom. These statements were deliberately timed to be audible to Plaintiff, causing Plaintiff discomfort and embarrassment.

174. On July 24, 2023, Mr. Yarhouse loudly stated, "I am wet," twice after Plaintiff returned from the restroom. Plaintiff reasonably perceived this comment as inappropriate workplace conduct intended to humiliate and intimidate Plaintiff.

175. Plaintiff formally complained about Mr. Yarhouse to her supervisor and HR.

176. The day after Plaintiff submitted her formal complaint against Mr. Yarhouse, Mr. Yarhouse stated that he would like to 'tape Plaintiff's mouth shut' to a cleaning staff member. He

27

did so while standing near Plaintiff's open office door, ensuring that Plaintiff could hear him. This was a direct and explicit act of retaliation.

177. Subsequent to Plaintiff's complaint against Mr. Yarhouse, Mr. Yarhouse installed a lockbox around the temperature control panel located near the meeting table in front of the building, which controlled the heating and air conditioning for Plaintiff's office, Mr. Yarhouse's office, and a male mechanical supervisor's office. The second lockbox in the back off the building controls the heating and cooling for other offices in the building.

178. Mr. Yarhouse informed Plaintiff that the key to the lockbox that control Plaintiff's office temperature was provided only to him and the other male mechanical supervisor's office—both male, non-Southeast Asian American employees. This prevented Plaintiff from adjusting the temperature in her own office.

179. The temperature in Plaintiff's office was deliberately set to extreme levels, including as low as around 59 degrees Fahrenheit in the morning and as high as around 86 degrees Fahrenheit in the afternoon.

180. These temperatures are outside the temperatures that OSHA (Occupational Safety and Health Administration) recommends for an employer to set in a  workplace, which are between 68 degrees and 76 degrees Fahrenheit.

181. Plaintiff requested a key to Mr. Yarhouse's supervisor, Mr. Battle, to adjust the programmed temperatures but was denied. Mr. Battle then deliberately removed Mr. Yarhouse's key from his drawer in Plaintiff's presence to reinforce that Plaintiff would not be given control over the office temperature.

182. In another incident, and again subsequent to Plaintiff's complaint against Mr. Yarhouse, Plaintiff again found the women's restroom door blocked from the outside when Plaintiff was

going to the restroom, and Plaintiff had to push a large heavy box that was located in front of the door fully under the printer table so Plaintiff could access the restroom.

183. However, once Plaintiff completed use of the restroom, she was unable to open the restroom door, as the large heavy box was blocking it again from the outside. Plaintiff was physically trapped inside the restroom. Plaintiff then turned the door handle and pushed it really hard to open it around one inch and Plaintiff then put Plaintiff hand through the small opening to forcefully push the box back under the table, and then forcefully push the door open to escape.

184. After escaping, Plaintiff checked and found that Mr. Yarhouse was the only staff member present in the building at the time, both before Plaintiff entered the restroom and after Plaintiff escaped from the restroom.

185. Plaintiff reported the incident to Plaintiff's supervisor, who then requested Mr. Yarhouse's supervisor to meet with her and Mr. Yarhouse. During the meeting, Mr. Yarhouse s openly stated that "[Plaintiff] cannot have an office in this building."

<u>New Charge of Discrimination</u>

186. While not identified in the Charge, given that this action was originally filed in July 2023, Plaintiff continues to suffer harassment, bullying, retaliation and hostile work environment conditions by Defendant's agents, including Ms. Kenya Peterson, and various security staff; and suffers further complications with her office setting, since instituting this action. Consequently, Plaintiff has filed another charge of discrimination with the EEOC, Agency Case No. 438-2024-01500, detailing the continued abuse and retaliation for engaging in EEO protected activity.

187. Plaintiff has been subjected to severe and pervasive conduct by multiple supervisors and co-workers of Plaintiff. She was retaliated against for engaging in EEO protected activity.

188. Defendant altered the terms and conditions of Plaintiff's employment in an unsuccessful attempt to constructively discharge Plaintiff. Plaintiff, a dedicated civil servant, has and continues to suffer significant injury as a result of the egregious conduct of Defendant and its agents.

## CAUSES OF ACTION

### COUNT I
### Discrimination in violation of Title VII of
### the Civil Rights Act of 1964, as amended, as to National Origin, Color, and Race
### (42 U.S.C. §§ 2000e, et *seq.*)

189. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set out here in full.

190. Plaintiff is Southeast Asian American.

191. Plaintiff is of Indonesian descent (national origin).

192. Plaintiff has a distinct accent.

193. Due to Plaintiff's race and ethnicity, Plaintiff has certain physical characteristics which include dark circles that surround Plaintiff's eyes and appear to be "black eyes" (e.g., as if Plaintiff had been punched in the face) at first glance.

194. Plaintiff is the only Program and Operations Manager or similarly situated employee of Defendant who is Southeast Asian American or of Indonesian descent.

195. During Plaintiff's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against her with respect to the terms and conditions of her employment based on the ethnic and physical characteristic of Plaintiff being an Asian-looking person of Indonesian descent (e.g., Southeast Asian appearance with non-English accent as opposed to Caucasians and other ethnicities without non-English-speaking accent.

196. Plaintiff was treated differently simply because she did not look or speak like the other managers, co-workers, and her supervisors.

197. Defendant's conduct through its agent, including, but not limited to, exclusion of Plaintiff from meetings, demeaning and defaming remarks against Plaintiff, imposition of unreasonable work restrictions that the Defendant's staff did not require other similar situated employees to do, targeted harassments, and public humiliation, constitutes unlawful discrimination based on Plaintiff's race, color,  and national origin.

198. As a result of such discrimination, Plaintiff suffered multiple adverse employment actions, including a demotion, loss of career advancement opportunities, and relocation to offices with unbearable working conditions.

199. The effect of these practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected her employment status.

200. These unlawful employment practices were intentional.

201. The unlawful employment practices were undertaken with malice or with reckless indifference to Plaintiff's federally protected rights.

202. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to her damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

203. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proven at trial.

204. In acting as alleged herein, Defendant, acting through its agents,  has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from

an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages from Defendant in amounts to be proved at trial.

205. As a result of Defendant's acts of discrimination as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit.

## COUNT II
### Hostile Work Environment in violation of Title VII of the Civil Rights Act of 1964, as amended, as to National Origin, Color, and Race (42 U.S.C. §§ 2000e, et *seq.*)

206. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set out here in full.

207. Defendant repeatedly subject Plaintiff to unwelcome harassment regarding the terms and conditions of her employment because of her national origin, color, and race.

208. Defendant, through its supervisory agents, and other employees, took the following actions, among others, to intentionally harass Plaintiff and create a hostile work environment based on her national origin, color, and/or race, incidents Defendant employees who were non-Southeast Asian Americans or those of Indonesian descent did not experience:

    a.  Plaintiff was berated and defamed by Mr. Mantey, Plaintiff's supervisor, when other similarly situated employees were not berated and defamed for enforcing Defendant's Code and regulations;

    b.  Ms. Bingham, Plaintiff's supervisor, used a racial epithet (Black Eyes Comment) when talking to Plaintiff during a conference call with another manager, which is extremely pejorative, controversial and much more than a simple insult, which was confirmed in an apology email by Ms. Bingham;

    c.  Ms. Bingham requiring that Plaintiff subject to Ms. Bingham and her team drafts of all customer letters and emails for prior review, and then failing to timely respond

to or approve Plaintiff's draft response for a permit in a floodplain;

d. Plaintiff was demoted from the position of Water Resources Program and Operations Manager, a role that had involved significant supervisory, programmatic, and administrative responsibilities, to a different division, effectively stripping Plaintiff of all supervisory and managerial duties associated with the Water Resources Division;

e. Plaintiff was relocated from a large office on the eighth floor of a high rise building to a trailer with a damaged ceiling in a floodplain, and subject to unbearable working conditions;

f. Plaintiff's inability to access critical software tools and a project site despite repeated attempts and requests for assistance;

g. Plaintiff receiving an unfair and inaccurate performance evaluation which intentionally omitted her accomplishments;

h. Mr. Harrison, Plaintiff's supervisor, ridiculing Plaintiff in front of her colleagues and contractors;

i. Mr. Harrison, Plaintiff's supervisor, preventing and interfering with Plaintiff's opportunity to transfer to a new locality within Defendant;

j. Mr. Harrison dissuading Plaintiff from engaging in EEO protected activity;

k. Ms. Bingham instructed Plaintiff not to create a paper trail in connection with the complaint for the Larus Court permit, which, while it may have harmed Defendant, would have reflected most poorly on Plaintiff, especially during an audit—which in fact Plaintiff had handled the permitting process correctly;

l. Ms. Bingham requiring Plaintiff to include Ms. Jackson in all CSO project meetings;

m.  Ms. Jackson undermining Plaintiff in front of her supervisor, Mr. Whitehurst;

n.  Ms. Jackson opening and aggressively, publicly humiliating Plaintiff, which was confirmed later through an apology after consequences had already occurred;

o.  Retaliation by Ms. Bingham, Mr. Matley and Mr. Battle based on complaints made against each of them;

p.  Ms. Brodie, an HR representative, requiring unnecessary training for Plaintiff for issues that were not a part of her job in an effort to undermine Plaintiff and lead others to believe that she had been further demoted from a salaried position to an hourly position;

q.  Mr. Whitehurst only applying the Extreme Weather Policy as to Plaintiff and not a similarly situated employee; and

r.  Mr. Yarhouse's substantial abuse and harassment of Plaintiff, including after Plaintiff reported Mr. Yarhouse to HR and his supervisors.

209. These actions were severe, pervasive, and continue unabated and without any accountability.

210. This hostile work environment was compounded by Defendant and its agents retaliating against Plaintiff for her engaging in EEO protected activity through internal complaints to her supervisors and EEO representative and filing the Charge.

211. Had Defendant been a private employer as opposed to local government, almost certainly these bad actors would have been held accountable and likely terminated or otherwise disciplined.

212. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and

emotional distress, all to her damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

213. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proven at trial.

214. In acting as alleged herein and aforementioned, the Defendant's actions constitute conscious, malicious, despicable, and oppressive disregard of Plaintiff 's rights  that are protected under Title VII.

215.    Defendants' violations of Title VII establish a cause of action, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs of suit to Plaintiff in the amounts to be proved at trial.

## COUNT III
### Retaliation in violation of Title VII of
### the Civil Rights Act of 1964, as amended, as to National Origin. Color, and Race
### (42 U.S.C. §§ 2000e, et *seq*.)

216. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set out here in full.

217. Plaintiff filed multiple internal complaints with Defendant, and spoke to various HR and EEO representatives of Defendant, including:

    a.   Complained to HR regarding Ms. Bingham's Black Eyes Comment;

    b.   Complained to HR and speaking with HR representative, Ms. Haskins, regarding Ms. Bingham's imposition of a discriminatory and retaliatory requirement regarding drafts of customer letters;

    c.   Meeting with EEO manager Ms. Henderson regarding Ms. Bingham's conduct and

Black Eyes Comment;

d. Contacting EEO assistant manager Mr. Keeley, given Ms. Henderson's refusal to respond to Plaintiff;

e. Reporting Mr. Battle's conduct to her supervisor; and

f. Reporting Mr. Yarhouse to HR and his supervisor.

218. Defendant retaliated against Plaintiff immediately after she complained to Defendant's HR and EEO Division by:

a. Demoting Plaintiff within weeks of her complaints to a lower-status, non-supervisory position;

b. Imposing unique restrictions on Plaintiff's email communications, while similarly situated colleagues were exempt;

c. Delaying or denying access to necessary project management tools, impeding her ability to perform job duties; and

d. Moving Plaintiff to unsafe office conditions in response to her discrimination complaints.

219. But for Plaintiff's complaints, Plaintiff would not have been demoted and subjected to continuous attempts to constructively discharge (forced resignation) Plaintiff.

220. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to her damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

221. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer, a loss of wages and salary,

bonuses, compensation, employment benefits, career path opportunities, and expenses, in an

amount to be proven at trial.

222. In acting as alleged herein and aforementioned, the Defendant's actions constitute

conscious, malicious, and reckless disregard of Plaintiff 's rights  that are protected under Title VII.

223.    Defendants' violations of Title VII establish a cause of action, for monetary relief

consisting of compensatory damages and punitive damages, attorney's fees and costs of suit to

Plaintiff in the amounts to be proved at trial.

**COUNT IV**
**Retaliation in violation of Title VII of**
**the Civil Rights Act of 1964, as amended, for Engaging in Protected Activity**
**(42 U.S.C. §§ 2000e, et *seq*.)**

224. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained

in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set

out here in full.

225. Plaintiff filed a formal Charge with the EEOC, the existence of which was disseminated to

all of her supervisors and multiple coworkers, including, but not limited to, Mr. Matley, Ms.

Bingham, Mr. Whitehurst, Mr. Harrison, Ms. Jackson, Ms. Henderson, Ms. Brodie, Mr. Yarhouse,

226. But for Plaintiff filing a Charge, Plaintiff would not have been demoted, relocated to a

trailer as an office, and subjected to continuous attempts to constructively discharge Plaintiff.

227. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered,

and will continue to suffer, generally physical, mental, and psychological damage in the form of

extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and

emotional distress, all to his damage, in amounts within the jurisdictional limits of this Court, to be

proved at trial.

228. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff

has been injured in that he has suffered, and will continue to suffer, a loss of wages and salary,

bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proven at trial.

229. In acting as alleged herein, Defendant has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages from Defendant in amounts to be proved at trial.

230. As a result of Defendant's acts of retaliation as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor and against Defendant on the above-stated counts, and that in addition this Court issue an Order granting the following:

A.      Enter judgment on her behalf against Defendant;

B.      Declare that Defendant violated Plaintiff's rights under Title VII, and restraining and enjoining Defendant from further violations;

C.      Enter a permanent injunction enjoining Defendant from the unlawful conduct complained of herein;

D.      Enter an Order that Defendant be required to promulgate an effective policy against such discrimination and to adhere thereto;

E.      Award Plaintiff compensatory damages, including, but not limited to, for emotional distress, mental anguish, and humiliation due to discrimination by Plaintiff due to Plaintiff's race, national origin, color and retaliation due to Plaintiff's protective activities.

F.      Award Plaintiff punitive damages due to, *inter alia*, Defendant's misconduct that

has caused Plaintiff to suffer a hostile working environment after her demotion,

humiliation, insults, and disrespect due to discrimination based on race, national

origin, color, and retaliation due to Plaintiff engaging in protected activities.

G.      Award Plaintiff compensatory and punitive damages in an amount to be proven at

trial, but no less than $300,000.00;

H.      Award Plaintiff her court costs, expenses, attorneys' fees, pre-judgment interest and

post-judgement interest, as applicable; and

I.      Grant such other relief as this Court may consider just and proper.

Date: February 11, 2025,                    Respectfully submitted,


                                            By: __/Robert Powers/_____
                                            Robert Powers, Esq. (VSB# 80822)
                                            Tyler M. Roth Esq. (VSB# 93740)
                                            MCCLANAHAN POWERS, PLLC
                                            3160 Fairview Park Drive, Suite 410
                                            Falls Church, VA 22042
                                            Telephone: (703) 520-1326
                                            Facsimile:  (703) 828-0205
                                            Email: rpowers@mcplegal.com
                                                   troth@mcplegal.com
                                                   mmurawiec@mcplegal.com
                                            *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2025, I electronically filed the foregoing document
with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record
and interested parties through this system, which will deliver a true and correct copy of the
foregoing document via CM/ECF.


Date: February 11, 2025,                    By: __/Robert Powers/_____
                                            Robert Powers, Esq.
                                            *Counsel for Plaintiff*