IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SURANI S. OLSEN,             )
      Plaintiff,         )
                      )
      v.               )          Civil Action No. 3:23CV475 (RCY)
                      )
CITY OF RICHMOND,       )
      Defendant.     )
                      )

## MEMORANDUM OPINION

       This is a Title VII employment discrimination action brought by Plaintiff Surani Olsen, wherein Plaintiff alleges that she has been subjected to discrimination at her place of employment, the City of Richmond ("the City"), based on her race and national origin. The case is before the Court on the City's Motion to Dismiss Plaintiff's First Amended Complaint (the "Motion," ECF No. 20). The Motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated below, the Court will grant in part and deny in part Defendant's Motion.

## I. BACKGROUND

### A. Factual Allegations

       Generally, when deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or a plaintiff's legal conclusions. *Id.* Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). Finally, at the motion to dismiss stage, a court

may consider the face of the complaint, documents attached to the complaint, documents attached to the motion to dismiss that are integral to the complaint and are authentic, and matters of public record subject to judicial notice. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

In the context of a Title VII case, the scope of a complaint is generally limited by the preceding Charge of Discrimination ("EEOC Charge") filed with the Equal Employment Opportunity Commission ("EEOC"), since "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). "If the claims raised under Title VII exceed the scope of the EEOC [C]harge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) (citation modified).

> For example, the plaintiff's claim generally will be barred if his charge alleges discrimination on one basis—such as race—and he introduces another basis in formal litigation—such as sex. A claim will also typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits. Similarly, we have held that the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct. By the same token, if the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred.

*Id.*

On the other hand, a plaintiff may properly pursue claims based on conduct that is "like or reasonably related to" conduct described in the EEOC Charge, even when it was not expressly described therein. *Stewart v. Iancu*, 912 F.3d 693, 706 (4th Cir. 2019); *see also Hill v. Western Electric Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982). And, in the Fourth Circuit, a plaintiff may

2

allege retaliation for filing the EEOC Charge itself without first bringing such a claim in a distinct EEOC Charge.  *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992).  Finally, if the EEOC Charge was filed by the plaintiff without legal representation, the Charge is afforded liberal construction.  *Chacko*, 429 F.3d at 509.

### 1.    Factual Allegations Reasonably Related to the EEOC Charge

Because the scope of the EEOC Charge limits those factual allegations in the Amended Complaint that are eligible for consideration, the Court begins its recitation of the facts with the portions of the Amended Complaint that are "like or reasonably related to" the complaints of the EEOC Charge.  *Stewart*, 912 F.3d at 706.

Plaintiff Surani Olsen is a Southeast Asian American woman from Indonesia.  Am. Compl. ¶ 5, ECF No. 18; Charge of Discrimination ("EEOC Charge") 3, ECF No. 21-4.[1]  As a result of Plaintiff's "race and ethnicity, Plaintiff has certain physical characteristics which include dark circles that surround Plaintiff's eyes and appear to be black eyes at first glance."  Am. Compl. ¶ 40.  As a result of her national origin, Plaintiff also speaks with a heavy accent.  *Id.* ¶ 5.

---

[1] Plaintiff did not include her EEOC Charge in her Amended Complaint.  Nevertheless, the Court considers it since the Amended Complaint expressly relied on the Charge, *see* Am. Compl. ¶ 5, and Plaintiff does not contest its authenticity, *see generally* Mem. Opp'n Mot. Dismiss; *Philips*, 572 F.3d at 180.

Moreover, the Court notes that Plaintiff has filed multiple EEOC Charges.  Plaintiff filed her first EEOC Charge on November 22, 2022, which she amended by way of a superseding EEOC Charge on March 27, 2023.  Am. Compl. ¶ 3.  In July of 2023, Plaintiff filed a second, separate EEOC Charge, which she categorizes as a "continuation of the allegations identified in the First Charge."  *Id.* ¶ 186; Plaintiff's Mot. Leave Supp. Pleadings 3, ECF No. 31.  This second Charge was not administratively exhausted until August 20, 2025, when Plaintiff received Notice of Right to Sue on the second Charge.  *See* ECF No. 31-1.  Plaintiff now seeks to supplement her First Amended Complaint to reflect the issuance of the Notice of Right to Sue on the second Charge.  *Id.* at 4. On September 12, 2025, the Court ordered Defendant to respond to Plaintiff's request.  ECF. No. 32.

Defendant argues generally in its Motion to Dismiss that because the second EEOC Charge was unperfected at the time the First Amended Complaint was filed, the allegations identified therein should not be considered in evaluating the sufficiency of her claims.  As this Memorandum Opinion will articulate, however, the allegations contained in the First Amended Complaint and the first EEOC Charge are sufficient to sustain all four of Plaintiff's claims at this juncture.  Further, the Court finds that the proposed supplements to Plaintiff's First Amended Complaint do not address nor cure Plaintiff's request for punitive damages against Defendant, which the Court will deny.  For the purposes of this Memorandum Opinion, therefore, the Court considers only the March 2023 Charge.

Plaintiff has been employed with the City since December of 2016.  *Id.* ¶ 12.  From December 8, 2020, through August 29, 2022, Plaintiff was employed as the City's "Program and Operations Manager."  *Id.* ¶ 13.  In that role, Plaintiff administrated various municipal permitting programs, and supervised multiple engineers and inspectors.  *Id.*

As the Program and Operations Manager, Plaintiff was supervised by Ms. April Bingham. *Id.* ¶ 35.  On March 18, 2022, Plaintiff received a phone call from Ms. Bingham and another manager, Mr. JC.  *Id.* ¶ 38.  Neither Ms. Bingham nor Mr. JC are of Southeast Asian descent.  *Id.* During the call, Ms. Bingham, Mr. JC, and Plaintiff discussed a particular permit.  *Id.* ¶ 39.  During their conversation, Ms. Bingham "used the phrase 'Black Eye.'"  *Id.*; EEOC Charge 2.  Plaintiff understood the phrase to be a pejorative reference to her physical appearance, particularly since Ms. Bingham was aware of the dark circles surrounding Plaintiff's eyes.  Am. Compl. ¶¶ 39, 41. Ms. Bingham did not use the phrase when speaking to any other, non-Southeast Asian employees. *Id.* ¶ 39.[2]

Soon thereafter, Plaintiff contacted the City's Human Resources representative, Ms. Brenda Henderson, to discuss the "Black Eye" comment by Ms. Bingham.  *Id.* ¶ 42.  Plaintiff met with Ms. Henderson.  *Id.*  Ms. Bingham later apologized in an email, though "Plaintiff felt that the apology did not adequately address the discriminatory nature of the remark."  *Id.* ¶ 43.

About three months later, on July 8, 2022, Plaintiff was working on a permit application for a particular project on Abbey Road.  *Id.* ¶ 44.  In conjunction with that project, Plaintiff sent multiple emails regarding the project.  *Id.*  Later that day, Ms. Bingham sent Plaintiff an email requesting that Plaintiff cease her communications regarding the project.  *Id.* ¶ 45.

---

[2] In April of 2023, the phrase was used again by one of the City's consultants during an online meeting.  Am. Compl. ¶ 41.

On July 13, 2022, another of Plaintiff's supervisors, Mr. Mantey, sent Plaintiff an email regarding a permit for a project on Yorktown Avenue. *Id.* ¶ 26. In that email, Mr. Mantey "falsely accuse[d] . . . [Plaintiff] of being 'vindictive' in her professional capacity regarding the Yorktown permit." *Id.* ¶ 26; EEOC Charge 1. This particular email was sent to several other City employees, "creat[ing] a public record that undermin[ed] [Plaintiff's] reputation" within the City, and "directly attacked Plaintiff's professional credibility and standing within the department." Am. Compl. ¶ 27. Other similarly situated employees were not subject to such comments. *Id.* ¶ 28. A member of Mr. Mantey's team then processed the permit as approved, under Plaintiff's name, without Plaintiff's consent. *Id.* ¶¶ 29–30; EEOC Charge 2. This "improper approval . . . placed Plaintiff in a precarious position where she could be held accountable by [federal and state agencies] for potential noncompliance." Am. Compl. ¶ 29. This unauthorized use of Plaintiff's name also created long-term career risks for Plaintiff, since "any future reviews or audits" would reflect that Plaintiff had approved the permit. *Id.* ¶ 32. This risk caused Plaintiff to experience emotional distress and mental anguish. *Id.*

On July 14, 2022, the day after Mr. Mantey's "vindictive" comment, Ms. Bingham emailed Plaintiff again, imposing another restriction upon Plaintiff's emails. *Id.* ¶ 47. This time, Ms. Bingham mandated that "Plaintiff submit drafts of all customer letters and emails to [Ms. Bingham] and her team for prior review before sending them to customers." *Id.*; EEOC Charge 1; Am. Compl. Ex. A, ECF No. 18-1. "This requirement was not applied to other Program and Operations Managers . . . who have similar duties as Plaintiff but . . . are [not] Southeast Asian Americans from Indonesia." Am. Compl. ¶ 48.

When Plaintiff asked why the review was necessary, Ms. Bingham stated that the restriction was partly based on Mr. Mantey's accusation that Plaintiff had behaved vindictively. *Id.* ¶ 49. The review process caused significant delays in Plaintiff's communication with

customers, which, in turn, caused customers to become frustrated with Plaintiff. *Id.* ¶ 50. Thus, Ms. Bingham's requirement that Plaintiff submit all emails to her subjected Plaintiff to unnecessary scrutiny and negative working conditions "that her colleagues, other Program and Operations Managers, did not face." *Id.* ¶ 51.[3]

On approximately July 14, 2022, Plaintiff filed a complaint with another of the City's HR Representatives, Ms. Shiron Haskins, about Ms. Bingham's requirement that Plaintiff submit all emails for approval. *Id.* ¶ 54. Ms. Haskins directed Plaintiff to Ms. Henderson, but, while in the company of Plaintiff, asked Ms. Bingham about the email restriction. *See id.* ¶¶ 56–57. In response to Ms. Haskins' inquiry, "Ms. Bingham publicly and ironically reiterated the baseless accusation that Plaintiff was 'vindictive,' further humiliating Plaintiff in front of Ms. Haskins [as well as another employee.]" *Id.* ¶ 57.

The next day, on July 15, 2022, Plaintiff met again with Ms. Henderson. *Id.* ¶ 58. During the meeting, Plaintiff and Ms. Henderson discussed "Ms. Bingham's discriminatory conduct, including, but not limited to, the Black Eye Comment made by Ms. Bingham." *Id.* ¶ 59. During this meeting, Plaintiff also expressed an intention to file both a formal, internal complaint against Ms. Bingham as well as a formal EEOC charge. *See id.* ¶¶ 59–63. Plaintiff filed an internal complaint against Ms. Bingham; however, despite asking for updates regarding the internal complaint in November and December, Plaintiff never heard back from Ms. Henderson. *See id.* ¶¶ 63–67; Am. Compl. Ex. B, ECF No. 18-3.

On August 25, 2022, Defendant was told by another City employee, Mr. Eric Whitehurst, that she was being demoted. Am. Compl. ¶¶ 70–71; *see* EEOC Charge 1. While conveying the information to Plaintiff, Mr. Whitehurst "laugh[ed] and exhibit[ed] a sardonic smile." *Id.* Mr.

---

[3] Later, on June 5, 2023, Ms. Bingham implemented a similar restriction upon Plaintiff when she instructed her not to respond in a particular email chain regarding a revoked permit. Am. Compl. ¶ 121–22.

Whitehurst informed Plaintiff that the decision had been made by City Directors, including Ms. Bingham and Mr. Mantey.  Am. Compl. ¶ 72.  As a result of the demotion, Plaintiff was stripped of all supervisory and managerial duties, and placed in a position for which she had no experience. *Id.* ¶¶ 73, 76, 82.  The City then filled Plaintiff's previous role with three individuals who, unlike Plaintiff, lacked the necessary certificates to perform the work.  *Id.* ¶ 80.  And, unlike Plaintiff, these individuals were neither Southeast Asian nor from Indonesia.  *Id.*  Finally, as a result of her demoted role, Plaintiff was assigned to work under Mr. Harrison, a manager with whom Plaintiff had experienced multiple disagreements.  *Id.* ¶ 82.  Plaintiff alleges that, prior to her demotion, she performed all her duties satisfactorily.  *Id.* ¶ 81.

As a result of her demotion, Plaintiff was moved from "the eighth floor of a high rise building" to "a much smaller office (around half the size of Plaintiff's former office) at the Administrative Building of the Wastewater Treatment Plant."  *Id.* ¶ 86.  Plaintiff's new office "did not have a working HVAC system so there was no [air conditioning] in the summer, resulting in internal room temperatures in excess of 80 degrees . . . and no heat in the winter, resulting in internal room temperatures around 60 degrees."  *Id.* ¶ 87.  Plaintiff's new office was located in a "floodway with a high risk of annual flooding" and was covered in mold.  *Id.* ¶ 89.  And, due to the proximity to wastewater, the office was filled with the smell of "awful sewage or rotten egg."[4] *Id.* ¶ 88.  Later, Plaintiff became aware of a laboratory report showing that the ceiling tiles and basement tunnels of the new office contained asbestos.  *Id.* ¶ 92.  After multiple complaints, Plaintiff was moved to a maintenance trailer outside the Wastewater Treatment Plant.  *Id.* ¶ 94.

According to Plaintiff, however, the trailer was hardly an improvement.  The trailer "had a damaged ceiling," "was poorly constructed," and proximate to ongoing construction activity.  *Id.*

---

[4] On at least one occasion, a particular smell of rotten egg gas "spew[ed] out" of Plaintiff's radiator, causing other employees outside the office to notice the smell.  Am. Compl. ¶ 90.

¶ 145. "[W]henever nearby construction activities occurred," the office would shake, causing debris to fall from the ceiling into Plaintiff's office. *Id.* This regular disruption was hazardous to Plaintiff's physical health and made it difficult for Plaintiff to concentrate. *Id.* ¶ 146. The shaking "also damaged the building's foundation tiles, which exacerbated the unsafe and unstable environment." *Id.* ¶ 146. Moreover, like the office inside the Plant, the trailer office lacked heating and cooling. *Id.* ¶ 147. Finally, the bathroom inside the trailer was regularly broken, and would go uncleaned for months, despite regular visits from cleaning staff. *Id.* ¶ 148. For the first four months of her placement in the trailer, Plaintiff was "denied access to a key to the front door . . . and for nearly a year, was not given the proper office identification and name tag." *Id.* ¶ 150. As a result of "[t]his denial of access to [a] key . . . Plaintiff was often locked out of her trailer." *Id.* ¶ 152. And, as a result of the lack of name tag, Plaintiff grew concerned that "other staff [would] believe that Plaintiff had been further demoted to an hourly staff member, further undermining Plaintiff." *Id.* ¶ 153.[5]

Finally, both the Amended Complaint and the EEOC Charge complain about Plaintiff's interim performance evaluation. Am. Compl. ¶ 107; EEOC Charge 2. On February 23, 2023, Plaintiff received her interim performance evaluation from her new supervisor, Mr. Harrison. Am. Compl. ¶ 107. This evaluation purported to include all of Plaintiff's accomplishments from July 1, 2022, to August 31, 2022; however, the review did not include any of Plaintiff's accomplishments from her previous position. *Id.* Plaintiff asked that Mr. Harrison amend the evaluation to reflect her previous work, but Mr. Henderson refused. *Id.* Plaintiff alleges that the City "intentionally omitted Plaintiff's accomplishments" and therefore "failed to provide Plaintiff a fair and accurate performance review." *Id.* ¶ 109. This inaccurate review injured Plaintiff's

---

[5] Plaintiff also alleges that, after her demotion, she was denied access to a project management software "critical for accessing contract data and project-related information" and performing the work associated with her demoted position. Am. Compl. ¶¶ 95–100. She was finally granted access in July of 2023. *Id.* ¶ 100.

future opportunities for advancement, raises, and continued employment. *Id.* Plaintiff asserts that "[t]he failure to accurately document and evaluate Plaintiff's performance . . . undermined Plaintiff's professional reputation and opportunities for growth . . . especially when contrasted with the treatment of other managers who do not share Plaintiff's racial or national origin background." *Id.* ¶ 110.

    2.   <u>Factual Allegations Unique to the Amended Complaint</u>

        *a.*    *Allegations Not "Like or Related to" EEOC Charge*

Beyond those allegations that reasonably relate to the EEOC Charge, the Amended Complaint alleges multiple instances of discrimination. Plaintiff asserts that, from the outset of her employment with the City, she experienced pay discrimination based on her sex. *Id.* ¶¶ 16–23. The EEOC Charge does not involve any sex-based discrimination. *See generally* EEOC Charge.

The Amended Complaint also alleges that, immediately after Plaintiff began her tenure as Program Operations Manager, she experienced difficulty with her work laptop. Am. Compl. ¶ 24. When Plaintiff contacted IT about the issue, IT personnel remotely connected to the laptop in an effort to diagnose and fix the problem. *Id.* The remote connection, however, allegedly caused Plaintiff's laptop to crash. *Id.* Thus, "Plaintiff believes that the IT staff member caused the computer to crash and lose [her] files, because she was Southeast Asian American with a substantial accent." *Id.* The EEOC Charge does not mention any IT staff nor any discrimination related to Plaintiff's work laptop. *See generally* EEOC Charge.

Because these allegations are not "like or related to" those included in the EEOC Charge, Plaintiff may not rely on them for purposes of the instant action. *See Stewart*, 912 F.3d at 706.

###### b.     Alleged Retaliation for Pursuing EEOC Charge

Plaintiff first filed a formal EEOC Charge against the City on November 22, 2022.  Am. Compl. ¶ 3.  Then, on March 27, 2023, Plaintiff filed the amended EEOC Charge that underlies the instant action.  *Id.*; EEOC Charge 1.  Plaintiff advances a number of allegations that do not directly relate to the events described in the amended EEOC Charge, but rather amount to allegations of retaliation for the filing of the EEOC Charges themselves.  The Fourth Circuit has held that such allegations are not subject to the general administrative exhaustion requirements. *Nealon*, 958 F.2d at 590.  Thus, the Court will consider the following in relation to Plaintiff's claim of retaliation for filing the EEOC Charges.[6]

###### i.     Mr. Whitehurst & access to the McCloy Pump Station

Around one month after the filing of her first EEOC Charge, *see id.* ¶ 11, in January of 2023, Plaintiff began to serve as a project manager at McCloy Pump Station.  *Id.* ¶ 101.  However, Mr. Whitehurst—the same supervisor who smiled "sardonic[ally]" while informing Plaintiff of her demotion, *id.* ¶ 71—failed to approve Plaintiff's request to access the Station for nearly two months and did not provide her a physical access card until May of 2024.  *Id.* ¶¶ 102, 105.  This forced Plaintiff to rely on assistance from her colleagues, consultants, and contractors in order to access the site.  *Id.* ¶ 104.  When other, non-Southeast Asian American contractors and consultants required access to the Station, Mr. Whitehurst immediately provided them access.  *Id.* ¶ 103.

---

[6] The Court finds, however, that each of the following allegations are not otherwise "like or reasonably related to" the allegations of the EEOC Charge since each amount to a discrete instance of purported discrimination.  In other words, none involve the same type of conduct about which Plaintiff complains in the EEOC Charge.  *See Walton v. Harker*, 33 F.4th 165, 173 (4th Cir. 2022) (finding that allegations did not relate to those of the EEOC charge where they involved distinct facts, such that the charge could not have put the employer on notice as to the basis for the complaint); *Chacko*, 429 F.3d at 509 ("the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern or misconduct").  Thus, aside from her claim of retaliation for filing the EEOC Charges themselves, Plaintiff may not rely on any of the following to support her dispute with the City.

Plaintiff asserts that Mr. Whitehurst was aware of Plaintiff's EEOC Charge, and she implies that he meant to retaliate against her. *Id.* ¶ 225.

Plaintiff experienced difficulty entering the Station even after receiving the proper access authority. On one undated occasion, Plaintiff alleges that an armed security guard "delayed[] and intimidated Plaintiff" when she attempted to access the building. *Id.* ¶ 106. Plaintiff asserts that this intimidation created an environment of fear and was intended as retaliation for her EEOC filing. *Id.*

   ii. <u>Mr. Harrison & Plaintiff's other job applications</u>

Another of Plaintiff's supervisors was Mr. Harrison. *Id.* ¶ 114. In March of 2023, Plaintiff experienced a humiliating encounter with Mr. Harrison when, in front of "multiple contractors and consultants," Mr. Harrison instructed Plaintiff: "Don't wipe your butt . . . before you sh\*\*!" *Id.* ¶ 115. This comment was seemingly related to Plaintiff's active EEOC Charge and intent to pursue legal action, about which Mr. Harrison was aware. *Id.* ¶ 117. Mr. Harrison had also previously told Plaintiff that he did not believe she would win in a lawsuit against the City. *Id.* ¶ 118.

The same month, Plaintiff applied for two open job positions with the City in other localities. *Id.* ¶ 111. The interviewer for one of these positions advised Plaintiff that he would contact Mr. Harrison to discuss her application. *See id.* ¶ 113. Mr. Harrison, however, later revealed that he was close friends with one of the interviewers for the position. *Id.* ¶ 114. "After several weeks, Plaintiff was not selected for either position in either locality." *Id.* ¶ 112.

   iii. <u>Ms. Jackson's required involvement</u>

On May 15, 2023, Ms. Bingham instructed Plaintiff to include Ms. Barbara Jackson in all meetings related to Combined Sewer Overflow. *Id.* ¶ 128. "Plaintiff felt that this change in protocol was implemented in retaliation for Plaintiff's prior protected activities and had the effect of diminishing Plaintiff's authority and professional standing within the department." *Id.*

As Ms. Jackson became more involved with Plaintiff's work, Plaintiff felt that Ms. Jackson undermined Plaintiff's professional standing on at least three occasions. First, on an unspecified date in June of 2023, Ms. Jackson and Mr. Whitehurst instructed Plaintiff to cancel one of her "critical infrastructure project[s]," which "directly undermined her authority and role within [the City]." *Id.* ¶¶ 134–35. Then, on an unspecified date in July of 2023, Plaintiff overheard Ms. Jackson loudly dismissing Plaintiff's concerns about two of her projects. *Id.* ¶ 134. Finally, on August 10, 2023, Ms. Jackson berated Plaintiff that she was "the decision-maker" in relation to a "critical switchgear project." *Id.* ¶ 136. Plaintiff alleges that this conduct "was demeaning, public, and intended to diminish Plaintiff's authority." *Id.*

### iv.    *Ms. Brodie's conduct*

Plaintiff also asserts that Ms. Brodie, an HR employee for the City who was aware of Plaintiff's EEOC Charges, retaliated against Plaintiff on two occasions. *Id.* ¶ 155. First, during a meeting on June 27, 2023, Ms. Brodie "twice interrupted" another staff member who was answering a question from Plaintiff. *Id.* ¶ 156. Second, on an unspecified date in August of 2023, Ms. Brodie informed Plaintiff that her attendance was required at a training session for hourly employees. *Id.* ¶ 158. Plaintiff contends that this "training requirement . . . had the potential to damage her professional reputation by suggesting to other staff that she was being relegated to a lower status, non-managerial role." *Id.* ¶ 160.

### v.    *Mr. Yarhouse's conduct*

When Plaintiff was relocated to the maintenance trailer, she was placed in an office neighboring her coworker, Mr. Douglas Yarhouse. *Id.* ¶ 168. Starting in July of 2023, Mr. Yarhouse engaged in a pattern of "abus[ive]" and disruptive conduct against Plaintiff. *Id.* ¶ 169. "Nearly every day" that month, Mr. Yarhouse "forcefully pushed his desk against the shared wall

between his office and Plaintiff's . . . creating loud, sudden noises that startled Plaintiff." *Id.* ¶ 170.

On an unspecified date in July of 2023, Plaintiff asked Mr. Yarhouse a question about a particular project. *Id.* ¶ 171. Mr. Yarhouse then positioned himself behind Plaintiff's open office door and stated: "What . . . would you do, what would I get?" Plaintiff understood Mr. Yarhouse's response "as an implied *quid pro quo* demand, which caused Plaintiff to feel intimidated and deterred Plaintiff from seeking further assistance from Mr. Yarhouse." *Id.* ¶ 171.

Then, on three separate occasions in July, each after Plaintiff had returned from the women's restroom, Mr. Yarhouse made "loud and offensive comments . . . deliberately timed to be audible to Plaintiff." *Id.* ¶¶ 173–74. These comments included sentiments such as: "no time to go taking a dump," and "I am wet." *Id.*

On July 17, 2023, six days after Mr. Yarhouse made his first inappropriate comment regarding Plaintiff's trips to the bathroom, Mr. Yarhouse physically blocked the women's restroom door with a heavy printer table and large box. *Id.* ¶ 172.

On an unspecified date thereafter, Plaintiff submitted a formal complaint against Mr. Yarhouse. *Id.* ¶ 175. Plaintiff alleges that Mr. Yarhouse took a number of retaliatory actions against her for the formal complaint, including: (1) telling a cleaning staff member that he would like to "tape Plaintiff's mouth shut" while "standing near Plaintiff's open office door, ensuring that Plaintiff could hear him," *id.* ¶ 176; (2) installing a lockbox around the temperature control panel of the maintenance trailer, and deliberately setting the temperature in Plaintiff's office to extreme levels, ranging from 59 degrees to 86 degrees Fahrenheit, *id.* ¶ 179; and (3) physically trapping Plaintiff in the women's restroom by placing a heavy box against the door, *id.* ¶ 182. Following these incidents, Plaintiff reported Mr. Yarhouse's conduct to her supervisor, who

requested a meeting with both Plaintiff and Mr. Yarhouse. *Id.* ¶ 185. "During the meeting, Mr. Yarhouse openly stated that 'Plaintiff cannot have an office in this building.'" *Id.*

      *vi.*    <u>Mr. Whitehurst & Extreme Weather Conditions Policy</u>

Most of Plaintiff's retaliatory allegations took place in the summer months of 2023, with the latest occurring in August of 2023. *See, e.g.*, Am. Compl. ¶¶ 121–22, 128, 131, 156, 162, 170. However, Plaintiff advances one final instance of retaliation in February of 2024. *Id.* ¶ 162.

In February of 2024, the area surrounding Plaintiff's office experienced extreme weather conditions, such that some employees were permitted to leave early and arrive late. *Id.* ¶ 164. Those employees included another female Program and Operations Manager. *Id.* ¶ 163. Plaintiff, however, was informed that, as a Program and Operations Manager herself, she was considered an "essential" employee and was not permitted to leave early or arrive late. *Id.* ¶ 162.

## B. Relevant Procedural History

Plaintiff filed her initial Complaint in this matter on July 26, 2023. Compl., ECF No. 1. On September 20, 2023, Plaintiff moved to stay all proceedings so she could pursue additional proceedings with the EEOC. Mot. Stay, ECF No. 4. The Court granted the Motion on November 13, 2023. Order, ECF No. 7; Order, ECF No. 10. On November 8, 2024, Plaintiff moved to reopen the case, Mot. Reopen, ECF No. 11, which the Court granted on November 14, 2024, Order, ECF No. 12. On February 11, 2025, Plaintiff filed her Amended Complaint. Am. Compl., ECF No. 18. On February 25, 2025, the City filed the instant Motion to Dismiss. Mot. Dismiss, ECF No. 20; Mem. Supp. Def.'s Mot. Dismiss Pursuant to R. 12(b)(6) ("Mem. Supp. Mot. Dismiss"), ECF No. 21. On March 10, 2025, Plaintiff filed her Memorandum in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("Mem. Opp'n Mot. Dismiss"), ECF No. 22. The City filed its Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss ("Reply"), ECF No. 24, on March 13, 2025.

## II. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted); *see also Martin*, 980 F.2d at 952.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

15

### III. ANALYSIS

Plaintiff advances four Title VII claims against the City: one count of discrimination, Am. Compl. ¶¶ 189–205; one count of hostile work environment, *id.* ¶¶ 206–21; and two counts of retaliation, *id.* ¶¶ 216–30.   In the instant Motion, the City argues that Plaintiff does not adequately allege any of her claims.  Mem. Supp. Mot. Dismiss 8–18, ECF No. 19.  The City also contends that Plaintiff is barred from seeking punitive damages.  *Id.* at 19.  For her part, Plaintiff contends that each claim is adequately alleged in the Amended Complaint.  *See generally* Mem. Opp'n Mot. Dismiss, ECF No. 22.   In the alternative, she argues that she should be granted leave to further amend the Complaint.  *Id.* at 29.

The Court agrees with Plaintiff that she has plausibly alleged each of her claims for relief. As such, the Court will deny the City's Motion to Dismiss as to Plaintiff's substantive claims.  The Court agrees with the City, however, that Plaintiff is precluded from seeking punitive damages against it.  As such the Court will grant the City's Motion to Dismiss as to Plaintiff's punitive damages claim.

### A.    Count One: Discrimination Based on National Origin, Color, and Race[7]

Count One of Plaintiff's Amended Complaint advances a discrimination claim against the City.  The City argues that Count One should be dismissed because Plaintiff has not plausibly alleged any adverse action motivated by unlawful discrimination.  Mem. Supp. Mot. Dismiss 8–12.  Specifically, the City argues that, as a factual matter, some of the conduct about which Plaintiff complains was not motivated by discrimination.  *Id.* at 10.  In support, the City attempts to develop

---

[7] The Court notes that, while Plaintiff alleges discrimination based on national origin, color, and race, "[t]hese categories—known as 'protected characteristics' or 'protected classes'—are not mutually exclusive.  In particular, claims based on race and national origin may substantially overlap or even be indistinguishable depending on the specific facts of a case."  *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016).  Thus, the Court analyzes Plaintiff's claim without regard as to whether any purported discrimination was based on Plaintiff's race, color, ethnicity, or all three.

the factual record by introducing additional email conversations outside of the Amended Complaint. *See id.* (citing Mem. Supp. Mot. Dismiss Ex A, ECF No. 21-1; Mem. Supp. Mot. Dismiss Ex. B, ECF No. 21-2).  The City also argues that Plaintiff did not experience any adverse employment action. *Id.* at 11.

In response, Plaintiff asserts that, under settled Fourth Circuit law, reassignments such as that experienced by Plaintiff are considered adverse employment actions.  Mem. Opp'n Mot. Dismiss 6 (citing *Hoyle v. Freightliner*, 650 F.3d 321, 337 (4th Cir. 2011)).  Plaintiff further argues that, by demonstrating that she was treated differently than similarly situated employees, she has plausibly alleged discriminatory animus.  Mem. Opp'n Mot. Dismiss 10–11.

The Court largely agrees with Plaintiff and finds that the Amended Complaint adequately alleges a claim of racial discrimination against the City.  As such, the Court will deny the City's Motion to Dismiss as to Count One.

Title VII provides:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

In order to establish a *prima facie* case of unlawful discrimination under Title VII, an employee must show that:

> (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination, including because the employer . . . replaced the plaintiff with someone outside the protected class.

*Sempowich v. Tacial Sys. Tech.*, 19 F.4th 643, 649–650 (4th Cir. 2021).

Plaintiff's Amended Complaint readily satisfies the first two elements.  By pleading that she has been discriminated against based on her race, color, and national origin, she has claimed

discrimination based on her membership in a protected class. *See* 42 U.S.C. § 2000e-2(a); *supra* n.7. As to the second element, Plaintiff alleged that she performed all her job duties satisfactorily. Am. Compl. ¶ 81. Thus, the Court need only determine the third and fourth elements: whether Plaintiff has adequately alleged an adverse action within the meaning of Title VII, and whether the adverse action took place under circumstances giving rise to an inference of unlawful discrimination. *Sempowich*, 19 F.4th at 649–650.

The Court finds that the City's demotion of Plaintiff, alongside the attending consequences, constitute an adverse employment action, thus satisfying the third element of the discrimination analysis.

An adverse employment action is one that adversely affects "the terms, conditions, or benefits of the plaintiff's employment." *Grimes v. Dep't of Def.*, 2025 WL 1334054, at *3 (E.D. Va. May 7, 2025). Critically, such adverse action need not be "material" or "substantial"; rather, a plaintiff satisfies this element whenever she can demonstrate that the relevant action left her "worse off." *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, 358–59 (2024) (overturning previous requirement that Title VII plaintiffs demonstrate "significant employment disadvantage") ("[Title VII] flatly prevents injury to individuals based on protected status, without distinguishing between significant and less significant harms") (citation modified). Nevertheless, a plaintiff's claim of discrimination cannot be sustained on claims of "mere inconvenience, annoyance, disappointment, or change," without a resulting effect on a plaintiff's employment conditions. *Grimes*, 2025 WL 1334054, at *3 (finding that "negative feedback, ignored complaints, reprimands, requests to cover shifts, denial of telework, and lack of performance evaluations" do not constitute adverse employment actions); *see also Couch v. City of Va. Beach*, 2025 WL 672733, at *7 (E.D. Va. Mar. 3, 2025) (finding "changed job duties, work criticism, missed meetings, unprofessional

behavior, rude comments from a supervisor, and the like, fall far short of constituting adverse employment actions.").

Plaintiff argues that her Amended Complaint involves a litany of adverse employment actions, including: (1) her demotion; (2) Ms. Brodie forcing Plaintiff to attend a payroll training session for hourly employees; (3) Mr. Mantey's vindictive comment; (4) Mr. Mantey's team's approval of a permit using Plaintiff's name; (5) Mr. Harrison's refusal to consider Plaintiff's pre-demotion accomplishments in her interim performance evaluation; and (6) Ms. Bingham's restrictions on Plaintiff's communication with customers.  Mem. Opp'n Mot. Dismiss 7–10.[8] While none such occurrences are desirable, only Plaintiff's demotion actually resulted in a "disadvantageous change" to the terms and conditions of Plaintiff's employment, since it resulted in, *inter alia*, different responsibilities, less supervisory responsibilities, and required Plaintiff to relocate to the Wastewater Treatment Plant.[9]  Am. Compl. ¶¶ 73, 76, 85–86, 139; *see Muldrow*, 601 U.S. at 356 (holding that job site reassignment to an undesirable location may constitute adverse employment action).  The remainder of the listed actions amount to the kind of "snubs" that, absent an actual effect on employment conditions, cannot constitute an adverse employment action.  *E.g.*, *Grimes*, 2025 WL 1334054, at *3.  Nevertheless, because Plaintiff's demotion does

---

[8] Plaintiff also lists a number of purportedly adverse actions that the Court has determined it cannot consider beyond Plaintiff's retaliation claims.  *Compare supra* Part I.A.2.b *with* Mem. Opp'n Mot. Dismiss 9–10.  Thus, these allegations cannot support a finding of adverse employment action.

Moreover, in her briefing on the instant Motion, Plaintiff alleges for the first time that Mr. Harrison removed Plaintiff from regular manager meetings.  Mem. Opp'n Mot. Dismiss 10.  In support, she cites Amended Complaint ¶ 197, which states, without more, that the City "exclude[d] Plaintiff from meetings."  This allegation could not possibly give notice to the City that Plaintiff intended to specifically claim that Mr. Harrison removed Plaintiff from manager meetings.  *Bell Atl. Corp.*, 550 U.S. at 55.  As such, the Court will not consider this assertion in conjunction with her discrimination claim.

[9] The City insists that Plaintiff's purported demotion was only a "lateral move," and therefore cannot amount to an adverse employment action.  Mem. Supp. Mot. Dismiss 11.  However, taking the Amended Complaint as true, *e.g.*, *Ashcroft*, 556 U.S. at 678, Plaintiff's departmental transfer—whether or not characterized as a "demotion"—certainly left Plaintiff "worse off."  *Muldrow*, 601 U.S. at 356.  As such, it amounts to an adverse employment action.

constitute an adverse action, the Court finds that Plaintiff has adequately alleged the third element of her discrimination claim.

The fourth and final element of a discrimination claim is whether "the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Sempowich*, 19 F.4th at 649–50.  The Court finds that the allegations of the Amended Complaint adequately support such an inference.

Title VII plaintiffs often seek to establish such an inference at the pleading stage via "comparator evidence," *i.e.*, allegations that the plaintiff was treated differently than similarly situated individuals outside of the protected class.  *E.g.*, *id.*  Alternatively, a plaintiff may satisfy this element by making other allegations that would support an inference of discriminatory animus, such as allegations that the adverse action did not make good business sense, or evidence that the action was related to instances of overt racial discrimination.  *E.g.*, *id.*; *Seltzer v. Dresdner Kleinwort Wasserstein*, 356 F. Supp. 2d 288, 295 (S.D.N.Y. 2005).

Here, the City argues that, as a factual matter, the demotion was not motivated by discriminatory animus.  Mem. Opp'n Mot. Dismiss 10–11.  In support, it provides external evidence, which it claims demonstrates that Plaintiff's demotion was a necessary result of departmental restructuring.  *Id.*  The Court finds the City's argument unavailing for two reasons. First, as a general matter, when presented with a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)—such as the instant Motion—the Court is restrained to those allegations advanced in the face of the Complaint, documents attached thereto, documents attached to the motion to dismiss that are integral to the complaint and are authentic, and matters of public record subject to judicial notice.  *Philips*, 572 F.3d at 180.  Thus, given the procedural posture of this matter, the City's factual argument is premature and inappropriate.  Second, the Court finds that

the allegations of the Amended Complaint do, in fact, support an inference that Plaintiff was demoted due to her race, color, and/or national origin.

In explaining this conclusion, the Court first reminds the parties of the relevant allegations here. On March 18, 2022, while Plaintiff was on a phone call with her supervisor, Ms. Bingham, and another employee, Mr. JC, Ms. Bingham used the phrase "Black Eye." Am. Compl. ¶ 39. "Ms. Bingham was aware that, due to Plaintiff's race and ethnicity, Plaintiff has certain physical characteristics which include dark circles around Plaintiff's eyes and appear to be black eyes at first glance." *Id.* ¶ 40. Thus, Plaintiff considered the comment to be "a pejorative reference to Plaintiff's ethnic appearance, and took great offense to it." *Id.* ¶ 41.

Later that year, on August 25, 2022, Plaintiff learned that she was being demoted, a decision that was made in part by Ms. Bingham. *Id.* ¶ 72. Plaintiff's demotion resulted in significant detriment to Plaintiff: she was relocated from a high-rise building to an office in the Wastewater Treatment Plant, which frequently fills with the smell of sewage and rotten eggs. *Id.* ¶ 88. To make it worse, the building lacked HVAC, resulting in uncomfortably warm and cold conditions. *Id.* ¶ 87. Moreover, the office was located in a floodway, which resulted in mold along the walls and ceilings. *Id.* ¶ 89. And, finally, the building was believed to contain asbestos. *Id.* ¶ 92. While Plaintiff is eventually relocated again, she was relocated to a maintenance trailer, which also lacked an HVAC system, was nearby disruptive construction, and was equipped with defective plumbing. *Id.* ¶¶ 139–149.

The Court struggles to make sense of Plaintiff's demotion. Plaintiff was transferred from a position for which she was well-qualified to a position for which she wholly lacked experience. *Id.* ¶¶ 81–82. The City then redundantly filled Plaintiff's original position with three individuals, none of whom, unlike Plaintiff, held the requisite certifications. *Id.* ¶ 81. None of these three individuals shared Plaintiff's racial or national identity. *Id.* ¶ 80.

To top it off, Plaintiff's demotion also had an overtone of personal malice given the derogatory connotations of working in a sewage treatment plant, as well as the fact that, in her new role, Plaintiff would be supervised by Mr. Harrison, with whom Plaintiff had previously had personal disagreements. *Id.* ¶ 82.

Taken together, these allegations support an inference of discriminatory animus. First, the demotion decision was partly made by Ms. Bingham, who had previously made a racially-charged comment to Plaintiff. While almost six months lapsed between Ms. Bingham's comment and the demotion itself, the inference of racial discrimination is significantly strengthened by the particular facts of the transfer: Plaintiff was illogically transferred to a department where she wholly lacked any experience, and, oddly, replaced three times over by individuals outside her protected class without the requisite experience. Finally, the fact that Plaintiff was transferred to such an obviously undesirable location such as a Wastewater Treatment Plant, accompanied by the fact that she was assigned to a supervisor with whom she had experienced multiple personal disagreements, create an inference that the specifics of the demotion were chosen out of malice. Thus, the Court finds that the Amended Complaint adequately alleges that the demotion was motivated by discriminatory animus, satisfying the final element of her discrimination claim.

The Amended Complaint adequately alleges each element required to sustain Plaintiff's claim of discrimination, and the Court will deny the City's Motion as to Count One.

## B.    Count Two: Hostile Work Environment

Count Two alleges a claim of hostile work environment against the City. As to this claim, the City argues that it too fails because the Amended Complaint does not adequately allege severe and pervasive unwelcome harassment, as is required to support a claim of a hostile work environment. Mem. Supp. Mot. Dismiss 12. In response, Plaintiff argues that the Amended

Complaint involves numerous allegations of unwelcome harassment, the combined effect of which created an abusive work environment.  Mem. Opp'n Mot. Dismiss 11–21.

The Court finds that the alleged circumstances resulting from the City's demotion of Plaintiff, if so proven, amount to an actionable hostile work environment.  As such, the Court will deny the City's Motion to Dismiss as to Count Two.

An employer violates Title VII "when it subjects an employee to a hostile work environment" with discriminatory motivation.  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022).  To survive dismissal, Plaintiff must plausibly allege that she was subjected to (1) unwelcome conduct, (2) because of her membership in a protected class, (3) that was severe or pervasive enough to make her work environment hostile or abusive, and (4) that is imputable to the City.  *Id.*

Plaintiff's demotion and attending circumstances readily satisfy the first three elements.[10] First, Plaintiff's demotion, relocation to the Wastewater Treatment Plant, and assignment to a supervisor with whom she had personal disagreements was certainly "unwelcome conduct" on the

---

[10] Plaintiff argues that a number of allegations in the Amended Complaint constitute unwelcome conduct supporting her claim of a hostile work environment.  Mem. Opp'n Mot. Dismiss 12–15.  Again, however, many of these allegations cannot support her legal theory.  First, many of these allegations fall beyond the scope of the EEOC Charge and therefore cannot be considered outside of Plaintiff's retaliation claims.  *Id.* at 14–15.  Moreover, aside from Plaintiff's demotion and Ms. Bingham's "Black Eye" comment, none of the additional allegations advanced by Plaintiff are accompanied by a non-speculative basis to believe that such action was motivated by racial animus.

For instance, Plaintiff points to Mr. Mantey's "vindictive" comment as well as Ms. Bingham's requirement that Plaintiff approve all customer communication with her before dissemination.  Mem. Opp'n Mot. Dismiss 13–14.  The Amended Complaint alleges that both of these incidents were only experienced by Plaintiff, and that no other similarly situated employees experienced similar instances.  Am. Compl. ¶¶ 28, 48.  Both comparisons, however, are merely conclusory, *see id.*, which is insufficient to establish that the harassment was *based on* Plaintiff's protected class.  *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 409 (4th Cir. 2022) ("We may infer that harassment is based on race when the plaintiff has suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race.  But a plaintiff cannot rely on her own 'conjecture' to impute a racial character to what appears to be neutral harassment.")  Here, Plaintiff's allegations certainly support an inference that she, Ms. Bingham, and Mr. Mantey "did not see eye-to-eye."  *Hawkins v. PepsiCo, Inc.*, 2023 F.3d 274, 281 (4th Cir. 2000).  However, the superficial attempt to frame personal disagreement as motivated by racial animus by alleging that Plaintiff's peers did not experience similar treatment is insufficient to support a claim of hostile work environment based on these allegations.  *Id.*

And, finally, even if these allegations were discriminatory and able to be considered by the Court, the Court finds that they fall far short of creating an "abusive working environment."  *Laurent-Workman*, 54 F.4th at 210.

City's part.[11]    Second, as the Court has already explained *supra* Part III.A, the allegations in the Amended Complaint support an inference that the demotion was based on Plaintiff's race.  Third, the demotion is readily imputable to the City, since Plaintiff's demotion was implemented by her supervisors.  *E.g.*, *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (holding that an employer is strictly liable for the conduct of a supervisor where the relevant conduct is a "tangible employment action" such as causing a "reassignment with significantly different responsibilities") (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).

Thus, the Court need only determine whether Plaintiff has adequately alleged that the demoted conditions constituted an abusive working environment for Plaintiff.  The Court finds that she has.

In deciding whether a Title VII plaintiff has established a "hostile" or "abusive" environment for purposes of a hostile work environment claim, courts must consider "all the circumstances."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  In doing so, the Supreme Court has specifically instructed courts to consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*  Courts should also consider "the effect on the employee's psychological well-being."  *Id.*  If the combination of the circumstances means that "a reasonable person in the plaintiff's position" would perceive the environment as "hostile or abusive," then the plaintiff has adequately alleged a hostile work environment.  *Boyer-Liberto*, 786 F.3d at 277.  Finally, a Title VII plaintiff must establish that she subjectively perceived the environment as hostile and abusive.  *Id.*

---

[11] Critically, subjecting an employee to physically derogatory or offensive working conditions can constitute "conduct" by an employer.  *Johnson v. Angels*, 125 F. Supp. 3d 562, 569 (M.D.N.C. 2015) (segregated bathrooms); *Foster v. Roberts Dairy Co.*, 372 F. Supp. 2d 1165, 1175 (child-sized desk in a supply closet); *Oden v. Southern Ry. Co.*, 1984 WL 48881, at *2 (N.D. Ga. June 29, 1984) (relocation to desk next to toilet).

As a preliminary matter, the Court notes that Plaintiff has adequately alleged that she subjectively perceived the demoted conditions as hostile and abusive. Am. Compl. ¶ 85, 91, 93. Thus, the determinate question is whether Plaintiff has alleged objectively hostile conditions.

On balance, the factors set out in *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993), support a finding that the demoted conditions were objectively abusive and/or hostile. First, due to the fact that the purportedly hostile environment was a physical one, the abuse was utterly pervasive for the time that Plaintiff was stationed at the Wastewater Treatment Plant: Plaintiff experienced the upsetting conditions of the Plant each day she was stationed there, for the entirety of that day.[12]

Second, the alleged conditions were physically humiliating *and* threatening. While Plaintiff was stationed at the plant, she was degradingly made to work amongst the stench of sewage and rotten eggs. Am. Compl. ¶ 88. The building also lacked HVAC, resulting in uncomfortably warm and cold conditions. *Id.* ¶ 87. Plaintiff's station also posed a physical hazard to her, since the building may have contained asbestos and had mold along the walls and ceilings. *Id.* ¶ 89. During the course of her time in the Wastewater Treatment Plant, Plaintiff also became concerned that the "rotten egg gas" that would occasionally spew from her radiator could be deleterious to her health. *Id.* ¶ 90. And, the Court notes that stationing an employee to work so close to human waste carries a particularly demeaning overtone. Thus, this factor strongly weighs toward a finding of an objectively hostile environment.

Third, and finally, Plaintiff has adequately alleged that the conditions in the Wastewater Treatment Plant were objectively psychologically distressing, which both demonstrates an injury to Plaintiff's "psychological well-being," *Harris*, 510 U.S. at 23, and leads to the natural conclusion that the conditions unreasonably interfered with her work performance. *Id.* ¶ 91.

---

[12] Notably, Plaintiff does not make clear how long she was stationed in the sewage treatment plant before she was relocated to the maintenance trailer.

As a result of the foregoing, the Court finds that the Amended Complaint adequately alleges that the demoted conditions imposed upon Plaintiff constituted a hostile work environment.[13]  As such, the Court will deny the City's Motion as to Count Two.

## C.    Count Three: Retaliation Based on Internal Complaints

Count Three of the Amended Complaint alleges retaliation by the City for Plaintiff's internal complaints.  The City argues that the Court should dismiss Count Three because Plaintiff has failed to allege materially adverse action or a causal nexus between any such action and Plaintiff's protected conduct.  Mem. Supp. Mot. Dismiss 15.  In response, Plaintiff argues that her demotion allegations also support a count of retaliation.  Mem. Opp'n Mot. Dismiss 21–24.  The Court again agrees with Plaintiff, and will deny the City's Motion as to Count Three.

As noted, Plaintiff advances Count Three against the City based specifically on retaliation for her various internal complaints.  Am. Compl. ¶ 217.  These include Plaintiff's March 2022 complaint to HR regarding Ms. Bingham's "black eye" comment, *id.* ¶ 42, and Plaintiff's mid-July 2022 meetings with the City's HR representatives, *id.* ¶¶ 54–55, 58–59.  Like the March complaint, the July meetings also involved discussion about Ms. Bingham's "black eye" comment, as well as Ms. Bingham's requirement that she approve all of Plaintiff's consumer communications.  *Id.*  During the July meetings, Plaintiff also informed the City HR representatives that she intended to pursue legal claims against the City.[14]

---

[13] Conversely, Plaintiff's maintenance trailer office likely did not constitute a hostile work environment. While the trailer similarly suffered from uncomfortable temperatures, was nearby distracting construction work, and had unreliable plumbing, the trailer did not involve the physically hazardous or humiliating conditions present in the sewage treatment plant. *See* Am. Compl. 149–154.

[14] In the Amended Complaint, Plaintiff also seeks to establish protected activity based on internal complaints lodged against coworkers and supervisors *after* her demotion.  *See* Am. Compl. ¶ 217 (listing Plaintiff's reports against Mr. Battle, a supervisor Plaintiff encountered while in the maintenance trailer office, and Mr. Yarhouse).  Of course, Plaintiff's demotion cannot be retaliation for conduct that Plaintiff in which Plaintiff has not yet engaged.

Moreover, these allegations fall well outside the EEOC Charge, and therefore fall beyond the scope of facts eligible for consideration.  While allegations beyond the scope of the Charge may support a later judicial claim of retaliation, they may only do so in conjunction with an allegation of retaliation for the filing of the EEOC Charge

In order to support a claim of retaliation, a plaintiff must show "(1) that she engaged in protected activity, (2) that her employer took an adverse action against her, and (3) that there was a causal link between the two events." *Laurent-Worman*, 54 F.4th at 212.

"[I]n the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "Participation" activities include filing a Charge or otherwise participating in EEOC investigations. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Conversely, employees engage in protected oppositional activity when, *inter alia*, they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). Oppositional activity encompasses opposition to actions that are actually unlawful, as well as opposition to conduct an employee "reasonably believes to be unlawful." *Navy Fed.*, 424 F.3d at 406.

In both of the meetings described above, Plaintiff reasonably believed that she was opposing unlawful activity by her employer since she, allegedly, believed she was opposing race-based discrimination against her by her supervisor. *E.g.*, Am. Compl. ¶¶ 56, 59. As such, both Plaintiff's March 2022 complaint and her mid-July 2022 meetings with HR constituted protected activity within Title VII. Thus, the Court finds that Plaintiff has adequately alleged the first element of retaliation.

The Court finds that the allegations of the Amended Complaint likewise satisfy the second element of retaliation, since the Court has already concluded that Plaintiff's demotion constituted an "adverse action."[15] *See supra* Part III.A.

---

itself, or for protected conduct alleged within the EEOC Charge. *See Stewart*, 912 F.3d at 706. Thus, the Court considers only those purportedly protected actions described *infra* in conjunction with its assessment of Count Three.

[15] Notably, the standard for what may constitute an adverse action in the retaliation context is slightly broader than that in the discrimination context, since retaliation can be effectuated by conduct outside the workplace. *Laurent-Workman*, 54 F.4th at 213 (explaining that a plaintiff may establish retaliation based on any materially adverse conduct

Thus, the Court turns to the third element of retaliation: causation.  A plaintiff may establish a causal nexus between the adverse action and the protected conduct one of two ways.  First, a plaintiff may allege specific facts establishing retaliatory animus.  *Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 173 (4th Cir. 2020).  Second, a plaintiff may demonstrate that the two events occurred "very close" in time, such that their temporal proximity gives rise to a natural inference of causation.  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  While the Fourth Circuit has not established exactly what might constitute "very close" in time, the lapsing of months generally "weaken[s] . . . the inference of causation between the two events." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003); *accord Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012).  Conversely, when a plaintiff alleged that less than a month lapsed between protected conduct and adverse action, she was found to have sufficiently established the necessary causal link.  *See Jacobs v. N.C. Admin. Off. Cts.*, 780 F.3d 562, 579 (4th Cir. 2015) ("[T]hree weeks ... is sufficient to establish a disputed issue of fact as to the causation element of the prima facie case."); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001) (holding that an eleven-day lapse between an accommodation request and termination established causation).  Finally, even where protected conduct occurred more than a month prior to the purported adverse action, a causal inference may be nonetheless made if there are intervening circumstances supporting such an inference.  *Lettieri v. Equant*, 478 F.3d 640, 650 (4th Cir. 2007).

In this case, the latest of the protected activity relevant to Count Three occurred on approximately July 14–15, 2022, when Plaintiff reached out to Ms. Haskins, a City HR representative, and Ms. Henderson, the City's Equal Employment Opportunity manager, regarding

---

that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination"). Nevertheless, the Court finds that the allegations of Plaintiff's demoted conditions constitute a "materially adverse action" for purposes of retaliation, since such conditions, imposed as a result of taking protected action, would certainly make a reasonable worker hesitate before carrying out such action.  *See supra* Part III.A.

Ms. Bingham's comment and conduct.[16]  Am. Compl. ¶¶ 53–54, 58.   Slightly more than one month later, on August 25, 2022,  Plaintiff learned she was being demoted.  *Id.* ¶ 70.

The lapsing of more than one month places this case just outside the bounds of a causal inference based on temporal proximity alone.  *See Ali*, 832 Fed. App'x at 173; *King*, 328 F.3 at 151 n. 5; *Jacobs*, 780 F.3d at 579; *Halbrook*, 252 F.3d at 706.   That inference, however, is strengthened by the intervening circumstances.  *Lettieri*, 478 F.3d at 650.   As the Court has described *supra* Part III.A, the particular facts of the demotion give rise to an inference of malice by the decisionmakers: Plaintiff was placed in a foul-smelling sewage treatment plant, without HVAC, under a supervisor with whom she had previously had personal disagreements.   Am. Compl. ¶¶ 82, 87–88, 92.  This suggestion of personal malice lends itself to both a plausible inference of racial animus, as the Court determined *supra* Part III.A, as well as an inference of retaliatory animus.  Beyond evidence of malice, there is additional reason to believe that the demotion was a result of Plaintiff's protected activity, since Ms. Bingham—who later took part in the decision to demote Plaintiff, *id.* ¶ 72, showed up to Plaintiff's July 15, 2022 HR meeting and "publicly" mocked her, reiterating Mr. Mantey's "accusation that Plaintiff was 'vindictive.'"  *Id.* ¶ 57.   This conduct by Ms. Bingham gives rise to the inference that Plaintiff's complaint particularly agitated Ms. Bingham, which in turn implies that Ms. Bingham may have taken action against Plaintiff by way of the later demotion.   In sum, the Court finds that the Amended Complaint plausibly alleges that the demotion was motivated by retaliatory animus.

---

[16] Plaintiff also asserts that she engaged in protected activity when, on an unspecified date, she left a voicemail with another HR employee to follow up about her complaint against Ms. Bingham.  Am. Compl. ¶¶ 65, 217.  Without alleging the date on which Plaintiff's voicemail occurred or specific facts connecting adverse action to the voicemail, Plaintiff cannot demonstrate that she was retaliated against for the voicemail.  Moreover, merely leaving a voicemail to check on an existing internal complaint does not itself constitute a protected activity within Title VII.  As such, the Court does not consider Plaintiff's voicemail in its analysis of Count Three.

Plaintiff has adequately alleged each element of her retaliation claim based on her internal complaints. Thus, the Court will deny the City's Motion to Dismiss as to Count Three.

## D. Count Four: Retaliation Based on EEOC Charges

Plaintiff's fourth and final claim against the City alleges retaliation against Plaintiff for filing her initial November 2022 EEOC Charge and her second, superseding March 2023 EEOC Charge. Am. Compl. ¶¶ 224–230. The City argues that, like Count Three, this count fails for want of materially adverse action and allegations of retaliatory animus. Mem. Supp. Mot. Dismiss 16–19. In response, Plaintiff largely argues that her demotion constituted retaliation for her EEOC Charges. Mem. Opp'n Mot. Dismiss 22–24. Plaintiff also, however, argues that Mr. Harrison's and Mr. Yarhouse's conduct constituted retaliation against her. *Id.* at 25–26.

At the outset, the Court notes that Plaintiff cannot rely on her demotion allegations for purposes of Count Four, since both EEOC Charges came *after* the demotion; in fact, the demotion appeared to be the catalyst for Plaintiff's decision to pursue formal legal action in the first place. *See id.* at 25; Am. Compl. ¶ 117. Thus, logic dictates that Plaintiff's demotion cannot constitute retaliation for her subsequent protected activity.

Moreover, as the Court described *supra*, Title VII only provides a cause of action against *employers*. Employers, in turn, are only held liable for the conduct of their employees in the context of Title VII where either (1) "the employer was negligent with respect to [an employee's] offensive behavior; or (2) the employee was a supervisor, "empowered . . . to take tangible employment actions against the victim." *Vance*, 570 U.S. at 427, 431. Plaintiff has not alleged that the City was negligent as to Mr. Yarhouse's behavior,[17] *see* Am. Compl. ¶¶ 171–185, and has not alleged that Mr. Yarhouse held any supervisory powers over Plaintiff, *id.* ¶ 168 ("Mr. Douglas

---

[17] In fact, the Amended Complaint states that, once Plaintiff reported Mr. Yarhouse's conduct to her supervisor, Mr. Yarhouse's supervisor had a meeting to discuss the conduct with Plaintiff and Mr. Yarhouse. Am. Compl. ¶ 185.

Yarhouse . . . was a male coworker of Plaintiff."). Thus, Mr. Yarhouse's conduct likewise cannot constitute retaliation on the City's part.

Nevertheless, the Court finds that Plaintiff's allegations regarding Mr. Harrison's conduct could, if proven, support a claim of retaliation. As such, the Court will deny the City's Motion as to Count Four.

As the Court recited above, in order to sustain a claim of Title VII retaliation, Plaintiff must show: "(1) that she engaged in protected activity, (2) that her employer took an adverse action against her, and (3) that there was a causal link between the two events." *Laurent-Worman*, 54 F.4th at 212.

Here, Plaintiff alleges retaliation based on her two EEOC Charges, filed on November 22, 2022, and March 27, 2023, respectively. Am. Compl. ¶ 3. Filing an EEOC Charge is a squarely protected activity. *Laughlin*, 149 F.3d at 259; 42 U.S.C. § 2000e-3(a). Thus, Plaintiff has properly alleged the first element of a retaliation claim.

As to the second element, the Court finds that the Amended Complaint supports a plausible inference that Mr. Harrison, acting as a City supervisor,[18] took material adverse action against Plaintiff. In the context of a retaliation claim, an employer takes material adverse action whenever it engages in conduct that has the capacity to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 64. Such conduct, however, can only support a retaliation claim when it is "*materially* adverse." *Laurent-Workman*, 54 F.4th at 213–214 (emphasis added). The materiality standard "separates minor harms from those that threaten to chill employees from opposing unlawful discrimination." *Id.*; *accord Burlington*, 548 U.S. at 68 ("We speak of *material* adversity because we believe it is important to separate

---

[18] Unlike Mr. Yarhouse, Plaintiff adequately alleges that Mr. Harrison was her supervisor. *See id.* ¶¶ 113–114.

significant from trivial harms.  Title VII, we have said, does not set forth a general civility code for the American workplace.") (citation modified) (emphasis in original).

Here, the Amended Complaint alleges two relevant encounters with Mr. Harrison: (1) the February 23, 2023 interim performance evaluation, Am. Compl. ¶¶ 107–110; and (2) his conduct surrounding Plaintiff's applications to other positions with the City, *id.* 112–118.  The Court finds that both instances could, if so proven, constitute materially adverse action for purposes of Plaintiff's second retaliation claim.

First, the Court considers the adversity posed by the interim performance evaluation. Approximately six months after Plaintiff was demoted, on February 23, 2023, Plaintiff received an interim performance evaluation from her new supervisor, Mr. Harrison.  *Id.* ¶ 107.  That evaluation, however, omitted all of Plaintiff's pre-demotion accomplishments.  *Id.*  Plaintiff alleges that this omission "had an adverse effect on Plaintiff's employment opportunities for advancement, increases in compensation, and continued employment." *Id.* ¶ 109.  Yet, when Plaintiff asked Mr. Harrison to correct the error, he refused.  *Id.* ¶ 107.  The Supreme Court has held that interfering with an employee's professional advancement constitutes material adverse action, since it "might well deter a reasonable employee from complaining about discrimination." *Burlington*, 548 U.S. at 69 (explaining that "excluding an employee from a weekly training lunch that contributes significantly to the employee's profession advancement" could amount to material adverse action). Thus, because Plaintiff has alleged that the interim performance review impacted Plaintiff's professional advancement, she has likewise alleged that the review constituted materially adverse action.[19]

---

[19] The Court notes that Plaintiff proposes adding language to ¶ 107 of the Amended Complaint, as well as corresponding exhibits, to establish that she has not received any further performance evaluations since the 2023 interim performance evaluation.  Mot. Leave Supp. Pleadings 9.  This, in turn, has "materially limited her ability to obtain merit-based salary increases for the years 2023, 2024, and 2025." *Id.*  As stated above, the 2023 interim performance evaluation, and its implications for Plaintiff's professional advancement, are alone enough to satisfy the materially adverse action requirement of Plaintiff's Title VII retaliation claim.  Thus, the Court only considers

The Court likewise finds that the allegations of the Amended Complaint give rise to a reasonable inference that Mr. Harrison's conduct in relation to Plaintiff's other job application constituted a material adverse action. In March of 2023, Plaintiff decided to apply for two other positions with the City, both of which offered better compensation packages than the position she held at the time. Am. Compl. ¶ 111. That month, Plaintiff had a conversation with Mr. Harrison, during which he admonished Plaintiff: "Don't wipe your butt . . . before you sh\*\*!" *Id.* ¶ 115. At that time, Mr. Harrison knew that Plaintiff was preparing to file a Charge with the EEOC and was considering formal legal action. *Id.* ¶ 117. Mr. Harrison told Plaintiff that he did not believe Plaintiff would prevail in a lawsuit against the City. *Id.* ¶ 118.

After Plaintiff interviewed for one of the other positions, the interviewer told Plaintiff that he would reach out to her supervisor—Mr. Harrison. *Id.* ¶¶ 113–14. Later, Mr. Harrison told Plaintiff that one of the interviewers was his personal friend. *Id.* ¶ 114. Plaintiff was not selected for either position. *Id.* ¶ 112.

Viewed in the light most favorable to Plaintiff, these allegations give rise to the natural inference that Mr. Harrison dissuaded the interviewer from hiring Plaintiff. If so proven, such conduct on Mr. Harrison's part certainly constitutes a materially adverse action, since a reasonable employee would be hesitant about pursuing an EEOC Charge if she knew that her current employer would discourage future employers from hiring her based on that protected conduct.

Thus, the Court finds that Plaintiff's allegations regarding the interim performance evaluation and Mr. Harrison's conduct in relation to Plaintiff's job applications satisfy the second element of her retaliation claim.

---

the information provided in the Amended Complaint and first EEOC Charge to support this claim, pending the outcome of Plaintiff' Motion for Leave to File Supplemental Pleadings.

To satisfy the third element of her retaliation claim, Plaintiff must demonstrate a causal nexus between the adverse action(s) and the protected activity.  As the Court described *supra*, such a nexus may be established by temporal proximity, specific facts demonstrating causation, or a combination of the two.  *Ali*, 832 F. App'x at 173; *Lettieri*, 478 F.3d at 650.

Here, the Court finds that Plaintiff fails to establish such a nexus between the interim performance evaluation and any protected activity.  The evaluation occurred on February 23, 2023—approximately three months after Plaintiff's first EEOC Charge, and one month before Plaintiff's second EEOC Charge.  Thus, the timing of the evaluation does not give rise to an inference of retaliatory animus.  *See supra.*  And, Plaintiff does not allege any facts that otherwise create a plausible inference of such animus.  *See* Am. Compl. 107–110.  Accordingly, the interim performance evaluation does not satisfy the third element of Plaintiff's retaliation claim.

Nevertheless, the Court finds that the third element is satisfied, since Plaintiff has adequately alleged a causal nexus between her EEOC Charge and Mr. Harrison's conduct relating to Plaintiff's job applications.  First, while Plaintiff does not expressly allege whether Mr. Harrison's conduct came before or after her March 27, 2023 EEOC Charge, she does allege that she applied for the other positions the same month that she filed the EEOC Charge.  Am. Compl. ¶¶ 3, 112–13, 117–18.  Thus, one could construe the allegations of the Amended Complaint to mean that Mr. Harrison's adverse conduct coincided with the Charge or immediately followed it.[20] *See id.*  Such temporal proximity, at this stage of litigation, certainly supports an inference of retaliatory animus.  *King*, 328 F.3d at 151 n.5.

---

[20] The Court notes, however, that if later discovery demonstrates that the entirety of Mr. Harrison's purportedly retaliatory conduct occurred before the EEOC Charge was filed, Plaintiff will be prohibited from pursuing damages for that claim, since Mr. Harrison's conduct falls well outside the scope of the EEOC Charge, *supra* n. 9, and the retaliation exemption from administrative exhaustion only saves those retaliation claims where the adverse action *followed* the EEOC Charge.  *See, e.g.*, *Riley v. Techn. & Mgmt. Servs. Corp. Inc.*, 872 F. Supp. 1454, 1640 (D. Md. 1995) (explaining that the retaliation exception "does not apply . . . when the alleged retaliation could have been raised in the original EEOC complaint").

Even without such temporal proximity, Plaintiff alleges specific facts that otherwise support an inference of causation. Critically, Plaintiff alleges that Mr. Harrison knew that Plaintiff was pursuing legal action against the City and was pursuing a complaint based on her demotion. Am. Compl. ¶¶ 117–118. Mr. Harrison allegedly told Plaintiff that he did not believe she would prevail. *Id.* ¶ 118. Moreover, Mr. Harrison's alleged "wipe your butt" comment particularly supports an inference of retaliatory animus, since the comment could be taken to mean that Plaintiff should not have pursued legal action against the City if she intended to later rely on his reference for future employment. This comment, then, implies personal frustration on Mr. Harrison's part in relation to Plaintiff's protected activity, and perhaps a desire to retaliate against Plaintiff as a result. The fact that Plaintiff was interviewing with Mr. Harrison's friend would have given Mr. Harrison a perfect opportunity to actualize that desire. Taken together, the timing and specifics of Plaintiff's allegations support an inference of retaliatory animus. Thus, the Court finds that the Amended Complaint adequately alleges the third and final element of Plaintiff's retaliation claim.

Because Plaintiff has plausibly stated each element of a retaliation claim, the Court will deny the City's Motion as to Count Four.[21]

---

[21] In her briefing and in her Amended Complaint, Plaintiff alleges that a number of lesser adverse actions support her retaliation claim. Mem. Opp'n Mot. Dismiss 24–25 (citing the requirement that Plaintiff attend training with hourly employees, not giving Plaintiff a key to the maintenance trailing, not giving Plaintiff a nameplate, inadequate cleaning of trailer restrooms, lack of access to necessary software, and Ms. Bingham's requirement that she review all customer communications); Am. Compl. ¶ 102–106, 155–160 (complaining of being interrupted in meetings, not being provided with a key to the sewage treatment plant, interacting with an armed security guard, and requiring Ms. Jackson to be involved in particular meetings). The Court finds that these actions, however, fall within the category of minor harms that are not actionable as retaliation. Accordingly, the Court does not consider them in conjunction with its analysis of Count Four.

Plaintiff also alleges that, in February of 2024, she was forced to work during extreme weather conditions. *Id.* ¶ 162. This allegation cannot support a finding of retaliation because it wholly lacks allegations supporting a finding of retaliatory animus, *see id.* ¶¶ 162–167, and took place almost a year after she filed the EEOC Charge. As such, this allegation plays no part in the Court's analysis of Count Four.

### E.    Punitive Damages

Finally, the City argues that the Court should strike Plaintiff's punitive damages claims since "punitive damages may not be recovered against a municipality absent express authorization by statute," and because Title VII exempts governments from punitive damages claims.  Mem. Supp. Mot. Dismiss 19–20 (citing *Newport v. Fact Concerts*, 453 U.S. 247, 259–260 (1981); *McClam v. City of Norfolk Police Dep't*, 877 F. Supp. 277, 284 (E.D. Va. 1995)).   Plaintiff does not include any argument as to this point.  *See generally* Mem. Opp'n Mot. Dismiss.

The City is correct; as a general matter, courts in Virginia do not permit punitive damages claims to proceed against municipalities.  *Brown v. Cobb*, 2018 WL 3080064, at *5 (E.D. Va. June 21, 2018) (collecting cases).  Moreover, Title VII does not authorize punitive damages against governments.  42 U.S.C. § 1981(a)(b)(1).

As such, the Court will grant the City's motion to dismiss as to Plaintiff's punitive damages claims.[22]

### IV. CONCLUSION

For the reasons detailed above, Defendant's Motion to Dismiss will be granted in part and denied in part.

An appropriate Order shall issue.

/s/ *RCY*
_____
Roderick C. Young
United States District Judge

Date: September 16, 2025
Richmond, Virginia

---

[22] In her briefing on the instant Motion, Plaintiff contends that she should be granted leave to further amend her Amended Complaint.  Mem. Opp'n. Mot. Dismiss 29.  Plaintiff does not, however, articulate a specific basis for why such leave is necessary.  *See id.*  As such, the Court denies Plaintiff's request.