**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

FILED
NOV 18 2025
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**SURANI S. OLSEN** )
**Plaintiff** )
)
v. ) Case No.: 3:25cv956
)

**CITY OF RICHMOND**
Serve: Laura K. Drewry
CITY ATTORNEY )
900 East Broad Street, Suite 400 )
Richmond, VA 23219
)
**Defendant** ) **TRIAL BY JURY DEMANDED**
)

## COMPLAINT

Comes Now, Plaintiff, Surani Olsen ("Plaintiff"), moves this Honorable Court for judgment against Defendant, City of Richmond ("Defendant"), on the grounds and praying for the relief hereinafter set forth:

## SUMMARY OF THE ACTION

1. This is a civil rights action brought by Plaintiff, a current defendant's employee, who has been discriminated and retaliated against by Defendant because of her race, color,

national origin, and participation in Equal Employment Opportunity ("EEO") protected activity. Plaintiff has also been subjected to a hostile work environment by way of unwarranted actions being taken against Plaintiff, being disrespected and humiliated publicly and being treated differently with different standards when compared to other similarly situated employees who are not of Plaintiff's protected classes. Plaintiff Surani S. Olsen seeks relief from unlawful employment practices by Defendant City of Richmond based on her race, color, sex, and national origin (Southeast Asian American from Indonesia) and in retaliation for her protected opposition to discriminatory practices pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

---

**JURISDICTION**

2. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII").
3. This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 et seq. (federal question) and 1343 (civil rights).

**VENUE**

4. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. 1981a, and Defendant is subject to the personal jurisdiction of this Court in the Eastern District of Virginia because Defendant maintains facilities and operations in this District, and all events and issues giving rise to this action occurred in this District and Division in Richmond, VA.

5. Venue is further proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(1) and (d), this Division under L.C.R. 3(B)(4), and under 42 U.S.C. Section 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2); as Plaintiff is employed by Defendant in Richmond, VA, where the alleged offenses and injuries occurred, and Plaintiff's employment records are maintained by Defendant in this judicial District and Division.

**STANDING**

6. Plaintiff has satisfied all of the procedural and administrative requirements set forth in Section 706 of Title VII, 42 U.S.C. § 2000e-5, in particular:
   a. On January 27, 2025, Plaintiff timely filed her Second Charge.
   b. Plaintiff timely filed the aforementioned Second Charge with the EEOC within three hundred (300) days from the latest date of discrimination relative to this matter.
   c. On or after August 20, 2025, Plaintiff received her Second NRS, and less than 90 days upon receipt of the Second NRS, Plaintiff files this Complaint.

---

**PARTIES**

7. Plaintiff Surani S. Olsen is a citizen of the United States, female, and a South-east Asian American from Indonesia. She has a heavy accent as a result of her national origin. Plaintiff has lived in Virginia since 2008 and has been employed by Defendant City of Richmond since December 2016 in various positions.

8. Defendant City of Richmond is a municipal corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Richmond, Virginia 23219.

9. Since January 1st, 2004 and at all times relevant to this Complaint, Defendant has been a municipal government and an employer subject to the requirements of Title VII, 42 U.S.C. §§ 2000e, et seq. ("Title VII").

---

**RELATIVE PROCEDURAL HISTORY OF RELATED CASE**

10. On November 22, 2022, Plaintiff first submitted a Charge of Discrimination with the EEOC under Agency Case No. 438-2023- 00359 (the "First Charge"), complaining that Plaintiff was discriminated and retaliated against based on race, color, and national origin; had been exposed to a hostile work environment; and retaliated against for engaging in EEO protected activity. Later Plaintiff amended the First Charge in

December 2022 and in March 2023, and finally EEOC portal worked and accepted Plaintiff's First Charge officially.

11. On or after April 27, 2023, Plaintiff received a Notice of Right to Sue ("First NRS") from the EEOC, and less than 90 days upon receipt of NRS, on July 26, 2023, Plaintiff timely filed her Complaint, pro se, against Defendant, before the U.S. District Court for the Eastern District of Virginia, Civil Action No. 3:23-cv-475, which was later amended on February 11, 2025 which is still pending ("Pending Case").

12. Then on April 27th and June 3rd, 2024, Plaintiff submitted additional charge of discrimination, retaliation, and hostile work environment against Defendant to EEOC staff, Ms. Laketa Banks and EEOC Director and on the EEOC portal, however, the portal was not working and charge could not be saved. Then Plaintiff submitted additional charges of discrimination, retaliation and hostile work environment (including hostile treatment, retaliation, and discrimination at the maintenance building, and Kenya Peterson's discrimination and hostile treatment against Plaintiff) with the EEOC in December 2024 and was interviewed by Mr. Deandre Whitehurst (EEOC) in the same month. Finally, on January 27, 2025, after unable to save the charges for many times, Plaintiff's charges was officially accepted by EEOC, which was Charge No. 438-2024-01500 ("Second Charge") where Plaintiff complained that Plaintiff continued to be discriminated and retaliated against by the Defendant based on race, color, and national origin; continued to be exposed to a hostile work environment; and continued to be retaliated against for engaging in EEO protected activity after the First Charge. In the Second Charge, EEOC allowed Plaintiff to include all the charges that Plaintiff submitted in April, 2024 and June, 2024, since the EEOC Portal was not working both times when Plaintiff submitted the charges.

13. On or after August 20, 2025, Plaintiff received a Notice of Right to Sue letter from the EEOC for her Second Charge ("Second NRS"), requiring her to file suit related to the Second Charge on or before November 18, 2025.

14. On August 29, 2025, Plaintiff moved in her Pending Case pursuadfxz]nt to Fed. R. Civ. P. 15(d) to supplement her pleadings to add the Second NRS ("Motion"). On September 22, 2025, Defendant filed a response expressly not opposing Plaintiff's request to supplement

Case 3:23-cv-00795-RCY Document 47-1 Filed 12/29/25 Page 5 of 59 PageID# 462

her pleadings to "reflect that she filed a second charge of discrimination with the EEOC on January 27, 2025, and that the EEOC issued its Notice of Right to Sue letter from the second charge on August 20, 2025".

15. However, as of the date of this Complaint, the Court has not ruled on the Motion. Given the statutory requirement requiring Plaintiff to file a Complaint within ninety (90) days of her receipt of the Second NRS, and out of an abundance of caution to preserve those claims arising out of the Second Charge, Plaintiff files this Complaint.

## STATEMENT OF FACTS

### A. Plaintiff's Employment and Protected Characteristics

16. Plaintiff is a Southeast Asian American woman originally from Indonesia.

17. Plaintiff was employed by Defendant City of Richmond since 2016 in various positions within the Department of Public Utilities ("DPU").

18. Prior to the adverse actions described herein, between December 8, 2020 and August 29th, 2022, Plaintiff held the position of Program and Operations Manager, a salaried management position. Plaintiff's duties included management and administration of various permitting programs and supervisory duties. She also supervised multiple permit-reviewer engineers, project management analyst, and a supervisor field inspector (who also supervised 4 field inspectors).

19. Plaintiff's work performance was consistently satisfactory and Plaintiff received no disciplinary actions prior to the discriminatory conduct described herein.

20. On August 29, 2022, Plaintiff was **demoted** to another division of Defendant to no longer have any supervisory duties and any permitting program administration duties. Plaintiff filed her First Charge in large part as a result of the demotion, a clear adverse employment action.

21. While Plaintiff is still employed by Defendant, Plaintiff continues to be subjected to a hostile work environment, daily discrimination and retaliation, and still receives lesser pay on each paycheck than her male counterparts despite having better qualifications.

**B. Relevant Historical Facts:**

Relevant historical facts that were already included in the Amended Complaint for Case No. 3:23cv-475, that was filed in this Court:

22. On August 25th, 2022, in the meeting between Plaintiff and Eric Whitehurst ("EW"), a Deputy Director with Defendant, he informed Plaintiff with a smirk and then a laugh that Plaintiff was not going to manage Water Resources Division anymore and was required to report to Engineering Manager Alan Harrison to ask for projects from him at the end of August 2022. Plaintiff perceived this as a retaliation due to Plaintiff's discrimination complaint to the City's Equal Employment Opportunity's Office (Ms. Brenda Henderson) in July 2022 because Mr. Harrison had disagreed with Plaintiff regarding his projects' permitting requirements for various projects. In the first meeting with Mr. Harrison, Mr. Harrison requested Plaintiff to submit Plaintiff's resume to him, as if Plaintiff was applying for a job with his division. Soon after the demotion (around one month), Mr. Harrison was promoted to be a Deputy Director.

23. On or about August 29, 2022, Plaintiff was demoted from Plaintiff's position as Water Resources Program and Operations Manager, resulting in a substantial reduction in responsibilities and authorities, including removal of Plaintiff's program management or program administration duties for the Chesapeake Bay Preservation Area program, Erosion and Sediment Control program, Floodplain management program and Community Rating System/Floodplain program, and removed Plaintiff's supervisory duties of multiple permit reviewer engineers, project management analyst, and supervisor inspector.

24. Plaintiff's demotion was discriminatory and retaliatory. Similarly situated employees outside Plaintiffs protected classes were not demoted. The evidence for this demotion includes the August and November 2022's DPU Communications and Updates that do not include Plaintiff's reassignment news.

**C. Hostile Work Environment and Retaliation Due To Demotion and Relocation to Offices with Unbearable Working Conditions at the Administration Building**

25. Defendant's demotion of Plaintiff was an attempt, albeit unsuccessfully, to constructively discharge Plaintiff.

26. In connection with the demotion, Plaintiff was immediately relocated from Plaintiff's office on the eighth floor of a high-rise building on Broad Street to a much smaller office (approximately half the size) at the Administrative Building of the Wastewater Treatment Plant as instructed by Plaintiff's supervisor, Mr. Alan Harrison, even though Plaintiff's former office was empty or unoccupied at the Water Resources Division at Broad St.

27. Plaintiff's office in the Administrative Building did not have a working HVAC system, so there was no Air Conditioner (AC) during the summer, resulting in Plaintiff's office temperatures around and exceeding 80 degrees Fahrenheit, and it had no heat in the winter, resulting in Plaintiff's office temperatures around 60 degrees Fahrenheit in winter. These office temperatures do not comply with OSHA temperature recommendations.

28. Equally disturbing, the office was often permeated with a sewage or rotten egg smell due to proximity to the wastewater treatment plant.

29. On April 17, 2023, a massive volume of rotten egg gas spewed from Plaintiff's office radiator that was suddenly turned on, and it immediately filled the room, causing mental anguish and health concerns that was also smelled by other staff, Mr. JK, an engineer, whose office was just located outside of Plaintiff's office. This event caused Plaintiff's mental anguish and made Plaintiff's concern about the effect of the gases to Plaintiff's health since the heating radiator in this office was very old and moldy. Other radiators in the other staff's offices in the same building did not spew out the rotten egg gas on that day.

30. In addition, mold covered the heater unit as well as the ceilings in this office room (Plaintiff's office room). Plaintiff may have been exposed to asbestos based on laboratory test reports indicating asbestos in ceiling tiles.

31. Furthermore, Plaintiff's office was located in a regulatory floodway with high risk of annual flooding, compared to Plaintiff's previous office, before demotion, that was not located in a regulatory floodway.

32. These conditions were designed to constructively discharge Plaintiff due to her race, color, sex, and national origin, and Plaintiff's discrimination complaint to the City's Human Resources EEO Division regarding April Bingham's black eye comment and other actions.

33. Plaintiff refused to quit despite the demotion, and intolerable working conditions. Consequently, after repeated complaints, Plaintiff was moved to a maintenance trailer at the Wastewater Treatment Plant, and finally to the Operations Building, as further described below.

34. Unlike other individuals, all of whom were non-Southeast Asian American including Ms. Jackson, for the first seven months, Plaintiff was never informed about the schedule for pesticide spraying that used outdoor toxic pesticide chemical, Spectre, despite repeated requests to Maintenance Staff member Mr. Christopher Battle, the Plant Manager, and Ms. Jackson.

35. On at least one occasion, Mr. Battle yelled at Plaintiff and instructed Plaintiff to go home when she requested to be informed of the pesticide spraying schedule.

36. Plaintiff ultimately complained of Mr. Battle to Plaintiff's supervisor, Mr. Harrison, which finally prompted Mr. Battle's compliance with the scheduling request.

37. In retaliation, Plaintiff was relocated to the maintenance trailer, where the offices of all Mr. Battle's staff located. His staff are all hourly waged field supervisors.

**D. Continued Discrimination Based on Race, Color, and National Origin, Retaliation and Hostile Work Environment and Retaliation at the Maintenance Trailer**

38. After repeated complaints about unbearable working conditions, Plaintiff was moved to a maintenance trailer at the Wastewater Treatment Plant by Mr. Whitehurst, Plaintiff's supervisor from July 2023 until July 2024. The trailer office was poorly constructed with

a damaged ceiling. The entire office shook whenever nearby construction activities occurred, sending debris onto Plaintiff's filing cabinet and office equipment, not only created an unsafe work environment but also posed a direct threat/hazard to Plaintiff's physical safety and caused her severe anxiety and mental anguish.

39. The office's proximity to ongoing construction activities further exacerbated the situation. The frequent extreme building vibrations and shaking, particularly when roadwork, excavation, pipe installations, and other construction activities were carried out nearby, further disrupting Plaintiff's ability to concentrate and perform Plaintiff job. The vibrations damaged the building's foundation tiles, which exacerbated the unsafe and unstable environment.

40. In this office, Plaintiff experienced the same heating and cooling issues as in the Administrative Building, with Plaintiff's office temperatures were frequently programed to around 61 degree Fahrenheit when it's cold outside, and up to 86 degrees Fahrenheit when it's warm/hot outside, which are outside OSHA recommendations. Plaintiff complaint to Plaintiff's supervisor, Mr. Whitehurst, but the issues were not fixed permanently as the temperatures went back to the same extreme temperatures after it was changed for a day.

41. In addition, Plaintiff's office's plumbing was defective. The women's restroom often malfunctioned, failing to properly flush, and, despite weekly (and sometimes daily) visits from the cleaning staff, the toilet was disgustingly not cleaned for the first 4 months Plaintiff worked in the Maintenance Building. During this period, Plaintiff had to leave the Maintenance Building simply to use other restroom facilities, further disrupting her work and contributing to a degrading and hostile work environment.

42. Plaintiff's new office at the maintenance trailer with damaged ceiling, issues with extreme temperatures, and other issues, was also located in the floodplain, which Plaintiff perceived as yet another attempt by Defendant to constructively discharge Plaintiff; a substantially fall from the grace of Plaintiff's large office on the eight floor of a high rise building before demoted.

43. Despite requesting for the key from Plaintiff's supervisor (Mr. Whitehurst), Plaintiff was denied a key to the front door of her trailer office for the first four months after she moved to this office, while all other Defendant's staff in the same building, who are male and are not Southeast Asian Americans, were provided with the front door keys. None of them were from Indonesia. Not having the front door key had caused Plaintiff to be locked out after 3:30-4:00 PM when other staff had left, requiring assistance from maintenance personnel and other staff who had the key.

44. In addition, for nearly a year, Plaintiff was not provided with the proper office name tag indicating Plaintiff's name and title, while all other staff in the same building who have permanent offices in the building like Plaintiff, who are male, were provided with name tags with titles on the front doors of their offices. None of these other staff are Southeast Asian American or from Indonesia. Mr. Whitehurst visited Plaintiff at least once at the Maintenance building and knew that Plaintiff did not have the title tag but he did not do anything about it.

45. None of the staff who received keys and name tags were Southeast Asian American or from Indonesia, which made Plaintiff perceived that Plaintiff was discriminated and retaliated against by the Defendant, was not provided with the front door key for four months and was not provided with title tag, due to her race, color, and national origin.

46. The lack of a name tag with title may have caused other staff in the maintenance building to believe that Plaintiff had been further demoted to an hourly staff member, further undermining Plaintiff and permitting the hostile work environment and disrespectful treatment to continue during the time period Plaintiff had an office in the maintenance trailer, as identified herein including one male field staff, Ronald Story, storming into Plaintiff's office yelling at her to report to Barbara Jackson.

Case 2:23-cv-00795-RCY Document 41 Filed 11/19/25 Page 11 of 59 PageID# 1468

**E. Discrimination, Retaliation, and Hostile Work Environment from Douglas Yarhouse**

47. Mr. Douglas Yarhouse ("Mr. Yarhouse")was a male colleague of Plaintiff who had an office directly next to Plaintiff's office in the maintenance trailer. Mr. Barry Deaton ("Mr. Deaton") was a male colleague of Plaintiff, who had an office at the maintenance trailer. Both of them are not a Southeast Asian American and are not from Indonesia. They have the knowledge of Plaintiff's EEOC charges because Plaintiff informed them about the charges as they questioned the reason why Plaintiff was moved to the building. They talked to Mr. Battle, other staff, and Mr. Whitehurst about the charges.

48. DY engaged in pattern of abuse or hostile treatment against Plaintiff in 2023 and 2024.

49. In July 2023, after Plaintiff requested information from Mr. Yarhouse regarding an electrical source for a project, Mr. Yarhouse positioned himself behind Plaintiff's half-open office door and stated, "What could/would you do, what would I get?" Plaintiff understood this as an implied quid pro quo demand, which caused Plaintiff to feel intimidated and deterred Plaintiff from seeking further assistance from Mr. Yarhouse.

50. Between July 11 and 21, 2023, Mr. Yarhouse made repeated loud and offensive statements about needing to use the restroom but "no time to go taking dump" to Mr. Deaton, shortly after Plaintiff used the women's restroom, harassing her for using restroom facilities that only stopped after Plaintiff complaint to Plaintiff's supervisor, Mr. Whitehurst. These statements were deliberately timed and were very loud to be audible to Plaintiff, causing Plaintiff discomfort and embarrassment.

51. Nearly every day during in January 2024, Mr. Yarhouse forcefully pushed his desk against the shared wall between his office and Plaintiff's former office and slammed his door really hard when he closed it, creating loud, sudden noises that startled Plaintiff. This conduct was intentional and designed to intimidate Plaintiff, reinforcing an abusive work environment.

52. On July 17, 2023, Plaintiff discovered that the women's restroom door had been physically blocked with a heavy printer table and a large box, preventing access. Plaintiff immediately requested a security camera installation in the area to Mr. Battle, who was Mr. Yarhouse's supervisor, or to Mr. Deaton, the instrumentation and control maintenance

supervisor, but was denied. Ms. Larkin, a maintenance staff, witnessed the blocked bathroom door and removed it when Plaintiff showed her that the bathroom door was blocked. Plaintiff requested the security camera footage from outside the building to check who was in the building when Plaintiff was blocked inside the bathroom, but the City's staff who was in charge of this video informed Plaintiff that they did not have the video.

53. On July 24, 2023, Mr. Yarhouse very loudly stated, "I am wet," twice after Plaintiff returned from the restroom. Plaintiff reasonably perceived this comment as inappropriate workplace conduct intended to humiliate and intimidate Plaintiff.

54. On the same day, July 24, 2023, Plaintiff submitted a formal complaint about the hostile work environment by Mr. Yarhouse to Plaintiff's supervisor (Mr. Eric Whitehurst) on July 24, 2023, but the hostile treatment stopped momentarily for several weeks and then continued.

55. The day after Plaintiff submitted her formal complaint against Mr. Yarhouse, Mr. Yarhouse stated that he would like to 'tape Plaintiff's mouth shut' to Ms. Katerine Larkin, a maintenance staff. He did so while standing near Plaintiff's open office door, ensuring that Plaintiff could hear him. This was a direct and explicit act of retaliation.

56. Ms. Larkin also sang a song that asked Plaintiff to get out of the office since she would like to be in Plaintiff's place (position) when she was outside of Plaintiff's office with open door, which was very hostile and demeaning. Ms. Larkin knew about Plaintiff' EEOC charge from Mr. Yarhouse. Ms. Larkin is not a Southeast Asian American and is not from Indonesia.

57. Subsequent to Plaintiff's complaint against Mr. Yarhouse, Mr. Yarhouse installed a lockbox around the temperature control panel located near the meeting table in front of the building, which controlled the heating and air conditioning for Plaintiff's office, Mr. Yarhouse's office, and Mr. Robert Vargas' office. The second lockbox in the back off the building controls the heating and cooling for other offices in the building, which were the offices of Mr. Deaton, Mr. Ronald Story, and the bathrooms. All the staff who have

offices in this building are not Southeast Asian American and are not from Indonesia, except Plaintiff.

58. On February 2, 2024, Mr. Yarhouse informed Plaintiff that he had installed the lock box around the temperature control panel that controlled heating and air conditioning for Plaintiff's office and the keys to the lockbox were provided only to him and Mr. Vargas—both male, non-Southeast Asian American employees,. This prevented Plaintiff from adjusting the temperature in her own office, while Mr. Yarhouse, Mr. Vargas, and other male staff in the building could adjust the temperature in the lockbox of their control panel, which was a discrimination and retaliation against Plaintiff

59. Plaintiff requested her supervisor Eric Whitehurst for the key to the lockbox and to set the temperature to 72 degrees Fahrenheit on the same day (February 2, 2024), and the day after, but Plaintiff was not provided with the key and the temperature was not increased from around 61 degrees to 72 degrees on that day. After being set to 72 degrees the next day, the temperature settings reverted to Mr. Yarhouse's preferred settings for Plaintiff's office, which was around 61 degree in the morning in the winter and 80 degree in the afternoon in the summer (or no AC). As Mr. Whitehurst asked Mr. Battle to take care of the issue, Plaintiff also requested a key to Mr. Yarhouse's supervisor, Mr. Battle, and for him to adjust the programmed temperatures but was denied. Mr. Battle then deliberately removed Mr. Yarhouse's key from his drawer in Plaintiff's presence to reinforce that Plaintiff would not be given control over the office temperature.

60. Until Plaintiff moved from the office in maintenance trailer to another office outside of WWTP in July 2024, Plaintiff's supervisor, Mr. Whitehurst and his delegated maintenance staff, Mr. Battle, continued to ignore Plaintiff's request for key and refused to provide her with a key to the lock box. Plaintiff perceived that Mr. Whitehurst discriminated against Plaintiff by not providing the key to the temperature control lockbox and by not instructing Mr. Yarhouse or Mr. Battle to set Plaintiff's office temperature to the OSHA (Occupational Safety and Health Administration)'s recommended temperatures between 68 degrees and 76 degrees Fahrenheit. Plaintiff also perceived that Mr. Whitehurst intentionally created a hostile work environment for

Plaintiff by not providing the key to the temperature control lockbox and allowed the temperatures of Plaintiff's office to be set around extreme temperatures around 61 degree Fahrenheit in the morning during the winter and up to 86 degree Fahrenheit in the afternoon during the summer from February 2, 2024 until around July 5, 2024.

61. From February 2024 until Plaintiff moved offices in July 2024, the temperature was set to 59-61 degrees Fahrenheit with the heater turned off in the morning until noon when it's cold outside, and was set to between 80 and 86 degrees Fahrenheit with the heater turned on in the afternoon, causing Plaintiffs office to be between 59 and 61 degrees in the morning and between 80 and 86 degrees in the afternoon, which were extremely cold and hot and outside OSHA's recommended temperatures, and created an unbearable work environment or hostile work environment for Plaintiff that altered her employment terms and conditions that were done by Defendant and its supervisors and staff in the hope that Plaintiff would simply resign in retaliation due to her EEOC charge and court complaint.

62. In another incident, on April 16, 2024 and again subsequent to Plaintiff's complaint against Mr. Yarhouse, Plaintiff again found the women's restroom door blocked from the outside when Plaintiff was going to the restroom, and Plaintiff had to push a large heavy box that was located in front of the door fully under the printer table so Plaintiff could access the restroom.

63. However, once Plaintiff completed use of the restroom, she was unable to open the restroom door, as the large heavy box was blocking it again from the outside. Plaintiff was physically trapped inside the restroom. Plaintiff then turned the door handle and pushed it really hard to open it around one inch and Plaintiff then put Plaintiff hand through the small opening to forcefully push the box back under the table, and then forcefully push the door open to escape.

64. After escaping, Plaintiff checked and found that Mr. Yarhouse was the only staff member present in the building at the time, both before Plaintiff entered the restroom and after Plaintiff escaped from the restroom. Plaintiff reported the incident to Plaintiff's supervisor, Mr. Whitehurst, who then requested Mr. Yarhouse's supervisor to meet with her and Mr. Yarhouse. During the meeting, Mr. Yarhouse s openly stated that "[Plaintiff] cannot have an office in this building."

65. On April 25, 2024, Plaintiff requested security cameras be installed by email but received no response from Plaintiff's supervisor, Mr. Whitehurst.

66. Plaintiff requested videos from security cameras outside the building for the week of April 16, 2024, to confirm that only Mr. Yarhouse inside the building at the time Plaintiff was in the bathroom, from the defendant's Department of Emergency Management (DEM) but was told there was no video, despite years of security cameras around the building previously available and managed by Mr. Deaton.

**F. Hostile Work Environment: Privacy Violation**

67. In or about December 2023, Mr. Yarhouse, Mr. Deaton, and Mr. Story, who were all hourly maintenance staff, discussed what Plaintiff's performance evaluation should be shortly after Plaintiff emailed her supervisor requesting her performance evaluation, suggesting the Defendant might allow them to access Plaintiff's laptop so they could see her work or that Plaintiff's supervisor, Mr. Whitehurst, might had informed them about Plaintiff request for performance evaluation, which created a hostile work environment or allowed these staff to harass Plaintiff and altered the terms and conditions of Plaintiff's employment.

**G. Hostile Treatment by Plaintiff Supervisor, Mr. Harrison**

68. By March 2023, while Plaintiff refused to resign despite the repeated abuse, Plaintiff applied to two positions in different localities, both offering better compensation packages. After several weeks, Plaintiff was not selected for either position.
69. The interviewer for one position at Chesterfield County indicated that he would contact Plaintiff's supervisors to discuss Plaintiff.
70. Plaintiff's supervisor, Mr. Harrison, told Plaintiff after one of the interviews that one of the interviewers from one of the localities was his personal friend.

71. This conversation with Plaintiff came in the wake of humiliating incident with Mr. Harrison in March 2023. In March 2023, during a conversation with multiple male contractors and consultants present (none of whom were Southeast Asian American), while talking to Plaintiff, Mr. Harrison loudly said: "Don't wipe your butt (or possibly 'ass') before you shit!" in front of five or six male consultants, inspector, and contractors.

Some of the male consultant and contractor laughed or smiled when they heard it while looking at Plaintiff.

72. This statement was highly inappropriate and caused Plaintiff significant mental anguish and distress.

73. Prior to this incident, Plaintiff had informed Mr. Harrison that she intended to file a complaint regarding her demotion and was considering legal action.

74. Mr. Harrison asserted he did not believe Plaintiff would prevail in any lawsuit, exacerbating the hostile work environment.

75. Mr. Harrison removed Plaintiff from Senior Management Meeting that she usually attended when she was Water Resources Manager after Plaintiff was demoted to work under his management in early 2023.

76. Mr. Harrison resigned in May 2023.

**H. Retaliation and Hostile Work Environment Continued - Inability to Access Critical Software Tools**

77. Plaintiff considered this incident retaliation from these staff due to her EEOC complaint since Following Plaintiff's demotion on August 29, 2022 and refusal to quit despite such demotion and relocation to unbearable working conditions, Defendant continued to create an unbearable working environment in hope that Plaintiff would simply resign.

78. From the end of August 2022 until July 19, 2023, Plaintiff was subjected to discriminatory treatment (based on race, national origin, and sex) regarding access to essential project management software used for managing Defendant's CSO projects. Specifically, Plaintiff was denied access to essential project management software used for managing Defendant's CSO projects, specifically the Rapids project management tab and buyer center/management tab, tools that were critical for accessing contract data and project-related information.

79. In contrast, Plaintiff's colleagues Todd Loney and Robert Stone (who was later promoted to Plaintiff's supervisor), who were also project managers in DPU, were granted access to

these project management software tools without delay. Neither of these individuals are Southeast Asian American or from Indonesia or female.

80. Mr. Loney, who began working for Defendant in November 2022, was provided access shortly after his start date, while Plaintiff, who had been employed for over 6 years and demoted in August 2022, was denied access for almost a year.

81. Plaintiff's inability to access necessary tools placed her at a disadvantage, forcing her to repeatedly rely on Mr. Stone to obtain contract data and other information, creating inefficiencies and affecting her professional performance.

82. After months of being denied access despite repeated requests, Plaintiff redirected her request and emailed her supervisor, Mr. Whitehurst, again and asked for access to the software. Only after multiple requests did Defendant's staff begin processing Plaintiff's access on July 19, 2023, nearly a year after she was demoted to manage CSO projects.

**I. Hostile Work Environment and Retaliation - Denial of Site Access of a Project that Plaintiff Managed**

83. In addition to Defendant's refusal to provide Plaintiff access to critical software solutions, Defendant did not grant access to the McCloy Pump Station to Plaintiff's work ID card for nearly two months. Plaintiff had not been provided access on her card to the gate of McCloy Pump Station, a remote project site she managed since January 2023, even though construction started in October 2023, until May 14, 2024.

84. All contractors and consultants involved with the project (all males, not Southeast Asian American) were provided access cards since October or November 2023.

85. Plaintiff had to ask for help from other City staff or consultants, mostly men, to open the gate when visiting the site.

86. Plaintiff submitted a request for access to her supervisor Mr. Whitehurst on March 22, 2024, but it was only approved on May 13, 2024. Compared to the access card for the contractor, who is not female and is not Southeast Asian American, that was approved within a day by Eric Whitehurst, Plaintiff's access was only approved after almost two months and she requested twice, which Plaintiff perceived as discrimination (based on race and national origin), retaliation, and hostile treatment that change the condition of

her employment since she was assigned to manage the project but could not access the project site by herself and had to ask the consultant, contractor and Defendant's operation staff to help open the gate to the site for her, who are mostly male, except for one female security staff. However, after her access was approved, most of the construction works, start up and testing for the project that Plaintiff managed at the site was already completed.

87. After receiving her access card, Plaintiff continued to have issues at the McCloy Pump Station. At the end of April or early May 2024, after Plaintiff filed the amended charge, the regular security guard who opened the gate in the past refused to open the gate to Douglasdale Pump Station (which leads to McCloy Pump Station's gate) for 5-10 minutes.

88. When Plaintiff approached the security building, another security staff, who was armed and who never showed up before, appeared from the back of the security building asking what Plaintiff wanted, which was unacceptable and scared Plaintiff despite Plaintiff having the proper employment identity card/badge and had been visiting the site almost weekly. This sudden and unnecessary escalation was unjustified, intimidating, and created an environment of fear and extreme hostility for Plaintiff, since it occurred immediately after Plaintiff's EEOC filing-raises a strong inference of retaliatory motive.

89. None of the gate operation staff, contractors, and consultants are Southeast Asian American.

90. Access to the remote gate was finally provided on May 14, 2024.

**J. Discrimination and Retaliation by Patra Brodie**

91. In August 2023, Patra Brodie from Human Resources, who is not Southeast Asian American and who was also not from Indonesia, was employed by Defendant in its Human Resources Department and was aware of Plaintiff's Charge.

92. On June 27, 2023, Ms. Brodie twice interrupted and prevented Mr. Jerry Stevenson, an operational staff member, from answering Plaintiff's questions related to a project site by making demeaning statements in front of Mr. Stevenson and other operational staff, further contributing to the hostile work environment, humiliated Plaintiff and diminished

her professional authority. Ms. Brodie had the potential to damage Plaintiff's professional reputation by suggesting to Mr. Stevenson and other staff that she was being relegated to a lower-status, non-managerial role. This shift in perception likely fostered a sense of hostility and undermined Plaintiff's standing among her colleagues, further contributing to an abusive and detrimental working environment,

93. Plaintiff reasonably believes that these actions, including the demeaning statements and interference with her ability to communicate effectively with her colleagues, were retaliatory in nature, given Ms. Brodie's knowledge of Plaintiff's Charge and EEO meeting with Ms. Henderson.

94. On August 5th, 2023, Ms. Brodie singled out Plaintiff, requested that Plaintiff attend payroll training regarding non-exempt hourly employee time entry with hourly waged staff and non-management staff. Ms. Brodie emailed Plaintiff with others cc'd and insisted Plaintiff attend the training with hourly or non-management staff despite her position as a salaried Manager and she had attended the same training the year before with other managers. This training, which focused on how to enter non-exempt hourly employee time, was primarily attended by non-management staff members who were not salaried and were paid on an hourly basis. An email communication discussing this training is attached hereto as Exhibit C, and incorporated by such reference.

95. Despite Plaintiff's position as a salaried Program and Operations Manager, Ms. Brodie insisted that Plaintiff attend the training with non-management staff members, while no other Program and Operations Managers or similarly situated employees, were subjected to such a requirement. Plaintiff was the only Southeast Asian American or of Indonesian descent to attend.

96. As a result, Plaintiff attended the training on August 17th, 2023 with non management and hourly staff (some of them were the hourly field supervisor staff who had offices in the same building as plaintiff), which further causing these staff to think that Plaintiff was demoted to hourly position, since they had questioned why Plaintiff's office was moved to that building.

97. No other Program and Operations Managers were required to attend the meeting with non-management staff except Plaintiff. Plaintiff was the only Southeast Asian person from Indonesia among all program and operations managers in the DPU Department required to attend the meeting with non-manager and hourly staff

98. Plaintiff believes this was retaliation for filing the EEOC discrimination charge, and it may have caused other staff to believe Plaintiff was reassigned to an hourly position lower than theirs, contributing to the hostile work environment.

99. Ms. Brodie's behaviors undermined Plaintiff's professional standing and emotional well being.

100. Before Plaintiff's demotion in 2022, Plaintiff had attended the same training with other Managers.

**K. Extreme Weather Conditions Policy Discriminatorily Applied**

101. In February 2024, Plaintiff was informed by Mr. Whitehurst that as a Program and Operations Manager, she was considered "essential", which means the policy regarding early closures or delayed opening during extreme weather did not apply to her.

102. However, Plaintiff was informed that another female Program and Operations Manager, Susan Hamilton, who is not Southeast Asian American and was not from Indonesia, was permitted to leave early and arrive late during snowstorm alerts in February 2024.

103. This disparate treatment constitutes a materially adverse action because it subjected Plaintiff to different and more burdensome working conditions compared to her colleague, based on her protected status as a Southeast Asian American from Indonesia.

104. The discriminatory nature of this unequal treatment is evidenced by the fact that Plaintiff, as a Program and Operations Manager, was held to a stricter standard than her colleague, solely because of her ethnic background. Plaintiff's colleague, who was allowed to leave early and come late during the snowstorm alerts, is not of Southeast Asian descent, highlighting the racial disparity in the treatment of similarly situated employees.

105. This conduct by Defendant and its supervisory staff also creates an abusive and hostile working environment, as it not only subjected Plaintiff to less favorable working conditions

but also fostered an atmosphere of resentment and exclusion based on racial and ethnic lines. Such unequal treatment is sufficiently severe to alter the terms and conditions of Plaintiff's employment, contributing to the ongoing hostile environment she has described herein.

106. In sum, the differential treatment of Plaintiff, coupled with the racial and ethnic disparity in how the snowstorm alert policy was applied, constitutes a materially adverse action that is causally linked to Plaintiff's protected status.

**L. Discrimination, Retaliation, and Hostile Work Environment By Kenya Peterson**

107. Kenya Peterson and Toi Harrison or Toi Jefferson are administrative staff who help Plaintiff and other project managers with invoices and requisition processing. They are not Southeast Asian American and were not from Indonesia.

108. Ms. Peterson was assigned to help Plaintiff since July 2024, and since the beginning she has shown condescending behavior toward Plaintiff by delaying her requisition request and stated that she (Ms. Peterson) did not know what to do when asked to process a bid requisition and then questioning Plaintiff's previous project procurement codes and budget allocations loudly when Plaintiff passed by her cubicle or near the printer room, despite having no supervisory authority over her and despite Plaintiff received the numbers from other administrative staff who helped her obtained the numbers when she could not access Rapids software, even though procurement codes and budget were only around 5% from overall Plaintiff's duties. These baseless challenges further contributed to her humiliation in front of others near the printer room.

109. On November 14th, 2024, Plaintiff submitted a requisition request form for Hampton Pump Station, CSO19A and CSO19B project to Kenya Peterson ("Ms. Peterson"), who is not Southeast Asian American and was not from Indonesia, who is assigned to help all project managers working under Mr. Stone, including Mr. Stone, Plaintiff, and Mr. Todd Loney.

110. On the next day, November 15th, 2024, Mr. Stone emailed Plaintiff stating we needed to get Ms. Peterson to process the requisition before she left for vacation for two weeks.

111. On November 15, Plaintiff received an email from Ms. Peterson asking for more information and requesting Plaintiff add the buyer name on the form, even though Plaintiff had already included the buyer name (Mr. Tuttle) in her email on November 14.

112. To expedite the process, Plaintiff provided all the requested information and added the buyer name to the miscellaneous part of the form, and emailed Ms. Peterson at 9:49 AM on November 15.

113. At 10:10 AM, instead of appreciating Plaintiff's effort, Ms. Peterson condescendingly emailed Plaintiff telling Plaintiff that Plaintiff could add the buyer's name on the miscellaneous line, even though Plaintiff had already done so at 9:49 AM.

114. Plaintiff found Ms.Peterson's request to add the buyer name on the form discriminatory because other project managers (Todd Loney and Robert Stone), both male and not Southeast Asian American, did not add buyers' names on their requisition request forms before or after November 15, 2024, but Ms. Peterson did not require them to do so.

115. Plaintiff emailed Plaintiff's supervisor, Mr. Stone, to complain about Ms. Peterson's request of buyer's name on the form at 11:16 AM.

116. Plaintiff is the only Southeast Asian American project manager that Ms. Peterson assists with requisitions.

117. Ms. Peterson's discriminatory request caused delay to the project by delaying requisition data entry, especially problematic as Ms. Peterson would be on vacation for two weeks starting November 18, and we were chasing a federal grant's construction deadline of over $2,300,000.

118. At 11:24 AM, Plaintiff emailed Ms. Peterson again asking for clarification since she had not received confirmation that Ms. Peterson had seen the buyer name added to the form at 9:49 AM.

119. Between 3:00 PM and 3:30 PM on November 15, 2024, since Ms. Peterson had not confirmed by email that she received or saw the form with a buyer's name on it as she requested and she had not entered the requisition request, Plaintiff went to Ms. Peterson's desk and asked if she could open the form to verify the buyer's name was there as

Plaintiff did not want her to delay processing of the requisition form due to her not seeing the buyer's name that Plaintiff added.

120. Plaintiff said with a flat professional tone as usual "Hi Kenya, can you open the form so we could see if the buyer's name is there?" near Ms. Peterson's cubicle door and behind her chair, while Plaintiff's left hand was up in the air with all fingers open as the regular hand gesture that Plaintiff use when talking, including with her at least once before this incident, with Plaintiff's right hand holding a project folder.

121. Plaintiff was speaking with hand gestures (moving hand), which is Plaintiff's normal manner of speaking and which Ms. Peterson had observed many times previously, especially several time when she interrupted Plaintiff's conversation with Mr. Robert Stone ("Mr. RS" or "Mr. Stone"), our supervisor, in his office, and when Plaintiff talked to Ms. Peterson before.

122. Ms. Peterson jumped out of her chair and moved to the right quickly with a furious face asking Plaintiff where she was pointing at, which shocked Plaintiff.

123. Confused and feeling threatened by Ms. Peterson 's hostile reaction, Plaintiff said Plaintiff was pointing to the ground as normal people's arms with their arms on the sides of their bodies will point to the ground.

124. This was not Plaintiff's first time talking with hand gestures in front of Ms. Peterson, who had seen Plaintiff talk this way many times in Mr. RS' office and when Plaintiff talked with her.

125. Plaintiff perceived that Ms. Peterson was treating her with hostility due to her inability to talk without moving her hands or hand gestures, and found Ms. Peterson retaliated, disrespectful and uncooperative (insubordinate) for ignoring her request to open the form.

126. Ms. Peterson then disrespectfully yelled at Plaintiff to "get out of her cubicle," which was abusive and hostile, publicly disrespecting and humiliating Plaintiff as several staff heard her yelling including Yi Sang, Toi Harrison/Jefferson, and other staff whose offices were located near Ms. Peterson's office/cubicle.

127. Besides to check if she saw the buyer's name on the form that Plaintiff sent to her, Plaintiff went to Ms. Peterson's cubicle was also to inform her that she was required to complete processing the requisition on that day (November 15th, 2024).

128. Shocked, Plaintiff moved back and stood in the alley near the cubicle next to the wall of Ms. Peterson's cubicle and facing the kitchen, trying to figure out what to do about the requisition and Ms. Peterson 's hostile treatment when she needed Ms. Peterson to complete the requisition processing that day before vacation, as per Mr. Stone's instruction.

129. Yi Sang ("YS"), an Engineer with the City, then came and asked Plaintiff what happened, and Plaintiff informed him that Plaintiff's confuse why that Ms. Peterson could access files in Plaintiff's One Drive that Plaintiff did not share. YS then left.

130. Toi Jefferson or Toy Harrison ("TJ"), a DPU's administrative supervisor who is not Southeast Asian American, came and told Plaintiff she would call security, which was hostile, harassing, and disrespectful. This baseless threat was made in public and was clearly designed to humiliate and intimidate Plaintiff. The incident caused her significant emotional distress and intensified the already hostile environment.

131. Because of TJ's threat to call security, Plaintiff moved to the public printer room next to the cubicle area and was still thinking the way to inform Ms. Peterson that Mr. Stone asked her to finish processing the requisition for the Hampton PS Improvement project on that day before she leaves.

132. TJ again told Plaintiff she would call security even though Plaintiff was in a printer room available to all employees with no one else present. Since Plaintiff was in the public area, Plaintiff informed TJ that she would call security as well.

133. After that, Ms. Peterson rose from her cubicle (possibly standing on a chair or table), faced toward Plaintiff, and screamed extremely loudly (audible throughout the building): "Surani, go back to your office!!!!!!!!" , which was extremely disrespectful and insubordination since Plaintiff was informed by our supervisor, Mr. Robert Stone, that KP was required to complete her processing the requisition on that day before she left for two weeks vacation and Mr. Stone has left that office on that day and Plaintiff was going to ask her to do that.

134. Ms. Peterson 's screaming made Plaintiff's body physically shake and was extremely offensive, hostile, threatening, and abusive, causing Plaintiff to feel physically threatened and experience extreme emotional distress, as Ms. Peterson 's body is approximately twice the size of Plaintiff's.

135. After Ms. Peterson screamed, an Engineering Manager of the Defendant, Mr. Stephen Morgan ("Mr. SM") came to the public printer room and suggested Plaintiff talk to Mr. RS, whom he said was more cordial.

136. Plaintiff told him near the printer room that she considered Ms. Peterson's screaming as discrimination, which Ms. Peterson likely heard.

137. As mentioned previously when Plaintiff was directed by her supervisor, Mr. Stone, to ensure timely submission of a requisition form needed for American Rescue Plan Act ("ARPA") compliance since Ms. Peterson is leaving for a two weeks vacation after November 15, 2024. Plaintiff respectfully requested that Ms. Peterson if she can open the form to check together if the buyer name that she requested was on the requisition form that Plaintiff sent to her so she could process the form. In response, Ms. Peterson filed a complaint with Mr. Stone (Plaintiff's and her supervisor), falsely alleging that Plaintiff had harassed her, despite the absence of any threatening or unprofessional conduct on Plaintiff's part. Ms. Peterson or other might helped her to change her computer time in her complaint email to Mr. Stone to around an hour and half to two hours earlier, showing as 1:45 PM, Plaintiff perceived that this was done in order to show that she submitted the complaint earlier than Plaintiff as Plaintiff also emailed to Mr. Stone to complain about Ms. Peterson's hostile treatment and disrespectfulness against Plaintiff at 3:49 PM, even though Plaintiff went to her cubicle around 3:00 PM and her email timestamps were almost the same as Plaintiff's email timestamp in her emails to Plaintiff that morning.

138. On December 20, 2024, Plaintiff requested by email to Human Resources of Defendant that the previous or other accounts payable staff to help Plaintiff processing invoices and requisitions and that Ms. Peterson stop communicating with her due to the trauma caused by the November 15 incident.

139. However, as of January 2, 2025, Plaintiff had not received a response, and Ms. Peterson continued emailing Plaintiff invoices, causing trauma flashbacks and requiring Plaintiff to take sick and vacation leaves, and/or worked without pay in January and February 2025.

140. Ms. Peterson and TJ's hostility toward Plaintiff on November 15, 2024, severely altered the conditions of Plaintiff's employment and created an extremely abusive work environment. Ms. Peterson and TJ both treated Plaintiff with hostility due to retaliation

due to Plaintiff's EEOC discrimination charge and Court Complaint against defendant since they were aware of the charge.

141. No security staff appeared after Ms. Peterson 's extreme loud screaming.

142. Before Ms. Peterson was assigned to help Plaintiff in July 2024, Plaintiff was assisted by Miss SH since 2022, who is female and not Southeast Asian American, and was always respectful and cooperative.

143. Ms. Peterson's conduct was both discriminatory and retaliatory and was motivated in part by Plaintiff's race, gender, and her prior protected EEO activity. The City's ongoing refusal to intervene, despite actual and constructive notice, constitutes deliberate indifference.

144. These incidents are part of a broader pattern of harassment and retaliation described in Plaintiff's Second Charge, in which she specifically identified ongoing abuse by Ms. Peterson and Defendant staff as part of a continuing hostile work environment that began in 2022 and has persisted through the present.

**M. Employer's Failure to Address Complaints and Continued Retaliation**

145. On November 20, 2024, Plaintiff complained about Ms. Peterson 's discrimination and hostility that she received at the Maintenance Building to Defendant's Human Resources staff ("HR") and management.

146. As of March 11, 2025, no HR staff had contacted Plaintiff, so she emailed HR asking why nobody had responded. Finally, Plaintiff met with HR on March 19, 2025, and he asked her to repeat all complaints and said he would investigate.

147. On April 25, 2025, HR told Plaintiff he would forward the complaint to Plaintiff's supervisor, Mr. Robert Stone ("Mr. RS"), to make a decision.

148. After verbal complaint in November 2024, on December 5, 2024, Plaintiff officially emailed Mr. RS, Plaintiff's supervisor, complaining about Ms. Peterson 's extreme hostile treatment and requesting to be assisted by other administrative staff who are not Ms. Peterson, but Mr. RS told Plaintiff he could not accommodate the request. Plaintiff subsequently submitted documentation, including contemporaneous emails and a letter

from her treating physician. She requested reassignment of invoice responsibilities and a separation from Ms. Peterson to avoid further psychological harm. However, Defendant failed to take any remedial action.

149. On December 13, 2024, Mr. RS forwarded Plaintiff's request to Veronica Kenner ("VK") to see if the situation merited accommodation under ADA or FMLA guidelines.

150. On December 16, 2024, Ms. VK requested Plaintiff fill out an ADA form, which Plaintiff found humiliating as it shifted responsibility from addressing KP's hostility to treating Plaintiff as disabled.

151. On December 17, 2024, Plaintiff requested again that Plaintiff to be helped by other administrative staff due to trauma with Ms. Peterson or that Plaintiff be allowed to perform the work herself, and informed Mr. RS she was considering resigning if forced to continue working with Ms. Peterson.

152. Mr. RS responded on December 19 that he was not able to approve the request.

153. As of January 3, 2025, Plaintiff had not heard back from HR, so she submitted another complaint to HR regarding additional matters including the name tag issue and Douglas Yarhouse. HR responded that someone from Employee Relations would reach out the next week.

154. In or about January 2025, Plaintiff again raised concerns with Mr. Stone, who then cc-ed Ms. April Bingham , DPU Director ("Ms. Bingham"). She explained the lasting emotional impact caused by her interactions with Ms. Peterson and requested intervention. No corrective action was taken. Instead, Plaintiff was advised that she would need to complete disability paperwork if she wished to avoid working with Ms. Peterson—effectively blaming the victim and shifting the burden of accommodation to Plaintiff.

155. Plaintiff then had to take vacation leaves on January 10 to 17th, 2025, January 22-24th, and February 4-7 due to flashback and trauma of Ms. Peterson's extreme hostility on November 15th, 2024, who continues to email Plaintiff.

156. On February 7, 2025, Plaintiff requested again to Mr. Stone that Ms. Peterson not contact Plaintiff to prevent memory flashback of her hostility, but Mr. Stone said he could not accommodate the request.

157. After these requests, Plaintiff received emails from Ms. Peterson more frequently than before, demonstrating Defendant's lack of concern about Ms. Peterson 's discrimination and hostile treatment.

158. KP continued to email Plaintiff after requests to stop on the following dates: December 13, 18, 20, January 2, 3, 14, 27, February 7, 10, 18, 25 (twice), 26, 28 (twice), March 3, 4, 5, 17, April 8, 10 (twice), 24, May 1, 13, 29 (twice), and June 3—a total of 28 times, and it continues until today.

159. On February 18 and 25, 2025, Mr. Stone allowed Ms. Peterson informed consultants to send all invoices first to her as designated management analyst and that failure to do so would be investigated, but the third party's invoices that she sent to Plaintiff had errors (either rate error or other errors) done by the contractors/consultants on April 8, May 2, and May 12, 2025 causing ineffectiveness and inefficiency as Plaintiff had to contact the third party to fix the errors and then they had to submit the invoices to her before submitting to Plaintiff.

160. As of March 11, 2025, no HR staff had contacted Plaintiff, so she emailed HR asking why nobody had responded. Finally, Plaintiff met with HR on March 19, 2025, and he asked her to repeat all complaints and said he would investigate.

161. On April 25, 2025, HR told Plaintiff he would forward the complaint to Plaintiff's supervisor, Mr. Robert Stone ("Mr. RS"), to make a decision.

162. On April 21, 2025, Ms. Peterson walked from the end of the hallway toward the entrance when Plaintiff was walking from the entrance toward the hallway, making Plaintiff feel threatened and intimidated.

163. Ms. Peterson also used a restroom near Plaintiff's office on July 1, even though there was a closer restroom to her office, triggering Plaintiff's trauma and causing her to take sick leave on July 2.

164. On April 25, 2025, TJ appeared in the bathroom when Plaintiff went and asked if Plaintiff was ready for a meeting on Monday, April 28. TJ also stood by the building entrance when Plaintiff left. Plaintiff felt intimidated as TJ was the one who threatened to call security on November 15, 2024. Many times, JM who is TJ's staff, whose body is also larger than Plaintiff, showed up on the hallway when Plaintiff walked out of the building after work.

165. Even before November 15, Ms. Peterson was uncooperative. On October 31, 2024, Plaintiff asked Ms. Peterson to confirm if a charge on an invoice that she sent to Plaintiff was for a Minority Business Enterprise, but Ms. Peterson refused and told Plaintiff to ask the consultant herself, even though this was an easy administrative task and the previous administrative staff who helped Plaintiff had done such administrative task.

166. Defendant's request for Plaintiff to complete a disability form when reporting Ms. Peterson 's hostility and discrimination shows Defendant refused to take action to correct the discrimination and hostility.

167. Defendant did not save security camera footages from November 15, 2024 when Plaintiff requested it, even though a work incident was reported within 30 days of the incident, showing Defendant does not intend to solve and support Plaintiff's hostile treatment charge and recovery from trauma due to Ms. Peterson's hostility, and the Defendant may have violated the State's record retention requirements since the video footage may have to be saved due to the discrimination and hostile work environment incident that were reported by Plaintiff to Human Resources in November 2024.

**N. Office Move and Additional Harassment and Hostile Work Environment**

168. On September 6, 2024, Plaintiff was moved from her former office at the DPU Operation Building to the former office of another Engineering Manager ("Mr. SM"), who is male and is not Southeast Asian American.

169. Before the move, this manager repeatedly entered Plaintiff's former office quietly and looked at books and folders on the shelves in front of Plaintiff's desk.

170. One time he pulled out a large 3-inch folder full of documents from the shelf and put it back without pushing it fully in, leaving half the folder hanging out.

171. Several days later, the folder suddenly fell and struck the leg of Plaintiff's table hard. If Plaintiff had been standing there or if her table bottom was open, she could have been seriously injured.

172. In September 2024, Defendant was rearranging cubicles, and approximately 7-9 staff put their desk phones, computers, and monitors in Plaintiff's former office.

173. When Plaintiff returned on September 30 to move to her new office, she could not find Plaintiff's desk phone and monitors anywhere. Someone had removed them without asking,

even though it was clear that room was Plaintiff's office and the items should have been left for Plaintiff to move.

174. On or about September 5, while discussing the painting schedule for Plaintiff's former office with this manager, he suddenly bumped his body into Plaintiff's left arm hard, causing her body to bounce to the right. Several maintenance staff saw this incident.

**O. Additional Hostile Work Environment Due To Office Lockout**

175. On October 15, 2024, Plaintiff's current office was painted and then locked, even though it had never been locked before for more than 10 years.

176. Plaintiff's supervisor allowed her to work from home that day and afterward until painting was done.

177. When Plaintiff returned to the office on October 17, she did not have the key. She asked Ms. Toi Jefferson ("TJ"), who is a female, and is not Southeast Asian American) for help calling security to open the door.

178. Even though Ms. T.J. said yes, no one came to open the door.

179. After 5-10 minutes, Plaintiff went to the security office to check if they were coming.

180. Two female security staff (not Southeast Asian American) asked Plaintiff why she needed the door unlocked, and the security supervisor refused to unlock it.

181. Only after Plaintiff warned them it was not acceptable to refuse, did they call maintenance staff Mr. N.S. (male, not Southeast Asian) to ask if they could unlock the door.

182. This was disrespectful as painting had been completed more than 2 days earlier and Plaintiff's desk was far from the walls.

183. Plaintiff considered this incident retaliation from these staff due to her EEOC complaint since she heard TJ informing other about her discrimination complaint.

**P. Hostile Work Environment By A Third-Party Consultant**

184. During several early online project meetings with third-party project manager/consultants (Aecom and others) in February 2024, several male consultants ignored Plaintiff or pretended they did not hear her when she commented or provided input.

185. One consultant pretended his earphone was not working twice.

186. Plaintiff found this disrespectful and discriminatory as they only did this to her and not others in the meetings (approximately 4 or more people), and Plaintiff was the only Southeast Asian American in these meetings.

187. Plaintiff believes they retaliated due to her EEOC charge and Court Complaint, as all these companies have over a million-dollar contract with Defendant.

**Q. Hostile Work Environment and Retaliation By Procurement Director**

188. On May 15, 2024, Plaintiff had a meeting with procurement staff (Jerry Tuttle) and several assistant City Attorneys about a contractor's request for expenses due to delay of tunnel isolation.

189. In the beginning of the meeting, when a question about the situation was asked by procurement and Plaintiff answered, the Procurement Director, Mr. Rene Almaraz, Mr. Almaraz cut Plaintiff off hostilely and talked loudly asking about who knew about the project that could answer the question, even though, they were included in the email chains about this issue from Plaintiff to Mr. Tuttle.

190. Plaintiff perceived this as a retaliation due to Plaintiff's discrimination complaint with EEOC.

191. The procurement staff talked normally after Plaintiff's supervisor told him that Plaintiff was the project manager.

192. Both procurement staff are males, are not Southeast Asian American, and are not from Indonesia.

193. Several Assistant City Attorneys attended this conference call or meeting and witnessed this hostility, including Ms. Emily Messer, Ms. Susan McKenney, and Ms. Caitlin Weston. All these staff are females, are not Southeast Asian American, and are not from Indonesia.

**R. Electrician Threatening Behavior**

194. On June 18, 2024, when Plaintiff was at McCloy project site, an electrician (DY's staff) opened the Control Panel Room door for Plaintiff since she was not provided with a key even though she is the project manager. This staff is not Southeast Asian American and was not from Indonesia.

195. When Plaintiff was talking with him and asked if he could lock the door after she checked the panel's alarms, he suddenly made one big step to move closer to Plaintiff suddenly twice, causing Plaintiff to move one step back immediately twice.

196. This movement was unacceptable and made Plaintiff feel distressed and scared.

**S. Retaliation and Hostile Work Environment Created by Ms. Bingham Continues**

**(Larus Court Permit Issue)**

197. In May 2023, a permittee contacted DPU Director Ms. April Bingham to request reimbursement of stormwater management design fees for his permit at 9300 Larus Court in Richmond, which was issued by Plaintiff's former staff but revoked by a consultant hired to review the permit after Plaintiff's demotion. Ms. Bingham is not Southeast Asian and was not from Indonesia.

198. The permittee was considering suing Defendant for this cost.

199. Plaintiff was never contacted by Ms. Bingham about it before being contacted by the permittee, even though Plaintiff could have provided permit information and City Code regulations to validate the permit requirement and issuance.

200. Plaintiff learned about the complaint after the permittee cc'd her on his email to Ms. Bingham several months after he first contacted her.

201. When Plaintiff emailed the City Attorney on June 5, 2023, to provide subdivision permit requirements and other information to clarify that the previous permit requirements were valid, Ms. Bingham warned Plaintiff to "minimize and/or eliminate written communication" about the matter in an email the same day that she cc'd to others.

202. This directive by Ms. Bingham was perceived by Plaintiff as retaliatory and discriminatory, aimed at minimizing Plaintiff's ability to provide written document of Plaintiff's work's compliance with the applicable regulations, thereby obscuring the paper trail reflecting Plaintiff's efforts in accordance with City's Ordinance and alter Plaintiff's employment conditions and potentially could cause issues with Plaintiff's future federal and state agencies' required reporting requirements.

203. This instruction was particularly concerning because Plaintiff had acted in accordance with the prescribed regulations and had provided written records to support the permit

decision, which were required for future compliance audits by State Agency (Department of Environmental Quality).

204. Ms. Bingham's actions seem to suggest a retaliatory attempt to undermine Plaintiffs hardwork and due diligence in fulfilling Plaintiff's duties.

205. Ms. Bingham is female and is not Southeast Asian American.

206. Furthermore, the consultant Ms. Bingham's team hired approved the permittee's application for an agreement in lieu of plans even though previously Plaintiff and her former staff did not allow it because the permittee's company owned two parcels in the subdivision.

207. Plaintiff's rejection had been based on the interpretation of the City Code, which held that the agreement was only applicable to single family residences that are not located within a common plan of development. The consultant's subsequent approval of the application of the agreement in lieu of plans, despite Plaintiff's objection and established criteria, underscores a possible deviation from established policies.

208. Later in May 2023, specifically on May 15, 2023, and during official meeting, Ms. Bingham issued instruction that Ms. Barbara Jackson, the Wastewater Treatment Plant Operations Supervisor ("Ms. Jackson") be included in all meetings related to combined sewer overflow (CSO) projects. Previously, Plaintiff was only required to engage the Operations Division as necessary. Plaintiff felt that this change in protocol was implemented in retaliation for Plaintiff's prior protected activities and had the effect of diminishing Plaintiff's authority and professional standing within the department, as example related to Dock St Pump Station project as specified later below.

**T. Retaliation and Hostile Work Environment: Abbey Road Permit Email Restriction**

209. On July 8, 2022, Plaintiff sent multiple emails regarding a building permit application at Abbey Road (the "Abbey Road Project") to a permittee and other permit reviewers.

210. Sending these emails was consistent with Plaintiff's mandated duties pursuant to Plaintiff's Employer/City of Richmond's ordinances, as the permittee was required to submit another permit application due to the size of disturbance.These actions were necessary to prevent delays in the permitting process, particularly given the location of the site in the Resource Protection Area (RPA), where timely communication is crucial for compliance.

211. PDR staff assigned the permit to Plaintiff on July 8, 2022, and informed her it had to be reviewed immediately as the permittee had complained to City Council.

212. After Plaintiff sent the two emails, one to the permittee and another one to PDR about the permit application, Ms. Bingham sent Plaintiff an email instructing her not to send more than two subsequent emails on the same topic, in a clear attempt to cover up paper trails reflecting Plaintiff's due diligence and efforts to do her duties. Ms. Bingham's action created an abusive working environment designed to undermine Plaintiff's professional standing and ability to perform her duties effectively.

213. Plaintiff considers this request discrimination as she was the only permit reviewer and manager for the permit to whom Ms. Bingham made this request, and Plaintiff was the only Southeast Asian American from Indonesia. The restraint and interference were not imposed against any other employees of the Defendant.

214. Plaintiff had to send more than two emails because: (1) the first was to PDR staff to inform them she reviewed and denied the permit; (2) the second was to the permittee to inform her of requirements to obtain approval; and (3) the third was to answer the permittee's questions in her response.

215. The permittee appreciated and thanked Plaintiff for the information in her emails.

216. Since the site was located in Resource Protection Area (RPA), it was important that the permittee receive comments as soon as possible to prevent delay, as PDR usually does not inform applicants why other departments (including Plaintiff's Department) deny permits.

217. Ms. Bingham's request ignored the fact that both PDR and the permittee appreciated the information Plaintiff provided.

**U. Retaliation and Hostile Work Environment Created by Ms. Jackson and Mr. Whitehurst**

218. On May 15, 2023, in an online meeting, Director April Bingham instructed that Barbara Jackson (Ms "BJ", "Wastewater Treatment Plant Operation Supervisor) be included in all meetings for CSO projects immediately instead of prior to preconstruction meeting or when necessary, which Plaintiff believes to be retaliatory.

219. In July 2023, Ms. Jackson loudly dismissed the necessity of the Dock Street Pump Station Upgrades project in Plaintiff's office, despite Plaintiff's detailed explanations, which could be heard by her staff, Ronald Story, whose office was located in front of Plaintiff's former office.

220. Ms. Jackson also dismissed the necessity of the Pump Stations' generators project, and repeatedly claimed that the existing generator was sufficient or a unit could be borrowed from the Water Treatment Plant.

221. When Plaintiff reiterated the project's necessity and the legal implications of its cancellation, including potential federal scrutiny regarding the allocated federal grants, Ms. Jackson continued to disregard the explanation. The persistent rejection of Plaintiff's professional expertise contributed to the hostile work environment.

222. In June 2023, in a meeting with Mr. Mr. Whitehurst and Ms. Jackson in Mr. Whitehurst's office, Plaintiff was instructed by both Mr. Whitehurst and Ms. Jackson to cancel the Pump Stations Generator Project, despite its critical function of designing and procuring generators for five combined sewer pump stations. Ms. Jackson repeatedly claimed that she has an existing generator, or a generator could be borrowed from the Water Treatment Plant, which was supported by Mr. Whitehurst. Mr. Whitehurst then requested Plaintiff to cancel the generator project, which Plaintiff did. The cancellation of a critical infrastructure project under Plaintiff's purview directly undermined her authority and role within Defendant.

223. On August 10, 2023, in a meeting attended by external consultants, Ms. Jackson openly and aggressively berated Plaintiff, asserting that she was the decision-maker, contrary to the known chain of command, which designated Mr. Whitehurst as the responsible official. This occurred in front of professional colleagues before Mr. Whitehurst's arrival, following Plaintiff's attempt to discuss the budget for a critical switchgear project as instructed by Mr. Eric Whitehurst. Ms. Jackson's conduct was demeaning, public, and intended to diminish Plaintiff's authority.

224. When Mr. Whitehurst arrived at the meeting, he failed to recall the scope of the Dock Street Pump Station Upgrades Project despite multiple prior discussions and email communications with Plaintiff. Instead of consulting Plaintiff, Mr. Whitehurst deferred to external consultant, a decision that publicly undermined Plaintiff's expertise and professional credibility. The presence of an external consultant in the meeting, Mr. George Guhse ("Mr. Guhse"), who displayed hostility and questioned the necessity of the project in an unfriendly manner, further exacerbated the humiliation. This pattern of treatment altered Plaintiff's working conditions and created an abusive working environment. While Ms. Jackson later apologized for yelling at Plaintiff and publicly humiliating her, an apology does not mitigate the severe emotional distress, mental anguish, and humiliation that Plaintiff endured. Another consultant who also attended the meeting, Mr. Brandon Cooper, who is a male and is not a Southeast Asian American, did not say anything when Mr. Whitehurst questioned Plaintiff about the project scope, even though he also received the email about the project scope previously.

225. Mr. Guhse, a male and is not a Southeast Asian American, also acted hostile against Plaintiff in that meeting, as he also questioned the scope with hostile/angry face, which Plaintiff considered as retaliation in support of the Defendant's agents as his company had a substantial amount of contract with the Defendant.

226. In a meeting with Barbara Jackson and Eric Whitehurst in June 2023, both informed Plaintiff that the Dock St generator projects were not needed and asked Plaintiff to cancel the Pump Station Generator Project, which Plaintiff did.

227. Mr. EW, Ms. Barbara Jackson, Mr. Cooper, and Mr. Guhse are all not Southeast Asian American.

**V. Defendant Altered Terms and Conditions of Plaintiff's Employment**

228. Due to all the aforementioned discriminations, retaliation, harassments, and hostile treatments against Plaintiff, Plaintiff has been subjected to severe and pervasive conduct by multiple supervisors, colleagues, and coworkers of Plaintiff. Plaintiff was retaliated against and was treated with hostility for engaging in Equal Employment Opportunity's protected activity with the City's Human Resources EEO, EEOC and the Court.

229. Defendant altered the terms and conditions of Plaintiff's employment in an unsuccessful attempt to constructively discharge Plaintiff. Plaintiff, a dedicated civil servant, has and continues to suffer significant injury as a result of the egregious conduct of Defendant and its agents.

## CAUSES OF ACTIONS

**COUNT I through III: DISCRIMINATION BASED ON RACE, COLOR, AND NATIONAL ORIGIN IN VIOLATION OF TITLE VII of the Civil Rights Act of 1964, as amended(42 U.S.C. §§ 2000e, et seq.)**

230. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint and restating all complaints in all preceding paragraphs with the same force and vigor as if set out here in full.

231. At all relevant times, Plaintiff is a member of a protected class based on her race ( Plaintiff is Southeast Asian), color, and national origin (Plaintiff is from Indonesia) who has a distinct Indonesian accent.

232. Due to Plaintiff's race and ethnicity, Plaintiff has certain physical characteristics which include dark circles that surround Plaintiff's eyes and appear to be "black eyes" (e.g., as if Plaintiff had been punched in the eye) at first glance.

233. Plaintiff is the only Program and Operations Manager of similarly situated employees of Defendant, who is Southeast Asian American from Indonesia.

234. Plaintiff's work performance was consistently satisfactory or meeting standards, and she received no disciplinary actions prior to the discriminatory conduct described herein.

235. During Plaintiff's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against her with respect to the terms and conditions of her employment based on the race, national origin, color, ethnic and physical characteristic of Plaintiff being a Southeast Asian-looking person of Indonesian descent (e.g., Southeast Asian appearance with Indonesian accent as opposed to Caucasians and other ethnicities without Indonesian accent) and speaks English with

Indonesian accent. Plaintiff was treated differently simply because she did not look or speak like the other managers, co-workers, colleagues, and her supervisors.

236. Defendant subjected Plaintiff to hostile and adverse employment actions and Plaintiff's supervisor failed or negligence to correct these hostile and adverse and disparage actions against Plaintiff including but not limited to: demotion to non-supervisory and non-program administration position, imposition of unreasonable work restrictions that the Defendant's staff did not require other similar situated employees to do, relocation to offices with unbearable and unsafe working conditions that had extreme temperatures around 61 degrees Fahrenheit in the winter and up to 86 degrees Fahrenheit in the summer; requirement to attend payroll training with non management staff that other program managers did not have to do, denial of front door key for four months, denial of office's temperature control panel's lockbox key, denial of proper office identification with title; denial of access to critical software tools for almost a year; denial of McCloy's site access for several months; disparate treatment regarding extreme weather policies; subjection to harassments and hostile work environments; public humiliation; and constructive discharge attempts by her supervisors, who were the Defendant's agents/staff. All these actions constitute unlawful discrimination based on Plaintiff's race, color, sex and national origin. Even after Plaintiff submitted complaints to her supervisor, Mr. Whitehurst, the Defendant's Deputy Director, about the aforementioned discrimination and hostile treatment, Defendant through Mr. Whitehurst's actions failed to correct or did not correct the Defendant's staff actions and/or the aforementioned hostile treatments, and allowed Plaintiff to be treated differently with no access to key to temperature control panel's lockbox, no access to front door key for 4 months, no access to project site's gate for months, no access to critical software for a year, no title tag on her office's front door, was required to attend an hourly payroll training with nonmanagers, and was placed in an office that had regular rotten egg gas smell and allowed her office temperatures to be set to extreme temperatures around 60 degrees in the morning and 80 degrees in the afternoon when it's hot outside.

237. Plaintiff's current supervisor, Mr. Stone, who is the Defendant's Deputy Director, also failed to protect Plaintiff from further trauma due to Kenya Peterson's hostility, and failed to prevent discrimination treatment from Kenya Peterson against Plaintiff after Plaintiff

complained to him that she asked Plaintiff to fill in buyer's name on the requisition form that she did not ask other project manager, including Mr. Stone, to do.

238. Defendant's conduct through its staff and supervisors, including, but not limited to, demeaning and defaming remarks against Plaintiff, imposition of unreasonable work restrictions that the Defendant's staff did not require other similar situated employees to do, discrimination, targeted harassments, extreme hostile treatment and public humiliation, constitutes unlawful discrimination based on Plaintiff's race, color, and national origin.

239. Plaintiff's experiences with Ms. Peterson reflect a pattern of discriminatory conduct based on Plaintiff's race, color, sex, and national origin. Ms. Peterson's repeated hostility, including obstruction of Plaintiff's professional responsibilities, and manufactured complaints to HR, were motivated at least in part by discriminatory animus. Ms. Peterson treated Plaintiff,who is of Asian descent and identifies as a woman of color from Indonesia, differently than other similarly situated employees and actively sought to undermine her authority and professional standing within Defendant.

240. Plaintiff was treated differently than similarly situated employees outside the protected classes of race, color, and/or national origin. Similarly situated employees outside Plaintiff's protected classes, who are not Southeast Asian American and are not from Indonesia and don't have Indonesian accent, were not subjected to these adverse employment actions.

241. Defendant treated Plaintiff less favorably than similarly situated employees outside her protected classes. For example, while male and non-Southeast Asian managers such as Mr. Glenn, Mr. Weeks, and Mr. Boston received consistent performance evaluations and corresponding pay increases, Plaintiff's evaluations were delayed, unfairly negative, or withheld altogether, despite her superior performance and tenure. This disparity in treatment reflects discriminatory bias on the basis of her national origin, color, and sex. As a comparison, in 2021, Plaintiff's salary was higher than Mr. Williams Boston's salary and Mr. Kenny Weeks' salary, but since Plaintiff's demotion, in 2024 Plaintiff's salary is lower than Mr. Boston and Mr. Weeks.

242. Plaintiff was also subjected to differential treatment and workplace hostility from security and facilities staff, who routinely ignored or dismissed her reasonable requests

related to her office environment and falsely accused her of misconduct in the presence of Ms. Peterson. These employees treated white colleagues and male managers with greater courtesy and deference, further contributing to a racially and sexually hostile environment.

243. Defendant's actions through its staff were motivated by discriminatory animus based on Plaintiff's race, color, national origin, and her Indonesian accent. The Defendant and its staff's aforementioned discriminatory actions adversely affected the terms, conditions or benefits of Plaintiff's employment.

244. Despite Plaintiff's multiple internal complaints regarding discriminatory treatment, Defendant leadership failed to investigate or intervene. The indifference of supervisors and HR personnel—especially Ms. Harrison, Mr. Whitehurst, and Mr. Stone—permitted the discriminatory conduct to continue unchecked and demonstrated institutional bias against Plaintiff based on her protected characteristics.

245. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer multiple adverse employment actions and substantial damages including but not limited to: loss of career advancement opportunities, demotion, relocation to offices with unbearable working conditions; lost wages and benefits; loss enjoyment of life after work and during weekends and holidays; emotional distress; mental anguish; humiliation; damage to professional reputation; and other economic and non-economic damages.

246. The effect of these practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected her employment status.

247. These unlawful employment practices were intentional.

248. The unlawful employment practices were undertaken with malice or with reckless indifference to Plaintiff's federally protected rights.

249. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry and hypervigilant, suffering, pain, humiliation, embarrassment, mental anguish, damage to Plaintiff's professional reputation, and emotional distress, all to her damage, in amounts within the jurisdictional limits of this Court, to be proven at trial.

250. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career advancement/path opportunities, and expenses, in an amount to be proven at trial.

251. In acting as alleged herein, Defendant, acting through its agents, has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages from Defendant.

252. As a result of Defendant's acts of discrimination as alleged herein, Plaintiff is entitled to all reasonable attorney's fees, all court costs, and other costs and expenses of suit.

**COUNT IV: DISCRIMINATION BASED ON SEX IN VIOLATION OF TITLE VII**

253. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint and restating all complaints in all preceding paragraphs with the same force and vigor as if set out here in full.

254. At all relevant times, Plaintiff was a member of a protected class based on her sex (female).

255. Plaintiff's work performance was consistently satisfactory and she received no disciplinary actions prior to the discriminatory conduct described herein.

256. Defendant subjected Plaintiff to adverse employment actions including but not limited to: denial of proper office identification with job title; subjection to hostile work environments; was not provided with timely access to rapid project management's softwares; was not provided with front door key to her office building for four months; was not provided with timely access to site on her ID badge, and disparate treatment compared to male employees from similarly situated employees including was required to fill in buyer's name on the requisition form by Kenya Peterson when other male project managers were not required to do.

257. Male employees and male contractors and consultants, including but not limited to Douglas Yarhouse, Ronald Story, and Barry Deaton received more favorable treatment including: proper office door's identification with title tags at maintenance building; access to maintenance building's front door key even though Plaintiff was not provided with access for four months; approval of access to project site within a week or on the same day; and access to temperature control's lockbox and to set temperatures in the office. Male project managers including Todd Loney, Robert Stone, and Stephen Morgan had timely provision of project management software access and non-discriminatory treatment from administrative staff (Kenya Peterson) when submitted requisition form, and respectful treatment from administrative staff including and not limited to when they stood in the hallway and printer room.

258. Defendant treated Plaintiff less favorably than similarly situated employees outside her protected classes. For example, while male and non-Southeast Asian managers such as Mr. Glenn, Mr. Weeks, and Mr. Boston received consistent performance evaluations and corresponding pay increases, Plaintiff's evaluations were delayed, unfairly negative, or withheld altogether, despite her superior performance and tenure. This disparity in treatment reflects discriminatory bias on the basis of her national origin, color, and sex. As a comparison, in 2021, Plaintiff's salary was higher than Mr. Williams Boston's salary and Mr. Kenny Weeks' salary, but since Plaintiff's demotion, in 2024 Plaintiff's salary is lower than Mr. Boston and Mr. Weeks.

259. Defendant's actions were motivated by discriminatory animus based on Plaintiff's sex. Plaintiff was treated differently than similarly situated employees outside Plaintiff's protected class based on sex.

260. The Defendant and its staff's aforementioned discriminatory actions adversely affected the terms, conditions or benefits of Plaintiff's employment.

261. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer substantial damages including but not limited to: lost wages and benefits; emotional distress; mental anguish; extreme humiliation; trauma; damage to professional reputation; and other economic and non-economic damages.

**COUNT V: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, AS TO NATIONAL ORIGIN, COLOR, SEX, AND RACE (42 U.S.C. §§ 2000E, ET SEQ.)**

262. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint and restating all complaints in all preceding paragraphs with the same force and vigor as if set out here in full.

263. Plaintiff filed multiple internal complaints with Defendant's Human Resources (HR) Staff and external complaints with EEOC, and spoke to various HR and EEO representatives of Defendant in 2022,2023, 2024, and 2025, including: a. Complained to HR regarding Ms. Bingham's Black Eyes Comment; b. Complained to HR and speaking with HR representative, Ms. Haskins, regarding Ms. Bingham's imposition of a discriminatory and retaliatory requirement regarding drafts of customer letters; c. Meeting with EEO manager Ms. Henderson regarding Ms. Bingham's conduct and comments; d. Contacting EEO assistant manager Mr. Chester Keeley to submit EEO complain because Ms. Henderson did not respond to Plaintiff's emails; e. Submitted an EEOC discrimination, retaliation, and hostile work environment charge against defendant in December 2022 and was interviewed by EEOC on December 5th, 2022. However, since EEOC's portal won't save Plaintiff's charges, the charge was officially accepted by EEOC on March 27, 2023 Complained about Mr. Battle's conduct to Plaintiff's supervisor, Mr. Harrison and Mr. Whitehurst; f. Complained about Mr. Yarhouse's conduct to HR and Plaintiff's supervisor, Mr. Whitehurst; g. Complained about Ms. Peterson's extreme hostility and discrimination and Ms. Jefferson's hostility to HR and Plaintiff's supervisor, Mr. RS and requested protective accommodations based on her mental health effects related to ongoing workplace hostility; h. Complained to Court and filed a lawsuit in Court against Defendant for violation of Title VII on July 26, 2023 (Case No. 3:23-cv-00475) due to demotion, discrimination, retaliation, and hostile work environment based on race, national origin, and color; i. Filed an Amended Complaint in the Court on February 11, 2025 and included other complaints that were filed in the second EEOC Charge that was filed on April 2024, June 2024, December 2024 (first submitted to Mr. Deandre Whitehurst from EEOC and Plaintiff was interviewed by

EEOC about the charge in December 2024), and charge was officially accepted by EEOC on January 27, 2025; j. Filed a complaint to HR regarding the complaints in this complaint; j. Complained to Plaintiff's supervisor, Mr. Whitehurst about front door key, and blocked bathroom doors and about Mr. Yarhouse programmed extreme temperatures in her office, Mr. Yarhouse's discriminatorily did not provide Plaintiff with temperature control panel lockbox key while other male staff in the office were provided with.

264. Plaintiff engaged in protected activity by: (a) filing a Charge of Discrimination with the EEOC on November 22, 2022 that was amended in December March 27, 2023 (Charge No. 438-2023-00359); (b) filing a lawsuit in federal court on July 26, 2023 (Civil Action No. 3:23-cv-00475) and filing an amended complaint for the Case on February 11, 2025; (c) filing additional charges of discrimination with the EEOC in April and June 2024 and then submitted additional Charge of Discrimination, retaliation, and hostile work environment against Defendant to Mr. Deandre Whitehurst from EEOC and was interviewed by him in December 2024; (d) Plaintiff's additional charge of discrimination, retaliation, and hostile work environment was officially accepted by EEOC on January 27, 2025 (Charge No. 438-2024-01500) after the submit button was not working for many times since December 2024; and (d) complaining about discrimination, retaliation, harassments, and hostile treatment to supervisors and human resources staff.

265. Plaintiff's work performance was consistently satisfactory and she received no disciplinary actions prior to the discriminatory conduct described herein.

266. Defendant and its staff were aware of Plaintiff's protected activity. Plaintiff informed Douglas Yarhouse and Barry Deaton of Plaintiff's EEOC charge when Plaintiff moved to the Maintenance Building in July 2023 because they were questioning why Plaintiff's was moved to the building while they were no other salaried staff or manager or engineer who had an office there. Plaintiff also informed Plaintiff's current supervisor, Deputy Director Robert Stone, about Plaintiff's EEOC charge and lawsuit against the defendant in our meeting in September and December 2024 and in 2025. In addition, Toi Harrison or Toi Jefferson was aware of Plaintiff's EEOC charge. Furthermore, Mr. Stone and Kenya Peterson ("Ms. Peterson") already knew about Plaintiff's discrimination charge in September 2024 because when Plaintiff asked KP to register Plaintiff to a conference in

September 2024, oddly she asked Plaintiff to ask for permission from Mr. Stone, even though Plaintiff and other managers have been approved to attend this training since 2022 and she had enrolled herself to the training with a two night hotel stay, even though she is not an engineer and does not need engineering's continuing education credit. Mr. Stone would not approve Plaintiff to go to the training conference due to political condition in September 2024, even though he approved Plaintiff's training request in 2025 after filing an EEOC charge about it.

267. Following Plaintiff's protected activity, Defendant subjected Plaintiff to a continuing pattern of retaliatory conduct including but not limited to:

a. Demoting Plaintiff within weeks of her complaints to a lower-status, non supervisory position.

b. Imposing unique restrictions on Plaintiff's email communications, while similarly situated colleagues were exempt.

c. Delaying or denying access to necessary project management tools, impeding her ability to perform job duties.

d. Moving Plaintiff to unsafe and intolerable office conditions in response to her discrimination complaints. Continued retaliation from Defendant by its supervisor, because Mr. Whitehurst continued to place Plaintiff in the maintenance building that vibrated really hard often due to continuous nearby constructions, even though Plaintiff reported to him that the women washroom was not working most of the time, the bathroom door was blocked several times, and the massive rotten egg odor emissions in the building numerous times after other (operation) staff left the building. Continued discriminatory and retaliatory treatment because Mr. Whitehurst failed to provide Plaintiff with the office door's title tag and front door key of maintenance building until Plaintiff moved to other office in July 2024.

e. Continued retaliation from Douglas Yarhouse that Plaintiff reported and complaint to her supervisor, Mr. Whitehurst, the Defendant's Deputy Director, but Mr. Whitehurst failed to intervene especially failed to provide Plaintiff with the key to the lockbox of Plaintiff's office temperature control panel, and failed to require Mr. Yarhouse to set the temperatures in Plaintiff's office to OSHA's recommended temperatures continuously and allowed the temperatures to be set to extreme temperatures outside of OSHA's recommended temperatures.

f. Plaintiff's supervisor, Mr. Whitehurst, allowed retaliation, did not object to and failed to intervene when Plaintiff questioned Patra Brodie's requirement for Plaintiff to attend payroll training with non managers that was cc-ed to him, and retaliation from Human Resources Staff (Patra Brodie), who required Plaintiff to attend payroll training with non-management staff when other managers, who are not Southeast Asian or who are not from Indonesia or who do not have Southeast Asian accent, were not required to do so.

g. Plaintiff's supervisors, Mr. Harrison and Mr. Whitehurst, delayed provision of Rapid's project management software access for almost one year compared to other male and non Southeast Asian managers (who were also not from Indo who received the access immediately.

h. Plaintiff's Supervisor, Mr. Whitehurst, delayed provision of McCloy Pump Station's site access for months, while male and non Southeast Asian contractors and consultants, who are also not from Indonesia, received immediate access or within a week after they requested.

i. Security guard refusal to open gate and appearance of armed security staff at project site (end of April/early May 2024), while other contractor and consultants who are not Southeast Asian and not from Indonesia, were allowed to get in immediately.

j. Third-party inspector Danny McCollum's hostile treatment after Barbara Jackson allowed him to stay.

l. Procurement staff's hostile interruption of Plaintiff in meeting with City Attorneys (May 15, 2024).

m. Office lockout incident at the Operation Center while they had never locked the door when the previous manager was there (about September or October 2024).

n. Kenya Peterson's discriminatory requisition form requirement that she did not ask other non female and non Southeast Asian project manager (who are also not from Indonesia) to do, and her subsequent extreme hostility including public screaming at Plaintiff at a public printer room while she did not do that to others (November 15, 2024).

o. Toi Jefferson's threat to call security on Plaintiff when she stood in the public hallway and public printer room (November 15, 2024).

p. Continued emails from Kenya Peterson after Plaintiff requested to Defendant for no interaction with her (28 emails between December 13, 2024 and June 3, 2025).

q. Denial of Plaintiff's requests to have other staff help Plaintiff processing her invoices and requisitions or to process requisitions and invoices herself.

r. Request for Plaintiff to complete ADA forms rather than addressing the hostile work environment.

s. Failure to provide security camera footage when received FOIA request from Plaintiff to document incidents.

t. Failure to save security camera footage from November 15, 2024 incident.

u. Failure to investigate and remediate complaints despite repeated requests.

**268.** Plaintiff was deliberately excluded from team meetings, critical communications, and decision-making processes. Ms. Peterson and others were permitted to work around or over Plaintiff's position, undermining her authority. Facilities staff refused to support her workplace needs, and Plaintiff's office conditions deteriorated, despite repeated requests. These conditions escalated after each instance of EEO activity and formed part of a sustained retaliatory pattern.

**269.** Defendant's retaliatory acts caused Plaintiff to suffer severe emotional distress, trauma, and anxiety, culminating in medical treatment, lost earnings, and stagnated career progression. These harms were foreseeable and directly linked to her protected EEO conduct, thereby violating Title VII's anti-retaliation provision.

**270.** But for Plaintiff's complaints, Plaintiff would not have been demoted and subjected to continuous attempts to constructively discharge (forced resignation) Plaintiff.

**271.** Following her Second Charge, Plaintiff received a performance review in 2025 that included unfounded criticisms, vague concerns about communication, and misleading judgments unrelated to her actual job performance. These negative statements reflected retaliatory animus and were inconsistent with Plaintiff's historical performance. The review excluded major accomplishments and blamed Plaintiff for vendor errors,

furthering her reputational harm and limiting her eligibility for salary increases and advancement.

**272.** There is a causal connection between Plaintiff's protected activity and the adverse actions, demonstrated by the temporal proximity between Plaintiff's protected activity (internal complaint, complaint with EEOC, the Defendant's EEO Division, and the US District Court) and the Defendant's retaliatory conducts, and by the pattern of escalating adverse actions following each instance of protected activity.

**273.** A reasonable employee would have found the retaliatory actions materially adverse in that they would dissuade a reasonable employee from engaging in protected activity.

**274.** As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer substantial damages including but not limited to: lost wages and benefits; career advancements, bonuses, physical damages, mental and psychological damages in the form of extreme and enduring worry, suffering, pain, emotional distress; severe anxiety; trauma; mental anguish; public humiliation; damage to professional reputation; medical expenses for trauma counseling; and other economic and non-economic damages.

**275.** In acting as alleged herein and aforementioned, the Defendant's actions constitute conscious, malicious, and reckless disregard of Plaintiff 's rights that are protected under Title VII.

**276.** Defendants' violations of Title VII establish a cause of action, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs of suit to Plaintiff in the amounts to be proved at trial.

---

**COUNT VI: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, FOR ENGAGING IN PROTECTED ACTIVITY (42 U.S.C. §§ 2000E, ET SEQ.)**

277. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint and restating all complaints in all preceding paragraphs with the same force and vigor as if set out here in full.

278. Following Plaintiff's protected activity, Defendant subjected Plaintiff to a continuing pattern.

279. Plaintiff filed a formal Charge with the EEOC, the existence of which was disseminated to all of her supervisors and multiple coworkers, including, but not limited to, April Bingham, Eric Whitehurst, Alan Harrison, Barbara Jackson, Ms. Brenda Henderson (HR), Patra Brodie (HR), Douglas Yarhouse, Barry Deaton, Chris Battle, Robert Stone, Toi Jefferson, Kenya Peterson, and other Defendant's staff.

280. But if Plaintiff did not submit a complaint to the Defendant's Human Resources Staff and Equal Employment Opportunity Manager and staff in July, August, November 2022 and January 2023, and then filed EEOC Charges or Amended Charges in November 2022, January 2023, April 2024, June 2024, and January 2025 Plaintiff would not have been relocated to a trailer as an office that has unbearable conditions with programmed extreme temperatures, massive rotten egg smell daily and strong building vibration regularly during constructions, and subjected to continuous retaliation attempts to constructively discharge Plaintiff including but not limited to:

a. Imposing unique restrictions on Plaintiff's email communications, while similarly situated colleagues and all other program managers were exempt;

b. Moving Plaintiff to unsafe office conditions in response to her discrimination complaints/charges.

c. Requiring Plaintiff to attend payroll training with non-management staff while other managers were not required to do and other managers were allowed to attend the training with managers;

d. Delayed provision of Rapid's project management software access for almost one year compared to other project managers received the access immediately. Delaying or denying access to necessary Rapids' project management tools for almost a year, impeding her ability to perform job duties;

e. Delayed provision of McCloy Pump Station's site access for months, while contractors and consultants for the project received immediate access or within a week after requested;

f. Security guard refusal to open gate and appearance of armed security staff at project site but they did not do that to others who needed to go to McCloy Pump Station site;

g. Third-party inspector Danny McCollum's hostile treatment;

h. Third-party consultants ignoring Plaintiff or pretending not to hear her in meetings;

i. Procurement staff hostile interruption of Plaintiff in meeting with City Attorneys;

j. Office lockout incident after painted;

k. Kenya Peterson's discriminatory requisition form requirements and subsequent extreme hostility including public screaming at Plaintiff;

l. Toi Jefferson's threat to call security on Plaintiff;

m. Continued emails from Kenya Peterson after Plaintiff requested no contact (28 emails between December 13, 2024 and June 3, 2025);

n. Denial of Plaintiff's requests to have Kenya Peterson replaced or to process requisitions and invoices herself;

o. Request for Plaintiff to complete ADA forms rather than addressing the hostile work environment;

p. In 2024, Plaintiff submitted a letter from her treating medical provider confirming that continued workplace interactions with Ms. Peterson were exacerbating her trauma symptoms. Plaintiff requested reassignment of duties or modification of reporting lines as a reasonable accommodation. This request followed her prior EEOC activity and was itself a protected expression of rights under Title VII. Management not only ignored the provider's recommendations but further retaliated by threatening Plaintiff with the need to file for disability if she sought relief—implicitly punishing her for asserting her rights.

q. After again raising complaints in 2025 regarding Ms. Peterson's behavior and requesting that invoice responsibilities be reassigned, Plaintiff was issued a retaliatory performance evaluation that unfairly criticized her communication, referenced events outside the review period, and mischaracterized her good-faith correction of consultant errors as misconduct. These events followed her renewed internal objections and were calculated to chill further protected activity.

r. In November 2024, Plaintiff was falsely accused of harassment by Ms. Peterson following a workplace interaction regarding an urgent requisition. Despite acting professionally and in

accordance with supervisory instructions, Plaintiff was threatened with involvement of security personnel. This threat was not made in response to any actual misconduct but as a retaliatory tactic to isolate and intimidate Plaintiff for previously exercising her EEO rights.

s. Plaintiff reported the fabricated incident and continued retaliation to HR and Defendant staff, including Ms. Bendernagel, the Defendant's Senior Deputy Director. Despite these reports, no remedial action was taken. Instead, her responsibilities remained unchanged, and she was subjected to ongoing scrutiny and marginalization. This inaction—when Defendant was on actual notice of Plaintiff's protected activity—reinforces the inference of retaliatory intent under Title VII.

281. Several of the retaliatory acts described herein occurred outside the formal scope of Plaintiff's EEOC charges, but still fall squarely within the ambit of Title VII's protections. These acts include performance-based discipline, denial of benefits, manipulation of work assignments, and refusal to provide workplace safety—all of which were materially adverse and occurred in close temporal proximity to Plaintiff's protected opposition and participation in EEO processes.

282. The retaliatory conduct described was not isolated but part of a sustained pattern of reprisal, culminating in lasting professional and psychological harm to Plaintiff. The City's actions would dissuade a reasonable person from engaging in protected activity and constitute unlawful retaliation under Title VII.

283. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to his damage, in amounts within the jurisdictional limits of this Court.

284. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that he has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses.

Case 2:25-cv-00479-RCY Document 47-1 Filed 11/19/25 Page 52 of 59 PageID# 509

285. In acting as alleged herein, Defendant has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights . Plaintiff is entitled to recover punitive damages from Defendant in amounts to be proved at trial.

286. As a result of Defendant's acts of retaliation as alleged herein, Plaintiff is entitled to all attorney's fees and costs of suit.

---

**COUNT VII: HOSTILE WORK ENVIRONMENT BASED ON RACE, COLOR, NATIONAL ORIGIN, AND SEX IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (42 U.S.C. §§ 2000E, ET SEQ.)**

287. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint and restating all complaints in all preceding paragraphs with the same force and vigor as if set out here in full.

288. Defendant repeatedly subject Plaintiff to unwelcome harassment regarding the terms and conditions of her employment because of her national origin, color, and race.

289. The harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive and unbearable working environment.

290. Defendant, through its supervisory agents, and other employees, took the following actions, among others, to create hostile work environment for Plaintiff and intentionally harass Plaintiff and create a hostile work environment based on her national origin, color, and/or race, incidents Defendant employees, who were non-Southeast Asian Americans or were not from Indonesia, did not experience:

a. Plaintiff was relocated from a large office on the eighth floor of a high rise building to a trailer with a damaged ceiling in a floodplain, and subject to unbearable working conditions;

b. Plaintiff's inability to access critical software tools and a project site despite repeated attempts and requests for assistance;

c. Mr. Harrison, Plaintiff's supervisor, ridiculing Plaintiff in front of her colleagues and contractors;

d. Mr. Harrison, Plaintiff's supervisor, preventing and interfering with Plaintiff's opportunity to transfer to a new locality within Defendant;

e. Mr. Harrison dissuading Plaintiff from engaging in EEO protected activity;

f. Ms. Bingham instructed Plaintiff not to create a paper trail in connection with the complaint for the Larus Court permit, which, while it may have harmed Defendant, would have reflected most poorly on Plaintiff, especially during an audit—which in fact Plaintiff had handled the permitting process correctly;

g. Ms. Bingham's instruction to limit written communication and to restrain Plaintiff from sending two emails with the same subjects, interfered with Plaintiff's ability to comply with the City of Richmond's Code/Ordinance, State regulations and Federal regulations, and Plaintiff's ability to comply with future State and Federal Agencies' written reporting requirements;

h. Ms. Bingham requiring Plaintiff to include Ms. Jackson in all CSO project meetings;

i. Douglas Yarhouse's repeated intimidating behavior including: demanding "what would I get" in exchange for information; talking loudly about bathroom use after Plaintiff used the restroom; repeatedly banging his table against the wall to startle Plaintiff; blocking the women's restroom door while Plaintiff was inside; installing a lock box on temperature controls and denying Plaintiff a key while providing keys to male employees; discussing Plaintiff's performance evaluation with other male staff; making loud noises and slamming doors to intimidate Plaintiff; talking about taping Plaintiff mouth shut, and leaving taps running to potentially flood the building;

j. Subjection to unbearable and unsafe office conditions including: extreme temperatures (60°F in winter, 80°F+ in summer); sewage/rotten egg smell; mold exposure; potential asbestos exposure; office shaking during construction with debris falling; malfunctioning and uncleaned restroom facilities; denial of office key for four months; and denial of proper office name tag for nearly a year;

k. Plaintiff's supervisor, Alan Harrison's statement to Plaintiff that she would not win in her discrimination lawsuit and his statement while he was talking to Plaintiff in front of multiple male contractors and consultants: "Don't wipe your butt (or possibly 'ass') before you shit!";

l. Patra Brodie's demeaning statements and prevention of operation staff from answering Plaintiff's questions. Patra Brodie and Eric Whitehurst requiring Plaintiff to attend payroll training with non managers while other managers could attend the training with managers only;

m. Inability to relocate to new positions despite qualifications, with evidence suggesting supervisor interference;

n. April Bingham's instruction to "minimize and/or eliminate written communication" to cover up Plaintiff's due diligence;

o. April Bingham's instruction not to send more than two emails on the same topic;

p. A third party construction inspector, Danny McCollum's angry confrontation and berating of Plaintiff on April 30, 2024 after contacting Barbara Jackson;

q. SM, a male Engineering Manager's repeated intrusions into Plaintiff's office, causing a heavy folder to fall and nearly injure Plaintiff, and physically bumping into Plaintiff in front of several maintenance staff;

r. Third-party consultants' repeated ignoring of Plaintiff or pretending not to hear her in meetings (Brandon Cooper from TY Lin and others).

s. Procurement Director's hostile interruption and dismissive treatment in meeting with City Attorneys;

t. Electrician's threatening advancement toward Plaintiff twice at project site;

u. Kenya Peterson's discriminatory requisition form requirement, refusal to cooperate, hostile treatment against Plaintiff due to Plaintiff inability to talk without hand gesture, disrespectful yelling at Plaintiff to leave her cubicle, and extreme public screaming at Plaintiff when Plaintiff was standing in the public hallway and public printer room that were not part of her office when she did not scream at others who stood at the same hallway and printer room such as Mr. Stephen Morgan and other employees. Mr. Stephen Morgan stood in the hallway next to her cubicle and

in the printer room in September 2024 but he was not screamed at by her. Ms. Peterson fabricated a false accusation of harassment against Plaintiff in retaliation for Plaintiff's effort to comply with management directives. The accusation—triggered by Plaintiff's attempt to process a requisition form per her supervisor's instructions—was wholly unsubstantiated but was escalated to HR. Plaintiff was later threatened with security involvement by another employee, causing further public humiliation and reinforcing the racially hostile climate in her workplace.

v. Toi Jefferson's threat to call security on Plaintiff for standing in the public hallway and public printer room for a minute that other employees have never experienced;

w. Plaintiff's supervisor and Human Resources staff refused to allow Plaintiff to be helped by other administrative staff to process her invoice, and instead have allowed Kenya Peterson to continue emailing Plaintiff regularly to ask Plaintiff to approve invoices that Plaintiff has received from contractors and consultants, triggering further trauma; Despite Plaintiff's repeated efforts to report the ongoing hostility—including providing medical documentation showing trauma-related health impacts—her supervisor, Mr. Stone, refused to reassign responsibilities or implement any remedial measures. Instead, he suggested Plaintiff pursue a disability accommodation, shifting the burden to the victim and implicitly blaming her for the abuse. HR also failed to investigate or address the issue, thereby condoning the hostile behavior.

x. Kenya Peterson's appearances near Plaintiff's office and in restrooms near Plaintiff's office, triggering trauma;

y. Toi Jefferson's appearance in bathroom when Plaintiff entered and standing by building entrance and in the hallway with others, causing intimidation;

z. Security staff's refusal to unlock Plaintiff's office door and questioning of her need for access;

aa. Security guards' refusal to open project site gates and appearance of armed security staff;

bb. Denial of keys, name tags, software access, and site access provided to male and non-Southeast Asian American employees;

cc. Barbara Jackson's yelling at Plaintiff in front of consultants;

dd. Plaintiff's supervisors, Deputy Director Eric Whitehurst and Robert Stone, and Human Resources Staff of the Defendant's failure to investigate or remediate complaints about Kenya Peterson's hostility and discrimination against Plaintiff despite repeated requests;

ee. Request for Plaintiff to complete disability forms rather than addressing Kenya Peterson's hostile conduct;

ff. Defendant's failure to provide FOIA request of or to preserve security camera footages inside the building to document incidents on November 15th, 2024 despite Plaintiff's complaint of hostile work environment to Human Resources staff (Mr. Timothy Williams) and to her supervisor (Deputy Director Stone); and

gg. Continued assignment of Kenya Peterson to work with Plaintiff despite Plaintiff's repeated requests to be helped by other staff due to trauma and documented trauma from the letter that Plaintiff's healthcare provider sent to plaintiff's supervisor, Mr. Stone, who is Defendant's Deputy Director.

hh. Plaintiff was further subjected to hostility and disparate treatment by Defendant's facilities and security staff, who refused to assist her with reasonable requests regarding her office environment and took sides against her during interpersonal disputes. These staffers consistently treated her white and male peers with greater courtesy and professionalism, reinforcing the perception that Plaintiff was being targeted due to her identity as an Asian woman of color.

ii. Plaintiff's annual and interim performance reviews were used as tools to further the hostile environment. The 2023 interim review failed to acknowledge her full work contributions

291. Plaintiff's supervisors, colleagues, and coworkers mentioned in this complaint were not Southeast Asian Americans and were not from Indonesia.

292. No other program and operations managers were Southeast Asian or from Indonesia and they were not treated like Plaintiff.

293. The harassment was based on Plaintiff's race, color, national origin, and sex, as evidenced by the fact that similarly situated male employees and employees who are not Southeast Asian American were not subjected to such treatment.

294. Defendant knew or should have known of the harassment and failed to take prompt and appropriate remedial action.

295. The hostile work environment was so severe, pervasive, and continue unabated and without any accountability that it severely altered the terms and conditions of Plaintiff's employment and created an continued abusive working environment.

296. The cumulative effect of the harassment—including workplace ostracism, intimidation, false reporting, and managerial indifference—caused Plaintiff to suffer debilitating mental and physical health consequences, including insomnia, anxiety, stress-induced conditions, and diminished self-worth. These symptoms were exacerbated by the perception that her race, gender, and cultural background made her more vulnerable to workplace abuse and less likely to receive institutional support.

297. As a direct and proximate result of the hostile work environment, Plaintiff has suffered and continues to suffer substantial damages including but not limited to: severe emotional distress; trauma requiring counseling; anxiety; mental anguish; extreme humiliation; physical symptoms including body shaking; loss of enjoyment of life; medical expenses; lost wages due to sick leave necessitated by trauma; and other economic and non-economic damages.

---

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor and against Defendant on the above-stated counts, and that in addition this Court issue an Order granting the following:

A. Enter judgment on her behalf against Defendant;

B. Declare that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, and restraining and enjoining Defendant from further violations;

C. Enjoin Enter a permanent injunction enjoining Defendant from the unlawful conduct complained of herein;

D. Enter an Order that Defendant be required to promulgate an effective policy, procedures, and training programs against such discrimination and retaliation to adhere thereto; Order Defendant to take all affirmative steps necessary to remedy the effects of its unlawful conduct, including but

not limited to assign other staff to help Plaintiff to process invoices and requisitions; discipline of employees who engaged in discriminatory, retaliatory, or harassing conduct; and expungement of any negative performance evaluations or disciplinary actions taken in connection with the discriminatory conduct; and provision of a safe, professional work environment free from discrimination, retaliation, and harassment;

E. Award Plaintiff compensatory damages for past and future economic losses, including lost wages, benefits, trauma treatment expenses, and other employment-related losses;

F. Award Plaintiff compensatory damages for the past, current, and future non-economic losses, including but not limited to, for extreme emotional distress, mental anguish, extreme public humiliation, trauma, loss of enjoyment of life, loss of reputation, loss of career advancement opportunities, and other non-economic damages due to Defendant's aforementioned unlawful actions that were not limited to discrimination due to Plaintiff's race, national origin, color and retaliation and creation of hostile work environment due to Plaintiff's protective activities in the amount to be proven at trial but no less than $300,000.00;

G. Award Plaintiff punitive damages in an amount sufficient to punish Defendant and deter future discrimination based on race, national origin, color, and retaliation due to engagement in protected activities in the amount to be proven at trial;

H. Award Plaintiff Plaintiff's attorneys' fees, court costs, pre-judgment interest and post-judgement interest and all expenses incurred in this action;

I. Award Plaintiff pre-judgment and post-judgment interest as provided by law; and

J. Grant such other and further relief as the Court deems just and proper.

---

**JURY TRIAL DEMAND**

**298. Under Fed. R. Civ. P. 38 (b), Plaintiff hereby demand trial by jury on all issues.**

---

Respectfully submitted,

**SURANI S. OLSEN**

Plaintiff, Pro Se

PO BOX 5321, Williamsburg, VA, 23188

sso20231016@gmail.com

804-791-8898

Dated: November 18, 2025