**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

| | |
|---|---|
| SURANI S. OLSEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Lead Civil Action No. 3:23CV475 (RCY) |
| | )    Civil Action No. 3:25CV956 (RCY) |
| CITY OF RICHMOND, | ) |
| | ) |
| Defendant. | )    JURY TRIAL DEMANDED |

FILED
FEB 2 5 2026
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiff, Surani S. Olsen ("Plaintiff"), hereby files this Amended Complaint against Defendant, City of Richmond ("Defendant"), pursuant to the Court's Order dated January 14, 2026 (ECF No. 49) and February 18, 2026, and moves this Honorable Court for judgment against Defendant, City of Richmond ("Defendant"), on the grounds and praying for the relief hereinafter set forth:

**I.    SUMMARY OF THE ACTION**

1.    This is a civil rights action brought by Plaintiff, a current employee of Defendant, who has been discriminated against, treated with hostilities in a hostile work environment, and retaliated against because of her sex, race, national origin and color and because of her participation in Equal Employment Opportunity ("EEO") protected activities.

2.    Plaintiff has been subjected to discrimination, retaliation, and hostile work environment by way of unwarranted actions being taken against her, being treated with extreme hostility, being disrespected, screamed at, and humiliated publicly, and being treated differently with different standards when compared to other similarly situated employees who are not of Plaintiff's protected classes.

3.    Plaintiff seeks relief from unlawful employment practices by Defendant based on her race, color, sex, and national origin (Southeast Asian American from Indonesia), and in retaliation for her protected opposition to discriminatory practices, pursuant to Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").

4. Plaintiff also seeks relief based on Equal Pay Act because Plaintiff's salary as a Program and Operations Manager has been lower from other male's Program and Operations Managers due to Defendant's discrimination against Plaintiff since 2023.

5. As a result of Defendant's discrimination and retaliation, Plaintiff is seeking all available remedies, including compensatory damages, as well as attorney's fees and court costs.

## II. JURY TRIAL DEMAND

6. Under Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues triable to a jury including this Amended Complaint and any further pleadings.

## III. PARTIES

7. Plaintiff Surani S. Olsen is a citizen of the United States, female, and a Southeast Asian American from Indonesia. She speaks with an accent as a result of her national origin. At all relevant times hereto, Plaintiff has lived in the Commonwealth of Virginia. Plaintiff has been employed by Defendant since December 2016 in Richmond, Virginia.

8. Defendant City of Richmond is a municipal corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Richmond, Virginia 23219.

9. Since January 1, 2004, and at all times relevant to this Complaint, Defendant has been a municipal government and an employer subject to the requirements of Title VII, 42 U.S.C. §§ 2000e, et seq.

## IV. JURISDICTION

10. This action arises Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA").

11. This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 et seq. (federal question) and 1343 (civil rights).

## V. VENUE

12. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1981a, and Defendant is subject to the personal jurisdiction of this Court in the Eastern District of Virginia because Defendant maintains facilities and operations in this District, and all

events and issues giving rise to this action occurred in this District and Division in Richmond, Virginia.

13. Venue is further proper in this judicial District pursuant to 28 U.S.C. § 1391, this Division under L.C.R. 3(B)(4), and under 42 U.S.C. § 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2); as Plaintiff is employed by Defendant in Richmond, Virginia, where the the majority of events described in this action took place within this judicial district, and Plaintiff's employment records are maintained by Defendant in this judicial District and Division.

## VI. STANDING (ADMINISTRATIVE EXHAUSTION) for Claims Related to EEOC Charges

14. Plaintiff has satisfied all of the procedural and administrative requirements set forth in Section 706 of Title VII, 42 U.S.C. § 2000e-5, in particular:

    a. On November 22, 2022, and as later amended in March 2023, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") under Agency Case No. 438-2023-00359 ("First Charge", see Exhibit 1), alleging she was discriminated and retaliated against based on race, color, and national origin; had experienced a hostile work environment; and retaliated against for engaging in EEO protected activity.

    b. Plaintiff timely filed the First Charge with the EEOC within three hundred (300) days from the latest date of discrimination relative to that charge.

    c. On or after April 27, 2023, Plaintiff received a Notice of Right to Sue letter from the EEOC ("NRS", see Exhibit 2), and less than 90 days upon receipt of the First NRS, on July 26, 2023, Plaintiff timely filed her initial Complaint against Defendant for case no. 3:23CV475 (ECF No. 1). On September 20, 2023, Plaintiff moved to stay all proceedings to pursue additional proceedings with the EEOC. Mot. Stay, ECF No. 4. The Court granted the Motion on November 13, 2023. Order, ECF No. 7; Order, ECF No. 10, On November 8, 2024, Plaintiff moved to reopen the case, Mot. Reopen, ECF No. 11, which the Court granted on November 14, 2024, Order, ECF No. 12. On February 11, 2025, Plaintiff filed her Amended Complaint, ECF No. 18. On February 25, 2025, the City filed the instant Motion to Dismiss. Mot. Dismiss, ECF No. 20; Mem. Supp. Def.'s Mot. Dismiss Pursuant to R. 12(b)(6) ("Mem. Supp. Mot. Dismiss"), ECF No. 21. On March 10, 2025, Plaintiff filed her Memorandum in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("Mem. Opp'n Mot. Dismiss"), ECF No. 22. The City filed its Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss ("Reply"), ECF No. 24, on March 13, 2025. On August 29, 2025, Plaintiff moved in her Pending Case pursuant to Fed. R. Civ. P. 15(d) to supplement her pleadings to add the Second NRS ("Motion"). On September 22, 2025, Defendant filed a response expressly not opposing Plaintiff's request to supplement her pleadings to "reflect that she filed a second charge of

Page 3 of 86

discrimination with the EEOC on January 27, 2025, and that the EEOC issued its Notice of Right to Sue letter from the second charge on August 20, 2025".

On September 16, 2025 the Court issued an order to grant the Motion to Dismiss as to Plaintiff's punitive damages claims but the Court denies the Motion, however, as to Counts One, Two, Three and Four of the Complaint in ECF No. 18. On September 22, 2025, Defendant submitted response to motion and on October 3, 2025 Defendant submitted answer to complaint. On December 7, 2025, Plaintiff submitted motion to continue to reset hearings time or date. On December 8, 2025 the Court ordered to approve Motion to Continue and reset the date of pretrial conference.

On December 10, 2025, the Court ordered Rule 16(b) scheduling order for trial date on July 6, 2026, three day trial, settlement conference, motions for joinder or to amend; other motions, final pretrial conference, dipositive motions, non-dipositive motions, Rule 26 disclosures, completion of discoveries, proposed witnesses, discovery to be used as evidence, jury instructions and verdict form, voir dire, pretrial briefs, written stipulation, proposed exhibits, pretrial objections, audio and video recordings, and use of Artificial Intelligence.

On December 16, 2025, the Court issued order regarding procedures for settlement conference on March 24, 2026.
On December 17, 2025, the Court ordered to set/reset hearings.

d.  On April 27th and June 3rd, 2024, Plaintiff submitted additional charge (second charge) of discrimination, retaliation, and hostile work environment against Defendant to EEOC staff, Ms. Laketa Banks and EEOC Director and on the EEOC portal, however, the portal was not working and charges could not be submitted and saved many times. Then Plaintiff submitted additional charges of discrimination, retaliation and hostile work environment with the EEOC in December 2024 and was interviewed by Mr. Deandre Whitehurst (EEOC) in the same month. Finally, on January 27, 2025, after unable to save the charges for many times, Plaintiff's charges was officially accepted by EEOC, which was Charge No. 438-2024-01500 ("Second Charge", refer to Exhibit 3) where Plaintiff complained that Plaintiff continued to be discriminated and retaliated against by the Defendant based on sex, race, color, and national origin; continued to be exposed to a hostile work environment; and continued to be retaliated against for engaging in EEO protected activity after the First Charge. In the Second Charge, EEOC allowed Plaintiff to include all the charges that Plaintiff submitted in April, 2024 and June, 2024, since the EEOC Portal was not working both times when Plaintiff submitted the charges.

e.  On or after August 20, 2025, Plaintiff received a Notice of Right to Sue letter from the EEOC for her Second Charge ("Second NRS", refer to Exhibit 4), requiring her to file suit related to the Second Charge on or before November 18, 2025.

f.   Plaintiff filed her Complaint ("New Complaint") for the second charge on November 18, 2025, which is civil case No. 3:25CV-956.

g.   On December 29, 2025, plaintiff's counsel and Defendant's counsel submitted Joint Position On Companion Case 3:25CV-956 to consolidate Plaintiff's two lawsuits related to her EEOC Charges against the Defendant, which are Case No. 3:25cv-956 ("New complaint") as it relates to the case no. 3:23cv 475 ("Lead Complaint").

h.   Plaintiff then filed her Amended Complaint for the new complaint on December 30, 2025.

i.   On January 14, 2026, the Court granted the Joint Motion for Consolidation (ECF No. 47 ) and ordered that Case No. 3:25cv956 be CONSOLIDATED with Plaintiff's lead complaint (Case No. 3:23cv 475). The Court also ordered Plaintiff to file an Amended Complaint within thirty (30) days of the entry of the Order. The Amended Complaint must set forth the claims upon which Plaintiff wishes to proceed and will become the sole, operative Complaint in this action. Therefore, Plaintiff files this Amended Complaint for the Lead Civil Action No. 3:23CV475.

## VII. FACTS

### Plaintiff's Employment and Protected Characteristics

15.   Plaintiff is a Southeast Asian American woman originally from Indonesia.

16.   Plaintiff has been employed by Defendant since December 2016 in various positions within the Department of Public Utilities ("DPU").

17.   Between December 8, 2020, and August 29, 2022, Plaintiff held the position of Program and Operations Manager in Water Resources. Her duties included administration of various permitting programs. She also held supervisory and management duties which included supervision of multiple permit-reviewer engineers, a project management analyst, and multiple inspectors.

18.   Relevant to this complaint, Plaintiff's supervisor from August 13 until August 25, 2022 was Eric Whitehurst, plaintiff's supervisor from August 25, 2022 until May 28, 2023 was Alan Harrison, plaintiff's supervisor from May 28, 2023 until June 26, 2024 was Mr. Eric Whitehurst, and plaintiff's supervisor from June 26, 2024 is Mr. Robert Stone (refer to Exhibit 5). Mr. Whitehurst, Mr. Harrison and Mr. Stone worked under supervision of Ms. April Bingham, the Director of Department of Public Utilities (DPU) until January 23, 2025. After that, they work under supervision of Mr. Jeff McBride, the Chief of Water Division, who works under Mr. Scott Morris, the current DPU Director. None of Plaintiff's Supervisors are Southeast Asian Americans from Indonesia.

19. Plaintiff's work performance was consistently satisfactory and she received no disciplinary actions prior to the discriminatory and retaliatory conduct described herein (refer to Exhibit 6).

20. Plaintiff, who is Southeast Asian American and was from Indonesia, has certain physical characteristics which include dark circles that surround her eyes and appear similar to "black eyes" at first glance, as if she was punched on the eyes. As a result of her national origin and race, Plaintiff also speaks with a heavy accent.

21. Plaintiff is the only Program and Operations Manager of similarly situated employees of Defendant who is Southeast Asian American or with national origin from Indonesia.

22. On August 29, 2022, Plaintiff was demoted to another division of Defendant to no longer have any supervisory duties. Plaintiff filed her Charge in large part as a result of the demotion, a clear adverse employment action. Plaintiff's demotion resulted in "disadvantageous changes" to the terms and conditions of Plaintiff's employment, since it resulted in, different responsibilities, less supervisory responsibilities, and required Plaintiff to relocate to the Wastewater Treatment Plant (from 2022 until mid 2024).

23. While Plaintiff is still employed by Defendant, Plaintiff continues to be subjected to a hostile work environment, discrimination and retaliation, and still receives lesser pay on each paycheck than her male counterparts (with similar title, program and operations managers) despite having better qualifications.

**Compensation Inequity Based on Sex in Violation of Equal Pay Act**

24. Moreover, Plaintiff has observed since 2023 that her salary was and continues to remain lower than that of other male Program and Operations Managers and Managers, including Mr. William Boston, Mr. Howard Glenn, and Mr. Kenny Weeks, all of whom are not Southeast Asian Americans and none of them were from Indonesia.

25. Mr. Glenn, and Mr. Weeks have the same title as Plaintiff, which is Program and Operations Manager. Mr. Boston has different title than Plaintiff in 2022 but has similar duties, but currently he has the same title as Plaintiff, which is Program and Operations Manager.

26. Even though in 2021 Plaintiff's salary was higher than Mr. Boston and Mr. Weeks, however, in 2022, Plaintiff's salary was $9,638 lower than Mr. Weeks, $10,862 lower than Mr. Glenn, and $20,697 lower than Mr. Boston. In 2023, 2024, 2025 and 2026, those differences increased.

27. These male employees, despite similar titles (Mr. Glenn, Mr. Weeks, and Mr. Boston (since 2026)) and similar qualifications and duties (Mr. Boston (between 2023 and 2026), receive higher compensations, even though Plaintiff has a Professional Engineer License while the other manager managers do not, which does not make

good business sense (as in private sector, individual who has this license has higher salaries than individuals who do not have this license) and shows that Defendant discriminates against Plaintiff as she receives lower salary than the other program and operations managers, who are not female and are not Southeast Asian Americans from Indonesia.

28. Additionally, the treatment of Mr. Saber Moazamigoodarzi, a colleague ("Mr. Moazamigoodarzi"), who is not Southeast Asian American, further underscores the disparity in treatment based race; specifically, Mr. Moazamigoodarzi informed Plaintiff that he received both a general salary increase and a promotional raise when he was promoted to Senior Engineer in 2022, compared to Plaintiff who only received promotional raise but did not receive the general salary increase in 2019, even though other employees received the general salary increase on the same day Plaintiff received promotional salary increase.

**Discrimination, Retaliation, and Hostile Work Environment Created by Ms. Bingham**

29. Ms. April Bingham ("Ms. Bingham") was at all relevant times hereto, Plaintiff's supervisor and the Director of the Department of Public Utilities. Ms. Bingham is African American, and she is not Southeast Asian American and was not from Indonesia.

30. Ms. Bingham discriminated and ultimately retaliated against Plaintiff based on Plaintiff's national origin, race, and color, as well as due to Plaintiff engaging in protected activities.

31. The conduct of Ms. Bingham, Defendant's employee, was sufficiently severe and pervasive, and directly resulted in harm to Plaintiff's employment conditions, creating an abusive working environment which began in early 2022.

32. On March 18, 2022, Plaintiff received a phone call from Ms. Bingham and another manager, Mr. Jonathan Cosby, neither of whom are of Southeast Asian American and neither were from Indonesia.

33. During the call, Ms. Bingham used the phrase "Black Eye" when talking to Plaintiff about a permit ("Black Eye Comment"), a phrase she did not use with other Program and Operations Managers from DPU (including Mr. Charles Yates and Ms. Susan Hamilton), who also reviewed the same permit, or similarly situated employees (refer to Exhibit 9). None of these other managers are Southeast Asian American or from Indonesia. The permit review was set to be due in several weeks since the call, so it was not due on the day she called.

34. Prior to this call, Ms. Bingham and Plaintiff had interacted personally (face-to-face) numerous times and, as a result, Ms. Bingham was aware that Plaintiff has certain physical characteristics which include dark circles that surround Plaintiff's eyes and appear to be black eyes at first glance, and that her appearance reflects her Southeast Asian race and national origin.

35. This phone conversation with Ms. Bingham was the first time Plaintiff has ever heard anyone use that term in a conversation with Plaintiff. Plaintiff considered the Black Eye Comment a pejorative reference to Plaintiff's dark circle around her eyes and her ethnic appearance, and took great offense to it. Plaintiff felt deeply hurt, insulted, humiliated, emotionally disturbed, offended, insulted, and discriminated against by Ms. Bingham due to her black eye comment.

36. Plaintiff notified Defendant's Human Resources representative, Ms. Brenda Henderson ("Ms. Henderson"), about the comments and informed her that Plaintiff would like to file a complaint and scheduled a meeting to meet her on July 15, 2022. Ms. Brenda Henderson is not Southeast Asian American and was not from Indonesia.

37. While Ms. Bingham later apologized in an email (refer to Exhibit 10), Plaintiff felt that the apology did not adequately address the discriminatory nature of the remark, and Ms. Bingham thereafter continued to harass and retaliate against Plaintiff as a result of her complaint to HR.

38. On July 13, 2022, Mr. Mantey called Plaintiff's vindictive due to enforcing the Defendant's Floodplain Ordinance/City Code requirements as shown on Exhibit 11. On July 14, 2022, Ms. Bingham discriminatorily reiterated the baseless accusation that Plaintiff was "vindictive," further humiliating Plaintiff in front of Ms. Haskins and her former supervisor, and exacerbating Plaintiff's emotional distress and mental anguish.

39. Contrary to Mr. Leonard Mantey's accusation, none of the regulatory requirements or languages in Plaintiff's emails to Mr. Mantey were vindictive and Plaintiff was only applying the City Code in Plaintiff's comments and requesting required documents to confirm that the proposed improvement was not substantial improvement as shown on Exhibit 11. Mr. Leonard Mantey is Defendant's Senior Deputy Director with PDR (Permit Development Review) Department.

40. Since Plaintiff was enforcing Floodplain Ordinance and The City Code on behalf of the Director or Ms. Bingham by requesting the required construction document, it does not make good business sense that Ms. Bingham, instead of supporting Plaintiff to implement the City Code as per her mandate, she supported Mr. Mantey, who supported the permit applicant, who refused to comply with the Floodplain Ordinance or the City Code, which shows that her decision to call Plaintiff "vindictive" for applying the Floodplain Ordinance clearly inference that she discriminated against Plaintiff based on race, color, and national origin, since both Mr. Mantey and Ms. Bingham are African Americans and are not Southeast Asian Americans, and they were not from Indonesia.

41. This conduct of Ms. Bingham, Defendant's employee, was sufficiently severe and pervasive, and directly resulted in harm to Plaintiff's employment conditions in preventing her to do her job in implementing the Floodplain Ordinance or the City Code that later caused her Division an issue with the State (DCR, Department of Conservation and Recreation) and federal government (FEMA) as she needed to

report to FEMA about all floodplain permits, creating a very abusive and stressful working environment for Plaintiff.

42. On the same day, Ms. Bingham also imposed another requirement upon Plaintiff, mandating that Plaintiff submit drafts of all customer letters and emails to her and her team for prior review before sending them to customers, however, no other program and operations managers, with similar title and duties, were required to do the same, including but not limited to Mr. Charles Yates and Ms. Susan Hamilton.

43. Ms. Hamilton and Mr. Yates had the same title and similar duties to Plaintiff to administer and manage permitting review of the permit programs in their Divisions. Mr. Yates and Ms. Hamilton are not Southeast Asian American from Indonesia, Mr. Yates is Caucasian and Ms. Hamilton is African American. This directive was memorialized by supervisor Patrick Bradley in an email to Plaintiff, attached hereto as Exhibit 12, and incorporated by such reference.

44. Plaintiff pleaded with Ms. Bingham to cancel the requirements and stated that the two emails that she mentioned were only less than 0.5% of the total emails that she sent during that year and forwarded to her multiple permittees' emails appreciating Plaintiff's assistances with their permits.

45. However, in the meeting on July 14, 2022, Ms. Bingham refused to retract the requirement and she also retaliatory laughed and prohibited Plaintiff from informing customers about this review when plaintiff asked if she could inform customers about the review by Ms. Bingham's team that caused the delay of permit review.

46. Her laughing shows that she had malicious intent against Plaintiff and that she discriminated against Plaintiff based on race, retaliated against Plaintiff due to Plaintiff's protected activities by prohibiting Plaintiff from informing customers about her team review that might cause delay. Plaintiff has the recording for this laugh.

47. When the reviews caused delays to permit process, even though customers had urgent questions related to their permit applications and sent multiple inquiries about the permit application reviews, Plaintiff was not allowed to inform customers that Ms. Bingham and her team were reviewing the draft comments that caused delay in Plaintiffs' responses to their permit applications, which was a hostile work environment for Plaintiff as some customers could become hostile verbally (including cursing, which happened in the past) when they did not receive their permit on time due to permit review delay.

48. Plaintiff perceived Ms. Bingham retaliated due to Plaintiff's questioning her black eye comment and complaint to Ms.Haskins (HR) about Ms. Bingham or due to internal EEO protected activities because this requirement was not applied to other Program and Operations Managers, including but not limited to Mr. Charles Yates ("Mr. Yates") or Susan Hamilton ("Ms. Hamilton"), individuals who have the same

title and similar duties as Plaintiff but neither of which are Southeast Asian Americans from Indonesia.

49. In explanation, Ms. Bingham retaliatory stated that this requirement only applied to Plaintiff in part because Plaintiff was accused of being vindictive by Mr. Mantey, as described previously, which caused Plaintiff to had stricter terms and conditions of employment than before or worse than before. Ms. Bingham retaliatory ignored and neglected the facts that Plaintiff's emails to Mr. Mantey does not contain any vindictive contents as they were professionally written based on the City/Defendant's City Code requirements as seen on Exhibit 11.

50. The imposition of this review process significantly altered Plaintiff's employment conditions, as it unnecessarily prolonged the review period for customer communications might cause Plaintiff to be unable to comply with permit review's deadlines that were determined by the State (DEQ) and were adopted by the Defendant's Code, which affected her performance and which changed the terms and conditions of Plaintiff's employment to worse than before, which could make her unable to comply with the required review period per the City Code that other managers with similar title or similar duties do not experience (example Mr. Charles Yates and Ms. Susan Hamilton), which was hostile and discriminatory against Plaintiff.

51. This delay, imposed solely upon Plaintiff, led to frustration and complaints from customers. However, Plaintiff was prohibited from informing customers that the delays were caused by the requirement to send drafts to Ms. Bingham and her team, thus exposing Plaintiff to unwarranted customer dissatisfaction and further humiliation.

52. This requirement, along with Plaintiff's inability to explain the delay, as Plaintiff was forbidden to inform permittees and/or their consultants that the draft response was being reviewed by Ms. Bingham and her team, created an abusive working environment by isolating Plaintiff from the ability to perform her job duties effectively, while subjecting her to unnecessary scrutiny and accountability that her colleagues, other Program and Operations Managers, did not face.

53. Additionally, when Plaintiff sought to inform customers of the delays and the involvement of Ms. Bingham's team, Ms. Bingham denied this request, effectively placing the burden of customer complaints solely on Plaintiff.

54. This decision, along with Ms. Bingham's failure to respond to or approve Plaintiff's draft responses, in a timely manner or otherwise, to a permittee's engineer about the floodplain entrance issue after July 14, 2022, further worsened the situation, leading to additional customer complaints and causing severe emotional distress and mental anguish for Plaintiff.

55.    In response to these new requirements, in front of Ms. Bingham, Plaintiff complained to a Human Resources representative Ms. Shiron Haskins ("Ms. Haskins"), about Ms. Bingham's directive.

56.    Ms. Haskins informed Plaintiff that she could submit a complaint to Defendant's EEO Manager, Ms. Brenda Henderson ("Ms. Henderson").

57.    Other than such suggestion, Ms. Haskins was negligent and failed to escalate the matter or address the discriminatory nature of the requirement, further allowing the hostile work environment to persist.


**Formal EEO Meeting and Defendant's Misconduct in EEO Process**

58.    On July 15, 2022, Plaintiff met with Defendant's EEO Manager, Ms. Henderson, who is not Southeast Asian American or from Indonesia.

59.    During this meeting, Plaintiff disclosed Ms. Bingham's discriminatory and retaliatory conduct, including the Black Eye Comment, and expressed Plaintiff's intent to file a formal discrimination complaint based on the action described above.

60.    Ms. Henderson provided Plaintiff with a complaint form and instructed Plaintiff to submit the complaint by August 15, 2022, which was approximately 31 days from the date of the meeting. This email is attached hereto as Exhibit 13, and incorporated herein by such reference.

61.    This deadline, oddly enough, was inconsistent with the federal government's prescribed time frame of 180 days for filing discrimination complaints under Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race and national origin. Since this deadline was much shorter than the required period, it was discrimination against Plaintiff by Defendant's Human Resources.

62.    Such a shortened deadline for filing a formal charge, when compared to the federally mandated period, further exacerbates Plaintiff's allegations of discriminatory treatment by the Defendant through its staff.

63.    Subsequently, on November 18, 2022, and again on December 1, 2022, Plaintiff emailed Ms. Henderson to file EEO complaints and to seek guidance on the filing process and informing Ms. Henderson that she would like to proceed to file a complaint. As shown on Exhibit 14. Ms. Henderson and Defendant's Human Resources staff failed to respond to these emails.

64.    Plaintiff's repeated attempts to address her complaint through the internal channels were met with silence and inaction, further highlighting the lack of support and responsiveness from Defendant's HR department.

65.    In light of the lack of response and the failure to provide adequate guidance on filing the complaint, Plaintiff was compelled to take further action and filed the Charge with the EEOC, following Plaintiff's demotion as discussed immediately below.

**Discrimination based on Race, Color, and National Origin, and Hostile Work Environment and Retaliation due to Plaintiff's Protected Activities through Adverse Employment Action or Demotion by Plaintiff's supervisors, Ms. April Bingham and Mr. Whitehurst, and other Adverse Employment Actions by Mr. Alan Harrison, Mr. Whitehurst, and Mr. Stone**

66.    On August 2nd, 2022, Ms. Brenda Henderson, the Defendant's EEO Manager,  sent an email to Ms. April Bingham about Plaintiff's black eye comment complaint as shown on Exhibit 15. Plaintiff obtained this email through FOIA request regarding email from Ms. Henderson to Ms. Bingham about Plaintiff.

67.    Twenty three (23) days or less than one month  after that email, on August 25, 2022, Plaintiff was informed about Plaintiff's demotion, and twenty seven (27) days after Ms. Henderson's email to Ms. Bingham, Plaintiff was demoted to a non-supervisory position, non program-administration position, and was relocated to the Wastewater Treatment Plant as seen in the attached Exhibit 16 and Exhibit 17 where Plaintiff was told to relocate to wastewater treatment plant and that Saber Moazamigoodarzi, a male, would replace Plaintiff as acting manager of her former division.

68.    This adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination, including because the Defendant replaced the plaintiff with someone outside the protected class as Saber Moazamigoodarzi is not a female and is not a Southeast Asian American from Indonesia.

69.    Plaintiff first learned about the demotion on August 25, 2022, from Mr. Eric Whitehurst ("Mr. Whitehurst"), who is not a Southeast Asian American or from Indonesia. Mr. Eric Whitehurst, a Senior Deputy Director who was supervised by Ms. April Bingham, he was assigned to be Plaintiff's supervisor on August 13, 2022, or twelve day before he gave the demotion instruction.

70.    While laughing and exhibiting a sardonic smile, Mr. Whitehurst informed Plaintiff that she would not be the manager for the Water Resources Division anymore and asked her to report to Mr. Lowell Alan Harrison ("Mr. Harrison") for assignment of her next project on August 29, 2022.  Mr. Whitehurst also said that Saber Moazamigoodarzi, Plaintiff's staff at that time, would replace Plaintiff.  Mr. Whitehurst's laugh and instruction had caused Plaintiff's severe emotional distress and mental anguish that caused Plaintiff's voice mail to be sounded like crying and made Mr. Yates laughed when he listened to it.

71.    Mr. Alan Harrison, an Engineering Manager, who, prior to the demotion, had argued with Plaintiff, about his projects' permit several times because he insisted that his projects did not need to comply with various permit/ordinance requirements as shown on Exhibit  21. After Mr. Harrison resigned, a consultant finally complied and

obtained all the required permits for one of the projects, around a year after Plaintiff sent comments on the permit application or after the argument. Another project of Mr. Harrison, that was started about the same time, has not obtained the required permits yet until today.

72. In response to Plaintiff's request for an explanation, Mr. Whitehurst said that the decision was made by Directors, including Ms. Bingham, the individual who Plaintiff had reported to Defendant's Human Resources and EEO representatives.

73. Plaintiff was removed from the position of Water Resources Program and Operations Manager, a role that had involved significant supervisory, programmatic, and administrative responsibilities.

74. Plaintiff was demoted to a different division, effectively stripping Plaintiff of all supervisory and managerial duties associated with the Water Resources Division.

75. These actions taken against Plaintiff were directly and causally related to Plaintiff's complaints of discriminatory treatment and retaliation by Ms. Bingham to Plaintiff for engaging in EEO protected activities as it was done 23 days after Ms. Bingham was questioned by Ms. Henderson about her black eye comments by email.

76. In addition, to facilitate the demotion, Ms. Bingham replaced Plaintiff's supervisor with Mr. Eric Whitehurst on August 13, 2022, which was twelve (12) days before Mr. Whitehurst had a meeting and informed Plaintiff of the demotion on August 25, 2022 in Plaintiff's office. This replacement was shown on Exhibit 5.

77. The demotion from a higher-ranking position and the stripping of Plaintiff's responsibilities represents materially adverse actions that would dissuade a reasonable employee from further engaging in protected activity, such as timely filing a formal charge of discrimination with the EEOC or reporting further discriminatory conduct.

78. Plaintiff demotion acted as chilling effect after she complaint to the Defendant's EEO Manager (refer to Exhibit 13), and then informed the EEO Manager of her intention to file EEOC charge in November and December 2022 (as shown on Exhibit 14), and after the EEO Manager emailed Ms. Bingham questioning her "black eye" comment to Plaintiff.

79. The temporal proximity between Defendant's EEO Manager's email to Ms. Bingham questioning about Plaintiff's EEO complaint about her black eye comment (on August 2nd, 2022) and the adverse employment action (demotion) taken on August 25, 2022, supports an inference of causation and retaliatory intent since the demotion was executed twenty three (23) days after Ms. Bingham was questioned by Ms. Henderson about her black eye comment.

80. Further action by Defendant that strengthened the retaliatory intent of Defendant against Plaintiff, was that Plaintiff' supervisor intentionally did not announce the demotion (or reassignment) in Department of Public Utilities Communications and Updates that were issued after the demotion, between September and December 2022,

as shown on Exhibit 18, which show that the Defendant intended to demote Plaintiff instead of reassign as Defendant tried to constructively discharge Plaintiff.

81. The removal of Plaintiff from Plaintiff's previous division without announcement caused Plaintiff's previous staff and Defendant's other staff to furthermore think that Plaintiff has fell from grace and was demoted to hourly position as her office was moved to the wastewater treatment plant's administrative office and then to maintenance building where she shared office with hourly male maintenance staff only and no other program and operations managers had offices there, for almost two years.

82. Plaintiff was laughed at by Mr. Yates on the phone when he called Plaintiff regarding the demotion and heard Plaintiff's sad voice mail's greeting after demotion, and Plaintiff was laughed or ignored by other staff who usually attended permit meeting with plaintiff.

83. The demotion was also retaliatory because Plaintiff's performance was exceeding expectation as rated in her performance evaluation dated July 5th, 2022 as shown on Exhibit 6, which was signed by her supervisor less than 51 days prior to being informed about the demotion.

84. These retaliatory actions significantly altered the terms and conditions of Plaintiff's employment, creating an environment that was both hostile and abusive, and limited Plaintiff's future employment prospects and promotional opportunities within Defendant.

85. Plaintiff was then replaced by Mr. Saber Moazamigoodarzi, a male, who did not have the required certifications to assume the overall position to manage Water Resources' Permitting Division. Defendant also assigned a male manager (William Boston) to manage a consulting company to help Mr. Moazamigoodarzi in reviewing permits, and two male consultants were assigned to perform permit review duties, however, all these individuals also do not have the required certifications to perform the erosion and sediment control and stormwater management permit's program administration.

86. Similarly, Mr. Rodney King ("Mr. King"), a male, was assigned to manage the inspectors previously managed by Plaintiff despite not having the requirement management certifications.

87. None of these managers who replaced Plaintiff were female or Southeast Asian American from Indonesia. Defendant essentially replaced Plaintiff with multiple male individuals but none of these staff have the overall certifications that are required to perform the program administrations by the Defendant's City Code and by the State regulation (DEQ) including Program Administrator certifications, which did not make good business sense or evidence that the action was related to instances of overt racial discrimination. None of these male individuals were Southeast Asian American from Indonesia.

88. The evidences that Plaintiff's replacement do not have the certifications are shown on Exhibit 20A, 20B, and 20C. The evidence of the certification requirements is shown on Exhibit 19A and 19B.

89. In addition, Plaintiff previously prepared FEMA's Community Rating System's five-year cycle report and annual report without consultant assistance (to ensure the flood insurance coverage of properties and water treatment plant in the City with a total value of around US $900 millions), but after plaintiff's demotion, Defendant had to hire and pay consultants to prepare the reports. None of the consultant staff are Southeast Asian American from Indonesia.

90. Plaintiff held all such certifications and satisfactorily had performed all of these duties as a single individual prior to the demotion. Defendant went out of its way to retaliate against Plaintiff. Defendant essentially replaced Plaintiff with three individuals, which does not make good business sense and support an inference of discriminatory animus.

91. Plaintiff's demotion resulted in significant "disadvantageous changes" to the terms and conditions of Plaintiff's employment and caused her to be in worse off condition then before demotion, and caused her to suffer adverse condition and/or hostile work environments as follows:

   a. Plaintiff was demoted to work as a Project Manager in a field that Plaintiff did not have any experience and to work under supervision by an individual (Mr. Alan Harrison) who had previously argued or disagreed with Plaintiff on multiple occasions regarding the permit requirements for his projects (the evidence of the argument is shown on Exhibit 21). Note that due to Mr. Harrison's insistence about the permit requirements for his project, one of his projects that was started in 2022 has not obtained all the required permits until today (3 or 4 years later), and another one (that Plaintiff had reviewed) received its permit approval approximately a year after Plaintiff provided the comments.

   b. Plaintiff was demoted to the administrative building at the wastewater treatment plant and then to the maintenance building at the wastewater treatment plant ("WWTP"), that both are located at the wastewater treatment plant that exposed Plaintiff to unbearable sewage smells and rotten egg emissions every day both indoor and outdoor, which are upsetting conditions that caused her physical distress, mental anguish and emotional distress all day that she did not have to experience before the demotion in her previous office. The evidences of the locations of these buildings at the WWTP are shown on Exhibit 22A and 22B.

   c. Plaintiff was immediately relocated from the eighth floor in a high-rise building on Broad Street to much smaller offices (each office's size is around half the size of Plaintiff's former office) at the Administrative Building of the Wastewater Treatment Plant for around ten months, and then to the maintenance building of the Wastewater Treatment Plant for around a year. Pictures of these offices are shown on Exhibit 22C.

d. Plaintiff's office in the Administrative Building did not have a working HVAC system so there was no air conditioning during the summer, resulting in internal room temperatures in excess of 80 degrees Fahrenheit and as high as 86 degrees Fahrenheit, and no heat in the winter, resulting in internal room temperatures around 60 degrees Fahrenheit and as low as 59 degrees Fahrenheit, which caused her physical distress and emotional distress and caused Plaintiff's face/skin to wrinkle faster due to cold temperature, which Plaintiff considers as physical harms and caused Plaintiff has to spend thousands of dollars on face and skin treatment. Refer to Exhibit 22D for the pictures of these temperatures.

e. Plaintiff's office at the Administration Building has mold on the ceiling and on the heater/radiator vent and wall as shown on Exhibit 22E. Based on a laboratory test report, Plaintiff's office at the Administration Building also has asbestos in the ceiling tiles and possibly the basement tunnels, so Plaintiff might have been exposed to asbestos as shown on Exhibit 22F. These caused Plaintiff's more emotional distress and severe mental anguish due to worry about the effects of mold and potential asbestos exposure to Plaintiff's health or physical harms.

f. Adding to Plaintiff's emotional distress and mental anguish was that she was moved to the wastewater treatment plant that is located in the regulatory floodway with very high risk of flooding. Especially during heavy rain, she had to worry many times about flooding since she knew that the elevation of her office buildings in the wastewater treatment plant is more than seven feet lower than FEMA (Federal Emergency Management Agency)'s base flood elevation as shown on Exhibit 23.

g. Equally disturbing was an awful sewage and rotten egg smell that permeated the air in her office, likely due to the proximity to the wastewater treatment plant.

h. On April 17, 2023, a massive volume of rotten egg gas spew out from Plaintiff's office radiator and filled the room with the smell. An engineer who was outside of Plaintiff's office smelled it immediately and commented the same to Plaintiff. This event caused Plaintiff's mental anguish all day, and made Plaintiff's concerned about the effect of the gases to Plaintiff's health since the heating radiator in this office was very old and moldy. Other radiators in the other staff's offices in the same building did not spew out the rotten egg gas on that day. She was the only Southeast Asian American from Indonesia in the offices.

i. From the administration building, Plaintiff was then moved to maintenance building that is also at the wastewater treatment plant.

j. Condition of the maintenance building is worse than the administration building as it's located next to a sewage pumping system with an underground well that was located not far from the building.

k. Often, a very strong and awful sewage or rotten egg smell permeated the air and vents in her office and the whole maintenance building, which were much worse

than the administrative building's air, especially when all other staff had left the office at 3:30 PM (as they work from 7:30 AM to 3:30 PM), which made Plaintiff suffered and worried about her health daily, and made Plaintiff wanted to quit her job as she believed that the Defendant intentionally released the gas/emissions after other staff left the office or when she was alone in the office when the other staff were not around (as the other staff were often not around because they were field staff so they were in the field most of the time and they left at 3:30 PM).

l.  Plaintiff's office, at the maintenance building/trailer, often sook hard whenever nearby construction activities occurred, sending debris onto Plaintiff's filing cabinet and office equipment.  Plaintiff has videos of the shaking office. The shaking of the office and falling debris not only created an unsafe work environment but also posed a direct threat/hazard to Plaintiff's physical safety and caused her severe emotional distress and mental anguish.

m.  The office's proximity to ongoing construction activities further exacerbated the situation. The frequent extreme building vibrations and shaking, particularly when roadwork, excavation, pipe installations, and other construction activities were carried out nearby, further disrupting Plaintiff's ability to concentrate and perform her job. The vibrations damaged the building's foundation tiles, which exacerbated the unsafe and unstable environment as shown on Exhibit 24. In addition, Plaintiff was never been informed prior to any of these construction activities so Plaintiff was not able to request for alternative work locations. Plaintiff has several videos of her vibrating offices.

n.  Plaintiff was placed in the maintenance building with hourly male maintenance staff but Plaintiff was not provided with a job title tag like the other male staff in that office, which caused Plaintiff to lose respect from other staff in that office as they treated plaintiff like hourly staff and even talked about Plaintiff's performance evaluation and their assumed hourly timesheet submittal, and one of them even yelled and instructed Plaintiff to report to Barbara Jackson when Plaintiff was preparing report for Mr. Whitehurst, which was abusive to Plaintiff causing her employment condition to be much worse than before.

o.  None of the staff who had permanent offices at the maintenance building are female or Southeast Asians or from Indonesia.

p.  The temperature control panel of plaintiff's office in the maintenance building was locked in a lockbox that was controlled by the male staff in that building. They set Plaintiff's office temperature to extremely cold when it's cold outside resulting in room temperature around 60 degrees Fahrenheit and to extremely warm when it's hot outside resulting in room temperature around 80 degrees Fahrenheit.

q.  In addition, the demotion caused Plaintiff to suddenly missing from internal and external permit meetings that Plaintiff regularly attended had caused internal and external colleagues and coworkers to think that Plaintiff has substantially fall

Page **17** of **86**

from the grace to an hourly position and damaged Plaintiff's professional reputation internally and externally (that she had built for six years) with all permit stakeholders who regularly had meetings with plaintiff before demotion.

r.   Several hourly maintenance staff and Ms. Barbara Jackson kept asking what was Plaintiff's positions during the first several weeks of Plaintiff's demotion to the wastewater treatment plant, which caused Plaintiff's emotional distress and mental anguish.

s.   Plaintiff's first assignment immediately after demotion was renovation of the roofs of a huge wastewater retention basin that emits sewage smells and toxic emissions.

t.   Plaintiff's supervisor, Mr. Alan Harrison, specifically instructed Plaintiff to visit the basin twice, once with the consultant to evaluate the condition and another time with him where he retaliatory told Plaintiff that Plaintiff needed to learn in front of Plaintiff's colleague, Mr. Todd Loney.

u.   Between 2023 and today, Plaintiff has the same amount of projects and has not been assigned new projects, even though at least two of Plaintiff's projects were completed in 2024 and at the end of 2025, compared to Mr. Todd Loney who has been assigned additional projects since then. Mr. Loney and Plaintiff are supervised by Mr. Stone.

v.   Plaintiff informed Mr. Stone that Plaintiff was not busy on July 29, 2025 and in January 2026, but Plaintiff has not received any responses from him, which demonstrates that Defendant through its supervisors continuous its retaliatory attempts to constructively discharge (forced resignation on) Plaintiff by not assigning new projects to Plaintiff since 2024 even though similar situated employee (Mr. Todd Loney), who are not Southeast Asian from Indonesia and are not female, who works under the same Deputy Director, has received new project assignments since then.

92.   As mentioned previously, the conditions of Plaintiff's offices after demotion in the Wastewater Treatment Plant were objectively psychologically distressing, which both demonstrates an injury to Plaintiff's "psychological well-being" and the conditions unreasonably interfered with her work performance, that's why she took more sick leaves than she ever had previously at the Water Resources Division.

93.   Immediately after demotion, she got sick and took eight day of sick leave, which shows that the demotion had severe effects on Plaintiff.

94.   Plaintiff was the only Southeast Asian American from Indonesia in her former Division and in the new Division.

95.   Plaintiff was then held to an unreasonable and unrealistic standard by Mr. Harrison, placing learning requirements upon Plaintiff that had not been placed on similarly situated individuals.

**Page 18 of 86**

96.    The particular facts of the demotion give rise to an inference of malice by Plaintiff's supervisors to create hostile work environment in an attempt to force her resignation: Plaintiff was placed in a foul-smelling sewage treatment plant, without working HVAC, under a supervisor with whom she had previously had personal disagreements. This suggestion of personal malice lends itself to both a plausible inference of racial animus, as well as an inference of retaliatory animus. Beyond evidence of malice, there is additional reason to believe that the demotion was a result of Plaintiff's protected activity, since Ms. Bingham—who later took part in the decision to demote Plaintiff, " publicly" mocked Plaintiff, reiterating Mr. Mantey's "accusation that Plaintiff was "vindictive", in her meeting with Plaintiff, her supervisor, Ms. Bingham, and Human Resources in July 2022, which insulted and humiliated Plaintiff publicly and caused Plaintiff to lose respect from others.

97.    Defendant's demotion of Plaintiff was an attempt, albeit unsuccessfully, to constructively discharge Plaintiff.

98.    The aforementioned unbearable conditions of her offices at the wastewater treatment plant created a hostile work environment for Plaintiff that effected her physical and emotional health that caused emotional distress, mental anguish, insomnia, and more wrinkles in her face and skin.

99.    Plaintiff refused to quit despite the demotion and absurd working conditions. Consequently, after repeated complaints, after around one year, Plaintiff was moved to a maintenance trailer that is also located at the Wastewater Treatment Plant for a year, and finally to the Operations Building as further described below.

**Retaliation Against Plaintiff Due to Plaintiff's Protected Activities by Plaintiff Supervisor, Mr. Alan Harrison**

100.    After the demotion, in September and November 2022, Plaintiff informed Mr. Harrison about Plaintiff's internal complaint and intention to file EEOC complaint and lawsuit during our first meeting. After the meeting, in retaliation, Mr. Harrison asked for Plaintiff's resume that he said to review if Plaintiff had relevant experiences, and gave Plaintiff first assignment to manage a huge wastewater retention basin's roof rehabilitation project, which included site visits inside the retention basin that retain sewage and emits various odorous sewage and toxic emissions. Before the meetings, Mr. Harrison was also aware of Plaintiff's internal EEO Complaint from HR and other management staff due to demotion of plaintiff to work under his direction.

101.    Mr. Alan Harrison, specifically instructed Plaintiff to visit the basin twice, once with the consultant to evaluate the condition and another time with him where he retaliatory told Plaintiff that Plaintiff needed to learn in front of Plaintiff's colleague, Mr. Todd Loney. He also retaliatory told Plaintiff that Plaintiff needed to learn in a

meeting between him, Plaintiff and Mr. Loney twice. Discriminatorily, he did not tell Mr. Loney that he needed to learn in both occasions, even though Mr. Loney was just hired in November 2022 and has never worked in the Division or DPU before. Both Mr. Harrison and Mr. Loney are not female and are Southeast Asian American from Indonesia. Mr. Harrison is Caucasian and Mr. Loney is African American.

102. After the demotion, while Plaintiff refused to resign despite the repeated abuse, Plaintiff applied to two positions in different localities, both offering better compensation packages. Plaintiff was interview for the positions on October 21, 2022 with a county, and on February 28, 2023 with another county. After the interviewers informed Plaintiff that they would check Plaintiff's references and one of them informed Plaintiff that they would check Plaintiff's reference with Defendant or Plaintiff's supervisor, however, Plaintiff was not selected for either position.

103. The interviewer for one of the localities indicated that they would contact Plaintiff's employer (the Defendant) to discuss Plaintiff on October 21, 2022. Even though Plaintiff did not reveal or inform Mr. Harrison of the interview, several days after the interview, Plaintiff's supervisor, Mr. Harrison, told Plaintiff that one of the interviewers from this locality was his personal friend. This happened about one month after Plaintiff told Mr. Harrison that Plaintiff had filed EEO complaint and was going to file EEOC complaint and a lawsuit due to the demotion, which supports inference of retaliation due to protected activities to dissuade Plaintiff from filing the EEOC charge and from continuing to file internal EEO complaint.

104. This conversation with Plaintiff also came in the wake of humiliating incident with Mr. Harrison in March 2023. In March 2023, during a conversation with multiple male contractors and consultants present (none of whom were Southeast Asian American and none of whom were females), while talking to Plaintiff, Mr. Harrison retaliatory loudly said: "Don't wipe your butt (or possibly 'ass') before you shit!" in front of five or six male consultants, inspector, and contractors. Some of the male consultant and contractor laughed or smiled when they heard it while looking at Plaintiff. The evidence for this comment from one of the witnesses is attached in Exhibit 25.

105. This statement was highly inappropriate and caused Plaintiff significant mental anguish and distress.

106. Prior to this incident, during a meeting in September 2022 and a phone call in March 2023, Plaintiff had informed Mr. Harrison that she intended to file EEOC complaint and a lawsuit regarding her demotion and was considering legal action.

107. Mr. Harrison retaliatory asserted he did not believe Plaintiff would prevail in any lawsuit, exacerbating the hostile work environment and retaliation due to Plaintiff's protected activities as Plaintiff had amended her EEOC Charge.

108. Mr. Harrison removed Plaintiff from Senior Management Meeting that she usually attended when she was Water Resources Manager after Plaintiff was demoted to work under his management in early 2023.

109. On February 23, 2023, Plaintiff received Plaintiff's interim performance evaluation, which, noticeably, was devoid of Plaintiff's accomplishments over the review period from July 1, 2022 to August 31, 2022. Plaintiff asked Mr. Harrison to include all Plaintiff's accomplishments for this period in the performance evaluation, including but not limited to successfully managed levees certification project (to ensure that around 900 millions worth of properties and water treatment plant were protected by certified levees), so the properties and treatment plant would be eligible to obtain flood insurance or coverage for loss by federal government, but he refused by phone and did not respond to plaintiff's email. The omission of accomplishments in an evaluation, particularly when compared to other employees' evaluations, creates an adverse employment action that has the potential to harm Plaintiff's career trajectory. Even though, Plaintiff performance was rated as meeting standard, Defendant intentionally omitted Plaintiff's accomplishments and failed to provide Plaintiff a fair and accurate performance review. In connection with the demotion, this further had an adverse effect on Plaintiff's employment opportunities for advancement, increases in compensation (as shown at id 28), and continued employment. The failure to accurately document and evaluate Plaintiff's performance is more than a clerical error—it undermined Plaintiff's professional reputation and opportunities for growth within the organization, especially when contrasted with the treatment of other managers who do not share Plaintiff's racial or national origin background or do not complain to EEOC or internal EEO Department. This selective omission supports the

inference that Plaintiff's evaluation was biased and discriminatory, constituting an unlawful practice.

110.    Mr. Harrison resigned in May 2023.


**Discrimination and Hostile Work Environment based on Gender, and Retaliation Against Plaintiff Due to Plaintiff's Protected Activities in the Maintenance Building under Mr. Whitehurst's Supervision Due to His Negligence (Based on 2nd EEOC Charge)**

111.    Plaintiff was instructed to move to an office at the maintenance trailer, which is also located in the wastewater treatment plant, by her supervisor Mr. Eric Whitehurst in July 2023. Plaintiff had an office at the maintenance trailer for almost a year, from July 2023 until July 2024.  Mr. Whitehurst is a male and is African American, and he is not Southeast Asian American and was not from Indonesia.

112.    Condition of the maintenance building is worse than the administration building as it's located next to a sewage pumping system with an underground well that was located not far from the building.

113.    Often, a very strong and awful sewage or rotten egg smell permeated the air and vents in her office and the whole maintenance  building, which were much worse than the administrative building's air, especially when all other staff had left the office at 3:30 PM (as they work from 7:30 AM to 3:30 PM), which made Plaintiff suffered and worried about her health daily, and made Plaintiff wanted to quit her job as she believed that the Defendant intentionally released the gas/emissions after other staff left the office or when she was alone in the office when the other staff were not around (as the other staff were often not around because they were field maintenance supervisor and field operation supervisor so they were in the field most of the time and they left at 3:30 PM).

114.     The maintenance trailer that is also located in the wastewater treatment plant and Plaintiff has to share office building with all male staff who were hourly paid  and are field maintenance staff.

115.    No other managers' offices were located in this trailer when Plaintiff's office was there.

116.    The trailer office had a damaged ceiling and was poorly constructed. Her entire office shook whenever nearby construction activities occurred, sending debris onto Plaintiff's filing cabinet and office equipment, causing the foundation tiles to lose that caused Plaintiff's severe mental anguish all day due to afraid that the building will collapse.

117. The shaking of the office and falling debris not only created an unsafe work environment but also posed a direct threat/hazard to Plaintiff's physical safety and caused her severe anxiety and mental anguish.

118. The office's proximity to ongoing construction activities further exacerbated the situation. The frequent extreme building vibrations and shaking, particularly when various roadwork, excavation, pipe installations, and other construction activities were carried out nearby, further disrupting Plaintiff's ability to concentrate and perform her job and gave her mental anguish and emotional distress due to worry that the building would collapse one day due to vibration. The vibrations damaged the building's foundation tiles, which exacerbated the unsafe and unstable environment as shown on Exhibit 24.

119. In addition, her office's plumbing was defective. The women's restroom often malfunctioned, failing to properly flush, and, despite weekly (and sometimes daily) visits from the cleaning staff, the toilet was disgustingly not cleaned for the first 4 months Plaintiff worked in the Maintenance Building.

120. During this period, Plaintiff had to leave the Maintenance Building simply to use other restroom facilities, further disrupting her work and contributing to a degrading and hostile work environment.

121. In addition, Plaintiff requested to Plaintiff's supervisor, Mr. Whitehurst for the front door key and was denied access to a key to the front door of her office (maintenance trailer) for the first four months by Plaintiff's supervisor's Mr. Whitehurst, causing Plaintiff to be locked out of her office building several times. In addition, for nearly a year, was not given the proper office identification and name tag (inclusive of title information).

122. Mr. Whitehurst was also berated Plaintiff about Mr. Harrison giving Plaintiff's key to the Administration Building without his permission, when Plaintiff questioned him why Plaintiff was not provided with the front door key of the maintenance building like Plaintiff was provided with the front door key to the Administration Building, which clearly support the inference of Mr. Whitehurst's intention to discriminate against Plaintiff as all male staff in the maintenance building have the front door keys.

123. All other staff, who have permanent offices in the Maintenance Building like Plaintiff, are male and are not Southeast Asian American and they were granted keys and office door's name tags which included their titles.

124. Because none of these staff were female, it supports the reasonable inference that the Defendant through her supervisor, for four months from July, 2023 until October 2023, Mr. Whitehurst, intentionally discriminated against Plaintiff due to her gender and retaliated against Plaintiff due to her internal EEO protected activities, external EEOC activities and discrimination and retaliation lawsuit that she submitted on July 27, 2023 until Plaintiff submitted amended complaint.

125. This denial of access to the key was a continuous and persistent disturbance to Plaintiff' work activities, particularly after 3:30 PM when other staff members had left for the day. As a result, Plaintiff was often locked out of her trailer and had to seek assistance from maintenance personnel, causing significant disruption to her work and adversely altering the conditions of her employment.

126. The lack of a name tag with title may have caused other staff to believe that Plaintiff had been further demoted to an hourly staff member, further undermining Plaintiff and permitting the hostile work environment to continue during the time period she maintained an office in the maintenance trailer, as identified herein.

127. The lack of name tag had caused Patra Brodie ("Ms. Brodie"), a Human Resources staff, who visited the wastewater treatment plant about June 27, 2023, to think that Plaintiff was demoted to hourly position and made demeaning statements against plaintiff, the same as the other staff in the maintenance building, who questioned what Plaintiff's title after relocation to the wastewater treatment plant.

128. Plaintiff believes that this visit caused Ms. Brodie to make demeaning statements against Plaintiff infront of operation staff and require Plaintiff to attend the hourly payroll training with non managers in the same sessions that the other hourly staff in the maintenance building attended and prevented a field staff/supervisor from informing Plaintiff information about a site condition as shown Exhibit 7.

129. In early February 2024, Mr. Whitehurst discriminatorily allowed a lockbox was installed around the temperature control panel that controlled the heating and air conditioning for Plaintiff's office without providing Plaintiff with the key to change the temperatures in her office, which caused Plaintiff could not adjust the temperature to acceptable temperature based on OSHA requirements. Mr. Whitehurst was retaliatory negligent and ignored Plaintiff's complaint about the lockbox installation and her inability to set her office temperature to acceptable temperatures as seen on Exhibit 8, due to her internal and external protected activities including but not limited to filing a Title VII lawsuit against Defendant.

130. All other staff, who are males, whose offices' temperatures were controlled by this lockbox were given the keys to the lockbox. They are all male and are Caucasians, and are not Southeast Asian American from Indonesia, were provided with the key to the lockboxes to control their offices' temperatures, including Mr. Douglas Yarhouse and Mr. Robert Vargas.

131. Since all the other staff, who are male, and are Caucasians and are not Southeast Asian American from Indonesia, were given the lockbox keys, which caused Plaintiff to believe that she was discriminated based on her gender due to her supervisor, Mr. Whitehurst's negligence and retaliatory animus due to her protected activities, because even though plaintiff complained to him several time, he did not order Mr. Battle to provide Plaintiff with the key to the lockbox or to set the temperatures to OSHA recommended temperatures, which showed that he was negligence and

retaliatory to allow the discrimination based on gender to continue and the hostile work environment to continue.

132. In addition, starting February 2, 2024, in retaliation to Plaintiff's protected activities, Mr. Whitehurst discriminatorily allowed the temperatures in Plaintiff's office to be set by all male staff, Mr. Yarhouse and Mr. Battle, who deliberately set the temperatures to extreme levels, resulting in her office temperatures to be as low as around 59 degrees Fahrenheit when it's cold outside and as high as around 86 degrees Fahrenheit when it's hot outside. Mr. Whitehurst allowed these male staff to set Plaintiff's office temperature to outside OSHA's recommended temperatures of 68 to 76 degrees Fahrenheit, which also overtly showed that Mr. Whitehurst discriminated against Plaintiff based on gender as she was not allowed to set or change the temperatures in her office that were set by the male staff, which had caused Plaintiff to suffer physically and mentally to work all day in the extreme temperatures that also caused her emotional distress, mental anguish and disturbed her work performance. She observed that the extreme temperature caused her skin to wrinkle faster that caused her to have to pay for expensive wrinkle skin treatment regularly.

133. These extreme temperatures in Plaintiff's office are shown on Exhibit 27. Mr. Battle, is a male and is African American, and is not Southeast Asian or was not from Indonesia. Mr. Yarhouse is Caucasian and is not Southeast Asian American. Mr. Battle is Mr. Yarhouse's Supervisor and Mr. Whitehurst is Mr. Battle's supervisor.

134. Even after Plaintiff complained to Mr. Whitehurst as shown on Exhibit 28, Mr. Whitehurst was negligent and failed to ensure that these temperatures were set to recommended temperatures by OSHA as seen on Exhibit 29. These conditions further convinced Plaintiff that she was discriminated based on her gender by Mr. Whitehurst, her supervisor, at the Maintenance Building.

135. On July 17, 2023, and again on April 16, 2024, Plaintiff discovered that the women's restroom door had been physically blocked from outside, while male restroom was not blocked, which was also gender discrimination that caused by Mr. Whitehurst's negligent as Plaintiff had complained to him after the first incident on July 17, 2023 but it happened again in 2024, and this time, it was not only blocked from the outside when nobody was inside the bathroom, but it was also blocked from the outside when Plaintiff was in the bathroom, which was horrible and made Plaintiff's trauma and mental anguish to have an office there with all these horrible discriminatory male staff.

136. On April 16, 2024, the women restroom door was also blocked with a big box from the outside when Plaintiff was inside. Plaintiff was physically trapped inside the restroom and had to forcefully push the door open to escape. Mr. Yarhouse, a male staff, was the only staff member present in the building at the time. Plaintiff's complaint to Mr. Whitehurst about these is shown on Exhibit 30A and 30B and Plaintiff requested for a security camera to be installed in the printer room where the bathroom door is located but received no response from Mr. Whitehurst.

137.    All these male staff were supervised by Mr. Eric Whitehurst, therefore, Plaintiff believed that Mr. Whitehurst was negligent in allowing these aforementioned gender discriminations to happen at the maintenance building even after she complained.

**Continue Retaliation Against Plaintiff Due to Plaintiff's Protected Activities and Discrimination Based on Gender/Sex Due to Mr. Whitehurst's Negligent (based on 2nd EEOC Charge)**

138.    Mr. Douglas Yarhouse ("Mr. Yarhouse") was a male coworker of Plaintiff who was not a Southeast Asian American, had knowledge of Plaintiff's Charge, and had an office directly next to Plaintiff's office in the maintenance trailer.

139.    Mr. Yarhouse engaged in pattern of abuse against Plaintiff in July 2023.

140.    Nearly every day in July 2023, Mr. Yarhouse forcefully pushed his desk against the shared wall between his office and Plaintiff's former office, creating loud, sudden noises that startled Plaintiff. This conduct was intentional and designed to intimidate Plaintiff, reinforcing an abusive work environment.

141.    In July 2023, after Plaintiff requested information from Mr. Yarhouse regarding an electrical source for a project, Mr. Yarhouse positioned himself behind Plaintiff's half-open office door and stated, "What could/would you do, what would I get?" Plaintiff understood this as an implied quid pro quo demand, which caused Plaintiff to feel intimidated and deterred Plaintiff from seeking further assistance from Mr. Yarhouse.

142.    On July 17, 2023, Plaintiff discovered that the women's restroom door had been physically blocked with a heavy printer table and a large box, preventing access, purportedly by Mr. Yarhouse. Plaintiff immediately requested a security camera installation in the area to Mr. Battle and other maintenance staff, Mr. Barry Deaton, but was denied. A photograph of the entrance to the woman's restroom and adjacent table is attached hereto as Exhibit D, and incorporated by reference.

143.    Between July 11 and July 21, 2023, Mr. Yarhouse made repeated loud and offensive statements about needing to use the restroom ("no time to go taking dump") not long after Plaintiff went to the women's restroom. These statements were deliberately timed to be audible to Plaintiff, causing Plaintiff discomfort and embarrassment.

144.    On July 24, 2023, Mr. Yarhouse loudly stated, "I am wet," twice, not long after Plaintiff returned from the restroom. Plaintiff reasonably perceived this comment as inappropriate workplace conduct intended to humiliate and intimidate Plaintiff.

145.    Plaintiff formally complained about Mr. Yarhouse to her supervisor, Mr. Eric Whitehurst and HR on that day.

146. The day after Plaintiff submitted her formal complaint against Mr. Yarhouse, Mr. Yarhouse stated that he would like to 'tape Plaintiff's mouth shut' to a cleaning staff member. He did so while standing near Plaintiff's open office door, ensuring that Plaintiff could hear him. This was a direct and explicit act of retaliation.

147. Subsequent to Plaintiff's complaint against Mr. Yarhouse, Mr. Yarhouse installed a lockbox around the temperature control panel located near the meeting table in front of the building, which controlled the heating and air conditioning for Plaintiff's office, Mr. Yarhouse's office, and a male mechanical supervisor's office. The second lockbox in the back off the building controls the heating and cooling for other offices in the building.

148. Mr. Yarhouse informed Plaintiff that the key to the lockbox that control Plaintiff's office temperature was provided only to him and the other male mechanical supervisor's office—both male, non-Southeast Asian American employees. This prevented Plaintiff from adjusting the temperature in her own office.

149. The temperatures in other offices, offices of Mr. Deaton and Mr. Ronald Stroy, in that building are controlled by other control panel in the back of the building, which was also locked in a lockbox, however, the keys were given to both Mr. Deaton and Mr. Stroy. Both Mr. Deaton and Mr. Stroy are male and are not Southeast Asian American and were not from Indonesia.

150. The temperature in Plaintiff's office was deliberately set to extreme levels, including as low as around 59 degrees Fahrenheit in the morning and as high as around 86 degrees Fahrenheit in the afternoon.

151. These temperatures are outside the temperatures that OSHA (Occupational Safety and Health Administration) recommends for an employer to set in a workplace, which are between 68 degrees and 76 degrees Fahrenheit.

152. Plaintiff requested a key to Mr. Yarhouse's supervisor, Mr. Battle, to adjust the programmed temperatures but was denied. Mr. Battle then deliberately removed Mr. Yarhouse's key from his drawer in Plaintiff's presence to reinforce that Plaintiff would not be given control over the office temperature.

153. In another incident, and again subsequent to Plaintiff's complaint against Mr. Yarhouse, Plaintiff again found the women's restroom door blocked from the outside when Plaintiff was going to the restroom, and Plaintiff had to push a large heavy box that was located in front of the door fully under the printer table so Plaintiff could access the restroom.

154. However, once Plaintiff completed use of the restroom, she was unable to open the restroom door, as the large heavy box was blocking it again from the outside. Plaintiff was physically trapped inside the restroom. Plaintiff then turned the door handle and pushed it really hard to open it around one inch and Plaintiff then put Plaintiff hand through the small opening to forcefully push the box back under the table, and then forcefully push the door open to escape.

155. After escaping, Plaintiff checked and found that Mr. Yarhouse was the only staff member present in the building at the time, both before Plaintiff entered the restroom and after Plaintiff escaped from the restroom.

156. Several days after the incident, Plaintiff requested from Defendant's staff (Mr. Chris Battle/maintenance and City's Department Emergency Management) for the security camera footage of the outside of the building during the time Plaintiff before and after Plaintiff went into the restroom, however, Plaintiff was told that there was no saved footage.

157. Plaintiff reported the incident to Plaintiff's supervisor, Mr. Whitehurst, who then requested Mr. Yarhouse's supervisor to meet with her and Mr. Yarhouse. During the meeting, Mr. Yarhouse s openly stated that "[Plaintiff] cannot have an office in this building." After this meeting, Plaintiff's office temperatures were turned off or still set to extremely low or high, especially on June 26, 2024 when Plaintiff's office and the whole building's temperature reached 86 degrees Fahrenheit when Plaintiff was the only person in the building after 3:30 PM as can be seen on Exhibit 51.

**Denial of Critical Software Access Due to Gender Discrimination by Supervisor Alan Harrison and Eric Whitehurst (based on 2nd EEOC Charge)**

158. Following Plaintiff's demotion on August 29, 2022 and refusal to quit despite such demotion and relocation to unbearable working conditions, Defendant continued to create an unbearable working environment in hope that Plaintiff would simply resign.

159. From the end of September 2022 until July 19, 2023, Plaintiff was subjected to discriminatory treatment regarding access to essential project management software used for managing Defendant's CSO projects. Specifically, Plaintiff was denied access to the Rapids project management tab and the buyer center/management tab, tools that were critical for accessing contract data and project-related information due to retaliation to Plaintiff's internal complaint to Defendant's EEO Manager that Mr. Whitehurst and Mr. Harrison was aware of and discrimination against Plaintiff based on gender.

160. In contrast, Plaintiff's colleagues—Todd Loney ("Mr. Loney") and Mr. Stone—who are males and were also project managers in the DPU, were granted access to these tools without delay, without they needed to request for access. Neither of these individuals are Southeast Asian American from Indonesia.

161. Mr. Loney, who began working for Defendant in November 2022, was provided access shortly after his start date, while Plaintiff, who had been employed by Defendant for over 6 years and demoted in August 2022, was denied access for almost a year. Plaintiff's supervisor, Alan Harrison, provided Mr. Loney with the access since 2022 but Plaintiff was treated the same.  Mr. Harrison is Plaintiff Supervisor and is a male and Caucasian, he is not Southeast Asian American or from Indonesia.

162. Plaintiff's inability to access necessary tools placed Plaintiff at a disadvantage, forcing Plaintiff to repeatedly rely on Mr. Stone to obtain contract data and other information, which created inefficiencies in performing job duties and affected Plaintiff's work performance as Plaintiff had to depend on Mr. Stone to get the information related to projects.

163. After months of being denied access, despite repeated requests that were cc-ed to Plaintiff's supervisor at that time, Mr. Whitehurst, Plaintiff's request was finally approved by Mr. Whitehurst.

164. In addition, Defendant through Plaintiff's supervisor, Mr. Whitehurst, did not grant access to Plaintiff to the McCloy Pump Station, where Plaintiff served as a Project Manager since January 2023, for nearly two months despite immediately granting access to all male, non-Southeast Asian American contractors and consultants involved in the project after the access request was submitted.

**Mr. Stone's Negligence and Retaliation In Allowing Continued Hostile Work Environment, Discrimination, and Retaliation by Kenya Peterson (Based on Gender, Race, and National origin) due to Plaintiff's Protected Activities and Lawsuits**

165. Plaintiff was moved to the Operation Center Building from the Maintenance Building on approximately the end of June or early July 2024. Ms. Kenya Peterson ("Ms. Peterson" or "KP") is a project management analyst who helps Plaintiff and other project managers and Mr. Stone with invoices and requisition processing. She is female and is African American, she is not Southeast Asian American and was not from Indonesia.

166. Plaintiff and KP work under the same supervisor, Mr. Robert Stone (Mr. Stone). Mr. Stone is KP's supervisor and he approves KP's timesheets and reviews her performance. She is aware of Plaintiff's EEO complaint and EEOC charge and lawsuit since Plaintiff informed Mr. Stone about them in July and September 2024. Mr. Stone is a male and is not a Southeast Asian American from Indonesia.

167. Ms. Peterson was assigned to help Plaintiff and other project managers (Mr. Todd Loney and Mr. Robert Stone) since July 2024, and since the beginning she has shown condescending behavior toward Plaintiff by delaying her first requisition requests and questioning Plaintiff's previous project procurement codes and budget allocations loudly when Plaintiff walked nearby her cubicle in 2024.

168. As example, Plaintiff sent her first requisition request to Ms. Peterson on July 16, 2024 for the project bid at 1721 Byrd St, but Ms. Peterson did not submit this request to procurement until July 29, 2024 or thirteen days after, however, when Plaintiff asked her why she had not submitted the requisition, she stated that she did not know how to do it or what to do, but she did not inform Plaintiff if Plaintiff did not ask, which could cause the requisition to be not being processed without Plaintiff's

knowledge and could jeopardize the project's qualification for full federal grant/funding if it could not meet required construction's deadline.

169. Another staff in the office, a female manager, Ms. JK, who had also been assisted by her, told Plaintiff that she experienced the same thing when she first asked KP to help her, she said KP also said she did not understand or she did not know what to do. This manager told Plaintiff that she thought that Plaintiff was treated differently by KP due to Plaintiff's race or national origin.

170. Another example was on September 24, 2024, when Ms. Peterson asked Plainitff if Plaintiff needed any office supplies, and Plaintiff responded by asking for a laptop bag replacement due to the bag is in deteriorating condition, to which Ms. Peterson responded to with "no problem" as shown on Exhibit 31A.

171. Several weeks after that, Plaintiff went to her desk and ask her about the laptop bag and she said that she had ordered it but it had not arrived yet. She then said the same thing when Plaintiff asked again several weeks later. However, until February 4, 2026, more than a year after, this laptop bag has not been provided to Plaintiff yet.

172. When Plaintiff complained to our supervisor, Mr. Stone, on February 4, 2026, Mr. Stone stated that he could not find any laptop bag's order in late September or early October's 2024, which Plaintiff perceived that in retaliation to Plaintiff's ongoing EEOC charges and lawsuit, either she did not order the laptop bag or if she ordered it, she did not provide it to Plaintiff, and Plaintiff perceived that she treated Plaintiff differently than other Program and Operations Managers or other Defendant's staff due to Plaintiff's EEO and EEOC charges and lawsuit.

173. Additionally, on October 31, 2024, Plaintiff asked Ms. Peterson to confirm if a charge on an invoice that she sent to Plaintiff was for a Minority Business Enterprise, but Ms. Peterson refused and superiorly told Plaintiff to ask the consultant herself, even though this was an easy administrative task related to the invoice that she was processing. This email from KP is shown on Exhibit 31B. Plaintiff then asked the consultant by herself as Plaintiff was not her supervisor.

174. Finally, on December 5, 2024, KP told Plaintiff that she was required to attend a budget meeting, which shows that Mr. Stone allowed KP to act more superior in position to Plaintiff as when Plaintiff responded to this email and cc-ed it to Mr. Stone, he did not correct KP and he did not respond or say anything.

175. Unlike Ms. Peterson, the previous project management analyst who helped Plaintiff with invoices and requisitions for around two years, Ms. S.H., was always cooperative and she informed Plaintiff that it was a pleasure to work with Plaintiff after KP was assigned to take over her task as shown on Exhibit 32.

176. Furthermore, after Plaintiff had moved to the Operations Center for around 2 months, Ms. Peterson was the one who informed Plaintiff that Plaintiff needed to move to other much smaller office far away from Mr. Stone's office in the Streetlight Division.

177. She was also the one who show Plaintiff the location of the office. Mr. Stone actually did not want Plaintiff to move to that office, but he wanted Plaintiff to move to an office that is located an office away from his office.

178. However, Mr. Stone did not contradict her, which shows that Mr. Stone allows Ms. Peterson to be in superior position to plaintiff. As shown on Exhibit 33, Mr. Peterson is supervised by Mr. Stone, he approves her timesheets for payroll and evaluates her performance. Plaintiff was also supervised by Mr. Stone.

179. On February 26, 2025, Mr. Stone also allowed Ms. Peterson act superior to Plaintiff and informed consultants to send all invoices first to her as designated management analyst and that failure to do so would be investigated, even though the third party's invoices that she sent to Plaintiff before and after that request had errors (either rate error or other errors) done by the contractors/consultants, as examples but were not limited to invoices she sent to Plaintiff on April 8, May 2, and May 12, 2025, causing ineffectiveness and inefficiency as Plaintiff had to contact the third party to fix the errors and then they had to submit the invoices to her before submitting to Plaintiff as Ms. Peterson refused to approve the invoices if it's not circulated according to her rule.

180. Ms. Stone negligently did not prevent her from enforcing her rules (even after he was informed of these errors in the invoices), which caused Plaintiff to perceive that Ms. Peterson is in a more superior position than Plaintiff's position (in a commanding privileged position) even though we both work under the same supervisor, who is Mr. Stone.

181. Finally, in early September 2024, Ms. Peterson retaliated against Plaintiff again when Plaintiff verbally requested Ms. Peterson ("KP") to assist in enrolling ( paying for the enrollment of) Plaintiff to an engineering/technical conference to fulfill Plaintiff's required continuing education credit for Plaintiff's professional engineer's license.

182. Before Plaintiff's demotion and submission of EEO complaint, usually, other project management analyst would inform Plaintiff that they would do that after Plaintiff requested them to assist with training registration payment after Plaintiff became Program and Operations Manager; however, since Ms. Peterson knew about Plaintiff's EEOC Charge and would like to retaliate due to Plaintiff protected activities, she told Plaintiff that Plaintiff had to ask permission from Mr. Stone.

183. However, knowing that Mr. Stone would reject Plaintiff's request following her lead, she then retaliatory and smugly verbally informed Plaintiff after she rejected Plaintiff's request that she had enrolled herself to the conference with a two-day hotel

stay, although she was not a professional engineer or engineer and she does not need the engineering education credits.

184. Following KP's lead, Mr. Stone then rejected Plaintiff request due to political reason the next day, which clearly shows that Mr. Stone was also retaliated due to Plaintiff's EEOC charges and lawsuits.

185. On November 14th, 2024, Plaintiff submitted a requisition request form for Hampton Pump Station, CSO19A and CSO19B project to Kenya Peterson ("Ms. Peterson"), who is assigned to help all project managers working under Mr. Stone, including Mr. Stone, Plaintiff, and Mr. Todd Loney. This request has the buyer's name on the email as shown on Exhibit 34.

186. On the next day, November 15th, 2024, Mr. Stone emailed Plaintiff stating that we needed to get Ms. Peterson to process the requisition before she left for vacation for two weeks as shown on Exhibit 35.

187. On November 15, Plaintiff received an email from Ms. Peterson asking for more information and requesting Plaintiff add the buyer name on the form, even though Plaintiff had already included the buyer name (Mr. Tuttle) in her email on November 14. This email from her is shown on page 2 of Exhibit 36.

188. To expedite the process, Plaintiff provided all the requested information and added the buyer name to the miscellaneous part of the form, and emailed Ms. Peterson at 9:49 AM on November 15. This email is shown on page 1 and attachment of Exhibit 36.

189. At 10:10 AM, instead of appreciating Plaintiff's effort, Ms. Peterson condescendingly emailed Plaintiff telling Plaintiff that Plaintiff could add the buyer's name on the miscellaneous line, even though Plaintiff had already done so at 9:49 AM. This email is shown on Exhibit 37.

190. Plaintiff found Ms.Peterson's request to add the buyer name on the form discriminatory based on gender, race, and national origin because other project managers (Todd Loney and Robert Stone), both are male and are not Southeast Asian Americans from Indonesia, did not add buyers' names on their requisition request forms before or after November 15, 2024, but Ms. Peterson did not require them to do so when she processed their requisitions.

191. Plaintiff then emailed Plaintiff's supervisor, Mr. Stone, to complain about Ms. Peterson's request of buyer's name on the form at 11:16 AM as shown on Exhibit 38.

192. Mr. Stone did not respond to Plaintiff's complaint, which Plaintiff found to show that he was negligent for allowing Ms. Peterson to discriminate against Plaintiff, when it's really urgent for the requisition to be processed immediately due to tight deadline to get over $2,000,000.00 of federal grant (ARPA) for the project and Ms. Peterson was leaving for 2-week vacation after that day. These requisitions from other project

managers that she processed without buyer's name before and after the November 15, 2024 are provided in Exhibit 39.

193. Plaintiff is the only Southeast Asian American project manager from Indonesia that Ms. Peterson assists with requisitions.

194. Ms. Peterson's discriminatory request caused delay to the project by delaying requisition data entry, especially problematic as Ms. Peterson would be on vacation for two weeks starting November 18, and we were chasing a full federal grant's construction deadline of over $2,000,000.00, therefore, we needed that requisition to be processed on that day.

195. At 11:24 AM, Plaintiff emailed Ms. Peterson again asking for clarification since she had not received confirmation that Ms. Peterson had seen the buyer name added to the form at 9:49 AM as shown on Exhibit 40.

196. Between 3:00 PM and 3:30 PM on November 15, 2024, since Ms. Peterson, who usually leave work between 4:00 and 4:30 PM, had not confirmed by email that she received or saw the form with a buyer's name on it as she requested and she had not entered the requisition request, Plaintiff went to Ms. Peterson's desk to ask her if she could open the form to verify the buyer's name was there as Plaintiff did not want her to delay  processing of the requisition form due to her not seeing the buyer's name that Plaintiff added since Mr. Stone requested to Plaintiff that Ms. Peterson to complete processing that form on that day before she left for a two week vacation.

197. Plaintiff said with a flat professional tone as usual "Hi Kenya, can you open the form so we could see if the buyer's name is there?" near Ms. Peterson's cubicle door, while Plaintiff's left hand was up in the air with all fingers open as the regular hand gesture that Plaintiff use when talking, including with her at least once before this incident, with Plaintiff's right hand holding a project folder.  Her desk and chair were set to face the opposite site of her cubicle door.

198. Plaintiff was speaking with hand gestures (moving hand), which is Plaintiff's normal manner of speaking and which Ms. Peterson had observed many times previously, especially several time when she interrupted Plaintiff's conversation with Mr. Robert Stone ("Mr. RS" or "Mr. Stone"), our supervisor, in his office, and when Plaintiff talked to Ms. Peterson before.

199. Ms. Peterson jumped out of her chair and moved to the right quickly with a furious face and furious posture with her hand asking Plaintiff where she was pointing at, which shocked Plaintiff and made Plaintiff felt threatened as her body was much larger than Plaintiff.

200. Feeling threatened by Ms. Peterson 's hostile reaction, Plaintiff said Plaintiff  was pointing to the ground as normal people's arms with their arms on the sides of their bodies will point to the ground, just like one of Ms. Peterson's arm at that time.

201. This was not Plaintiff's first time talking with hand gestures in front of Ms. Peterson, who had seen Plaintiff talk this way many times in Mr. RS' office and when Plaintiff talked with her.

202. Plaintiff perceived that Ms. Peterson was treating her with hostility due to her inability to talk without moving her hands or hand gestures (that she had seen multiple times prior to this incident) in retaliation to Plaintiff's EEOC charges and discrimination lawsuit (as on November 8, 2024, Plaintiff moved to reopen the court case, which the Court granted on November 14, 2024), and found Ms. Peterson retaliated, disrespectful and uncooperative for ignoring her request to open the form.

203. Ms. Peterson then retaliatory and disrespectfully yelled at Plaintiff to "get out of her cubicle," which was abusive and hostile, publicly disrespecting and humiliating Plaintiff as several staff heard her yelling including Yi Sang, Toi Harrison/Jefferson, Ms. VH and Mr. FG, whose offices were located near Ms. Peterson's office/cubicle.

204. Besides to check if she saw the buyer's name on the form that Plaintiff sent to her, Plaintiff went to Ms. Peterson's cubicle was also to inform her that she was required by Mr. Stone to complete processing the requisition on that day.

205. Shocked and due to her threatening posture and afraid that she was going to jump and attack Plaintiff since her body is much larger than Plaintiff's body, Plaintiff immediately moved back to the other side of the hallway from near her cubicle door while stating that Plaintiff was in the City's space (public space).

206. Plaintiff moved back and stood in the alley near the cubicle next to the wall of Ms. Peterson's cubicle and facing the kitchen, trying to figure out what to do about the requisition and Ms. Peterson 's hostile treatment when she needed Ms. Peterson to complete the requisition processing that day before vacation, as per Mr. Stone's instruction.

207. Several DPU Staff whose offices near KP's office, saw Plaintiff moved to the hallway after KP yelled, including Ms. VH, Mr. FG (both are not Southeast Asian American and were not from Indonesia) and others. Mr. Yi Sang ("YS", who are not Southeast Asian American from Indonesia), an Engineer with the City, then came and asked Plaintiff what happened, and Plaintiff informed him that Plaintiff's confuse why that Ms. Peterson could access files in Plaintiff's One Drive that Plaintiff did not share. Mr. YS is a male and is not Southeast Asian American from Indonesia. Mr. YS then left.

208. Ms. Toi Jefferson Harrison ("Ms. Jefferson" or "Ms. Harrison"), another project management analyst, who is African American and is not Southeast Asian American and was not from Indonesia, then retaliatory came to the hallway and stood in front of Plaintiff very closely, and with her hostile face, threatened Plaintiff that she would call security if Plaintiff did not move away, which was discriminatory against plaintiff (as the hallway is a public area), very hostile, harassing Plaintiff for doing her job, and disrespectful.

209. This baseless threat was made in public and was clearly designed to humiliate, harass, and intimidate Plaintiff just around one week after Plaintiff reopened Plaintiff lawsuit against the Defendant at the EDVA, which made Plaintiff believes that her hostile action against Plaintiff was because she retaliated due to Plaintiff's Title VII lawsuit against Defendant as both TJ and KP were aware of Plaintiff's EEOC complaints and lawsuits.

210. The incident caused her significant emotional distress, mental anguish, and intensified the already hostile environment. Ms. Jeferson did that because she knew about Plaintiff's protected activities and lawsuit against defendant and in retaliation, she treated Plaintiff with hostilities and supported KP's hostilities against Plaintiff.

211. Since the first several weeks Plaintiff moved to that building, Ms. Jefferson had been telling the staff outside Plaintiff office about Plaintiff's discrimination charge and even to the staff who have offices outside of Plaintiff's current office.

212. Because of TJ's threat to call security, Plaintiff moved to the public printer room, which is next to the cubicle area, and was still thinking the way to inform Ms. Peterson that Mr. Stone asked her to finish processing the requisition for the Hampton PS Improvement project on that day before she left, since Mr. Stone has left that office on that day and so we could meet federal grant's deadline and get the federal grant for the project.

213. Ms. Jefferson again treated Plaintiff with hostilities and harassed Plaintiff while Plaintiff was trying to do her job, because she told Plaintiff she would call security even though Plaintiff was in a printer room available to all employees with no one else present, which was another discrimination and hostility against Plaintiff. Since Plaintiff was in the public area, Plaintiff informed TJ that she would call security as well.

214. Historically, Ms. Jefferson had shown her retaliatory hostility earlier in September when she did not call the security to open Plaintiff's office door that was locked by maintenance without providing the key to Plaintiff. Ms. Jefferson was also the one who informed others about Plaintiff's discrimination charge to staff whose offices near Plaintiff's offices in the Operations Center including several times to the staff who sit near Plaintiff's current office loudly.

215. After that, Ms. Peterson then rose from her cubicle (possibly standing on a chair or table), faced toward Plaintiff, and screamed extremely loudly (audible throughout the building): "Surani, go back to your office!!!!!!!!" , which was discriminatory, and extremely harassing, offensive, hostile, abusive, humiliating, and disrespectful.

216. Ms. Peterson 's screaming made Plaintiff's body physically shake and was extremely offensive, hostile, threatening, and abusive, causing Plaintiff to feel physically threatened and experience extreme emotional distress and extreme physical distress ("her body was shaking hard"), as Plaintiff estimated that Ms. Peterson 's body is approximately twice the size of Plaintiff's.

Page 35 of 86

217. Defendant's Engineering Manager, Mr. Stephen Morgan ("Mr. Morgan"), whose office was located near the printer room witnessed Ms. Peterson's screaming and Plaintiff's whole body shaking. Mr. Morgan is male and is African American. He is not Southeast Asian American and was not from Indonesia.

218. After Ms. Peterson screamed, an Engineering Manager of the Defendant, Mr. Stephen Morgan ("Mr. SM") came to the public printer room and asked Plaintiff to move away from the printer room as KP was still staring hostilely at Plaintiff from above her cubicle.

219. Mr. Morgan, who was the Defendant's senior manager, then told Plaintiff to talk to Mr. Stone, whom he said was more cordial than Ms. Peterson, which showed that Mr. Morgan recognized that Ms. Peterson was showing off her superiority to Plaintiff by screaming at Plaintiff publicly and extremely loudly in the printer room.

220. However, Mr. Stone had left for the day and did not come back to the office due to a meeting at another location. Mr. Stone was negligent to leave and did not correct KP due to her discriminatory request for buyer's name, which caused Plaintiff needed to go to her cubicle to ensure that she read that form that Plaintiff sent to her, confirmed that she saw the buyer's name on the form, and processed the form before she left for two week vacation.

221. Mr. Morgan, as a senior manager who is more superior than Plaintiff, was negligent and did not tell Ms. Peterson and Ms. Toi Jefferson Harrison to stop harassing Plaintiff and stop treating Plaintiff with hostility when she was standing in the printer room trying to do her job as requested by Mr. Stone who had left the office. Instead of warning Ms. Peterson and Ms. Jefferson to stop their harassment and hostilities against Plaintiff, Mr. Morgan told Plaintiff to go back to Plaintiff's office and to talk to Mr. Stone as he said that Mr. Stone is more cordial than Ms. Peterson, which shows that Mr. Morgan admitted that Ms. Peterson is more superior than Plaintiff in her Division.

222. Plaintiff told him near the printer room that she considered Ms. Peterson's screaming as discrimination, which Ms. Peterson likely heard and in retaliation immediately crafted email to complaint to our supervisor, Mr. Stone and Ms. Bingham.

223. In retaliation to Plaintiff's statement that what she did was discrimination against plaintiff and due to Plaintiff's EEOC charges and lawsuit, Plaintiff found out that Ms. Peterson filed a complaint with Mr. Stone (Plaintiff's and her supervisor), falsely stating that Plaintiff had asked her in very demanding way (refer to her complaint on Exhibit 41B), despite Plaintiff only asked her once to open the form and despite the absence of any threatening or unprofessional conduct or harassing conduct on Plaintiff's part, and despite Plaintiff immediately moved out of her cubicle to the hallway after she disrespectfully and hostilely yelled at Plaintiff to get out with her threatening body posture. Plaintiff found out about this complaint and false

accusations after receiving a FOIA (Freedom of Information Act) information from Defendant on October 14, 2025 (refer to Exhibit 41A).

224. In addition, Ms. Peterson falsely claimed that the public hallway and the public printer room as her workspace in her complaint email to Ms. Bingham, and falsely claimed that Plaintiff refused to back up from her workspace several times, which was not true, as Plaintiff has three witnesses, Mr. Yi Sang, Ms. VH and Mr. FG, who saw Plaintiff in the hallway immediately after they heard KP yelled at Plaintiff to get out of her cubicle. These witnesses are Defendant's staff who have offices near KP's office, and none of these witnesses are Southeast Asian American from Indonesia.

225. Plaintiff has the recording of phone calls with Ms. VH and Mr. FG where they confirmed that they saw Plaintiff in the hallway after hearing KP's yelling.

226. See Exhibit 42 for Mr. Yi Sang confirmation that Plaintiff was in the hallway after she yelled.

227. KP also falsely claimed that she advised Plaintiff to back up of her cubicle, since the truth was that she did not advise, but she yelled disrespectfully to Plaintiff to get out of her cubicle with her threatening body posture.

228. Additionally, she falsely claimed in her complaint to Mr. Stone that multiple people threatened Plaintiff to call security when in fact only Ms. Jefferson threatened Plaintiff to call security when Plaintiff was in the hall way.

229. Ms. Peterson or other might helped her to change her computer time in her complaint email to Mr. Stone to around an hour and half to two hours earlier, showing as 1:45 PM in her complaint, Plaintiff perceived that this was done in order to show that she submitted the complaint earlier than Plaintiff as Plaintiff also emailed to Mr. Stone to complain about Ms. Peterson's hostile treatment and disrespectfulness against Plaintiff at 3:49 PM, even though Plaintiff went to her cubicle between 3:00 PM and 3:30 PM, and her email timestamps were almost the same as Plaintiff's email timestamp in her emails to Plaintiff that morning as shown on Exhibit 37.

230. Plaintiff forwarded this FOIA result of KP's false accusations against Plaintiff to Ms. Bendernagel and Mr. Stone complaining about KP's false accusations but received no response.

231. Instead, as retaliation, Plaintiff was issued a warning or notice of verbal counselling after Plaintiff informed them that Plaintiff emailed KP to question her reason to scream at Plaintiff because Defendant closed Plaintiff's complaint about her discriminating and screaming at Plaintiff without informing Plaintiff about any results of investigations, findings, or resolutions except for requiring Plaintiff to submit reasonable accommodation for disability.

232. Plaintiff feels that this memorandum is retaliation for her ongoing Title VII lawsuits against the Defendant (City of Richmond), her continued EEO complaints to HR and supervisors, my continued complaints to EEOC, and based on her current work related reasonable accommodation request (submitted by her and her doctor) and her minority status in the office.

233. On December 20, 2024, Plaintiff requested by email to Human Resources of Defendant that the previous or other accounts payable staff to help Plaintiff processing invoices and requisitions and that Ms. Peterson stop communicating with her due to the trauma caused by the November 15 incident.

234. In December 2024, Plaintiff started to go to psychiatrist due to this traumatic experience with KP's hostile treatment against Plaintiff that continues to this year.

235. Previous account payable, Ms. SH, had helped Plaintiff processed invoices and requisitions for over 2 years with no issues as shown on Exhibit 32. Ms. SH is African American and is not Southeast Asian American from Indonesia.

236. However, as of January 2, 2025, Defendant's supervisor and HR had not approved Plaintiff's request, causing Ms. Peterson to continue emailing Plaintiff invoices, causing trauma flashbacks and requiring Plaintiff to take sick and vacation leaves, and/or worked without pay in January and February 2025.

237. Ms. Peterson and TJ's hostility toward Plaintiff on November 15, 2024, severely altered the conditions of Plaintiff's employment and created an extremely abusive work environment. Ms. Peterson and TJ both treated Plaintiff with hostility due to retaliation due to Plaintiff's EEOC discrimination charge and Court Complaint against defendant since they were aware of the charge.

238. Abuse and threats by KP and TJ has caused physical distress (shaking) and psychological distress, which both demonstrates an injury to Plaintiff's "psychological well-being" caused Plaintiff took a lot of leaves and has been going to psychiatrists to manage this trauma.

239. In retaliation to Plaintiff's internal EEO complaint, EEOC Charges, and lawsuits, no security staff appeared after Ms. Peterson 's extreme loud screaming, even though two female security staff were in the lobby's security office at that time. Several Defendant's supervisors, who was in the building at that time of the incident, were negligent and failed to address Ms. Peterson's hostilities.

240. Before Ms. Peterson was assigned to help Plaintiff in July 2024, Plaintiff was assisted by Miss SH since 2022, who is female and not Southeast Asian American, and was always respectful and cooperative.

241. Ms. Peterson's conduct was both discriminatory and retaliatory and was motivated in part by Plaintiff's race, national origin, gender, and her prior protected activities and lawsuit. The City's ongoing refusal to intervene, despite actual and constructive notice, constitutes deliberate indifference.

242. When Plaintiff informed another Defendant's staff who has been assisted by KP in processing invoices and requisitions, this staff told Plaintiff that she thought that KP discriminated against Plaintiff due to Plaintiff's race and national origin.

243. These incidents are part of a broader pattern of discrimination, harassment and retaliation described in Plaintiff's Second Charge, in which she specifically identified ongoing abuse by Ms. Peterson and Defendant staff as part of a continuing hostile work environment that began in 2022 and has persisted through the present.

244. Due to this traumatic and hostile event, Plaintiff has seen several psychiatrists due Plaintiff's trauma with the hostile treatments from Ms. Peterson and will continue to see them.

245. In retaliation to Plaintiff's internal and external protected activities, Mr. Stone has not assigned Plaintiff additional projects even though in July 2024 and in January 2025 Plaintiff informed him that Plaintiff was not busy and asked for additional projects.

246. Between 2023 and today, Plaintiff has the same amount of projects and has not been assigned new projects, even though at least two of Plaintiff's projects were completed in 2024 and at the end of 2025, compared to Mr. Todd Loney who has been assigned additional projects since then. Mr. Loney and Plaintiff are supervised by Mr. Stone.

247. Plaintiff informed Mr. Stone that Plaintiff was not busy on July 29, 2025 and in January 2026, but Plaintiff has not received any responses from him, which demonstrates that Defendant through its supervisors continuous its retaliatory attempts to constructively discharge (forced resignation on) Plaintiff by not assigning new projects to Plaintiff since 2023 even though similar situated employee (Mr. Todd Loney), who are not Southeast Asian from Indonesia and are not female, who works under the same Deputy Director, has received new project assignments since then.

**<u>Employer's Failure and Negligence to Address Complaints Due to Discrimination based on Race, Color, Sex, and National Origin, and Continued Retaliation Due to Plaintiff's Protected Activities</u>**

248. On November 15, 2024, Plaintiff complained to her supervisor and Ms. Peterson's supervisor, Mr. Robert Stone ("Mr. Stone"), about Kenya Peterson ("KP" or "Ms. Peterson")'s disrespectfulness and hostilities but received no response. Then on November 20, 2024, Plaintiff complained about Ms. Peterson's discrimination and hostility against Plaintiff to Defendant's Human Resources staff (Mr. Timothy Williams).

249. On April 8, 2025, Plaintiff submitted official complaint to Mr. Stone about being discriminated against and treated with extreme hostility by Kenya Peterson and Toi Jefferson, however, Mr. Stone repeatedly told Plaintiff that he could not do anything about it and insisted that Plaintiff still has to work with KP.

250. Plaintiff also requested to be assisted by other administrative staff who are not Ms. Peterson due to the traumatic incident with her, but Mr. Stone told Plaintiff he could not accommodate the request.

251. Plaintiff subsequently submitted documentation, including a letter from her treating psychiatrist. She requested reassignment of invoice responsibilities and a separation from Ms. Peterson to avoid further psychological harm. However, Defendant failed and refused to take any remedial action.

252. On November 15, 2024, after treated Plaintiff with extreme hostility and humiliated plaintiff publicly, KP retaliatory submitted a false harassment complaint against Plaintiff and requested a meeting with Ms. Bingham.

253. She knew about Plaintiff's EEO and EEOC charges/complaints, therefore, she retaliatory requested a meeting with Ms. Bingham about Plaintiff, therefore, it does not make sense that she did not submit her complaint to her supervisor only, Mr. Robert Stone, like plaintiff, and she did not submit her complaint to Human Resources Department like plaintiff, but she contacted Ms. Bingham for a meeting, which shows her retaliatory animus and Mr. Stone's negligent and retaliatory to allow this retaliation conduct since she informed Mr. Stone her intention.

254. As seen on Exhibit 41, she falsely accused Plaintiff harassed her by refusing to back up of her work space, even though Plaintiff backed up immediately after she yelled at Plaintiff to get out of her cubicle, as witnessed by Yi Sang, an engineer with the City (refer to Exhibit 42).

255. Plaintiff did make a statement to her that Plaintiff was in the City's space after Plaintiff moved to the hallway since the hallway is a public area and Plaintiff was afraid that she was going to jump and attack Plaintiff based on her angry body posture and hostility on her face. There were several other witnesses as well who saw Plaintiff in the hallway after hearing KP's yell including Ms. VH and Mr. FG.

256. On December 13, 2024, Mr. RS forwarded Plaintiff's request to Human Resources ("HR") staff, Ms. Veronica Kenner ("VK") to see if the situation merited accommodation under ADA or FMLA guidelines.

257. On December 16, 2024, Ms. VK requested Plaintiff fill out an ADA form, which Plaintiff found humiliating as it shifted responsibility from addressing KP's hostility to treating Plaintiff as disabled.

258. On December 17, 2024, Plaintiff requested again that Plaintiff to be helped by other administrative staff due to trauma with Ms. Peterson or that Plaintiff be allowed to perform the work herself, and informed Mr. Stone she was considering resigning if forced to continue working with Ms. Peterson.

259. Mr. Stone responded on December 19 that he was not able to approve the request.

260. As of January 3, 2025, Plaintiff had not heard back from HR, so she submitted another complaint to HR.

261. In or about January 2025, Plaintiff again raised concerns with Mr. Stone, who then cc-ed Ms. April Bingham , DPU Director ("Ms. Bingham"). She explained the lasting emotional impact caused by her interactions with Ms. Peterson and requested intervention.

262. No corrective action was taken by plaintiff's supervisors. Instead, Plaintiff was retaliatory advised that she would need to complete disability paperwork if she wished to avoid working with Ms. Peterson—effectively blaming the victim and shifting the burden of accommodation to Plaintiff.

263. Having no choice, Plaintiff then had to take vacation leaves and sick leaves on January 10 to 17th, 2025, January 22-24th, and February 4-7 due to flashback and trauma of Ms. Peterson's extreme hostility on November 15th, 2024, who continues to email Plaintiff. However, Plaintiff worked during those vacations days due to Plaintiff's projects needed to meet deadlines to obtain federal grants.

264. Plaintiff also have to consult with health care professional/doctor/ psychiatrist about Plaintiff's trauma with KP's extreme hostility since December 2024 and will continue to see them.

265. On February 7, 2025, Plaintiff requested again to Mr. Stone that Ms. Peterson does not contact Plaintiff to prevent memory flashback of her hostility, but Mr. Stone said he could not accommodate the request.

266. As of March 11, 2025, no HR staff had contacted Plaintiff, so she emailed HR asking why nobody had responded. Finally, Plaintiff met with HR on March 19, 2025, and he asked her to repeat all complaints and said he would investigate.

267. On April 25, 2025, HR told Plaintiff he would forward the complaint to Plaintiff's supervisor, Mr. Robert Stone ("Mr. RS"), to make a decision.

268. After these requests, Plaintiff received emails from Ms. Peterson more frequently than before, demonstrating Defendant's lack of concern about Ms. Peterson 's discrimination and hostile treatment.

269. KP continues to email Plaintiff for multiple times per month.

270. On April 21, 2025, Ms. Peterson intentionally walked from the end of the hallway toward the entrance with a smirk on her face when Plaintiff was just coming to work and walking from the entrance toward the hallway, making Plaintiff feel threatened and intimidated.

271. Ms. Peterson also used a restroom near Plaintiff's office on July 1, even though there was a closer restroom to her office, triggering Plaintiff's trauma and causing her to take sick leave on July 2.

272. On April 25, 2025, TJ appeared in the bathroom when Plaintiff went and asked if Plaintiff was ready for a meeting on Monday, April 28. TJ also stood by the building entrance when Plaintiff left. Plaintiff felt intimidated as TJ was the one who threatened to call security on November 15, 2024.

273. Defendant's request for Plaintiff to complete a disability form when reporting Ms. Peterson 's hostility and discrimination shows Defendant refused to take action to correct the discrimination and hostility.

274. Discriminatorily and retaliatorily to Plaintiff due to Plaintiff's EEO and EEOC Charges and lawsuits and discrimination complaint about KP, Defendant also did not save indoor security camera footages from November 15, 2024 when KP screamed at Plaintiff.

275. Therefore, when Plaintiff requested it, Defendant told Plaintiff that the video was not saved, even though a work incident was reported within 30 days of the incident as shown on Exhibit No. 49.

276. This shows that Defendant, in retaliation to Plaintiff's protected activities, does not intend to solve and support Plaintiff's discrimination, retaliation, and hostile work environment charge and recovery from trauma due to Ms. Peterson's hostility, and the Defendant may have violated the State's record retention requirements since the video footage may have to be saved due to the discrimination and hostile work environment incident that were reported by Plaintiff to Human Resources and Mr. Stone in November 2024.

277. Despite Plaintiff's complaints, Defendant through Plaintiff's supervisor and Human Resources Staff representatives failed to take any remedial action. Instead, Plaintiff was advised that she would need to complete disability paperwork if she wished to avoid working with Ms. Peterson—effectively blaming the victim and shifting the burden of accommodation to Plaintiff.

278. Plaintiff gave Mr. Stone the letter from Plaintiff's doctor in June 2025 regarding Plaintiff's trauma with KP's hostilities and requested accommodation to be assisted by other staff, and then the doctor also sent a reasonable accommodation request to Defendant's HR on November 13, 2025 requesting Plaintiff to be assisted by other administrative staff to prevent Plaintiff from having more trauma or to treat Plaintiff's trauma due to interaction with KP and due to KP's hostilities against her. Plaintiff forwarded this request from her doctor to Mr. Stone in January 2026, however, until today, no decisions have been made and Ms. Peterson continued to email Plaintiff. Even writing her name on this amended complaint re-traumatized Plaintiff.

279. Ms. Peterson continued to email Plaintiff since her screaming at Plaintiff publicly triggering the flashbacks of Plaintiff's traumatic experience with her.

### Willful Retaliation and Hostile Work Environments by Plaintiff's Supervisors, Mr. Robert Stone and Ms. Laura Bendernagel Due to Plaintiff's Protected Activities and lawsuits in violation of Title VII

280. Plaintiff's current supervisor, Mr. Stone, also knew about Plaintiff lawsuits from a third party (beside knew about it from Plaintiff since July and September 2024) as on

December 20, 2024 Mr. Robert Stone accepted a meeting invite from Defendant's Counsel, Mr. Simon, to discuss Plaintiff based on Plaintiff's FOIA request.

281. Mr. Stone and Ms. Bendernagel are both Plaintiff's supervisors as shown on Exhibit 33, and they are not Southeast Asian Americans from Indonesia. Ms. Bendernagel just became Plaintiff's supervisor's supervisor (Mr. Stone's supervisor) at the end of April or early May 2025. Mr. Stone is plaintiff's supervisor since June 16, 2024.

282. The December 20, 2024 prescheduled meeting between Plaintiff's supervisor's Mr. Robert Stone and Defendant's counsels as shown in Exhibit 43, following his denial of Plaintiff's accommodation request due to trauma with Kenya Peterson's extreme hostile treatment (see Exhibit 44), establishes willful retaliation due to Plaintiff's lawsuits against Defendant based on her protected activities.

283. It's willful retaliation because Mr. Stone: (1) was aware of litigation and legal risks; (2) sought legal advice about Plaintiff from Defendant's counsel; (3) chose to deny accommodation despite knowing it would constitute further retaliation; (4) prioritized litigation defense over Plaintiff's medical needs causing hostile work environment for Plaintiff since November 2024 that alter the terms and conditions of Plaintiff's employment causing Plaintiff has to continue deal with her trauma; (5) after the meeting, Mr. Stone wrote retaliatory several bad ratings in her performance evaluation that he and his supervisor, Ms. Bendernagel, sent to Plaintiff on September 29, 2025; (6) after the meeting, wrote retaliatory and unnecessary notice of counseling and verbal warning for Plaintiff on November 6, 2025 to warn Plaintiff not to email Ms. Peterson and Ms. Jefferson after October 28, 2025, even though Plaintiff had informed them on October 28th meeting with Mr. Stone and Ms. Bendernagel that Plaintiff emailed Ms. Peterson and Ms. Jefferson once to ask them for the reasons for their hostilities and  Plaintiff was not planning to email KP or Ms. Jefferson anymore.  Plaintiff emailed them due to the Defendant closed Plaintiff's complaint without informing Plaintiff any results of the investigations and if anything has been done to address Ms. Peterson's and Ms. Jefferson's hostilities.; (7) and retaliatory emailed and warned Plaintiff of possible termination due to not showing up to work (taking vacation leaves) in early 2025 after his meeting with Defendant's counsel in December 2024, even though prior to the warning, Plaintiff had informed

him of Plaintiff's vacation leave requests by text messages (and he had accepted text message leave request before at least once), even though, the warning was withdrawn after Plaintiff stated that Plaintiff had informed him through text messages; (8) retaliatory negligence not to ask third parties' consultants to include Plaintiff in various meetings and to cc Plaintiff their submittal when they excluded Plaintiff in their submittal emails or meetings about Plaintiff project at Hampton Pump Station in 2024 that caused Plaintiff was not aware of or too late to be aware of some changes to the project based on the meetings, which affected her work performance for the project, which affected her performance evaluation as Hampton Pump Station project first bid was cancelled and rebidded due to consultant's error that the external project managers (the two consultants that Defendant hired) did not catch. This rebid caused the increase cost of the next bid result for more than $600,000.00.

284. On October 28, 2025, in a meeting with her, Mr. Stone and HR (Mr. Gerald Westry), Ms. Bendernagel also retaliatory stated that Plaintiff's one email to KP on October 22, 2025 (questioning their reasons for hostilities against plaintiff) could be considered harassment or harassment against KP, after both Plaintiff's complaint about her hostilities were closed without any resolutions to Plaintiff by Mr. Stone except that Plaintiff was still expected to work and communicated with KP.

285. Plaintiff's one email to KP within one year period since the incident in 2024, was not harassment, since the investigation for the incident by HR, according to Mr. Westry from HR, was closed without any warnings or results or findings provided to Plaintiff. Also there was no proof of Plaintiff's harassing her in her email to Mr. Stone as shown on Exhibit 41B where KP baselessly said that Plaintiff was very demanding, and Plaintiff also moved back to the hallway after she yelled at Plaintiff as seen by Yi Sang, and two other staff of Defendant (with initial FG and VH). Besides, she falsely claimed that the hallway and the printer room were her workspace, as these two public areas were not and are not part of her cubicle. She also falsely claimed in her email that she advised Plaintiff to leave, when in fact she disrespectfully yelled at Plaintiff to get out of Plaintiff's cubicle with her threatening body posture. Ms. Bendernagel negligently ignored these facts that Plaintiff had informed her by email.

286. Ms. Bendernagel also retaliatory failed to respond to Plaintiff's complaint to her about KP and TJ's hostilities against Plaintiff on October 16, 2025 except for offering mediation between Plaintiff and KP or TJ, but when Plaintiff accepted the mediation offers due to no results from HR investigation of the incident provided to Plaintiff, but both KP and TJ refused the mediation offer.

287. Courts find willfulness where employers consult counsel before adverse action against plaintiffs in pending litigation. Ms. Bendernagel met with Defendant's counsel before sending Plaintiff's retaliatory performance evaluation with bad ratings.

288. This willfulness demonstrates that: (1) Defendant through its supervisors continuous to retaliatory attempts to constructively discharge (forced resignation on) Plaintiff. (2) Defendant will not voluntarily cease retaliation; (3) the conduct is deliberate, not correctable through internal processes; (4) Moreover, some of this occurred after this Court's September 16, 2025 ruling—Defendant continued retaliating even after judicial warning.

## Willful Retaliation from Ms. Bendernagel after her September 22, 2025 Meeting with Defense Counsel Due to Plaintiff's Protected Activities (Internal EEO, External EEOC and Lawsuits)

289. Ms. Laura Bendernagel is Defendant's Senior Deputy Director who is Mr. Robert Stone's supervisor and Mr. Stone is Plaintiff's Supervisor since July 2024. Both are not Southeast Asian American from Indonesia and both do not have dark circles around their eyes.

290. Seven days after the meeting between Ms. Bendernagel with Defendant's counsel on September 22, 2025 (as shown on Exhibit 45), Ms. Bendernagel sent retaliatory performance evaluation to Plaintiff on September 29, 2025.

291. Since approximately seven days before Ms. Bendernagel sent the retaliatory performance evaluation to Plaintiff for signature—she had a meeting with Defendant's counsel- further demonstrates temporal proximity and the coordinated

and willful nature of Defendant's retaliation due to Plaintiff's lawsuits against Defendant based on protected activities. This temporal proximity, establishes that Defendant's conduct was deliberate and calculated rather than inadvertent.

292.   As shown on Exhibit 46, the 2025 performance evaluation rated Plaintiff for not meeting expectation for acceptance of responsibility for positive outcomes and deliverables of tasks assigned to them or individuals under their supervision and oversight as Mr. Stone and Mr. Bendernagel blamed Plaintiff due to KP sending Plaintiff third party's invoices with errors (even though KP is Mr. Stone's staff and is not Plaintiff's staff as he is responsible to manage her workload, evaluate her performance, and approve her timesheets), only quoted several emails and statement that were done outside evaluation period and failed to include/review her hundreds successful communications to manage projects to various project stakeholders during evaluation period. The performance review was used as tools to further the hostile environment due to retaliation to her EEOC charges and lawsuits against Defendant.

293.   Ms. Bendernagel emailed Plaintiff a negative performance evaluation that she approved  and Mr. Stone wrote based on mainly two events that occurred outside the evaluation period, and one event where Plaintiff's provided data to revise consultant's wrong answer to shutdown length question that her supervisor, Mr. Stone, retaliatory did not support and instead he supported the consultant in the May 2025's meeting, however, he changed his mind in a meeting in September 2025, validating Plaintiff's position to allow more than one day shutdown. The two other events include the emails Plaintiff sent to Mr. Todd Loney about the budget for Plaintiff's project (including but not limited to Hampton Pump Station project) budget spreadsheet that he requested that Plaintiff sent to him, and another event was Plaintiff's statement in Plaintiff's self performance evaluation that Plaintiff successfully caught errors in third party's consultant invoices that the administrative assistant (who was Ms. Peterson and is not Plaintiff's staff as she and Plaintiff are equally supervised by Mr. Stone) did not catch before sending the invoices to Plaintiff for Plaintiff's approvals.

294.   In his email, Mr. Loney asked for the budgets for Plaintiff's projects in the spreadsheet that Plaintiff sent to him on the deadline day while stating that she also

sent it to Mr. Stone several days prior. One of the projects that Plaintiff manages, which is Hampton Pump Station , CSO19A and CSO19B (HCC project) Improvements Project, are comanaged with Mr. Stone as Mr. Stone managed CSO19A and CSO19B project by himself and Plaintiff managed Hampton Pump Station  Improvements project by herself prior to Mr. Stone being assigned to be Plaintiff's supervisor and Mr. Stone's decided to combine the two projects to be managed by both Plaintiff and Mr. Stone. Mr. Loney was in the meeting when Mr. Stone decided to combine the two projects so he was aware of that the projects were managed separately previously and had separate budgets. Several days before the deadline, Plaintiff sent the spreadsheet to Mr. Stone to get his input on the budget for HCC project as Plaintiff did not have access to the CSO 19A and CSO19B's  project budget. However, by the due date, Mr. Stone has not responded, but Mr. Loney has emailed Plaintiff requesting the budget at around noon. Mr. Loney instead of appreciating Plaintiff input, criticized Plaintiff in his email by stating that Plaintiff did not need to escalate and Plaintiff responded to him by stating that Plaintiff was not escalating any issues as shown on Exhibit 50.

295.   In retaliation to Plaintiff's protected activities, this evaluation also explicitly penalizing Plaintiff for evaluating her own performance based on Ms. Bendernagel request prior to her first performance evaluation meeting on September 5, 2025, and documenting that Plaintiff corrected errors in third party's invoices that administrative staff (Kenya Peterson) did not catch before submitting to Plaintiff and for responding to other project manager (Todd Loney)'s request for her project budget information and his subsequent emails that criticized Plaintiff's emails.

296.   This performance evaluation also a proof of discrimination based on sex, race, and national origin by Plaintiff's supervisors since Mr. Loney was allowed to be combative and critical to Plaintiff in his emails but Plaintiff's non criticize and non-combative email to him was labelled as critical or combative in the performance evaluation, and they prohibited Plaintiff from being critical or defensive while allowing others/colleagues (in the above example, Todd Loney's email) to be critical and defensive against Plaintiff, are very unfair or discriminatory against Plaintiff

based on gender, race, and national origin. In addition, Ms. Peterson was allowed to be combative, hostile and discriminatory against Plaintiff on November 15, 2024 without consequences as Plaintiff's complaint about her hostile and discriminatory treatment against plaintiff was closed without providing any findings or results or any positive resolution to Plaintiff except for requesting Plaintiff to submit disability accommodation, which shows Plaintiff's supervisors discriminatory animus based on race and national origin.

297.    Ms. Kenya Peterson and Mr. Loney are African Americans and are not a Southeast Asian Americans, and they were not from Indonesia.  Ms. Bendernagel, Defendant's Senior Deputy Director, was negligent and failed to prevent Plaintiff from being discriminated in Plaintiff's latest performance evaluation, which cause the terms and conditions of Plaintiff's employment to be worse than before being demoted.

298.    Furthermore, it made the condition (work condition)  worse for plaintiff that in the performance evaluation, plaintiff's supervisors criticized plaintiff for purported being combative or critical in two incidents that occurred after the evaluation period, even though the  email and statement that they used as the basis for the evaluation occurred after the evaluation period and they were not combative and the statement was made due to request from Ms. Bendernagel for Plaintiff to evaluate her own performance prior to their September 5, 2025's meeting about her performance.

299.    The performance evaluation is retaliation due to Plaintiff's protected activities because:

    a.    But, if not for Plaintiff's supervisor, Plaintiff would not have made the statement about correcting invoices that KP sent to Plaintiff to show her performance in reviewing invoices.

    b.    But if not for Plaintiff's supervisor who comanaged the HCC project but late in replying to Plaintiff email about the budget, Plaintiff would have  send the draft budget spreadsheet that Plaintiff completed to Mr. Loney on time.

    c.    But if not for Plaintiff's supervisor who vetoed Plaintiff's instruction to consultants to change answer to bidder about shutdown period from 24 hours to

more than 24 hours during the dry weather period in front of all male and Caucasian consultants and construction manager, and then changed his mind several months after that to allow more than 24 hours shutdown period for equipment installation, Plaintiff would not have been humiliated and demeaned infront of the consultants and construction manager.

300. The Statement shows that in her performance evaluation, plaintiff's supervisors did not appreciate Plaintiff performing plaintiff's duties by correcting errors in invoices sent to Plaintiff by administrative staff (Kenya Peterson) and the email shows that Plaintiff providing project budget information to other project manager (Todd Loney) and revising the incorrect future project budget allocation based on input from consultant (George Guhse from TYLin) that was off by several millions dollars for replacement of pumps at McCloy Pump Station since Plaintiff just completed the same project.

301. Besides, it's part of Plaintiff's duties to be critical of errors in evaluating projects and invoices, prohibiting Plaintiff from being critical (in the performance evaluation) is also very unfair or discrimination against Plaintiff when the purpose of the critical or defensive statements/emails match with the purpose/mission/duties of plaintiff's position, in this case, to critically review consultant or contractor's works or submittals or invoices, to inform my supervisor of the errors in the invoices that the administrative staff submitted to her, and to inform a colleague and supervisors that were just replaced the two pumps at McCloy Pump Station and it will last at least 15 to 25 years, and that the allocated budget for replacement pumps at McCloy Pump Station was incorrect and way overbudget, and informed them of the correct estimated budget.

302. Ms. Bendernagel, Plaintiff supervisor also supported and appreciated Plaintiff to be critical in the first meeting about this evaluation on September 5, 2025. However, she retaliatory had a change of tone, after the Court issued an order dismissing the Defendant's Motion to Dismiss of Plaintiff's discrimination and retaliation lawsuit against Defendant on September 16, 2025 and after her meeting with Defendant's counsel on September 22, 2025, and then she approved the issuance of several

underperformed performance evaluation ratings for Plaintiff in the annual performance evaluation that she sent to plaintiff on September 29, 2025.

303.    In her September 29th, 2025 evaluation of Plaintiff's performance, she prohibited Plaintiff (in the performance evaluation) from being critical or defensive while allowing others/colleagues (in the above example, Todd Loney's email) to be critical and defensive against Plaintiff, are very unfair or discriminatory against Plaintiff based on gender, race, and national origin.

304.    In addition, Ms. Bendernagel's husband, Mr. Kelvin Coles, works for a consulting company and has been hired to help Mr. Stone manage several Mr. Stone's projects, including Plaintiff's project that Plaintiff co-manage with Mr. Stone since January 2025, which is the Hampton PS, CSO19A and CSO19B project. Mr. Kelvin Coles is a male, is African American, and is not Southeast Asian American from Indonesia. If Plaintiff resigned, Plaintiff believes that he will take over to manage all Plaintiff's projects, which may create conflict of interest for Ms. Bendernagel.

305.    This willfulness retaliation demonstrates that: (1) Defendant through its supervisors continuous to retaliatory attempts to constructively discharge (forced resignation on) Plaintiff. (2) Defendant will not voluntarily cease retaliation; (3) the conduct is deliberate, not correctable through internal processes; (4) Moreover, some of this occurred after this Court's September 16, 2025 ruling—Defendant continued retaliating even after judicial warning.

**Kenya Peterson's Retaliatory Conduct Due to Plaintiff's Protected Activities As A Result of Mr. Stone's Retaliatory Negligence**

306.    In November 2025, Ms. Kenya Peterson ("KP") sent a retaliatory email to Defendant's counsel regarding Plaintiff as shown on Exhibit 47 due to Plaintiff's lawsuits against Defendant based on EEOC's Notice of Right To Sue letter or based on EEOC protected activities, since she was aware of Plaintiff's EEOC charge since last year and she knew about Plaintiff's lawsuits about Ms. Bingham's discrimination and retaliation (that's why she asked for a meeting with Ms. Bingham she submitted

her false allegations about Plaintiff harassing her to Plaintiff's supervisor and Ms. Bingham on November 15, 2024, as employees will typically complain to their direct supervisor and HR if they have issues just like Plaintiff).

307. Her email regarding her false accusations was sent with a revised time stamp at 1:45 PM, which was clearly false accusations as Plaintiff was in Plaintiff's office all morning until 3:00 PM with no personal interaction with anyone before Plaintiff walked to her office at around 3:00 PM as Plaintiff was afraid that she left without submitting the requisition.

308. Kenya Peterson's retaliatory and discriminatorily request for Plaintiff to fill in buyer's name on the requisition form even though Plaintiff had informed her the buyer's name in Plaintiff's first email to her requesting her to process the form was not only discrimination as she did not ask other male project managers, who are non-Southeast Asian and not from Indonesia, to do the same, but was also a retaliation due to Plaintiff's EEOC complaint and lawsuits against Defendant.

309. Mr. Stone, plaintiff's supervisor, also in retaliation to Plaintiff's protected activities, did not prevent this discrimination when Plaintiff complaint to him about it around 1.5 hours after receiving the email from KP as seen on Exhibit 38 because Plaintiff received no response from him, instead, he informed Plaintiff that KP needed to process the form that day due to her 2-week vacation after that day and then left from his office, which caused Plaintiff had to go to KP's cubicle to make sure that she saw the buyer's name and that the buyer's name issue won't prevent her from processing the requisition request form so it could be processed on that day.

310. Mr. Stone was negligent due to retaliation to Plaintiff's protected activities since he did not correct the discriminatory behavior by KP on that day and his demand to Plaintiff that KP had to complete processing the form that day had caused Plaintiff to go to KP's cubicle at around 3:00 PM to confirm that she saw the buyer's name on the form, which at the end led to KP to act extremely hostile towards Plaintiff, which to yell at Plaintiff to get out of her cubicle and then to scream at Plaintiff extremely loudly humiliated Plaintiff publicly after Plaintiff moved to the public printer room.

311. In June 2025 and January 13, 2026, Plaintiff has submitted medical documentation (physician letter to supervisor Robert Stone) confirming that continued contact with

Kenya Peterson exacerbates her trauma symptoms. Plaintiff's medical doctor also sent reasonable accommodation medical certification to Defendant's HR, Mr. requesting reasonable accommodation to replace KP with other staff to prevent Plaintiff's from further traumatic experience.  Despite this medical documentation, due to Plaintiff's discrimination, hostile work environment, and retaliation lawsuits against Defendant, Mr. Stone, Plaintiff's supervisor and HR, both Defendant's agent has retaliatory (due to Plaintiff's Title VII lawsuits and EEOC charges to continuous retaliatory attempts to constructively discharge (forced resignation on) Plaintiff):

a.  Refused to allow Plaintiff to be assisted by other administrative staff in invoice/requisition processing

b.  Allowed Kenya Peterson (KP) to email Plaintiff over 28 times between December 2024 and June 2025 and numerous times every month after that.

c.  Plaintiff complained to Mr. Stone and Ms. Bendernagel about KP's false accusations on October 16, 2025 by email but Plaintiff received no response except that Ms. Bendernagel would forward it to HR, which show both Mr. Stone and Ms. Bendernagel were negligent to allow the hostilities from KP due to the severe negative effects of these false accusations to Plaintiff's professional reputation and mental health.

d.  Caused Plaintiff to work while on "vacation" (uncompensated) due to Peterson-induced trauma in early 2025 as they refused to accommodate Plaintiff's request to be provided with other staff to assist with processing invoices and orders.

e.  Each interaction with Peterson re-traumatizes Plaintiff, and Defendant's refusal to accommodate exacerbates her condition.

f.   Due to keep  receiving multiple emails from KP after she screamed at Plaintiff with extreme hostility with threatening body posture in 2024 and due to Plaintiff's complaint about her hostilities and discrimination were closed by Defendant (HR and Plaintiff's supervisor, Mr. Stone) without providing any resolutions to Plaintiff, except that Plaintiff was told to file disability accommodation request,

Plaintiff emailed KP to ask her reason to scream at Plaintiff on November 15, 2024.

g. This email was sent prior to an evaluation meeting on October 28, 2025 with Mr. Stone, Ms. Bendernagel and Mr. Westry. Plaintiff informed Mr. Stone and Ms. Bendernagel about this email in the meeting and informed them that Plaintiff did not plan to email them anymore.

h. Plaintiff also informed them about one email that Plaintiff sent to Toi Jefferson Harrison to question her about her reason to threaten to call security against Plaintiff on November 15, 2024 and that Plaintiff did not plan to email her anymore.

i. In retaliation to Plaintiff's protected activities (both internal EEO complaint and external EEOC complaint), Mr. Stone and Ms. Bendernagel wrote Plaintiff's a notice of counselling and verbal warning to warn Plaintiff not to email KP and TJ anymore, which was unnecessary and retaliatory since Plaintiff already informed them that she only emailed KP and TJ once and was not going to email them anymore and that she did not receive any responses from both.

j. In addition, plaintiff's supervisors, retaliatory warned plaintiff in the notice of counselling to not interrogate other colleagues/witnesses about their knowledge of the incident on November 15, 2024 outside a framework established and mediated by HR, even though Plaintiff's complaint was closed without any findings or resolutions provided to plaintiff except that Plaintiff was required to file reasonable disability accommodation and to continue work with KP, which shows that they were trying to cover up the hostile work environment incident and also shows that they harassed plaintiff for talking to colleagues/witness about the incident.

k. Plaintiff feels that this memorandum is retaliation for her ongoing lawsuit against the City of Richmond, her continued complaints to HR and supervisors, her continued complaints to EEOC, and based on her current work related reasonable accommodation request (submitted by her and her doctor) and her minority status.

l. Ms. Bendernagel offered mediation service where KP and Plaintiff could take turn to talk to her about the incident but KP rejected the mediation offer by Ms. Bendernagel, even though, Plaintiff accepted the mediation offer.

m. Evidence Destruction: Defendant has retaliatory and systematically destroyed evidences of discrimination by Kenya Peterson, including:

- Seven (7) attachments deleted from Plaintiff's November 20, 2024 complaint to her supervisor Mr. Robert Stone as seen on Exhibit 48, similarly these attachments were also removed from Plaintiff's complaint to Human Resources in Plaintiff's email to HR in early 2024.

- Security camera footages from November 15, 2024 incident were not preserved by Defendant despite timely discrimination and hostile work environment complaint in November 2024, and FOIA request as shown on Exhibit 49. The Court recognizes that the obligation to preserve evidence arises when a party has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." Even though Defendant had actual notice of Plaintiff's protected activities and potential litigation (which requires them to preserve evidences) no later than:

- On July 15, 2022 (when Plaintiff scheduled a meeting with EEO manager to complain about Ms. Bingham's black eye comments and email restrictions)
- November 22, 2022 and March 2023 (First EEOC Charge)
- July 26, 2023 (First Title VII lawsuit against Defendant was filed)
- November 15 and 20, 2024 (Complaint about KP to HR and Mr. Stone)
- November 18, 2025 (Plaintiff's second Title VII lawsuit against Defendant was filed)

n. Despite this notice, Defendant destroyed evidences as retaliation to Plaintiff's protected activities. Plaintiff's supervisor was negligence because they did not inform FOIA staff to preserve these evidences in the security camera footages.

**Defendant's Retaliatory Creation of Termination Pretext Due to Plaintiff's protected Activities and EEO Lawsuits Against Defendant**

312.  The pattern of Defendant's retaliation due to Plaintiff lawsuits to create termination pretext is unmistakable as follows:

o.  On December 20, 2024, Mr. Stone met with Defendant's counsels about Plaintiff's lawsuits (these two complaints).

p.  On September 22, 2025, Ms. Bendernagel met with Defendant's counsel, Mr. Simon, about Plaintiff.

q.  On September 29th 2025: Ms. Bendernagel emailed Plaintiff a negative performance evaluation based on mainly two events that occurred outside the evaluation period and one event where Plaintiff's provided data to revise consultant's wrong answer to shutdown length question that her supervisor, Mr. Stone, retaliatory did not support and instead he supported the consultant in the May 2025's meeting, however, he changed his mind in a meeting in September 2025, validating Plaintiff's position to allow more than one day shutdown.

r.  Ms. Bendernagel, Defendant's Senior Deputy Director, was also negligent and failed to prevent Plaintiff from being discriminated in Plaintiff's latest performance evaluation that she sent to Plaintiff on September 29, 2025, that discriminatorily criticized Plaintiff as criticize and combative while allowing non Southeast Asian American (who is also not from Indonesia) colleagues to criticize and being defensive against Plaintiff in their email with Plaintiff and Plaintiff's supervisors discriminated against Plaintiff due to Plaintiff's race, national origin and/or color as Plaintiff was the only project manager, who are Southeast Asian American and was from Indonesia, under their supervisions.

s.  Originally during the meeting with her, Mr. Stone and Mr. Wesley, on September 5, 2025, Ms. Bendernagel stated that KP or administrative staff could not review invoices because they did not access to contract, but that's not true, so Plaintiff informed her that Plaintiff would have to send any work order request to her so she should have access to all work orders and as a matter of fact, Plaintiff did not

have access to latest engineering rate contracts as Plaintiff asked Mr. Stone or procurement staff to provide the contracts to Plaintiff.

t.  Then after the meeting, Ms. Bendernagel changed her stand and informed Plaintiff during the next meeting that reviewing errors in invoices is Plaintiff's duties or program manager's duties, which does not make good business' sense as these are administration duties to review if the charged rates match with the approved rates and in private sector this will be the duties of administration staff or project assistant. Since it does not make good business sense to not assign administrative duties to administrative staff, this action supports discrimination and retaliation (due to Plaintiff's protected activities) intention behind it. Besides Plaintiff and other project managers had to submit to administrative staff or KP for approval any requisition request, so Plaintiff believes that they have access to the contracts and rapids.

u.  Ms. Bendernagel also retaliatory stated that she felt attacked during conference because Plaintiff did not say "how are you" when Plaintiff chased her, said "Hi Laura, and stated to her that Plaintiff would like to recommend that KP or administration staff should be required to check for invoice's errors,  after she suddenly said "hi" and fastly approached Plaintiff who was eating buffet breakfast while standing in the hallway and then moved away really fast without giving Plaintiff a chance to response.  Plaintiff also felt she attacked as Plaintiff did not remember that she said "how are you" and clearly remembered that she did not give Plaintiff a chance to response, which why it felt like an attack to Plaintiff. And Plaintiff's supervisor, Mr. Stone usually does not say "how are you" when he came to Plaintiff's office or when Plaintiff's went to his office to talk about projects or work since 2024. Other manager, like Mr. Morgan frequently came to Plaintiff's office without saying anything and walked directly to the shelf or drawers.

v.  October 28th, 2025, in a meeting with Ms. Bendernagel, Mr. Stone, and Mr. Gerald Westry (Human Resources representative), after Plaintiff requested other examples for some the basis of the bad ratings in the September 29's performance

evaluation since the provided examples were mostly outside of the evaluation period, in retaliation (to Plaintiff question and protected activities) Mr. Stone told Plaintiff that Plaintiff should consider if she would like to work with Defendant, and in retaliation Ms. Bendernagel asked if Plaintiff like her job and told Plaintiff that nobody pointed a gun and tell her to work with Defendant. Mr. Westry, a Human Resources staff, also retaliatory told Mr. Stone and Ms. Bendernagel that they did not need to provide basis for the performance evaluation in the meeting, which clearly discriminated against Plaintiff and retaliated against Plaintiff due to protected activities compared to other staff who were provided with the basis for their performance evaluations.

w. Even after receiving a letter from Plaintiff's doctor about Plaintiff's trauma with KP, Defendant's agent, Mr. Stone continue to allow KP to email plaintiff's often, even though about works, but these emails from her bring out Plaintiff's trauma with her, therefore, Plaintiff did not respond to her emails. If Plaintiff did not respond to these emails and the payments of third parties' contractors and consultants' invoices were delayed for months, Plaintiff could be terminated. Plaintiff believes these retaliatory actions from Plaintiff's supervisors were intended to influence Plaintiff to resign voluntarily.

x. All previous retaliatory actions could lead to potential termination of Plaintiff.

y.  Between 2023 and today, Plaintiff has the same amount of projects and has not been assigned new projects, even though at least two of Plaintiff's projects were completed in 2024 and at the end of 2025, compared to Mr. Todd Loney who has been assigned additional projects since then. Mr. Loney and Plaintiff are supervised by Mr. Stone. Plaintiff informed Mr. Stone that Plaintiff was not busy on July 29, 2025 and in January 2026, but Plaintiff has not received any responses from him, which demonstrates that Defendant through its supervisors continuous its retaliatory attempts to constructively discharge (forced resignation on) Plaintiff by not assigning new projects to Plaintiff since 2023 even though similar situated employee (Mr. Todd Loney), who are not Southeast Asian from

Indonesia and are not female, who works under the same Deputy Director, has received new project assignments since then.

## Additional Retaliation Due To Plaintiff's Title VII Lawsuits and EEOC Charges against Defendant

313. About September 2024, SM, a male Engineering Manager's repeated intrusions into Plaintiff's office, causing a heavy folder to fall and nearly injure Plaintiff, and physically bumping into Plaintiff in the hallway in front of several maintenance staff when Plaintiff's office was repaired prior to be painted.

314. On October 15, 2024, Plaintiff's current office was painted and then locked, even though it had never been locked before for more than 10 years.

315. Plaintiff's supervisor allowed her to work from home that day and afterward until painting was done.

316. When Plaintiff returned to the office on October 17, she did not have the key. She asked Ms. Toi Jefferson Harrison ("TJH"), who is a female, and is not Southeast Asian American) for help calling security to open the door. Even though Ms. T.J.H. said yes, no one came to open the door.

317. After 5-10 minutes, Plaintiff went to the security office to check if they were coming.

318. Two female security staff (who are not Southeast Asian American and were not from Indonesia) asked Plaintiff why she needed the door unlocked, and the security supervisor refused to unlock it.

319. Only after Plaintiff warned them it was not acceptable to refuse, did they call maintenance staff Mr. N.S. (who is male and are not Southeast Asian American from Indonesia) to ask if they could unlock the door.

320. This was retaliation due to it occurred after Plaintiff informed and disrespectful as painting had been completed more than 2 days earlier and Plaintiff's desk was far from the walls.

Plaintiff considered this incident retaliation from Ms. TJH, maintenance and security staff due as they were aware of her protected activities after she informed Mr. Stone about her

Title VII charges and lawsuits and since she heard TJ informing other about her discrimination complaint during the first week of relocating to this office and after she moved to her current office in the Streetlight Division.

**Continued Retaliation by Defendant's Staff in 2026**

**321.** On February 12, 2026 Plaintiff found her around 3 inch length stapler broken or the top was loosened or detached from the bottom part when she came to the office, however it was not broken on the day before. Plaintiff perceived that Defendant's staff had came to Plaintiff's office and broken them in retaliation to dissuade Plaintiff from filing the amended complaint that was due on February 13, 2026.

**Defendant Altered Terms and Conditions of Plaintiff's Employment**

322. As detailed previously, Plaintiff was treated differently than similarly situated employees outside the protected classes of race, color, sex, and/or national origin. Similarly situated employees outside Plaintiff's protected classes were not subjected to these adverse employment actions.

323. Due to all the aforementioned discriminations, retaliation, harassments, and hostile treatments against Plaintiff, Plaintiff has been subjected to severe and pervasive conduct by multiple supervisors, colleagues, and coworkers of Plaintiff. Plaintiff was discriminated against due to her protected classes and was retaliated against and was treated with hostility for engaging in Equal Employment Opportunity's protected activities with the City's Human Resources EEO, EEOC and the Court.

324. Defendant altered the terms and conditions of Plaintiff's employment in an unsuccessful attempt to constructively discharge Plaintiff. Plaintiff, a dedicated civil servant, has and continues to suffer significant injury as a result of the egregious conduct of Defendant and its agents.

# VIII. CAUSES OF ACTION

## COUNT I
### Discrimination in Violation of the Equal Pay Act of 1963
### (29 U.S.C. § 206(d))

325.   Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

326.   Plaintiff is female.

327.   Plaintiff is Southeast Asian American.

328.   Plaintiff has a distinct accent.

329.   Plaintiff received less compensation than her male counterparts for equal work on similar jobs, the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

330.   Each of these male counterparts held a similar position as Plaintiff.

331.   Plaintiff was paid less than these male counterparts simply as a result of her sex.

332.   Defendant has discriminated against Plaintiff in violation of the EPA by subjecting her to unequal pay on the basis of sex, as described herein.

333.   Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Defendant also discriminated by subjecting her to less pay and benefits in violation of the EPA.

334.   As a direct and proximate result of Defendant's willful, knowing and intentional discrimination, acts or omissions, as described herein, Plaintiff has suffered harm, including but not limited to, lost wages, lost benefits, diminished future earning capacity, and other pecuniary and non-pecuniary losses.

335.   Plaintiff should be awarded all legal and equitable remedies, including underpaid

wages, compensatory damages for all willful violations and reasonable attorneys' fees under 29 U.S.C. § 216, et seq.

336. Plaintiff should be awarded the entire amount of underpayment, interest, costs, reasonable attorneys' fees and other statutory penalties or relief as may be allowed by the Court pursuant to the EPA.

## COUNT II
## Retaliation in Violation of the Equal Pay Act of 1963
## (29 U.S.C. § 206(d))

337. Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

338. Plaintiff alleges that she suffered retaliation and harm because of her protected activity, in violation of 29 U.S.C. § 215(a)(3).

339. As a result of Defendant's willful retaliation, Plaintiff has suffered and continues to suffer materially adverse harm, including but not limited to lost wages and benefits, diminished employment opportunities, and humiliation, embarrassment, emotional and physical distress, and mental anguish.

340. By reason of Defendant's willful retaliation, Plaintiff is entitled to all remedies available for violations of the anti-retaliation provision of the Equal Pay Act, as incorporated into the Fair Labor Standards Act, including compensatory damages.

341. As a direct and proximate result of the acts and omissions of Defendant, as described above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

342. Plaintiff should be awarded the entire amount of underpayment, interest, costs, reasonable attorneys' fees and other statutory penalties or relief as may be allowed by

the Court pursuant to the effects of this retaliation.

## COUNT III through V: DISCRIMINATION BASED ON RACE, COLOR, AND NATIONAL ORIGIN, IN VIOLATION OF TITLE VII of the Civil Rights Act of 1964, as amended(42 U.S.C. §§ 2000e, et seq.)

343. Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

344. Plaintiff is a member of a protected class based on her race ( Plaintiff is Southeast Asian American), color, and national origin (Plaintiff's national origin is Indonesia), and Plaintiff has a distinct accent and certain physical characteristics which include dark circles that surround Plaintiff's eyes and appear to be "black eyes" (e.g., as if Plaintiff had been punched in the eye) at first glance.

345. Plaintiff is the only Program and Operations Manager of similarly situated employees of Defendant, who is Southeast Asian American from Indonesia.

346. Plaintiff's work performance was consistently satisfactory or meeting standards, and she received no disciplinary actions with her performance evaluation prior to the discriminatory conduct described herein.

347. During Plaintiff's employment, Defendant engaged in unlawful discriminatory employment practices by discriminating against her with respect to the terms and conditions of her employment based on ethnic and physical characteristic of Plaintiff being a Southeast Asian-looking person from Indonesian (e.g., Southeast Asian appearance with non-English-speaking accent or Indonesian accent as opposed to Caucasians and other ethnicities without non-English-speaking accent or without Indonesian accent, with dark circle around her eyes).

348. Plaintiff was treated differently simply because she did not look or speak like the other managers, co-workers, colleagues, and her supervisors.

349. Defendant's conduct through its agents, subjected Plaintiff to discriminatory or adverse employment actions (and Plaintiff's supervisors and/or HR failed or were negligent to correct these hostile and adverse and disparage actions against Plaintiff) including but not limited to: demeaning and defaming remarks against Plaintiff, using

insulting pejorative black eye term in questioning her about her work, calling her vindictive publicly due to her doing her job in enforcing the Defendant's City Code/Ordinance, demoting her to non-supervisory and non-program administration position, relocating her to offices with unbearable and unsafe working conditions that smells sewage and rotten eggs and didn't have heater or air conditioning or had extreme temperatures around 61 degrees Fahrenheit in the winter and up to 86 degrees Fahrenheit in the summer, her supervisors were negligent to allow her to be subjected to discrimination and hostile work environments by her colleagues, subjection to public humiliation and extreme hostile work environment for being screamed at and threatened to be removed by security due to standing in public areas in the office for around one to two minutes; subjection to discrimination and retaliation in Plaintiff's latest performance evaluation by including evaluation of Plaintiff's emails and statement that occurred outside the evaluation period and did not evaluate her based on her hundreds of emails during evaluation period, did not assign new projects to her since 2024, and constructive discharge attempts by her supervisors. All these actions constitute unlawful discrimination based on Plaintiff's race, color, and national origin because similar situated employees with the same title or with the same job duties did not experience these discriminatory actions. Even after Plaintiff submitted complaints to Defendant's EEO Manager, Human Resources Staff, and her supervisors about the aforementioned discriminations, Defendant through its supervisors and HR leaders was negligent and failed to correct the Defendant's staff/supervisors adverse and disparage actions against Plaintiff, and allowed Plaintiff to be treated differently.

350. Ms. Bendernagel, Defendant's Senior Deputy Director, was negligent and failed to prevent Plaintiff from being discriminated in Plaintiff's latest performance evaluation by including evaluation of Plaintiff's emails that occurred outside the evaluation period.

351. Mr. Stone and Mr. Whitehurst, Defendant's Deputy Director and Plaintiff's supervisor, was negligent and failed to prevent Plaintiff from being discriminated by Ms. Peterson and others.

352. Plaintiff was treated differently than similarly situated employees outside the protected classes of race, color, and/or national origin. Similarly situated employees outside Plaintiff's protected classes, who are not female, are not Southeast Asian American and are not from Indonesia and don't have dark circle around their eyes and Indonesian accent, were not subjected to these adverse employment actions.

353. Defendant, through its agents, treated Plaintiff less favorably than similarly situated employees outside her protected classes.

354. Plaintiff was also subjected to differential treatment and workplace hostility from security and facilities staff, who routinely ignored or dismissed her reasonable requests related to her office environment. These employees treated white colleagues and male managers with greater courtesy and deference, further contributing to a racially and sexually hostile environment.

355. Defendant's actions through its staff were motivated by discriminatory animus based on Plaintiff's race, color, national origin, and her Indonesian accent. The Defendant and its staff's aforementioned discriminatory actions adversely affected the terms, conditions or benefits of Plaintiff's employment.

356. Despite Plaintiff's multiple internal complaints regarding discriminatory treatments, Defendant's agents including her supervisors and Human Resources leaderships and staff failed to investigate or intervene. The indifference of supervisors and HR personnel—especially Ms. Bingham, Ms. Harrison, Mr. Whitehurst, Ms. Henderson, Ms. Haskins, Ms. Bendernagel and Mr. Stone—permitted the discriminatory conduct to continue unchecked and demonstrated institutional bias against Plaintiff based on her protected characteristics.

357. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer multiple adverse employment actions and substantial damages including but not limited to: loss of career advancement opportunities, demotion to non-supervisory and non program management position, relocation to offices with unbearable working conditions; lost wages and benefits; loss enjoyment of life after work and during vacations; public humiliation; emotional distress; mental anguish; humiliation; damage to professional reputation internally and externally; and other economic and non-economic damages.

358. The effect of these practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected her employment status.

359. These unlawful employment practices were intentional and undertaken with malice or with reckless indifference to Plaintiff's federally protected rights.

360. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry and hypervigilant, suffering, pain, humiliation, embarrassment, mental anguish, damages to Plaintiff's professional reputation internally and externally, career advancements, and emotional distress, all to her damage, in the amounts to be proven at trial.

361. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer economic harms including loss of higher salary, higher bonuses, better employment benefits, career advancement/path opportunities, all attorneys' fees, and all Court's expenses or costs of lawsuits, all to her damage, in the amounts to be proven at trial.

362. In acting as alleged herein, Defendant, acting through its agents, has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights.

363. Plaintiff requests the Court to declare that Defendant discriminated against Plaintiff based on her race, color, and/or national origin, in violation of Title VII.


## COUNT VI: DISCRIMINATION BASED ON SEX OR GENDER IN VIOLATION OF TITLE VII
(42 U.S.C. §§ 2000e, et seq.)

365. Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

366. At all relevant times, Plaintiff was a member of a protected class based on her sex/gender (female).

367. Plaintiff's work performance was consistently satisfactory and she received no disciplinary actions prior to the discriminatory conduct described herein.

368. Defendant subjected Plaintiff to adverse employment actions based on gender or sex including but not limited to: denial of proper office identification with job title; subjection to hostile work environments; was not provided with timely access to rapid project management's software; was not provided with front door key to her office building for four months; was not provided with timely access to site on her ID badge, was not provided with the key to the temperature control panel lockbox at the maintenance building; was subject to unbearable massive rotten egg smell in her office often when she was alone in the office; was not allowed to set her office room temperatures in the maintenance building, her supervisors allowed a male colleague to be critical and combative of her but she was not allowed to be critical in her response, and other disparate treatments compared to male employees from similarly situated employees including was required to fill in buyer's name on the requisition form by Kenya Peterson when other male project managers were not required to do.

369. Male employees and male contractors and consultants, including but not limited to Douglas Yarhouse, Ronald Story, Robert Vargas, and Barry Deaton received more favorable treatment including: proper office door's identification with title tags at maintenance building; access to maintenance building's front door key even though Plaintiff was not denied access for four months; approval of access to project site within a week or on the same day compared to Plaintiff that took months; and access to temperature control's lockbox and to set temperatures in the office. Male project managers including Todd Loney, Robert Stone, and Stephen Morgan had timely provision of project management software access and non-discriminatory treatment from administrative staff (Kenya Peterson) when submitted requisition form, and respectful treatment from administrative staff including and not limited to when they stood in the hallway and printer room.

370. Defendant treated Plaintiff less favorably than similarly situated employees outside her protected classes. For example, while male and non-Southeast Asian managers such as Mr. Glenn, Mr. Weeks, and Mr. Boston received consistent performance evaluations and corresponding pay increases, Plaintiff's evaluations were delayed, unfairly negative, or withheld altogether, despite her superior performance, qualification (as professional

engineer), and tenure. This disparity in treatment reflects discriminatory bias on the basis of her national origin, color, and sex.

371. Defendant's actions were motivated by discriminatory animus based on Plaintiff's sex/gender. Plaintiff was treated differently than similarly situated employees outside Plaintiff's protected class based on sex/gender.

372. The Defendant and its staff's aforementioned discriminatory actions adversely affected the terms, conditions or benefits of Plaintiff's employment.

373. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer non-economic harms, including but not limited to physical, mental, and psychological damages in the form of extreme and enduring worry and hypervigilant, suffering, pain, humiliation, embarrassment, mental anguish, damages to Plaintiff's professional reputation internally and externally, career advancements, and emotional distress, all to her damage, in the amounts within the jurisdictional limits of this Court.

374. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer economic harms including loss of higher salary/income, higher bonuses, better employment benefits, career advancement/path opportunities, all attorneys' fees, and all Court's expenses or costs of lawsuits, all to her damage, in the amounts within the jurisdictional limits of this Court.

375. In acting as alleged herein, Defendant, acting through its agents, has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights.

376. Plaintiff requests the Court to declare that Defendant discriminated against Plaintiff based on her sex in violation of Title VII.

**COUNT VII: HOSTILE WORK ENVIRONMENT BASED ON RACE, COLOR, NATIONAL ORIGIN IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (42 U.S.C. §§ 2000E, ET SEQ.)**

377. Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

378. Defendant repeatedly subject Plaintiff to unwelcome harassment regarding the terms and conditions of her employment because of her national origin, color, and race.

379. The harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive and unbearable working environment.

380. Defendant, through its supervisory agents, and other employees, took the following actions, among others, to create hostile work environment for Plaintiff and intentionally harass Plaintiff and create a hostile work environment based on her national origin, color, and/or race, incidents that Defendant employees, who have the same title (program and operations manager) or the same duties and are non-Southeast Asian Americans or were not from Indonesia (with dark circle around their eyes), did not experience:

    a.  Ms. Bingham used the racial epithet (Black Eyes comment) when talking to Plaintiff during a conference call with another manager, which is extremely pejorative, controversial and much more than a simple insult, which was confirmed in an apology email by Ms. Bingham;

    b.  Plaintiff was berated and defamed by Ms. Bingham, Plaintiff's supervisor, when other similarly situated employees were not berated and defamed for enforcing Defendant's Code and regulations; Ms. Bingham berated and defamed Plaintiff by repeating that Plaintiff was "vindictive" in front of others for enforcing the City Code/Ordinance on her behalf;

    c.  Plaintiff was demoted from the position of Water Resources Program and Operations Manager, a role that had involved significant supervisory, programmatic, and administrative responsibilities, to a different division, effectively stripping Plaintiff of all supervisory and managerial duties associated with the Water Resources Division;

    d.  Plaintiff perceived the demoted conditions as very hostile and abusive;

    e.  Plaintiff was demoted without proper announcement that made most Defendant's staff, including but not limited to Patra Brodie and staff at Maintenance Building, to question Plaintiff's new position and thought that Plaintiff was demoted to a much lower-level position or hourly or non-salary position;

    f.  Plaintiff was relocated from a large office on the eighth floor of a high rise building to offices in the wastewater treatment plant that are permeated with sewage and

rotten egg smells daily, are contaminated with mold, and subjected to extreme temperature conditions that causes unbearable working conditions daily;

g. Mr. Harrison, Plaintiff's supervisor, ridiculing Plaintiff in front of multiple male colleagues and contractors; "Don't wipe your butt (or possibly 'ass') before you shit!";

h. Inability to relocate to new positions despite qualifications, with evidence suggesting supervisor interference due to Mr. Harrison, Plaintiff's supervisor, preventing and interfering with Plaintiff's opportunity to transfer to a new locality;

i. Mr. Harrison telling Plaintiff that she would fail in her lawsuit, dissuading Plaintiff from engaging in EEO protected activity;

j. Mr. Harrison telling Plaintiff that she needed to learn;

k. Ms. Bingham instructed Plaintiff not to create a paper trail in connection with the complaint for the Larus Court permit, which, while it might had harmed Defendant, would had reflected most poorly on Plaintiff, especially during an audit—even though in fact that Plaintiff had handled the permitting process correctly;

l. Subjection to unbearable and unsafe office conditions including: extreme temperatures (60°F in winter, 80°F+ in summer); sewage/rotten egg smell; mold exposure; potential asbestos exposure; office shaking during construction with debris falling;

m. SM, a male Engineering Manager's repeated intrusions into Plaintiff's office, causing a heavy folder to fall and nearly injure Plaintiff, and physically bumping into Plaintiff in front of several maintenance staff;

n. Kenya Peterson's discriminatory requisition form requirement, refusal to cooperate, hostile treatment against Plaintiff due to Plaintiff inability to talk without hand gesture, disrespectful yelling at Plaintiff to leave her cubicle, and extremely hostile public screaming at Plaintiff when Plaintiff was standing in the public hallway and public printer room that were not part of her office when she did not scream at others who stood at the same hallway and printer room such as Mr. Stephen Morgan and other employees.

o. Ms. Peterson fabricated false accusations of harassment against Plaintiff in retaliation to Plaintiff's discrimination complaint against her in front of her to Mr. Morgan and in retaliation to Plaintiff's previous protected activities against Ms. Bingham/Defendant, and due to Plaintiff's effort to comply with management directives. The accusation—triggered by Plaintiff's attempt to

process a requisition form per her supervisor's instructions—was wholly unsubstantiated but was escalated to Plaintiff's supervisors, Mr. Stone and Ms. Bingham. Mr. Stone and Ms. Bendernagel were negligent and failed to address and investigate these false accusations against plaintiff, which are hostile and damage plaintiff's professional reputation.

p. Toi Jefferson's threat to call security on Plaintiff for standing in the public hallway and public printer room for about a minute or two minutes that other employees have never experienced that supervisor SM's negligent to address;

q. Plaintiff's supervisor and Human Resources staff refused to allow Plaintiff to be helped by other administrative staff to process her invoice, and instead have allowed Kenya Peterson (KP) to continue emailing Plaintiff and ordered Plaintiff to interact with KP, triggering further trauma; Despite Plaintiff's repeated efforts to report the ongoing hostility—including providing medical documentation showing trauma-related health impacts—her supervisor, Mr. Stone, refused to reassign responsibilities or implement any remedial measures. Plaintiff also mentioned that she would consider resign if she is still required to interact with KP, but Defendant retaliatory ignored and instead, Mr. Stone suggested Plaintiff pursue a disability accommodation, shifting the burden to the victim and implicitly blaming her for the abuse. HR also failed to investigate or address the issue, thereby condoning the hostile behavior.

r. Kenya Peterson's appearances near Plaintiff's office and in restrooms near Plaintiff's office, triggering trauma;

s. Toi Jefferson's appearance in bathroom when Plaintiff entered and standing by building entrance and in the hallway with others, causing intimidation;

t. Request for Plaintiff to complete disability forms rather than addressing Kenya Peterson's hostile conduct;

u. Defendant (through its agent, Deputy Director) deleted the evidence of security camera footage during KP's screaming incident even though Plaintiff has submitted discrimination and hostile treatment complaint on that day.

v. Defendant's failure to provide FOIA request of or to preserve security camera footages inside the building to document incidents on November 15th, 2024 despite Plaintiff's complaint of hostile work environment to Human Resources staff (Mr. Timothy Williams) and to her supervisor (Deputy Director Stone); and

w. Continued assignment of Kenya Peterson to work with Plaintiff despite Plaintiff's repeated requests to be helped by other staff due to trauma and documented trauma from the letter that Plaintiff's healthcare provider sent to plaintiff's supervisor, Mr. Stone, who is Defendant's Deputy Director.

x. Plaintiff received an unfair and inaccurate performance evaluation which intentionally omitted her accomplishments in 2022 as the 2023 interim evaluation failed to acknowledge her full work contributions.

y. Plaintiff received an unfair 2025 performance evaluation from Mr. Stone and Ms. Bendernagel that rated her not meeting expectation for acceptance of responsibility for positive outcomes and deliverables of tasks assigned to them or individuals under their supervision and oversight as Mr. Stone and Mr. Bendernagel blamed Plaintiff due to KP sending Plaintiff third party's invoices with errors (even though KP is Mr. Stone's staff and is not Plaintiff's staff), that Plaintiff corrected the errors after receiving the invoices from KP and mentioned this accomplishment in her self performance evaluation. Mr. Stone only quoted several emails and statement that were done outside evaluation period and discriminatorily and retaliatorily failed to include/review her hundreds successful communications to manage projects during evaluation period. The performance review were used as tools to further the hostile environment due to retaliation to her EEOC charges and lawsuits against Defendant. Due to this negative performance evaluation, has caused Plaintiff to not receive standard annual merit increase, are materially adverse employment actions, and were done in reaction for his engaging in protected activity. This was a wanton and willful violation of Plaintiff's rights.

z. Defendant's staff removed evidences of discrimination in the attachments to plaintiff's discrimination complaint to HR and her supervisor.

aa. Defendant's staff damaging Plaintiff's stapler, intimidating plaintiff.

380. Plaintiff's supervisors, colleagues, and coworkers mentioned in this complaint were not Southeast Asian Americans from Indonesia.

381. No other program and operations managers were Southeast Asian from Indonesia and they were not treated like Plaintiff with the aforementioned hostile work environments.

382. The harassment or hostile work environment was based on Plaintiff's race, color, and national origin, as evidenced by the fact that similarly situated male employees and

employees who are not Southeast Asian American or are not from Indonesia were not subjected to such treatments.

383. Defendant through Plaintiff's supervisor, knew or should have known of the harassment and hostile work environment condition, and failed to take prompt and appropriate remedial action.

384. The hostile work environment was so severe, pervasive, and continue unabated and without any accountability that it severely altered the terms and conditions of Plaintiff's employment and created a continued abusive working environment.

385. This hostile work environment was compounded by Defendant and its agents retaliating against Plaintiff for her engaging in EEO protected activity through internal complaints to her supervisors and EEO representative and filing the Charge.

386. Had Defendant been a private employer as opposed to local government, almost certainly these bad actors would have been held accountable and likely terminated or otherwise disciplined.

387. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proven at trial.

388. In acting as alleged herein and aforementioned, the Defendant's actions constitute conscious, malicious, despicable, and oppressive disregard of Plaintiff 's rights that are protected under Title VII.

389. The cumulative effect of the harassment—including workplace ostracism, intimidation, false reporting, and managerial indifference—caused Plaintiff to suffer debilitating mental and physical health consequences, including insomnia, anxiety, stress-induced conditions, and diminished self-worth. These symptoms were exacerbated by the perception that her race, national origin, and cultural background made her more vulnerable to workplace abuse and less likely to receive institutional support.

390. As a direct and foreseeable result of the hostile work environment, Plaintiff has suffered and continues to suffer substantial damages including but not limited to: physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, severe emotional distress; trauma requiring counseling;

anxiety; mental anguish; extreme humiliation; physical symptoms including body shaking; loss of professional reputation internally and externally; loss of enjoyment of life; medical expenses; lost wages, and lost of enjoyment of life due to sick leave and vacation leaves necessitated by trauma; and other economic and non-economic damages.

391.  Defendants' violations of Title VII establish a cause of action, for monetary relief consisting of compensatory damages, attorney's fees and costs of suit to Plaintiff in the amounts within the jurisdictional limits of this Courts. Plaintiff requests the Court to declare that Defendant violated Title VII because of the Defendant's hostile treatment against Plaintiff based on her race, color, and/or national origin.
Plaintiff requests the Court to declare that due to negligent, Defendant exposed Plaintiff to hostile work environment against Plaintiff based on her race, color, and/or national origin, in violation of Title VII.

## COUNT VIII: HOSTILE WORK ENVIRONMENT BASED ON GENDER/SEX IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (42 U.S.C. §§ 2000E, ET SEQ.)

392.  Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

393.  Defendant repeatedly subject Plaintiff to unwelcome harassment regarding the terms and conditions of her employment because of her sex.

394.  The harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive and unbearable working environment.

395.  Defendant, through its supervisory agents, and other employees, took the following actions, among others, to create hostile work environment for Plaintiff and intentionally harass Plaintiff and create a hostile work environment based on her sex, incidents that Defendant employees, who were non-Southeast Asian Americans or were not from Indonesia or did not have dark circle around their eyes, did not experience:

   a.  Plaintiff was publicly and baselessly berated and defamed by Mr. Mantey for applying and enforcing the Defendant's City Code/Ordinance in his email and was called vindictive while other male reviewer (Mr. David Muyundo) was not called vindictive for doing the same thing and enforcing the same City Code or asking for the same document;

b.  Ms. Bingham used the pejorative and insulting Black Eye term when questioning Plaintiff about Plaintiff's work, berated and defamed Plaintiff by repeating that Plaintiff was "vindictive" in front of others for enforcing the City Code/Ordinance on her behalf, while other male program managers were not berated, defamed, and called "vindictive" in front of others for enforcing the City Code on her behalf;

c.  Plaintiff was demoted and stripped of supervisory and program-administration duties to be replaced with three male staff that don't have the required certifications to manage the Water Resources Division like plaintiff;

d.  Plaintiff's inability to access critical software tools for a year and a project site for several months despite repeated attempts and requests to her supervisors compared to male colleagues and contractors who were provided with the access to software and project site almost immediately or within a week.

e.  Mr. Harrison, Plaintiff's supervisor, ridiculing Plaintiff in front of multiple all male colleagues and contractors due to his statement while he was talking to Plaintiff in front of them: "Don't wipe your butt (or possibly 'ass') before you shit!";

f.  Plaintiff's supervisor, Alan Harrison's statement to Plaintiff that she would not win in her discrimination lawsuit Mr. Harrison dissuading Plaintiff from engaging in EEO protected activity;

g.  Douglas Yarhouse's repeated harassment and intimidating behavior and Mr. Whitehurst's negligent to prevent Mr. Yarhouse from creating hostile work environment for plaintiff including: demanding "what would I get" in exchange for information; talking loudly about bathroom use after Plaintiff used the restroom; repeatedly banging his table against the wall to startle Plaintiff; installing a lock box on temperature controls and denying Plaintiff a key while providing keys to male employees; discussing Plaintiff's performance evaluation with other male staff; making loud noises and slamming doors to intimidate Plaintiff; talking about taping Plaintiff mouth shut, and leaving taps running to potentially flood the building;

h.  Mr. Whitehurst's negligent for not preventing male staff in the maintenance building from blocking the women's restroom door from the outside again in 2024 after it happened in 2023, and caused Plaintiff to be trapped inside a bathroom because of the door was blocked from outside;

j. Subjection to unbearable and unsafe office conditions including: extreme temperatures (60°F in winter, 80°F+ in summer) that were set by male colleagues in maintenance building; sewage/rotten egg smell; mold exposure; potential asbestos exposure; office shaking during construction with debris falling; malfunctioning and uncleaned restroom facilities; denial of office key for four months; and denial of proper office name tag for nearly a year;

k. Security guards' refusal to open project site gates and appearance of armed security staff while allowing male staff, male contractor, and male consultants to get in the site previously;

m. Denial of front door keys, name and title door tags, working women restroom, and site access that were provided to all other staff in the same building, who are all male and non-Southeast Asian American employees;

396.    Plaintiff was the only female staff/manager with permanent office in the maintenance building.

397.    The harassment was based on Plaintiff's sex, as evidenced by the fact that similarly situated male employees were not subjected to such treatments.

398.    Defendant knew or should have known of the harassment and failed to take prompt and appropriate remedial action as Plaintiff complaint to Mr. Whitehurst about various hostile work environment here but Mr. Whitehurst failed to address them.

399.    The hostile work environment was so severe, pervasive, and continue unabated and without any accountability that it severely altered the terms and conditions of Plaintiff's employment and created a continued abusive working environment that she experienced all day and every day.

400.    The cumulative effect of the harassment—including workplace ostracism, intimidation, false reporting, and managerial indifference—caused Plaintiff to suffer debilitating mental and physical health consequences, including insomnia, anxiety, stress-induced conditions, and diminished self-worth. These symptoms were exacerbated by the perception that her race, gender, and cultural background made her more vulnerable to workplace abuse and less likely to receive institutional support.

401.    As a direct and proximate result of the hostile work environment, Plaintiff has suffered and continues to suffer substantial damages including but not limited to: severe emotional distress; trauma requiring counseling; anxiety; mental anguish; extreme humiliation; loss of enjoyment of life; medical expenses; lost wages and lost of enjoyment of life due to

sick leave and vacation leaves necessitated by trauma; and other economic and non-economic damages.

402. In acting as alleged herein and aforementioned, the Defendant's actions constitute conscious, malicious, despicable, and oppressive disregard of Plaintiff 's rights that are protected under Title VII.

403. Plaintiff requests the Court to declare that Defendant negligently exposed Plaintiff to hostile work environment based on her sex in violation of Title VII.

## COUNT IX: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, FOR ENGAGING IN PROTECTED ACTIVITIES (42 U.S.C. §§ 2000E, ET SEQ.)

404. Plaintiff incorporates all preceding paragraphs as though set forth in full herein.

405. Plaintiff complained to Defendant's EEO Manager, Ms. Brenda Henderson, about Ms. Bingham's black eye comment and other discriminatory conducts on July 15, 2022. Defendant knew about this meeting the day prior to the meeting, due to this meeting was added to Plaintiff's Outlook work calendar. Ms. Henderson also communicated with Ms. Bingham about her black eye comment to Plaintiff on August 2, 2022.

406. Plaintiff filed a formal Charge with the EEOC in November 2022 and March 2023, and January 2025, was interviewed by EEOC in December 2022 and December 2024, and Plaintiff filed a Title VII lawsuits after receiving Notice of Right To Sue Letters from EEOC in 2023 and 2025, the existence of which was disseminated to all of her supervisors and multiple colleagues and coworkers, including, but not limited to, April Bingham, Leonard Mantey, Eric Whitehurst, Alan Harrison, Barbara Jackson, Ms. Brenda Henderson (HR), Patra Brodie (HR), Douglas Yarhouse, Barry Deaton, Ronald Stroy, Katherine Larkin, Chris Battle, Robert Stone, Laura Bendernagel, Jeff McBride, Scott Morris, Toi Jefferson Harrison, Kenya Peterson, and other Defendant's staff.

407. Following Plaintiff's protected activities including but not limited to internal EEO complaints and complaints to HR and supervisor, filing EEOC charges and lawsuits,

Defendant subjected Plaintiff to a continuing pattern of discrimination, hostile work environment, and retaliation.

408. Plaintiff engaged in protected activities as aforementioned as follows but not limited to: a. Complained to HR regarding Ms. Bingham's Black Eyes Comment in July 2022; b. Complained to HR representative, Ms. Haskins, regarding Ms. Bingham's retaliatory requirements in July 2022; c. Meeting with EEO manager Ms. Henderson regarding Ms. Bingham's conduct and "black eye comments"; d.Emailed Ms. Henderson in November and December 2022 to file a discrimination and retaliation complaint; e. Submitted an EEOC's charge against defendant to EEOC in November 2022 due to not receiving any responses from Ms. Henderson, was interviewed by EEOC on December 5th, 2022; f. As EEOC requested, filed the EEOC charge in February 2023, however, since EEOC's portal won't save Plaintiff's charges many times, the charge was officially accepted by EEOC on March 27, 2023; g. Received Notice of Right to Sue from EEOC on April 27, 2023; h. Complained to Court and filed a lawsuit against Defendant for violation of Title VII on July 26, 2023;i. Complained about discrimination, hostile work environment, and retaliation in the maintenance building and administration building to HR and Plaintiff's supervisors, Mr. Whitehurst and Mr. Alan Harrison in July 2023, August 2023, December 2023, February 2024, April 2024, and July 2024 ; j. Reporting Mr. Battle's conduct and Mr. Yarhouse's retaliation and hostilities to her supervisors in 2023 and 2024;k. Complained about Kenya Peterson's extreme hostility and discrimination and Toi Jefferson's hostility to HR (Mr. Timothy Williams) and Plaintiff's supervisor, Mr. Stone in November and December 2024 and April 2025; l. submitted a letter from her doctor to Mr. Stone regarding her trauma with KP's hostilities and requested accommodation for her mental health; m. submitted reasonable accommodation form/request due to her trauma to workplace hostilities by KP in June 2025 to Mr. Stone, in November 13 2025 to HR, and in January 2026 to Mr. Stone; n. Was interviewed by EEOC about 2nd charge in December 2024 and submitted the charge in December 2024 but could not save the file until January 27, 2025(Charge No. 438-2024-01500); o. Complained to Ms. Bendernagel about Kenya Peterson's and Toi J. Harrison's extreme hostile treatments and discriminations against plaintiff; p. Complained to Mr. Stone, Ms. Bendernagel and Human Resources staff about Kenya Peterson's false accusation against

plaintiff in October 2025; q. Complaint and submitted rebuttal email to Ms. Bendernagel, Mr. Stone and HR about the bad ratings in her performance evaluation in October and November 2025; r. Complaint about the baseless notice of counseling/verbal warning letter from Mr. Stone and Ms. Bendernagel, s. Received Notice of Your Right to Sue for Plaintiff's second EEOC Charge on August 20, 2025 and filed second Title VII lawsuit/complaint against defendant (Case, No. 3:25cv-956) on November 18, 2025; and t. Filed an amended complaint on December 30, 2025 for the second lawsuit.

409.    Plaintiff also informed Plaintiff's current supervisor, Deputy Director Robert Stone, about Plaintiff's EEOC charge and lawsuit against the defendant in our meeting in September and December 2024 and in 2025. In addition, Toi Harrison or Toi Jefferson was aware of Plaintiff's EEOC charge and was informing Defendant's staff whose offices are located outside Plaintiff's office about her complaint/charge. Furthermore, Kenya Peterson ("Ms. Peterson") already knew about Plaintiff's discrimination charge since September 2024.

410.    Plaintiff's work performance was consistently satisfactory and received no disciplinary actions prior to the discriminatory and retaliatory conduct described herein.

411.    But if not for Plaintiff's complaint to Defendant's EEO Manager and HR, Plaintiff would not have been demoted and relocated to unsafe and unbearable offices at the wastewater treatment plant, and subjected to continuous workplace hostilities and attempts to constructively discharge Plaintiff in the wastewater treatment plant.

412.    Following Plaintiff's protected activities especially Title VII lawsuits against Defendant, Defendant through Plaintiff's supervisors subjected Plaintiff to a continuing pattern of retaliatory conduct including but not limited to continued discrimination and harassment by coworkers, denial of reasonable accommodations, issuance of retaliatory performance evaluations and baseless disciplinary warning and other retaliations as follows:

a. Supervisor Bingham communicated by email with Defendant's EEO Manager on August 2, 2025 about her black eye comment to Plaintiff, and then on August 25th, demoted Plaintiff within

weeks of her complaints to a lower-status, non supervisory position in response to her internal discrimination complaint that she did not announce through DPU Communications and Updates like other reassignment.

b. Supervisor Eric Whitehurst and Alan Harrison with Ms. Bingham's approval then moved Plaintiff to unsafe and unbearable office conditions in the Wastewater Treatment Plant in response to her discrimination complaints.

c.Supervisor Eric Whitehurst was negligent for continuous discrimination, hostile treatments, and retaliation by Plaintiff's coworkers at the Maintenance Building even after Plaintiff submitted complaints to him.

d. Supervisor Mr. Stone was negligent for allowing Kenya Peterson (KP)'s retaliatory requisition form requirement that she did not ask other non female and non Southeast Asian from Indonesia project managers to do.

e. On November 15, 2024, Plaintiff was treated with extreme hostilities in retaliation to her protected activities following a workplace interaction regarding an urgent requisition. Despite acting professionally and in accordance with supervisor Robert Stone's instruction, Plaintiff was yelled at by KP and then threatened with involvement of security personnel, and finally publicly screaming at Plaintiff for standing at the public printer room due to shock with her hostilities and trying to figure out the next step. Deputy Directors and Senior Manager in the Operations Building were negligent to allow without reprimanding KP's extreme hostility in  screaming at Plaintiff.  This threat was not made in response to any actual misconduct but as a retaliatory tactic to isolate and intimidate Plaintiff for previously exercising her EEO and EEOC rights. After that Plaintiff was also falsely accused of harassment by Ms. Peterson in this incident that Plaintiff found out through FOIA request.

f. Plaintiff reported the fabricated incident and continued retaliation to HR and Defendant staff, including Ms. Bendernagel, the Defendant's Senior Deputy Director, and Mr. Stone. Despite these reports, no remedial action was taken. Instead, she is still required to work with KP, and she was subjected to ongoing scrutiny and marginalization, which caused **Plaintiff to work while on "vacation" due to Peterson-induced trauma (uncompensated labor) early last year.**   This inaction—when Defendant was on actual notice of Plaintiff's protected activity— reinforces the inference of retaliatory intent under Title VII.

Page **80** of 86

g. Mr. Stone's and HR's negligently and retaliatory denial to approve Plaintiff's reasonable accommodation to trauma requests due to KP's hostile treatment on November 15, 2024 and for allowing KP to continue emailing Plaintiff to cause further trauma since December 2024 even though he knew about the incident and received Plaintiff's complaint, and he and HR also received a letter from Plaintiff's doctor and reasonable accommodation request from plaintiff and plaintiff's doctor.

h. Deputy Directors and Senior Manager in the Operations Building were negligent to allow without reprimanding Kenya Peterson's extreme hostility including public screaming at Plaintiff at a public printer room while she did not do that to others on November 15, 2024.

i. Retaliatory failure to provide security camera footage when received FOIA request from Plaintiff to document hostile work environment incidents on November 15th, 2024.

j. Retaliatory failure to save security camera footage from hostile work environment incidents on November 15, 2024.

k. Retaliatory failure to investigate and remediate complaints despite repeated requests from Plaintiff about Kenya Peterson's hostile treatment and discrimination against plaintiff and Toi Jefferson's hostile treatment and discrimination against Plaintiff on November 15, 2024.

l. In 2025 and 2026, Plaintiff submitted a letter to HR and Mr. Stone from her treating medical provider confirming that continued workplace interactions with Ms. Peterson were exacerbating her trauma symptoms. Plaintiff requested reassignment of duties or modification of reporting lines as a reasonable accommodation. This request followed her prior EEOC activity and was itself a protected expression of rights under Title VII. Management and HR not only ignored the provider's recommendations but further retaliated by requiring Plaintiff to file for disability if she sought relief—implicitly punishing her for asserting her rights.

m. After Plaintiff submitted second charge, supervisor Bendernagel's meeting with Defendant's counsel about Plaintiff on September 22, 2025, Plaintiff was issued a retaliatory performance evaluation that was sent to her on September 29th, 2025 that unfairly criticized her communication, leadership and accountability that referenced two events outside the review period, unfairly did not include all her communication, leadership and accountability in managing projects in calculating these ratings (even though it was mentioned in the evaluation), and mischaracterized her good-faith correction of consultant errors in her statement in self-performance evaluation (that was done per Mr. Bendernagel's request on September 5, 2025)

and in her budgeting input to other project manager as misconduct. These events followed her internal and external protected activities and were calculated to chill further protected activity. This evaluation also included misleading judgments unrelated to her actual job performance that were mostly based on emails and statement that were sent outside of the evaluation period. These negative statements reflected retaliatory animus and were inconsistent with Plaintiff's historical performance. The review excluded major accomplishments and blamed Plaintiff for vendor errors, furthering her reputational harm and limiting her eligibility for merit salary increases and advancement.

n. In addition, Defendant Staff who had accessed to Plaintiff's computer without Plaintiff's knowledge, willfully tampering the attachments to Plaintiff's complaints to HR and her supervisor, removing evidences of requisitions from other project managers that were not required to have buyers' name on them by KP.

o. On November 6, 2025, Supervisor Robert Stone, with Ms. Bendernagel's approval, wrote retaliatory notice of counseling and verbal warning to Plaintiff after Plaintiff informed him that Plaintiff emailed KP and Ms. Jefferson/Ms. Harrison once to question why they treated Plaintiff with extreme hostilities in 2024 due to her complaint about KP and TJ's hostilities was closed without positive resolution for her or without informing her of any taken actions. In this notice, they also retaliatory warned Plaintiff not to interrogate colleagues about the incident outside a framework established and mediated by HR, even though they had informed Plaintiff previously that the complaint for the incident's investigation was closed already without providing plaintiff with any information about the investigation, the resolutions, or taken actions. This warning meant to dissuade Plaintiff from continuing her protected activities.

413. Plaintiff was deliberately excluded from team meetings, critical communications, and decision-making processes due to negligent of Plaintiff's supervisor in 2024 and 2025. These conditions escalated after each instance of EEO and EEOC protected activities and formed part of a sustained retaliatory pattern.

414. Defendant's retaliatory acts caused Plaintiff to suffer severe emotional distress, extreme trauma, and anxiety, culminating in medical treatment, lost earnings/income, damage to her professional reputation, and stagnated career progression. These harms were

foreseeable and directly linked to her protected activities, thereby violating Title VII's anti-retaliation provision.

415. Following her Second Charge and the Court's denial of Defendant' Motion to Dismiss of Plaintiff's first lawsuit against Defendant on September 16, 2025, Plaintiff received a performance review on September 29, 2025 that included unfounded criticisms, vague concerns about communication, and misleading judgments unrelated to her actual job performance that were mostly based on emails and statement that were sent outside of the evaluation period. These negative statements reflected retaliatory animus and were inconsistent with Plaintiff's historical performance. The review excluded major accomplishments and blamed Plaintiff for vendor errors, furthering her reputational harm and limiting her eligibility for salary increases and advancement.

416. There is a causal connection between Plaintiff's protected activity and the adverse actions, demonstrated by the temporal proximity between Plaintiff's protected activity (internal complaint, complaint with EEOC, the Defendant's EEO Division, and the US District Court) and the Defendant's retaliatory conducts, and by the pattern of escalating adverse actions following each instance of protected activity.

417. But if not for Plaintiff's internal EEO complaints, Plaintiff would not have been demoted, relocated to unbearable and unsafe offices in the WWTP, retaliated, and subjected to continuous attempts to constructively discharge (forced resignation) Plaintiff including hostile work environment, harassment, discrimination, and retaliation in the WWTP.

418. But if not for Plaintiff's Protected Activities, Plaintiff would not have been given bad performance evaluation in 2025, and subjected to workplace discrimination, retaliation, and hostilities and continuous attempts to constructively discharge Plaintiff between 2024 and 2025. But if not for Plaintiff's Protected Activities, Plaintiff would have been assigned additional projects since 2024.

419. A reasonable employee would have found the aforementioned retaliatory actions materially adverse in that they would dissuade a reasonable employee from engaging in protected activity.

420. As a direct and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental

anguish, damage to her professional reputation, trauma, and emotional distress, all to her damage, in amounts within the jurisdictional limits of this Court.

421.    As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered, will continue to suffer substantial damages including but not limited to: lost wages and salary, bonuses, employment benefits, compensation, career path/advancements opportunities, physical damages, medical expenses for trauma counseling; and other economic and non-economic damages, all to her damage, in amounts within the jurisdictional limits of this Court.

422.    In acting as alleged herein and aforementioned, Defendant has acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from improper motive amounting to malice, and in reckless disregard of Plaintiff's rights that are protected under Title VII.

423.    Defendant's retaliation is extreme and outrageous and conducted with knowledge or reckless disregard for the fact that Plaintiff's activities were protected under Title VII.

424.    Plaintiff seeks a declaration that Defendant retaliated against her in violation of Title VII due to her protected activities.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant her reliefs in the form of:

A.    Judgment on Plaintiff's behalf against Defendant;

B.    Declaration that Defendant discriminated against her, exposed her to hostile work environments,  and retaliated against her in violation of Title VII  and declaration that Defendant violated Plaintiff's rights under Title VII, and restrain and enjoin Defendant from further violations;

C.    An Order that Defendant be required to promulgate an effective policy against such discrimination and to adhere thereto;

D.    An injunction ordering Defendant to expunge or revise the unfair and discriminatory performance evaluation;

E.    Enter an injunction enjoining Defendant from the other unlawful conduct complained of herein;

F.    Award Plaintiff compensatory damages, including, but not limited to, for economic and non-economic damages, including but not limited to lost wages and salary, lost bonuses, lost employment benefits, lost compensation, physical damages and cost of treatment, lost of career path/advancements opportunities, medical expenses for trauma counseling, emotional distress, mental anguish, trauma, damage to professional reputation, and extreme humiliation due to hostile work environment and discrimination because of Plaintiff's race, national origin, color, sex, and due to retaliation due to Plaintiff's protected activities, with a total amount to be proven at trial, but no less than $600,000.00;

G.    Award Plaintiff her court costs and fees, lawsuit's expenses, attorneys' fees, back and front pay, retroactive merit increase, pre-judgment interest and post-judgment interest, as applicable; and

H.    Grant any and all other relief that this Court deems just and proper.

## XI. JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

DATED: February 25, 2026

Respectfully submitted,

Surani Olsen
Pro Se Plaintiff
PO Box 5321, Williamsburg, VA 23188
Sso20231016@gmail.com
804-791-8898

## CERTIFICATE OF SERVICE

I hereby certify that on __February 25, 2026, I will file the foregoing document with the Clerk of the Court and the Clerk of Court, using CM/ECF, will post a true and correct copy of the foregoing document online and notify Defendant's counsel via CM/ECF. I will also serve the foregoing document to the Defendant's counsel by email as per the agreement from Defendant's counsel on February 18, 2026 (attached) to the following email address:

City of Richmond
Alphonso Simon, Jr., Esquire
Assistant City Attorney
Richmond City Attorney's Office
900 East Broad Street,

Page **85** of 86

Room 400 Richmond, Virginia 23219
Email: Alphonso.Simon@rva.gov

By, *Surani Olsen*
Surani Olsen
Pro Se Plaintiff
PO Box 5321
Williamsburg, VA 23188
Sso20231016@gmail.com
804-791-8898

CERTIFICATION

I declare under penalty of perjury that: No attorney has prepared, or assisted in the preparation of this document.

___Surani S. Olsen_____    Name of Pro Se Party (Print or Type)

_*Surani Olsen*_____    Signature of Pro Se Party

Executed on: __February 25, 2026_____    (Date)

**Surani Olsen** <sso20231016@gmail.com>                                Wed, Feb 18, 1:27 AM (7 days ago)
to alphonso.simon, monica.malouf

Good morning Mr. Simon

Would you agree to be served by email in lieu of paper copies for any documents that will need to be served for case no. Lead Civil Action No. 3:23CV475 (Civil Action No. 3:25CV956 (RCY)) including Motion for An Extension of Time To File Amended Complaint? I also agree to receive the communications from Defendant solely by email

Please let me know

Thank you,

Surani Olsen
Pro Se Plaintiff

**Simon, Alphonso - City Attorney**                                Wed, Feb 18, 9:26 AM (7 days ago)
to Monica, me

Good morning Ms. Olsen

We agree to service of documents via email in Civil Action No. 3:23CV475/3:25CV956 (RCY))

Sincerely

Al Simon

Alphonso Simon Jr.
Assistant City Attorney
Office of the City Attorney